# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |
|---|---|
| GEORGE WESLEY HUGUELY V,<br><br>*Petitioner*,<br><br>v.<br><br>HAROLD CLARKE, Director, Virginia<br>Department of Corrections<br><br>*Respondent*. | Civil Action No. <u>3:20-cv-306</u> |

## PETITION FOR A WRIT OF HABEAS CORPUS

Jonathan P. Sheldon (VA Bar #66726)
Sheldon & Flood, PLC
10621 Jones Street, Suite 301A
Fairfax, VA 22030
(703) 691-8410
jsheldon@sfhdefense.com

Jeffrey M. Harris* (VA Bar #93883)
Bryan K. Weir (VA Bar #82787)
Jordan M. Call*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
bryan@consovoymccarthy.com
jordan@consovoymccarthy.com

*\* Pro hac vice application pending*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION ................................................................................................................. 4

    A.   The Relationship Between Mr. Huguely and Ms. Love ............................................. 5

    B.   Yeardley Love's Death ............................................................................................ 6

    A.   Mr. Huguely's Indictment and the Highly Sensationalized Press Coverage
        Surrounding this Case. .......................................................................................... 9

    B.   Trial ........................................................................................................................ 11

          1.   Malice ......................................................................................................... 12

          2.   Cause of Death/Reperfusion ...................................................................... 13

    C.   Verdict ................................................................................................................... 16

    D.   Direct Appeal ........................................................................................................ 17

    E.   State Post-Conviction Proceedings ........................................................................ 18

STANDARD OF REVIEW ............................................................................................... 18

CLAIMS FOR RELIEF .................................................................................................... 20

   I.      Mr. Huguely's Due Process and Sixth Amendment Rights Were Violated
          When the Jury Consulted a Dictionary Regarding the Meaning of Malice. ............... 20

   II.     Mr. Huguely's Sixth Amendment Rights Were Violated When He Received
          Ineffective Assistance of Counsel At Trial. .............................................................. 27

    A.   Mr. Huguely's Sixth Amendment Right to Effective Assistance of Counsel Was
        Violated When Trial Counsel Violated the Rule on Witnesses, Thereby Causing
        Crucial Expert Testimony to be Excluded ............................................................. 28

    B.   Mr. Huguely's Sixth Amendment Right to Effective Assistance of Counsel
        Was Violated When His Counsel Failed to Call Crucial Expert
        John S. Daniel, III, M.D. ........................................................................................ 33

  III.    Mr. Huguely's Rights Under the Due Process Clause and *Brady v. Maryland* Were
          Violated When the Commonwealth Failed to Disclose the Love Family's Imminent
          $30 Million Civil Suit Against Mr. Huguely .............................................................. 37

IV.    The Circuit Court Violated Mr. Huguely's Sixth Amendment Right to Counsel
       by Forcing Him to Proceed in the Absence of his Retained Counsel of Choice ........ 40

V.     The Circuit Court Violated Mr. Huguely's Right to a Fair and Impartial Jury
       Under the Sixth Amendment ........................................................................... 47

   A.  The State Courts Unreasonably Applied Clearly Established Federal Law by
       Refusing to Order Individualized, Sequestered Voir Dire........................................ 47

   B.  The State Courts Unreasonably Applied Clearly Established Federal Law by
       Refusing to Allow the Defense to Ask Questions During Voir Dire That Were
       Directly Relevant to Jurors' Ability to Remain Impartial ........................................ 50

   C.  Mr. Huguely's Sixth Amendment Right to an Impartial Jury Was Violated
       When the Circuit Court Refused to Strike for Cause a Juror Whose Answers
       During Voir Dire Revealed Serious Doubts about Her Impartiality ........................ 52

VI.    There Was Insufficient Evidence Offered at Trial to Support Mr. Huguely's
       Conviction for Second-Degree Murder. ................................................................... 53

PRAYER FOR RELIEF ............................................................................................ 56

# TABLE OF AUTHORITIES

**CASES**

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................................................... 37

*Canipe v. Commonwealth*, 25 Va. App. 629 (1997)................................................................ 22, 54

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) ........................................ 40

*Carty v. Thaler*, 583 F.3d 244 (5th Cir. 2009).............................................................................. 19

*Clark v. United States*, 289 U.S. 1 (1933) .................................................................................... 53

*Connors v. United States*, 158 U.S. 408 (1895)............................................................................ 50

*Dietz v. Bouldin*, 136 S. Ct. 1885 (2016).................................................................................... 20

*Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005)........................................................................... 32

*Duncan v. State of La.*, 391 U.S. 145 (1968)................................................................................ 52

*Essex v. Commonwealth*, 322 S.E.2d 216 (Va. 1984)............................................... 12, 22, 54, 55

*Gonzalez v. United States*, 553 U.S. 242 (2008).......................................................................... 46

*Gordon v. Braxton*, 780 F.3d 196 (4th Cir. 2015) ...................................................................... 19

*Harrington v. Richter,* 562 U.S. 86 (2011) .................................................................................. 32

*Haywood v. Commonwealth*, 20 Va. App. 562, 458 S.E.2d 606 (1995) ..................................... 56

*Huguely v. Commonwealth*, 754 S.E.2d 557 (Va.App. 2014) ..................................................... 17

*Huguely v. Commonwealth*, No. 140678 (Va. Nov. 19, 2014 and Jan. 15, 2015)....................... 17

*Huguely v. Commonwealth*, No. 1697-12-2 (Va.App. March 27, 2014)..................................... 17

*Huguely v. Virginia*, 136 S. Ct. 119 (2015) ............................................................................ 4, 17

*Huguely v. Warden*, Cir. Crt. File No. CL 16-23........................................................................ 18

*In re Greensboro News Co.*, 727 F.2d 1320 (4th Cir. 1984) ....................................................... 47

*In re R.D.*, 2012 PA Super 84, 44 A.3d 657 (2012)..................................................................... 38

*In re South Carolina Press Ass'n*, 946 F.2d 1037 (4th Cir. 1991) .............................................. 47

*In re State Record Co.*, 917 F.2d 124 (4th Cir. 1990)...................................................................... 48

*Irvin v. Dowd*, 366 U.S. 717 (1961)................................................................................................. 20

*Jackson v. Virginia*, 443 U.S. 307 (1979)....................................................................................... 54

*Kimmelman v. Morrison*, 477 U.S. 365 (1986)........................................................................... 27, 28

*London v. Commonwealth*, 49 Va.App. 230, 638 S.E.2d 721 (2006)........................................... 42

*Marina v. Vasquez*, 812 F.2d 499 (9th Cir. 1987) ......................................................................... 22

*Marshall v. United States*, 360 U.S. 310 (1959) ............................................................................ 52

*Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919 (10th Cir. 1992) ............................. 21

*McNeill v. Polk,* 476 F.3d 206 (4th Cir. 2007) ............................................................................... 21

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .................................................................................... 19

*Morgan v. Illinois*, 504 U.S. 719 (1992).......................................................................................... 52

*Morris v. Slappy*, 461 U.S. 1 (1983) ................................................................................................ 40

*Murray v. Carrier,* 477 U.S. 478 (1986).......................................................................................... 32

*People v. Wallert*, 98 A.D.2d 47 (N.Y. 1983) ................................................................................ 38

*Perricllia v. Commonwealth*, 229 Va. 85, 326 S.E.2d 679 (1985) ................................................ 55

*Powell v. Alabama*, 287 U.S. 45 (1932) .......................................................................................... 40

*Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984)...................................................... 47

*Remmer v. United States*, 347 U.S. 227 (1954) ....................................................... 20, 21, 24, 26

*Ristaino v. Ross*, 424 U.S. 589 (1976)............................................................................................ 52

*Rodriguez v. Chandler*, 492 F.3d 863 (7th Cir. 2007) ................................................................... 45

*Rompilla v. Beard*, 545 U.S. 374 (2005)................................................................................... 27, 28

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981) ................................................................... 50

*Schledwitz v. United States*, 169 F.3d 1003 (6th Cir. 1999) ......................................................... 38

*Schriro v. Landrigan*, 550 U.S. 465 (2007) ................................................................ 20, 24

*Smith v. Phillips*, 455 U.S. 209 (1982) .............................................................................. 21

*Strickland v. Washington*, 466 U.S. 668 (1984) ...................................................... 27, 32, 36

*Strickler v. Greene*, 527 U.S. 263 (1999) .......................................................................... 37

*Swain v. Alabama*, 380 U.S. 202 (1965) ............................................................................ 50

*Tice v. Johnson*, 647 F.3d 87 (4th Cir. 2011) ..................................................................... 32

*Townsend v. Sain*, 372 U.S. 293 (1963) ............................................................................. 24

*Turner v. State of La.*, 379 U.S. 466 (1965) ....................................................................... 20

*United States v. Dansker*, 565 F.2d 1262 (3d Cir. 1977) ................................................... 40

*United States v. Duncan,* 598 F.2d 839 (4th Cir. 1979) ..................................................... 21

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) .......................................... 40, 42, 45

*United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996) .................................................... 50

*United States v. Laura*, 607 F.2d 52 (3d Cir. 1978) ........................................................... 45

*United States v. Lawson*, 677 F.3d 629 (4th Cir. 2012) ...................................................... 21

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) ...................................................... 54

*United States v. Pelullo*, 105 F.3d 117 (3d Cir. 1997) ....................................................... 38

*United States v. White*, 492 F.3d 380 (6th Cir. 2007) ........................................................ 39

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................................ 27, 36

*Williams v. Martin*, 618 F.2d 1021 (4th Cir. 1980) ........................................................... 33

*Williams v. Stirling*, 914 F.3d 302 (4th Cir. 2019) ............................................................ 19

*Williams v. Taylor*, 529 U.S. 362 (2000) ............................................................... 19, 27, 53

*Winston v. Kelly*, 592 F.3d 535 (4th Cir. 2010) ................................................................. 19

*Wolfe v. Johnson*, 565 F.3d 140 (4th Cir. 2009) ................................................................ 19

*Workman v. Commonwealth*, 272 Va. 633 (2006) ........................................................ 37

**STATUTES**

28 U.S.C. § 2254(d) ........................................................................................................ 18

28 U.S.C. §2241(d) .......................................................................................................... 4

28 U.S.C. §2244(d)(1)(A) ................................................................................................ 4

28 U.S.C. §2254(a) ........................................................................................................... 4

28 U.S.C. §2254(b)(1)(A) ................................................................................................ 5

Va. Code §18.2-10(e) ..................................................................................................... 12

Va. Code §18.2-32 .......................................................................................................... 12

Va. Code §18.2-35 .......................................................................................................... 12

Va. Code §18.2-36 .......................................................................................................... 12

**OTHER AUTHORITIES**

Groot, Criminal Offenses §6 .................................................................................... 22, 54

Rules Governing Section 2254 Cases in the United States District Courts, Rule 8, Advisory

    Committee notes ..................................................................................................... 25

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. VI ................................................................................................... 40

## INTRODUCTION

George Wesley Huguely V (VA Offender ID #1458946), who is currently in the custody of the Virginia Department of Corrections at the State Farm Enterprise Unit in State Farm, VA, respectfully submits this petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.

Mr. Huguely was convicted of second-degree murder following the death of Yeardley Love while both were students at the University of Virginia in the spring of 2010. Although sensationalist press coverage falsely portrayed this case as a brutal, intentional killing, the actual evidence presented at trial told a very different story of what happened on the night in question.

Mr. Huguely and Ms. Love had an altercation earlier that night in which they briefly wrestled on the floor of her bedroom, but the defense offered abundant evidence that Mr. Huguely's actions were not the cause of Ms. Love's death. It was undisputed at trial that Mr. Huguely—who was severely intoxicated after a day of heavy drinking—did not intend to kill Ms. Love and went to her apartment to talk to her only after another friend refused to socialize with him. It was also undisputed that Ms. Love was alive when Mr. Huguely left her apartment; that Ms. Love's roommates called 911 because they believed she was suffering from alcohol poisoning; and that Mr. Huguely was genuinely shocked and devastated when he later learned that Ms. Love had died. The defense also offered evidence that Ms. Love's relatively minor external injuries were consistent with a fall to the floor from the bed, and that she likely died from positional asphyxia (accidental smothering) from sleeping face down on a wet pillow while she was heavily intoxicated. The prosecution, by contrast, argued that Ms. Love died from blunt force trauma that caused a fatal brain injury.

Given this competing evidence, two of the critical issues before the jury were whether Mr. Huguely acted with *malice*—which was the difference between second-degree murder and

manslaughter—and what caused Ms. Love's death. Yet, on both issues, the proceedings were plagued with problems that deprived Mr. Huguely of his constitutionally guaranteed right to a fair trial. As to malice, Mr. Huguely presented evidence to the state habeas court that the jury—which was clearly confused about the meaning of malice—consulted a dictionary during its deliberations to supplement the instructions provided by the court. This was a flagrant violation of the constitutional rule prohibiting external influences on the jury. Yet the state habeas court dismissed this claim without even holding an evidentiary hearing even though *the Warden's own evidence* showed that at least one juror had a clear recollection of using a dictionary.

Mr. Huguely's trial counsel also severely prejudiced his defense through their deficient performance. Due to counsel's violation of the rule on witnesses, the trial court excluded critical expert testimony that the defense needed to rebut the prosecution's evidence regarding the cause of Ms. Love's death. And trial counsel failed to call another expert witness whose testimony was needed to bolster the defense's theory of the cause of death and respond to the prosecution's evidence. This deficient performance severely hindered Mr. Huguely's defense and resulted in the jury having an inaccurate picture of the critical medical evidence regarding the cause of death.

The Commonwealth also violated the Due Process Clause and the *Brady* doctrine by failing to disclose the fact that the Love family was planning to bring a $30 million civil suit against Mr. Huguely after the completion of the criminal trial. The defense learned for the first time at a post-trial hearing that the Loves' civil attorneys had been in contact with the prosecution, and had postponed bringing the civil suit at the prosecution's request. This information was plainly material to the criminal case against Mr. Huguely. The civil case advanced a negligence theory and characterized Ms. Love's death as an "accident." That view of the facts is flatly inconsistent with the Commonwealth's theory of the criminal case—namely, that Mr. Huguely should be convicted

2

of second-degree murder because he acted with malice. The imminent $30 million civil suit that was about to proceed under a legal theory contrary to the Commonwealth's theory in the criminal case would have unquestionably been material to Mr. Huguely's defense at trial it been properly disclosed by the Commonwealth.

Those deficiencies were further compounded by several highly prejudicial errors committed by the trial court. This was a remarkably high-profile case in Charlottesville that implicated a number of sensitive and emotionally charged issues, and received unprecedented coverage in the local media. Yet the trial court made a number of erroneous rulings that valued expediency and convenience over Mr. Huguely's right to a fair trial. The court declined to grant a short continuance when trial counsel fell ill to ensure the protection of Mr. Huguely's right to counsel of choice. It refused to impose safeguards to ensure that Mr. Huguely would receive a fair trial from an impartial jury despite the extremely high-profile nature of this case. It barred the defense from probing the potential bias of jurors during voir dire. And it refused to strike for cause a juror who taught at the University of Virginia and had seen extensive information about the case through the University.

*   *   *

In sum, these serious errors resulted in a fundamentally skewed proceeding in which Mr. Huguely was deprived of his ability to mount a comprehensive and effective defense based on the *actual facts* rather than the sensationalist and inaccurate press coverage of this case. Mr. Huguely respectfully requests that this Court order Respondent to show cause why the writ should not be granted and thereafter grant the petition and vacate the conviction. Alternatively, the Court should order an evidentiary hearing to ensure the development of a full record on the serious constitutional

errors that fundamentally skewed the trial and deprived Mr. Huguely of the opportunity to mount a comprehensive defense.

### JURISDICTION

"The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a). This Court has jurisdiction over this petition under §2254 because Mr. Huguely contends that he is being held in state custody in violation of the Constitution and laws of the United States. Venue is proper in this Court because Mr. Huguely is currently in the custody of the Virginia Department of Corrections at the State Farm Enterprise Unit within the State Farm Correctional Complex in State Farm, Virginia, which is within this judicial district. *See* 28 U.S.C. §2241(d). The respondent is Harold Clarke, the Director of the Department of Corrections

This petition is timely. A person in custody pursuant to the judgment of a state court may seek federal habeas relief within one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. §2244(d)(1)(A). Here, direct review concluded on October 5, 2015, the day the U.S. Supreme Court denied Mr. Huguely's petition for certiorari in his direct appeal. *See Huguely v. Virginia*, 136 S. Ct. 119 (2015). Section 2244(d)(2) provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." Mr. Huguely filed a petition for state habeas corpus relief on January 19, 2016, which was 106 days after the conclusion of direct review. Mr. Huguely thus had an additional 259 days

4

(365 minus 106) in which to file his §2254 petition following the conclusion of state habeas review. The state habeas proceedings concluded when the Virginia Supreme Court denied Mr. Huguely's petition for appeal on September 3, 2019. The due date for this petition is accordingly May 19, 2020 (259 days after September 3, 2019). This petition is being filed in advance of that date and is thus timely.

Mr. Huguely has also satisfied Section 2254's exhaustion requirement. A §2254 petitioner is required to "exhaust[] the remedies available in the courts of the State" before bringing claims for federal habeas relief. 28 U.S.C. §2254(b)(1)(A). All claims for relief being raised in this petition were previously raised on either direct review or state habeas review and were thus properly exhausted.

**STATEMENT OF FACTS**

### A.   <u>The Relationship Between Mr. Huguely and Ms. Love</u>

In spring 2010, George Huguely and Yeardley Love were 22-year-old seniors at the University of Virginia nearing graduation. Both lacrosse players, they had been in an "on-and-off" romantic relationship for approximately two years. 2/8/12 Tr. 99, 163. The relationship was tumultuous at times (both had been unfaithful to the other), but they remained friends and intended to continue their friendship after graduation. 2/8/12 Tr. 163-64.

On February 27, 2010, Mr. Huguely and Ms. Love had an altercation about text messages she had found on his phone. 2/9/12 Tr. 204-05. A visiting lacrosse player, Michael Burns, testified that he saw Mr. Huguely using his arm to hold Ms. Love down on top of him on the bed as she sought to get away. 2/9/12 Tr. 156, 160-61. Two days later, however, Ms. Love told Burns that everything was fine with Mr. Huguely, and she expressed no concern about him. 2/9/12 Tr. 169.

Mr. Huguely later gave Ms. Love an apology letter stating that she was his "best friend," and that he was "horrified with the way I behaved and treated you." Ex.21.

On April 27th, Ms. Love became angry when someone mentioned that Mr. Huguely was seeing and texting another woman. 2/8/12 Tr. 104-08, 120-22, 171-73. That evening, she entered Mr. Huguely's room without knocking and saw two visiting female high school seniors who were staying at Mr. Huguely's apartment while waiting to meet their host. Ms. Love demanded to know whether these were Mr. Huguely's "new girlfriends" or the women he had been texting, and she hit him repeatedly with her purse. 2/9/12 Tr. 191-92, 217-18; 2/17/12 Tr. 37-39. Ms. Love also told Mr. Huguely that she had "hooked up" with Michael Burns earlier that week. Mr. Huguely calmly backed away from Ms. Love and asked her to leave. 2/17/12 Tr. at 39; 2/9/12 Tr. at 219.

Ms. Love later emailed Mr. Huguely an apology, writing that she was "sorry [I] went crazy." Ex.132. The emails descended into a vitriolic exchange in which Mr. Huguely fumed at Ms. Love for "hooking up with [B]urns then attacking me." Ex.132. On April 30th, Mr. Huguely sent Ms. Love an email that read in its entirety, "We should talk tonight." Ex.132. One day later, on May 1st, Ms. Love and Mr. Huguely appeared friendly and were holding hands at a gathering of lacrosse players and their families. 2/17/12 Tr. 71-79.

### B.    Yeardley Love's Death

On Sunday May 2nd, Mr. Huguely began drinking early in the morning, and was already "slurring his words" by 9:00 a.m. 2/9/12 Tr. 185-86, 194-98, 242; 2/15/12 Tr. 49, 55-56, 96-99. At a lacrosse team golf tournament later that morning, Mr. Huguely continued to drink heavily and became increasingly intoxicated and uncoordinated to the point where could not even finish the last few holes. 2/15/12 Tr. 100. At a post-tournament reception, Mr. Huguely was slurring and

inarticulate and was described as being unable to maintain a conversation. 2/9/12 Tr. 186-87, 199-200; 2/15/12 Tr. 75-76, 121-22.

Mr. Huguely, his father, and some teammates subsequently went to a restaurant, where they continued to drink wine. Mr. Huguely tipped over a bottle of wine and later urinated on the side of the building. 2/15/12 Tr. 76, 123-24. The group ended dinner early because they did not want to be in public with Mr. Huguely while he was so drunk. At 10:30 p.m., Mr. Huguely met teammates Kevin Carroll, Ken Clausen, and Mikey Thompson in his apartment; he was visibly drunk and incoherent. 2/15/12 Tr. 58-59, 77-78, 124-25.

Around 11:40 p.m., Carroll and Clausen went out to get more beer and Thompson went back to his apartment. 2/15/12 Tr. 59-60, 77, 79. At roughly the same time, Mr. Huguely walked downstairs to the apartment of teammate Chris Clements, who was working and told Huguely to go away. 2/15/12 Tr. 102-03. Mr. Huguely—dressed in tennis shoes, cargo shorts, and a golf shirt—then walked across a well-lit path to Ms. Love's apartment. He carried no bag, weapon, or object. According to Mr. Huguely, he wanted to talk to Ms. Love about the arguments they had had earlier that week. Ex.26.

After a day of drinking, Ms. Love ended the day by celebrating a friend's birthday from around 5:00 p.m. to 10:00 p.m., where she consumed at least four drinks. 2/8/12 Tr. 113-15, 124, 182-86, 212. Ms. Love and her roommate, Caitlin Whiteley, then returned to their apartment, intending to shower and go back out. As Whiteley prepared to leave, however, she found Ms. Love lying in bed in just her underwear. According to Whiteley, Ms. Love was drunk and seemed like she might "pass[] out," but said she would consider meeting up later. 2/8/12 Tr. 188-92, 213-14. Ms. Love's blood alcohol level was between 0.14 and 0.18. Ex.105.

Mr. Huguely arrived at Ms. Love's apartment around 11:40 p.m. and let himself in through the external door to the apartment, which was unlocked. According to Mr. Huguely, when he arrived at Ms. Love's internal bedroom door (which was closed), she told him to go away. He then kicked a hole in the hollow composite door and reached through to let himself in. The two had an altercation and ended up wrestling on the floor, after which Mr. Huguely "tossed" her onto the bed. Mr. Huguely later told police that when he left the apartment, Ms. Love's nose was bleeding but he did not believe she had any serious injuries. Ex.26. Anna Lehmann, a student in the downstairs apartment, heard Mr. Huguely's steps on the stairs and one loud noise by the door. 2/8/12 Tr. 137-38. But, even though the apartment walls were "very thin," Lehmann heard no running, yelling, banging, or hitting of the walls or floor. 2/8/12 Tr. 135-36, 142, 153-54. Lehmann saw Mr. Huguely walking away at a normal pace and in a normal manner roughly ten minutes after he had arrived. 2/8/12 Tr. 138, 141-44, 158. On his way out of Ms. Love's apartment, Mr. Huguely took her laptop computer, which he threw in a nearby dumpster as he was walking home. He later explained that he took the laptop to ensure that Ms. Love would have to talk to him the next day, a drunken action he described as "not reasonable logic."

Once home, around 12:15 a.m., Mr. Huguely sat with Clausen and Carroll in the living room drinking beer for around 15 minutes; he was "really, really drunk" but did not appear injured or disheveled. 2/15/12 Tr. 65-69. Carroll, Thompson, and Will Bolton—who arrived shortly after Mr. Huguely returned—noted that Mr. Huguely was tired and intoxicated but otherwise saw nothing unusual. *Id.* Mr. Huguely went to bed by 12:30 a.m.

On May 3rd, at 2:15 a.m., Caitlin Whiteley and a friend (Philippe Oudshoorn) returned to the apartment and found Ms. Love in bed under her comforter in her usual sleeping position, face down on her left-hand pillow. 2/8/12 Tr. 193-95, 226-28. Ms. Love had injuries around her eye

and chin and there was a small amount of blood on the sheets and pillow, but those injuries did not appear serious; indeed, Whiteley and Oudshoorn initially believed that Ms. Love was suffering from alcohol poisoning. 2/8/12 Tr. at 232-33. Oudshoorn called 911 and attempted to perform CPR while waiting for the first responders to arrive. 2/8/12 Tr. 196-201, 211-15, 228-33. Rescue personnel arrived shortly thereafter and continued performing CPR using firm compressions for approximately 24 minutes but could not resuscitate Ms. Love. 2/9/12 Tr. 42-43, 48-50, 67.

Around 6:30 a.m., the police arrived to speak to Mr. Huguely, who was fully cooperative. *See* Ex. 26 (video of police interview). The officers took him to the police station and read him his *Miranda* rights. Mr. Huguely did not ask to make any phone calls or to talk to a lawyer, and he calmly answered all questions asked of him. When, after an hour of police questioning, the detective informed Mr. Huguely that Ms. Love was dead, Mr. Huguely reacted with shock and disbelief, exclaiming repeatedly, "She's not dead," "She's dead?," "How is she dead?," "Tell me she's not dead," "There is no way she's dead," and "She cannot be dead." Mr. Huguely told the police about their altercation but insisted that he had done nothing that could have resulted in Ms. Love's death. He said that they had briefly wrestled on the floor and that her nose was bleeding when he left, but he did not believe she was seriously injured. Forensic testing revealed no blood on Mr. Huguely or his clothes, or at his apartment. Ex.152; Ex.143.

## PROCEDURAL HISTORY

### A.  Mr. Huguely's Indictment and the Highly Sensationalized Press Coverage Surrounding this Case.

On April 18, 2011, Mr. Huguely was indicted on six counts of first-degree murder, robbery, burglary in the nighttime, statutory burglary, grand larceny, and murder in the commission of a

robbery. R.126-131. The robbery, burglary, and larceny charges were based on Mr. Huguely taking Ms. Love's laptop as he left the apartment.

This case attracted a staggering amount of sensationalized press coverage from both the local and national media. Between May 2010 and July 2011, the local ABC, CBS, and FOX stations covered this case more than 100 times. R.174-76. And, by late 2011, there had been 144 articles about this case in the *Charlottesville Daily Progress*, 45 in the *Cavalier Daily*, 90 in the *Richmond Times-Dispatch* and 84 in the *Washington Post*. R.177-96. Many of those articles contained highly sensationalist and inflammatory rhetoric about Mr. Huguely. *See*, *e.g.*, R.144-45 (Mr. Huguely was "an Anger Prone Scion of Prominent DC Family," "Students at All-Boys Landon School Planned Sex Parties, Sources Say," "More Drunken Violent Episodes Emerge," "Source: Huguely Attacked Teammate"). Others provided extensive coverage of earlier alleged "bad acts" by Mr. Huguely, R.149, or attempted to inject into this case issues of class, wealth, race, and domestic violence, R.150-51. And these media reports contained a number of demonstrably false statements, such as the suggestion that a "bloody shirt" had been found in Mr. Huguely's apartment. R.148.

In addition to the round-the-clock media coverage, this case was also addressed extensively by the University of Virginia, which has long played an outsized role in the Charlottesville community. Shortly after Ms. Love's death, the University held a vigil in her memory, with University President John Casteen delivering an impassioned speech calling students to action on issues of domestic violence. R.204-06. Even though the police investigation had barely begun, Mr. Casteen falsely stated that Ms. Love had been "attacked and beaten" and "thrown against [the] wall[]." R.205; *see id.* (referring to the "blows and abuse" that "ended Yeardley's life" and her "attacker's advantage or arrogance or mindless sense of right to abuse"). In fact, forensic evidence

10

clearly showed that there had *not* been any violent beating and there were no signs of a struggle within Ms. Love's apartment. There were no dents or marks on the walls, 2/10/12 Tr. 197-98; the wall art and furniture, including Ms. Love's personal effects on top of the furniture, were undisturbed, 2/10/12 Tr. 92-129, 199-203; and Ms. Love's downstairs neighbor who overheard the incident heard no yelling or hitting, 2/8/12 Tr. 135-36, 142, 153-54.

The April 11, 2011 preliminary hearing in this case produced a flood of local and national media far beyond anything previously seen in Charlottesville. The courtroom was packed with reporters from virtually every media outlet in the United States, and the hearing had to be moved to a larger venue to accommodate the overwhelming media presence. Due to the high-profile nature of this case within the Charlottesville community, Mr. Huguely filed a pre-trial motion for individual sequestered *voir dire* and sequestration of the jury during trial. R.143, R.336, R.364. On January 26, 2012, the court denied the motion for sequestered *voir dire* and to sequester the jury, although it granted the motion to the extent it requested individual *voir dire*. R.456.

*Voir dire* was conducted from February 6-8, 2012. During *voir dire*, the court refused to allow the defense to ask potential jurors if they could fairly consider evidence that could be seen as "blaming the victim." The court also refused to strike for cause several jurors with close connections to this case, including Juror 211, who taught at the University of Virginia, had heard extensive information about the case through the University, and had excused one of Ms. Love's friends from class for the funeral.

### B.   <u>Trial</u>

Mr. Huguely's trial took place over twelve days between February 8-22, 2012. Two of the key issues before the jury were whether Mr. Huguely had acted with malice and the specific cause of Ms. Love's death.

1.      Malice

In deciding whether Mr. Huguely was guilty of manslaughter or second-degree murder, "malice" was the key issue. "If a killing results from negligence, however gross or culpable, and the killing is contrary to the defendant's intention, malice cannot be implied." *Essex v. Commonwealth*, 322 S.E.2d 216, 220 (Va. 1984). This was an enormously consequential issue for Mr. Huguely, as the sentence for second-degree murder (which requires a showing of malice) is imprisonment of 5 to 40 years, *see* Va. Code §18.2-32, while the sentence for voluntary or involuntary manslaughter is between 1 and 10 years imprisonment, *see id.* §§18.2-35, 18.2-36, 18.2-10(e).[1] The defense argued that the jury should convict Mr. Huguely of, at most, involuntary manslaughter. 2/18/12 Tr. 222-26, 249-50. As Mr. Huguely's counsel argued at closing, "you can't believe or infer or find a brutal beating or conduct that showed such a level of force that you think he, you know, did it intentionally." 2/18/12 Tr. 224.

Undisputed evidence showed that Mr. Huguely was extraordinarily intoxicated on the night in question and went to Ms. Love's apartment to talk only after his teammate Chris Clements refused to socialize because he was working. 2/15/12 Tr. 102-03. The lay and forensic evidence overwhelmingly supported Mr. Huguely's explanation that he and Ms. Love briefly wrestled on the floor but that he never applied a degree of force likely to cause death or great bodily harm. There were no dimples, dents, or marks on the wall. The furniture and Ms. Love's personal effects were in order. Anna Lehmann, who lived downstairs and heard Mr. Huguely's footsteps on the stairs and a single crash near the door, heard no other hitting or banging sounds. Ms. Love had no

---

[1] The Commonwealth had initially charged Mr. Huguely with first-degree *premeditated* murder but abandoned that theory in closing after no evidence at trial supported it. 2/18/12 Tr. 186-88.

injuries to her left side, no fractures, and no grab marks. And Mr. Huguely had no blood on his person or his clothes. Ex.152; Ex.143. Mr. Huguely also reacted with genuine shock, disbelief, and horror when the police (who initially told him they were investigating an assault) told him that Ms. Love had died. In short, there was abundant evidence that Mr. Huguely never intended to commit a wrongful act against Ms. Love—who he called his "best friend" and with whom he was seen holding hands just 24 hours earlier.

In rebuttal, the prosecution argued incorrectly that there was no intent requirement for second-degree murder, and the defense asked for permission to respond on that issue. 2/18/12 Tr. 261-65. The Court denied the motion, but took the unusual step of directing the jurors back to the malice instruction and re-reading part of it to them. 2/18/12 Tr. 264-65. The malice instruction (instruction 21) stated in relevant part:

> Malice is that state of mind which results in the intentional doing of a wrongful act to another, without legal excuse or justification, at a time when the mind of the actor is under the control of reason. Malice may result from any unlawful or unjustifiable motive including anger, hatred or revenge. Malice may be inferred from any deliberate, willful, and cruel act against another, however sudden.

The jury clearly continued to struggle with the mens rea element during its deliberations, and requested additional clarification about the what the phrase "under the control of reason" meant in the malice instruction. 2/22/12 Tr. 22-24. The jury also sent a note to the judge stating that instruction 23 (degrees of homicide) appeared to contradict instructions 14 (indirect causation) and 15 (direct causation). The Court asked the jury to clarify its question, but the jury never did. 2/22/12 Tr. 25-31, 34-36.

### 2.   Cause of Death/Reperfusion

Another central issue in the trial was the cause of Ms. Love's death—namely, whether she died due to the altercation with Mr. Huguely or due to another cause. The prosecution's theory

was that Ms. Love died of injuries related to blunt force trauma to the head because bleeding was found in her brain. 2/8/12 Tr. 18-19. But bleeding in the brain can also be caused by CPR through a process known as "reperfusion." When blood flow is restored after the heart has stopped, bleeding in the brain can result even if the person has minimal or no external injuries and suffered no direct brain trauma. That is precisely what the defense argued here: that any bleeding in Ms. Love's brain was caused by the 25 minutes of forceful CPR performed by the paramedics who sought to resuscitate her.

The defense's theory of the cause of death was that Ms. Love likely died from positional asphyxia (accidental smothering) because she was heavily intoxicated and sleeping face-down on a wet pillow. 2/8/12 Tr. 57-58. The defense presented substantial evidence in support of that theory. For example, it proffered testimony from a toxicologist who opined that Ms. Love was intoxicated and thus both her judgment and psychomotor control would have been impaired. 2/15/12 Tr. 185-86. The defense also presented testimony from a neuropathologist (Dr. Leestma), who testified that Ms. Love's external injuries were not severe enough to cause a fatal brain injury. 2/15/12 Tr. 259, 270-73. Dr. Leestma further opined that any changes to her brain were likely caused by a lack of blood flow or oxygen resulting from the position of her body. *Id.* The defense explained the bleeding in Ms. Love's brain by introducing evidence about reperfusion—*i.e.*, that CPR pushes blood back into the brain's capillaries, which can bleed if they have been without blood for a few minutes. 2/8/12 Tr. 48, 59-60; 2/15/12 Tr. 260-69.

The prosecution sought to show that Ms. Love died of a lethal brain injury caused by blunt force trauma. But the prosecution's own witnesses acknowledged that her injuries could have been caused by a single-impact event such as a fall from the bed rather than the application of intentional force by Mr. Huguely. *See* 2/13/12 Tr. 192, 218-21; 2/14/12 Tr. 41-52. The prosecution's multiple

14

experts also opined that reperfusion could not have caused the bleeding in Ms. Love's brain. *See* 2/14/12 Tr. 68-83, 100-05, 156-58, 163-76; 2/9/12 Tr. 72-92; 2/10/12 Tr. 40-41, 48-49.

Because of the prosecution's substantial expert testimony attempting to disprove the defense's reperfusion theory, compelling rebuttal evidence on this point was critical for the defense. Indeed, the defense promised during its opening argument that it would show that the bleeding found in Ms. Love's brain resulted not from blunt force injury, but from reperfusion caused by CPR. 2/8/12 Tr. 59-60.

The defense had planned to present much of this critical reperfusion testimony through a clinical neurosurgeon, Dr. Uscinski. But trial counsel violated the rule on witnesses—which prohibits witnesses from hearing the testimony of other witnesses—by emailing Dr. Uscinski (and another defense expert, Dr. Daniel) about the substance of the prosecution experts' testimony. 2/18/12 Tr. 4-5. Trial counsel learned of this violation when Dr. Daniel (who was a lawyer as well as a physician) brought it to their attention that they should not be communicating about court proceedings with witnesses who planned to testify.

When this violation was revealed, the prosecution objected to Dr. Uscinski's testimony on this basis, and the trial court precluded Dr. Uscinski from testifying about a number of critical issues, including reperfusion, reperfusion injuries caused by CPR, and the concept that cerebral-vascular damage makes people susceptible to reperfusion injury. 2/18/12 Tr. 44-45. The Court stated, "[t]his is very troublesome and I wouldn't have expected this from counsel and I'm incredibly disappointed with it, but *this is an incredibly important issue for the parties* and I'm not going to bar him from testimony generally, but I'm not going to let him testify about reperfusion ...." *Id.* (emphasis added).

The defense called Dr. Uscinski as their last witness, who testified that Ms. Love's external injuries were inconsistent with a traumatic brain injury. 2/18/12 Tr. 63-71. But, because of trial counsel's violation of the rule on witnesses, Dr. Uscinski could not offer testimony in support of the defense's reperfusion theory. Notably—and inexplicably—the defense then argued in closing that Dr. Leestma "holds the opinion that the blood, *and this is a different [sic] than Dr. Uscinski holds*, but that the blood in the lower brain/upper brain was the result of the reperfusion." 2/18/12 Tr. 226 (emphasis added). Of course, Dr. Uscinski's opinion did not actually contradict Dr. Leestma's theory. Rather, Dr. Uscinski *agreed* with Dr. Leestma but was barred from presenting his testimony in this manner because of trial counsel's rule violation.

## C.   Verdict

On February 22, 2012, the jury returned a verdict finding Mr. Huguely guilty of second-degree murder and grand larceny, and not guilty of robbery, burglary, statutory burglary and first-degree felony murder. R.622-23. The jury recommended a sentence of 25 years imprisonment on the second-degree murder count and one year imprisonment on the grand larceny count. R.623-24.[2]

On May 25, 2012, Mr. Huguely filed a motion to set aside the verdict and for a new trial. R.632-703. The circuit court denied that motion on August 13, 2012. R.1364. On June 5, 2012, Mr. Huguely also filed a supplemental motion for a new trial based on violations of the *Brady* doctrine, R.705, R.1376, which the court denied on August 29, 2012, R.1463, R.1365. On August 30, 2012, the court sentenced Mr. Huguely to 23 years imprisonment on the second-degree murder

---

[2] Mr. Huguely did not appeal the grand larceny conviction and does not challenge that conviction here.

charge and one year imprisonment on the grand larceny count, with the sentences to run concurrently. R.1474-78.

**D.** **Direct Appeal**

Mr. Huguely filed a timely notice of appeal on September 25, 2012. R. 1479. In his petition for appeal, Mr. Huguely raised several assignments of error, including (1) violation of the Sixth Amendment when the circuit court forced him to proceed with trial notwithstanding the illness of one of his trial counsel; (2) violations of the Sixth Amendment for refusing to sequester the jury, refusing to allow relevant questions about potential juror bias, and refusing to strike jurors who could not remain impartial; (3) violations of the *Brady* doctrine when the Commonwealth failed to disclose information about the Loves' planned civil suit; (4) instructional errors; and (5) insufficiency of the evidence.

On April 23, 2013, the Court of Appeals granted in part and denied in part Mr. Huguely's petition for appeal. Per Curiam Decision, *Huguely v. Commonwealth*, CR11-102-1 (Va. Ct. App. April 23, 2013). Two months later, the Court of Appeals granted additional grounds for appeal. *See* Decision of Judges Elder, Petty, and McCullough, *Huguely v. Commonwealth*, CR11-102-1 (Va. Ct. App. June 14, 2013). On March 4, 2014, the Court of Appeals affirmed the conviction, *Huguely v. Commonwealth*, 754 S.E.2d 557 (Va.App. 2014), and then denied rehearing en banc. *Huguely v. Commonwealth*, No. 1697-12-2 (Va.App. March 27, 2014).

The Virginia Supreme Court subsequently denied Mr. Huguely's petition for appeal and petition for rehearing. *Huguely v. Commonwealth*, No. 140678 (Va. Nov. 19, 2014 and Jan. 15, 2015). On October 5, 2015, the U.S. Supreme Court denied Mr. Huguely's petition for writ of certiorari. *See Huguely v. Virginia*, 136 S. Ct. 119 (2015).

E.    **State Post-Conviction Proceedings**

On January 19, 2016, Mr. Huguely filed a timely petition for a writ of habeas corpus in the Charlottesville Circuit Court. *See Huguely v. Warden*, Cir. Crt. File No. CL 16-23. On May 5, 2016, Mr. Huguely filed his First Amended Petition for a Writ of Habeas Corpus. The state habeas petition raised a number of grounds for relief, including, *inter alia*, violations of the Sixth and Fourteenth Amendments in light of the jury's consultation of a dictionary during deliberations and ineffective assistance of counsel. On May 16, 2016, the Attorney General filed a Motion to Dismiss, to which Mr. Huguely replied on August 1, 2016.

On June 28, 2018, the court set a two-day evidentiary hearing, for August 17 and October 3, 2018. Mr. Huguely and the Attorney General both subsequently subpoenaed witnesses for the August 17, 2018 hearing. On August 10, 2018, the Circuit Court issued a letter opinion rejecting all of Mr. Huguely's claims and dismissing his petition without a hearing. On August 17, 2018, the court entered a final order dismissing the habeas petition.

On August 23, 2018, Mr. Huguely filed a petition for appeal in the Supreme Court of Virginia, *Huguely v. Woodson*, No. 181357. That petition was denied on September 3, 2019.

## STANDARD OF REVIEW

A federal habeas petition under §2254 should be "granted with respect to any claim that was adjudicated on the merits in State court proceedings" when the state court's decision (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if it is "substantially different" from the relevant Supreme Court precedent. *Wolfe v. Johnson*, 565 F.3d 140, 159 (4th

Cir. 2009). And a state court's decision is an "unreasonable application of" clearly established federal law if its analysis of the relevant issues is "objectively unreasonable." *Id.*; *see also Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (decision is an unreasonable application of federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case"). Alternatively, a state prisoner may be granted relief pursuant to §2254(d)(2) if the state court's decision was based on a factual determination "sufficiently against the weight of the evidence that it is objectively unreasonable." *Williams v. Stirling*, 914 F.3d 302, 311-12 (4th Cir. 2019) (quoting *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010)). Although a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system," the Supreme Court has stressed that "deference does not imply abandonment or abdication of judicial review" and "[d]eference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Moreover, any deference to state court decisions "does not apply if the petitioner properly exhausted his claim by raising it in the state court, but the state court did not adjudicate that particular claim on the merits." *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009). The federal court will instead "review such claims de novo" without applying any deference. *Id.* And "[a] claim is not 'adjudicated on the merits' when the state court makes its decision 'on a materially incomplete record.'" *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015). "A record may be materially incomplete 'when a state court unreasonably refuses to permit further development of the facts of a claim.'" *Id.* In such a case, the federal court reviews the claim de novo. *Id.*

At a minimum, Mr. Huguely is entitled to an evidentiary hearing on several of his claims, including whether the jury improperly used a dictionary to define the critical legal term in the case; what prejudice Mr. Huguely incurred as a result of the exclusion of two key trial witnesses due to

ineffective assistance by Mr. Huguely's trial counsel; and the circumstances surrounding the Love family's undisclosed pending civil suit. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474, (2007).

**CLAIMS FOR RELIEF**

**I.    Mr. Huguely's Due Process and Sixth Amendment Rights Were Violated When the Jury Consulted a Dictionary Regarding the Meaning of Malice.**

**A.**    The right of a defendant to "a fair trial by a panel of impartial, 'indifferent' jurors" is "priceless." *Irvin v. Dowd*, 366 U.S. 717, 721–22 (1961). That is because the "guarantee of an impartial jury … is vital to the fair administration of justice." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1893 (2016). A critical part of that impartiality is that the jury must not be influenced by anything not presented in the courtroom in making its decision. *Irvin*, 366 U.S. at 722 (jury verdict "must be based upon the evidence developed at the trial"); *Turner v. State of La.*, 379 U.S. 466, 472–73 (1965) ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.").

In its landmark decision *Remmer v. United States*, the Supreme Court set forth a clear standard for extra-judicial juror influence: "In a criminal case, *any* private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed *presumptively prejudicial*, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." 347 U.S. 227, 229 (1954) (emphasis added). A defendant must be tried

20

before "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Anything less is a violation of a defendant's constitutional rights under the Sixth Amendment and the Due Process Clause.

As *Remmer* explains, a defendant's constitutional rights are clearly violated when a jury looks to a source other than the judge for its understanding of the law. *See Remmer*, 347 U.S. at 229. This includes the use of dictionaries, as several courts have recognized. *See, e.g.*, *United States v. Lawson*, 677 F.3d 629, 645 (4th Cir. 2012) ("[T]his presumption … is applicable when a juror uses a dictionary or similar resource to research the definition of a material word or term at issue in a pending case."); *McNeill v. Polk*, 476 F.3d 206, 226 (4th Cir. 2007) (use of dictionary an impermissible external influence); *United States v. Duncan*, 598 F.2d 839, 866 (4th Cir. 1979) (same); *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir. 1992) ("A rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions.").

**B.**     As noted above, the existence or absence of malice was a central issue at trial—it was a hotly contested issue in the parties' arguments to the jury and was the difference between a sentencing range of 1 to 10 years in prison (for manslaughter) or 5 to 40 years in prison (for second-degree murder). Indeed, the jury forewoman later stated in a press interview that "the difference between second-degree murder and voluntary manslaughter" was one of the "big argument points in the jury room." Cathy Harding, *Inside the Jury that Convicted UVA Student George Huguely of Murder*, Slate (Feb. 23, 2012), available at https://slate.com/news-and-politics/2012/02/george-huguely-convicted-of-second-degree-murder-in-yeardley-love-case-how-the-jury-decided.html.

Malice is "an essential element of murder and is what distinguishes it from the crime of manslaughter." *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997). To elevate a homicide to second-degree murder, "the defendant must be shown to have willfully or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm." *Essex*, 322 S.E. 2d at 220; *see also* Groot, Criminal Offenses §6 (second-degree murder requires "a mental state of extreme recklessness—proceeding with conduct in the face of a known, very significant risk that death will occur"). That distinction is "close but crucial" and must be enforced with vigilance. *Essex*, 322 S.E. 2d at 222; *see also Marina v. Vasquez*, 812 F.2d 499, 506 (9th Cir. 1987) (observing that the "concept of malice goes to the very heart of the deliberative process of a jury in a murder case.").

The malice instruction given at trial (instruction 21) stated in relevant part:

Malice is that state of mind which results in the intentional doing of a wrongful act to another, without legal excuse or justification, at a time when the mind of the actor is under the control of reason. Malice may result from any unlawful or unjustifiable motive including anger, hatred or revenge. Malice may be inferred from any deliberate, willful, and cruel act against another, however sudden.

During its deliberations, the jury was clearly confused about what malice entailed. Struggling with the meaning of malice, the jury sent a note to the trial judge requesting clarification about what the instruction meant when it said that the defendant was "under the control of reason." 2/22/12 Tr. 22-24. The trial judge responded by re-reading part of the instruction and merely telling the jury to apply the "ordinary and common usage in everyday life and parlance." 2/22/12 Tr. 22-23. The jury was also struggling with other aspects of the instructions. It sent another note stating that instruction 23 (degrees of homicide) appeared to contradict instructions 14 (indirect causation) and 15 (direct causation). The court asked the jury to clarify its question, but the jury never did. Tr. 2/22/12 at 25-31, 34-36.

In an effort to clear up this confusion, at least some of the jurors appear to have taken the extraordinarily inappropriate step of consulting a dictionary. Mr. Huguely provided the state habeas court with an affidavit from Juror 42 stating that the jury consulted a dictionary to define malice. *See* Sealed Appendix to First Amended Petition for a Writ of Habeas Corpus (May 5, 2016), Juror 42 Decl. ¶7.[3] This juror unequivocally stated that the jury used a dictionary during its deliberations, and "*[t]his helped in deciding if there was malice and whether it had been shown in these charges.*" *Id.* (emphasis added). Mr. Huguely also provided the state habeas court with evidence that despite exhaustive efforts, he was unable to interview at least eight jurors, either because they declined to talk or did not answer their door or return a call. Two other jurors who initially spoke with the defense declined follow-up interviews regarding the dictionary issue. *See* Reply to the Warden's Motion to Dismiss, Ex. B (Sealed Declaration of Investigator Samuel Dworkin).

The Warden provided the state habeas court with affidavits from eleven jurors, including an affidavit from Juror 42, who stated that "the jury had an issue with the definition of the word 'malice.' The jury dealt with the issue by getting a dictionary." One other juror stated that a dictionary "might have been provided," seven jurors stated that they did not remember, one juror stated "I am 100% sure nobody brought a dictionary into the jury deliberations and 99% sure if the jury ever had a dictionary it was provided by the court," and only one juror stated that a dictionary was not used. *See* Letter Ruling on Motion to Dismiss (Aug. 10, 2018) at 3-4 ("Letter Ruling").

---

[3] Juror 42's Declaration and Reply Declaration that were filed in the state habeas proceedings are reproduced in the Sealed Appendix to this petition.

Mr. Huguely also submitted a reply declaration from Juror 42 addressing what appeared to be inconsistencies between her first declaration and the one she submitted to the Warden. *See* Reply to Warden's Motion to Dismiss, Ex. A (Sealed) at 1-2. The reply declaration stated unequivocally that "[i]t was a dictionary" the jury used during deliberations. Juror 42 further stated that when she signed the Warden's declaration, she was "in a rush," did not read it "thoroughly," and "did not review the statement line by line like I had done with the defense's statement."

In short, both Mr. Huguely's evidence *and the Warden's own evidence* showed that at least one juror had a clear recollection of using a dictionary to interpret the meaning of "malice"—a critical concept in the jury instructions and the difference between manslaughter and second-degree murder. Under the long line of Supreme Court cases cited above, this evidence was easily sufficient to show that Mr. Huguely's constitutional rights were violated when the jury looked to extra-judicial sources as part of its decisionmaking process. *See Remmer*, 347 U.S. at 229. This injection of extraneous, extra-judicial influences into the jury room violated clearly established federal law and is sufficient by itself to justify granting Mr. Huguely relief under §2254.

C.      At a minimum, the credible evidence proffered by Mr. Huguely—which came directly from one of the jurors who voted to convict him—should have resulted in an evidentiary hearing to conclusively determine whether the jury's deliberations were tainted by extraneous sources. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro,* 550 U.S. at 474; *see also Townsend v. Sain*, 372 U.S. 293, 313 (1963). Here, if Mr. Huguely were able to conclusively prove that the jury had consulted a dictionary, this unquestionably would have entitled him to habeas relief. Moreover, because the state habeas court refused to hold a hearing on this issue, Mr.

Huguely "did not receive a full and fair evidentiary hearing in a state court, either at the time of trial or in a collateral proceeding." Rules Governing Section 2254 Cases in the United States District Courts, Rule 8, Advisory Committee notes (citing *Townsend*).

The state habeas court initially scheduled an evidentiary hearing on this claim, but then abruptly cancelled it and dismissed this claim without a hearing. The court's dismissal of this claim was contrary to clearly established federal law as set forth in *Remmer* and rested on an unreasonable determination of the facts. The habeas court first stated that its "primary reason" for dismissal was that "I cannot find by a preponderance of the evidence that the incident occurred at all." Letter Ruling at 2-4. But, as noted, Juror 42 unambiguously stated in affidavits provided to both Mr. Huguely and the Warden that the jury *did* consult a dictionary.

The state habeas court seized on what it believed to be inconsistencies in Juror 42's testimony regarding whether the jury had consulted a dictionary or instead a "single sheet of paper." *Id.* But that finding rested on an unreasonable determination of the facts given that the state habeas court entirely ignored the reply declaration that Juror 42 provided to the defense. In that declaration—which the state habeas court did not even acknowledge—Juror 42 stated that the Warden had not sufficiently reviewed the affidavit with her and that she did not carefully go through it line by line. She further stated, unequivocally, that: "It was not a single sheet of paper. It was multiple pages. It was a dictionary." Reply to Warden's Motion to Dismiss, Ex. A (Sealed) at 1-2. Juror 42 further attested in no uncertain terms that "[a] juror read the definition of malice out loud from the dictionary." *Id.*

The state habeas court also relied heavily on the fact that nine deputies who claimed to serve as bailiffs during Mr. Huguely's trial provided affidavits stating that they did not provide a dictionary to jurors. Letter Ruling at 4. But those affidavits hardly deserved the weight the habeas

court attached to them. None of the deputies identified the bailiffs who were actually present during Mr. Huguely's trial, and neither the affidavits nor the Warden claimed that all of the bailiffs who worked at the trial had provided affidavits. Furthermore, even if the deputies did not provide a dictionary, a different court employee—such as a law clerk, courtroom clerk, or clerk's office employee—could have brought the dictionary to the jurors. (Juror 42 was unsure who brought the dictionary to the jury because she did not see the person. Reply to Warden's Motion to Dismiss, Ex. A (Sealed) at 2-3.)

In sum, Mr. Huguely clearly made a sufficient factual showing, supported by multiple affidavits from *one of the jurors who voted to convict him* attesting that a dictionary was brought into the jury room and that the dictionary definition of malice was read out loud to supplement the jury instructions. "[A]ny private communication, contact, or tampering, directly or indirectly*, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial ....*" Remmer*, 347 U.S. at 229. A credible allegation of external influence on the jury establishes "not only a presumption of prejudice, but also a *defendant's entitlement to an evidentiary hearing ....*" Barnes v. Joyner*, 751 F.3d 229, 242 (4th Cir. 2014) (citing *Remmer*) (emphasis added).

The Fourth Circuit recently explained when a hearing is necessary: a "defendant must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict." *Barnes*, 751 F.3d at 244(citation omitted). In other words, the "*Remmer* presumption and hearing requirement are triggered after the party attacking the verdict satisfies the 'minimal standard' of showing that 'extrajudicial communications or contacts [between a juror and a third party] were more than innocuous interventions.'" *Id.* at 245.

Here, Mr. Huguely has offered evidence of extrajudicial communications or contacts that were far more than "innocuous interventions." Given the centrality of malice to this case, the jury's use of a dictionary rather than the judge's instructions to define malice may well have resulted in a case-dispositive mistake in the jury's verdict. The state habeas court's dismissal of this claim rested on a decision that was contrary to or an unreasonable application of the *Remmer* doctrine and an unreasonable determination of the facts in light of Juror 42's own declarations. This Court should either grant Mr. Huguely relief under §2254 or, at a minimum, hold an evidentiary hearing on the issue of whether and how the jury's deliberations were tainted by extraneous influences.

## II.    Mr. Huguely's Sixth Amendment Rights Were Violated When He Received Ineffective Assistance of Counsel At Trial.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth the standard for a claim of constitutionally ineffective assistance of counsel. Under *Strickland*, a defendant must show that (1) trial counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Id.* at 687. "The *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims." *Williams*, 529 U.S. at 391.

Trial counsel are constitutionally deficient if their actions "seriously compromis[e] their opportunity to respond to [the prosecution's] case." *Rompilla v. Beard*, 545 U.S. 374, 385 (2005). Trial counsel's failure to develop critical evidence has also been found to constitute deficient performance. *See id.* at 390-93; *Kimmelman v. Morrison*, 477 U.S. 365, 384-85 (1986); *Williams*, 529 U.S. at 395; *Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003). As for prejudice, when "[a] specified attorney error results in the omission of certain evidence," the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. That reasonable probability means a showing "sufficient to undermine confidence in the outcome." *Id.* The Supreme Court has

emphasized that "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

Here, Mr. Huguely's trial counsel performed deficiently and severely prejudiced his defense in at least two related ways: by violating the rule on witnesses, thereby resulting in the exclusion of critical expert evidence, and by failing to call another key expert witness whose testimony was needed to rebut the Commonwealth's expert medical evidence.

A. **Mr. Huguely's Sixth Amendment Right to Effective Assistance of Counsel Was Violated When Trial Counsel Violated the Rule on Witnesses, Thereby Causing Crucial Expert Testimony to be Excluded**

Mr. Huguely's trial counsel provided constitutionally inadequate representation when they violated the rule on witnesses, thereby resulting in the exclusion of vital expert testimony from Dr. Uscinski on reperfusion. *See Rompilla*, 545 U.S. at 385 (trial counsel cannot "seriously compromis[e] their opportunity to respond to [the prosecution's] case"); *Kimmelman*, 477 U.S. at 374. As noted above, reperfusion was a critical issue at trial and was highly relevant to the cause of Ms. Love's death: the defense's theory was that Ms. Love died from positional asphyxia and that any bleeding in her brain was caused by reperfusion from CPR rather than blunt force trauma. 2/8/12 Tr. 48, 57-60. Unsurprisingly, the prosecution offered expert testimony of its own—through at least five different experts—to rebut the defense's reperfusion theory. *See* 2/14/12 Tr. 68-83, 100-05, 156-58, 163-76; 2/9/12 Tr. 72-92; 2/10/12 Tr. 40-41, 48-49.

*But trial counsel's deficient performance prevented Mr. Huguely from fully responding to the prosecution's reperfusion evidence.* Trial counsel violated the rule on witnesses—which prohibits witnesses from hearing the testimony of other witnesses—by emailing defense expert

Dr. Uscinski about the substance of the prosecution experts' testimony. 2/18/12 Tr. 4.[4] As a result, the trial court refused to allow Dr. Uscinski to offer any testimony about reperfusion even though "this is an incredibly important issue for the parties." 2/18/12 Tr. 44-45 (emphasis added). The court emphasized that "[t]his is very troublesome and I wouldn't have expected this from counsel and I'm incredibly disappointed with it." *Id.* The defense ultimately presented rebuttal testimony from Dr. Uscinski but not about reperfusion. 2/18/12 Tr. 63-71. And then, in closing, Mr. Huguely's attorneys inexplicably suggested that Dr. Uscinski *disagreed* with the other defense witnesses about reperfusion. 2/18/12 Tr. 226.

The state habeas court expressly found that trial counsel's violation of the rule on witnesses "was deficient performance." Letter Ruling at 13. The court found that prejudice was a "close case" but ultimately held that Mr. Huguely was not prejudiced because Dr. Leestma had also testified about reperfusion. *Id.* at 13-14. The habeas court found that Dr. Uscinski's testimony was not meant to focus on reperfusion and "combined with Dr. Leestma's ... gave the defense all that it needed to argue their theory." *Id.* at 13.

That conclusion—which was based on the self-serving and self-interested affidavit of trial counsel[5]—rested on a decision that was contrary to and an unreasonable application of *Strickland* and an unreasonable determination of the facts. Although Dr. Uscinski would have agreed with

---

[4] The key portions of the trial transcript regarding the exclusion of Dr. Uscinski's testimony are reproduced in the Public Appendix to this petition. The exhibits introduced at trial during the hearing on whether to exclude Dr. Uscinski's testimony are reproduced in the Sealed Appendix to this petition.

[5] Trial counsel alerted their insurance carrier regarding their violation of the rule on witnesses, and then cooperated *ex parte* with counsel for the Warden over Mr. Huguely's objections. Because Mr. Huguely was deprived of an evidentiary hearing, he was never able to examine trial counsel about their post hoc alleged trial strategy.

Dr. Leestma's testimony that Ms. Love's brain injuries were caused by reperfusion, they would have approached the issue from different areas of expertise. Medical testimony was the crux of this case with respect to the cause of Ms. Love's death, and both sides recognized the need to engage and present experts from *different backgrounds.* The prosecution accomplished this by calling Dr. Brady, an expert in CPR and emergency medical services, to counter the defense's anticipated reperfusion theory. The prosecution also called Dr. Gormley (medical examiner), Dr. Fuller (neuropathologist), Dr. Lopes (neuropathologist), and Dr. Virmani (cardiologist) to attempt to rebut the defense's theory.

Yet, due to trial counsel's deficient performance, the defense was barred from calling anyone other than their neuropathologist (Dr. Leestma) on the issue of reperfusion. As trial counsel's affidavit notes, however, they had retained "well-respected practicing neurosurgeon" Dr. Uscinski specifically to counter the prosecution's theory of Ms. Love's brain injuries. *See* Warden's Motion to Dismiss, Ex. A, Affidavit of Quagliana at ¶11.

Moreover, the defense offered only very cursory testimony on reperfusion through Dr. Leestma, since they were intending to develop these issues more comprehensively through Dr. Uscinski. 2/15/12 Tr. 260-69. Indeed, the very emails that violated the rule on witnesses also show that the defense intended to develop this evidence through Dr. Uscinski. For example, Dr. Uscinski's email made clear that he was prepared to respond to Dr. Lopes's contention that reperfusion injuries tended to be present only in the "watershed areas" of the brain. Exhibit C from Uscinski Hearing. Although the state habeas court credited trial counsel's self-serving assertion that they were not relying on Dr. Uscinski to prove their reperfusion theory, *see* Letter Ruling at 13, trial counsel's *contemporaneous* emails belie that assertion. *See* Exhibits A-E from Uscinski Hearing. As trial counsel herself emphasized in those emails, "*the jury is waiting to hear* from

someone with the right expertise that CPR creates enough blood pressure in the body to sufficiently perfuse the brain with blood so as to potentially cause injury." Exhibit A from Uscinski Hearing (emphasis added).

The state habeas court also unreasonably ignored the critical fact that trial counsel promised to present the jury with the reperfusion defense, and then, after getting Dr. Uscinski's testimony excluded, inexplicably *told the jury that Dr. Uscinski disagreed with Dr. Leestma on this issue.* 2/8/12 Tr. 59-60; 2/18/12 Tr. 226. The state habeas court characterized this claim as being about the failure to present "corroboration" or "[a]dditional cumulative evidence[.]" Letter Ruling at 14. This is not, however, a case where one expert was excluded but another expert offered the same, uncontradicted testimony on reperfusion. Rather, this is a case where one defense expert (Leestma) testified to reperfusion, one defense expert with very different qualifications (Uscinski) testified without mentioning reperfusion, and then trial counsel informed the jury that the two experts *disagreed* on this issue. This left the jury to conclude that Dr. Uscinski was silent on reperfusion because he thought Dr. Leestma was wrong, thereby undermining the defense's entire argument on this critical issue.

The state habeas court also acted unreasonably in finding that Mr. Huguely "proffered no specific testimony, by affidavit or otherwise, as to what exactly Dr. Uscinski would have said about reperfusion ...." Letter Ruling at 14. First, Mr. Huguely provided the state habeas court with trial counsel's original proffer, which made clear that Dr. Uscinski would have testified to the phenomenon of reperfusion injury in the context of CPR. 2/22/2012 Tr. 13-16; *see also* Exhibit E from Uscinski Hearing (Proffer as to Excluded Testimony). Second, Mr. Huguely provided an email from Dr. Uscinski—responding to trial counsel's plea for testimony addressing the specific area of bleeding in Ms. Love's brain—with a detailed explanation of how "reperfusion in the

31

'watershed areas' may lead to bleeding ...." Exhibit C from Uscinski Hearing. Moreover, habeas counsel was prepared to present detailed testimony from Dr. Uscinski himself at the evidentiary hearing before the court suddenly cancelled it on the unreasonable ground that a hearing would not "add anything on this point beyond what has been presented." Letter Ruling at 15.

Finally, the state habeas court found no ineffective assistance in light of "the overall performance of counsel." Letter Ruling at 14. But the ineffective assistance inquiry focuses on the *specific* actions or incidents at issue, not the attorney's overall performance. "[T]he right to effective assistance of counsel ... may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier,* 477 U.S. 478, 496 (1986); *see also Harrington v. Richter,* 562 U.S. 86, 111 (2011) (quoting *Murray* for the proposition that "in some instances 'even an isolated error' can support an ineffective-assistance claim"); *Tice v. Johnson*, 647 F.3d 87, 106 (4th Cir. 2011) (holding that counsel's performance was deficient based on a single error, and recognizing that counsel's performance "was otherwise laudably effective and competent").

For all of these reasons, the state habeas court's dismissal of this claim rested on a decision that was contrary to and an unreasonable application of clearly established federal law regarding the right to effective assistance of counsel and an unreasonable determination of the facts in light of the evidence in the record. Trial counsel's deficient performance that led to the exclusion of critical expert testimony was especially harmful to Mr. Huguely's defense given that this was a "close case," in which "the failure of defense counsel to present certain evidence or effectively challenge the state's evidence on important issues can be particularly prejudicial." *Dugas v. Coplan*, 428 F.3d 317, 335-36 (1st Cir. 2005); *see also Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors

than one with overwhelming record support."). Trial counsel's actions deprived Mr. Huguely of the effective assistance of counsel and should be sufficient grounds to grant this petition or, at a minimum, hold an evidentiary hearing to conclusively determine the prejudice Mr. Huguely suffered as a result of trial counsel's concededly deficient performance.

**B.** **Mr. Huguely's Sixth Amendment Right to Effective Assistance of Counsel Was Violated When His Counsel Failed to Call Crucial Expert John S. Daniel, III, M.D.**

Trial counsel also performed deficiently by failing to call Dr. Jack Daniel to testify as an expert regarding the cause of Ms. Love's death, thereby resulting in significant additional prejudice to Mr. Huguely's defense. *See, e.g.*, *Williams v. Martin*, 618 F.2d 1021, 1025-26 (4th Cir. 1980) (recognizing unique need for expert testimony where cause of death is "an essential element of the state's case").

The defense retained Dr. Daniel, a highly respected forensic pathologist and attorney, to testify about the cause of death. Dr. Daniel conducted a forensic analysis, prepared to testify in the case, traveled to Charlottesville for the trial, and remained outside the courtroom along with the other testifying experts—but then was not called as a witness. This was a surprise to Dr. Daniel, because trial counsel repeatedly informed him he would testify, probably as the last medical expert to give "an overview of all the forensic medical information to assist in tying the evidence together into a single coherent theory." *See* Appendix to Petition for a Writ of Habeas Corpus, *Huguely v. Woodson*, No. CL16-23, Declaration of John S. Daniel, III, at 7.[6] Specifically, Dr. Daniel intended to testify that Ms. Love died of asphyxia rather than blunt force trauma, that bleeding on her brain was caused by reperfusion from CPR, and that there were significant problems with the medical examiner's analysis. *Id.* at 4-7.

---

[6] Dr. Daniel's declaration is reproduced in the Public Appendix to this petition.

At the outset, it is likely that the reason trial counsel declined to call Dr. Daniel is that he was also copied on the emails that violated the rule on witnesses, *see* Exhibits A-D from Uscinski Hearing, and thus his testimony on reperfusion would have been excluded for the same reason as Dr. Uscinski's. But that only underscores the severe prejudice resulting from trial counsel's violation of the rule on witnesses, and provides yet another reason to grant Mr. Huguely habeas relief on that ground.

In all events, the state habeas court acted unreasonably when it dismissed this claim based largely on trial counsel's self-serving affidavit. The court concluded that Dr. Daniel's testimony would have been cumulative and that trial counsel declined to call Dr. Daniel for "tactic[al]" reasons. Letter Ruling at 11-12. But Dr. Daniel's testimony would not have been cumulative; to the contrary, he would have provided critical missing ingredients in support of the primary defense theory, while also supporting the other favorable evidence admitted at trial, particularly, Dr. Leetsma's limited testimony on reperfusion. *See* Daniel Declaration at ¶¶5-16 (discussing proposed testimony); 12/15/10 Tr. 43-53 (Daniel's testimony at pretrial hearing regarding cause of death and in support of the reperfusion theory); 12/15/10 Tr. 6-7 (trial counsel discussing important testimony that Dr. Daniel planned to offer).

Dr. Daniel was the only forensic pathologist retained by the defense, and he would have tied together expert testimony specific to the brain with a more holistic view of the cause of death. For example, Dr. Daniel would have testified that intoxication "is a known risk factor for asphyxial deaths of various types, and an intoxicated individual may become asphyxiated accidentally when their face and air passages become buried in a pillow or other bedclothes." Daniel Declaration at 3. Moreover, Dr. Daniel would have explained the connection between asphyxia and reperfusion, setting out that lack of oxygen to the brain causes damage to the blood vessels, and those vessels

then become vulnerable to reperfusion injury when CPR is later administered. *Id*. at 3-4. And, as a former medical examiner himself, Dr. Daniel would have been uniquely well situated to respond to the prosecution's medical examiner, Dr. Gormley. *Id*. at 5. For example, Dr. Daniel would have explained that Dr. Gormley failed to "recognize or acknowledge or consider the significant mismatch between the catastrophic lethal outcome and the extremely limited volume and distribution of intracranial bleeding." *Id*.

The notion that Dr. Daniel's testimony was critical to the defense was apparently shared by the prosecution. At closing, the prosecution highlighted the gaps in the defense's evidence by arguing that "[t]here's *no medical evidence* supporting the theory that intraparenchymal, petechial hemorrhages are caused by anything other than trauma." 2/18/2012 Tr. 179 (emphasis added). But that, of course, is the *precise* evidence that counsel could have introduced through Dr. Daniel if defense counsel had called him—and through Dr. Uscinski if his testimony had not been excluded due to trial counsel's rule violations.

Trial counsel's self-serving assertion (which the state habeas court accepted) that they failed to present Dr. Daniel's testimony for "tactic[al]" reasons also does not withstand scrutiny. Although lawyers frequently make mid-trial strategic decisions regarding the presentation of evidence, the record shows this is not what happened here. *First,* before trial, counsel had heard Dr. Daniel testify about cause of death and reperfusion, and intended to call him as a witness at trial. They thus made him subject to the rule on witnesses, rather than having him in the courtroom to consult during dense expert medical testimony. *Second,* even near the close of the Commonwealth's evidence, trial counsel was still proposing to Daniel topics on which they wanted him to testify. *See* Exhibits A-D from Uscinski Hearing. Furthermore, virtually every one of the post hoc reasons proffered by trial counsel to excuse their deficient performance was *well-known*

*to trial counsel long before trial.* Trial counsel's affidavit asserts that they were concerned about Dr. Daniel's cross-examination due to the amount of compensation he had received and information about his past employment at the medical examiner's office. But trial counsel was aware of these topics when they made Dr. Daniel subject to the rule on witnesses and when they continued to email him with specific reference to his future testimony.

In sum, the so-called "strategic decision" the state habeas court "invoke[d] to justify counsel's" conduct "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to" trial. *Wiggins,* 539 U.S. at 526-27. And "[t]he … evidence counsel failed to … present" here is "powerful." *Id.* at 534. Given the centrality of Dr. Daniel's testimony to Mr. Huguely's defense, there is certainly a "reasonable probability that a competent attorney … would have introduced it." *Id.* at 535. Moreover, there is at least a reasonable probability that the "result of the proceeding would have been different" had this evidence been introduced, *Strickland*, 466 U.S. at 694, since without Dr. Daniel's testimony, significant portions of the prosecution's medical evidence on reperfusion were left unrebutted. In light of trial counsel's own actions before and during trial—and Dr. Daniel's affidavit attesting that he was expecting to testify—trial counsel's bald invocation of tactical choices should not have been accepted as a basis to summarily deny Mr. Huguely's Sixth Amendment claim without even granting a hearing. The state habeas court's dismissal of this claim rested on a decision that is contrary to and an unreasonable application of clearly established federal law and an unreasonable determination of the facts, and this Court should either grant §2254 relief on this claim or grant Mr. Huguely an evidentiary hearing.

### III. Mr. Huguely's Rights Under the Due Process Clause and *Brady v. Maryland* Were Violated When the Commonwealth Failed to Disclose the Love Family's Imminent $30 Million Civil Suit Against Mr. Huguely

The Due Process Clause of the U.S. Constitution requires the prosecution to disclose to the defense any evidence in its possession that is favorable to the accused and "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). That obligation applies even when there has been "no request by the accused," and it "encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted). When a jurisdiction adopts an "open file" policy—as the Commonwealth has done—the defendant may reasonably assume that the file contains all potentially exculpatory evidence known to the prosecution. *Workman v. Commonwealth*, 272 Va. 633, 644-50 (2006).

Just weeks after the conclusion of Mr. Huguely's criminal trial, Sharon and Lexie Love—Yeardley Love's mother and sister—filed a civil complaint against Mr. Huguely seeking more than $30 million in damages. R.886-92. The core theory of their suit was that Ms. Love's death was an "accident," and that Mr. Huguely was civilly liable for negligence. R.887.

In anticipation of that suit, one of the Loves' attorneys, Mahlon Funk, appeared in circuit court on April 19, 2012, in an attempt to obtain exhibits and trial materials from the criminal case for use in the civil suit. At that hearing, Mr. Huguely's attorneys were surprised to hear Mr. Funk describe a nearly two-year-long relationship with the City Commonwealth's office. Most notably, the Loves' civil attorneys had apparently agreed to "hold any and all civil proceedings and investigations … until after the criminal trial was over." 4/19/12 Tr. 44-45; *see also* R.1093 (sworn affidavit from Mr. Funk stating that the Commonwealth asked "that we await the conclusion of the criminal trial so as not to interfere with witnesses and the like"). The civil attorneys "complied

with every request of … the Commonwealth to make sure nothing … in any way could have at all affect[ed] adversely [] any aspect of [the] criminal proceedings." 4/19/12 Tr. 44-45.

The Commonwealth's failure to disclose the Loves' imminent civil suit against Mr. Huguely rested on an unreasonable application of clearly established federal law, namely the *Brady* doctrine. *See*, *e.g.*, *People v. Wallert*, 98 A.D.2d 47, 48-50 (N.Y. 1983) (finding a "clear *Brady* violation" where the prosecution "knew prior to trial that the complainant had consulted a [civil] attorney who was but awaiting the outcome of the criminal action," but "felt no duty to disclose this information to defendant's counsel"); *In re R.D.*, 2012 PA Super 84, 44 A.3d 657, 676 (2012) ("Introduction of the existence of the civil suit in a criminal case is permissible 'to show the complainant's possible bias and interest in the outcome of the case.'").

For nearly two years, the Commonwealth had been aware that the Loves were working with attorneys on a civil suit. Yet the Commonwealth did not disclose either this fact or that prosecutors had been coordinating with those attorneys on major strategic decisions, such as the timing of the civil suit. This violates *Brady*. *See*, *e.g.*, *Schledwitz v. United States*, 169 F.3d 1003, 1008 (6th Cir. 1999) (*Brady* violation occurred where a key witness was presented as a "neutral and disinterested" expert, when, in fact, he had been "actively and intimately involved in the investigation" against the defendant for years); *United States v. Pelullo*, 105 F.3d 117, 123 (3d Cir. 1997) (*Brady* violation occurred where FBI agent's undisclosed notes and FBI surveillance tapes could have been used to impeach government witness whose credibility was central to case).

The Court of Appeals nonetheless rejected this argument on direct appeal on the ground that the Commonwealth discharged any *Brady* obligations through a January 30, 2012 letter in which it noted that the Loves have a "potential cause of action" against Mr. Huguely. *See* Per Curiam Decision at 8-9, *Huguely v. Virginia* (Va. Ct. App. Apr. 23, 2013). But a boilerplate

38

reference to a "potential" cause of action is a far cry from confirmation that the Loves had *already* engaged civil attorneys—and that those attorneys were coordinating case strategy with the prosecution. Indeed, in light of the Commonwealth's "open file" policy, this statement was not just incomplete but an affirmative misrepresentation, as it suggested that the Commonwealth *did not* have any additional information about the Loves' civil claims.

The Loves' imminent civil suit was plainly "material" to the criminal case. Most important, the theory of the case underlying the Loves' civil complaint was flatly inconsistent with the theory under which the Commonwealth prosecuted Mr. Huguely in the criminal case. From the very start of this case, the Commonwealth argued that Mr. Huguely should be convicted of first- or second-degree murder because he acted with malice. In contrast, the civil suit rests on a negligence theory—namely, that Mr. Huguely *did not* intentionally cause Ms. Love's death, and that she died as the result of an "accident." R.887. Under that view of the facts, Mr. Huguely would be guilty of, at most, involuntary manslaughter. Had the imminent civil suit been disclosed under *Brady*, the defense could have highlighted for the jury the significant disparities between the Commonwealth's arguments in this case and the Love family's arguments in the civil suit. Indeed, it is likely because of this inconsistency that the prosecution asked the civil attorneys to "await the conclusion of the criminal trial" before filing their suit. R.1093.

The Court of Appeals' rejection of this claim rested on an unreasonable application of the *Brady* doctrine and an unreasonable determination of the facts regarding the materiality of the withheld information. At a minimum, this court should hold an evidentiary hearing to assess both the scope of the withheld information and its materiality to this case. *See United States v. White*, 492 F.3d 380, 413 (6th Cir. 2007) (failure to conduct an evidentiary hearing for "serious" *Brady* claims would "effectively permit the government to ride roughshod over the accused, stripping the

accused of both sword and shield"); *United States v. Dansker*, 565 F.2d 1262, 1264 (3d Cir. 1977) (court should hold a hearing whenever the *Brady* claims are "neither frivolous nor palpably incredible"). Mr. Huguely expressly requested an evidentiary hearing to further explore these issues, R.882-884, yet the trial court refused to take even that modest step, R.1374. This court should rectify that error by granting him a hearing on the issue.

### IV. The Circuit Court Violated Mr. Huguely's Sixth Amendment Right to Counsel by Forcing Him to Proceed in the Absence of his Retained Counsel of Choice

**A.**     The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A critical component of that right is the "right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). As the Supreme Court has explained, "[i]t is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53 (1932). That is, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Moreover, the right to counsel is violated where a court demonstrates an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" *See Morris v. Slappy*, 461 U.S. 1, 11-12 (1983).

From the day of his arrest, Mr. Huguely chose to be represented by two retained attorneys, Fran Lawrence and Rhonda Quagliana. Mr. Huguely decided that he wanted two attorneys with their specific and complementary skills and outlooks to represent him at trial. Neither Mr. Lawrence nor Ms. Quagliana was designated as "lead counsel," and they served as equal partners throughout the representation.

Both attorneys participated extensively in the trial. Ms. Quagliana conducted *voir dire* of potential jurors over a two-day period, handled the examinations of police, rescue squad, and medical witnesses, and addressed the jury regarding sentencing. Mr. Lawrence gave the opening and closing statements and examined a number of other witnesses. Throughout the trial, Mr. Lawrence and Ms. Quagliana repeatedly sought each other's advice and conferred with one another regarding strategic decisions and the examination of witnesses.

On the ninth day of trial, February 16, 2012, Ms. Quagliana developed stomach flu and was unable to attend court because she was extremely ill. Ms. Quagliana's illness is well-documented and is not in dispute. *See* 8/22/12 Tr. 137 (THE COURT: "Let me just state this. I never doubted you were sick…. You have never, ever misrepresented anything to the Court."); R.1417-1431 (sworn affidavits documenting illness). That morning, Mr. Lawrence represented to the court that Ms. Quagliana was too sick to continue with trial in her condition. The court recessed the proceedings until 12:30 p.m. 2/16/12 Tr. 3-4. Ms. Quagliana was still "not doing terribly well" at that time, and the court granted Mr. Lawrence's request to adjourn for the day. *Id.* at 6-9.

The next day, February 17th, Ms. Quagliana continued to be actively ill and unable to attend court; she was admitted to the infusion center at Martha Jefferson Hospital that afternoon. Mr. Lawrence again objected to proceeding in Ms. Quagliana's absence, explaining that Mr. Huguely "has been surrounded by two counsel for the last two weeks and for the last two years who have been his team who have assisted him," and that he "objects to proceeding at all until he has his full defense team." 2/17/12 Tr. 8-9. The court nonetheless overruled this objection, asserting that "this case is going forward this morning with these witnesses." *Id.* at 9.

Mr. Lawrence was thus forced to examine a number of witnesses in Ms. Quagliana's absence. And, because Mr. Lawrence was not prepared to examine the medical witnesses who

were scheduled to testify on February 17th, *id.* at 4-6, the defense was forced to call its witnesses out of order. Even then, the court continued to insist on expeditiousness above all else, emphasizing throughout the day on the 17th that "[t]he defense needs to be ready to go tomorrow." *Id.* at 143; *see id.* at 89 (court stating that "I'm trying to avoid going into next week with the case and … I'm going to do everything in my power to keep the case moving quickly and on time").

The circuit court's insistence that Mr. Huguely proceed in the absence of his retained counsel of choice violated his Sixth Amendment right to counsel and requires a new trial. As the Supreme Court has emphasized, the Sixth Amendment commands "not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended *by the counsel he believes to be best*." *Gonzalez-Lopez*, 548 U.S. at 146 (emphasis added). Thus, "[w]here the right to be assisted by counsel of one's choice is wrongly denied … it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." *Id.* at 148. The constitutional violation is "'complete'" when the defendant "is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id.*; *see also id.* at 148-51 (violation of the right to counsel of choice is "structural" and is not subject to harmless-error review); *London v. Commonwealth*, 49 Va.App. 230, 239, 638 S.E.2d 721 (2006) (holding that *Gonzalez-Lopez* "calls into question our prior holdings requiring prejudice be shown" in order to prove a violation of the defendant's right to counsel of choice).

This rule makes good sense. The choice of an attorney is an inherently subjective and personal one, and it would be extremely difficult to "assess[] the effect of the error" when a defendant is denied his counsel of choice. *Gonzalez-Lopez*, 548 U.S. at 149 n.4. Different attorneys "will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, [] style of witness

examination, and jury argument." *Id.* at 150. It is simply "impossible to know what different choices the [alternative] counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceeding." *Id.* The Supreme Court thus had "little trouble" concluding that "erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error.'" *Id.*

Indeed, even if Mr. Huguely were required to demonstrate prejudice, that standard is readily satisfied. When Ms. Quagliana returned to court on the morning of Saturday, February 18th, she was forced to examine several witnesses even though she had not seen the testimony or cross-examinations of the five critical defense witnesses who had testified the day before. And the defense was forced to call its witnesses out of order. The defense planned to have its medical experts, Dr. Jan Leestma, Dr. Ronald Uscinski, and Dr. Jack Daniel testify back-to-back-to-back, in order to give the jury a cohesive picture of the medical evidence regarding the cause of Ms. Love's death—one of the most critical issues in this case. But because of the court's refusal to grant a short continuance to accommodate Ms. Quagliana's illness, the defense was forced to call several other witnesses in between the medical experts, thus undermining counsels' strategic goals and theory of the case. Proceeding in Ms. Quagliana's absence also undermined her status as an equal partner in the defense by suggesting to the jury that her presence was not necessary to the defense team.

**B.**     In rejecting Mr. Huguely's Sixth Amendment counsel-of-choice arguments on direct appeal, the Court of Appeals badly misconstrued the relevant inquiry under Supreme Court precedent. Most importantly, the Court of Appeals—in direct contravention of *Gonzalez-Lopez*— impermissibly imported a prejudice inquiry into the threshold question of whether the defendant's

Sixth Amendment rights were violated. The court claimed that it was addressing only whether "the trial judge committed Sixth Amendment *error* here." Opinion at 13 (Va. Ct. App. Mar. 4, 2014) ("3/4/14 Op."). But the court made a showing of prejudice a prerequisite to finding any constitutional error at all, in direct contravention of *Gonzalez-Lopez*. For example, the court emphasized that "[t]here is no indication that Ms. Quagliana's absence had a meaningful effect on the style or manner in which [] defense witnesses were examined by defense counsel." 3/4/14 Op. at 17. That is a paradigmatic example of the kind of prejudice inquiry *Gonzalez-Lopez* forbids.

Similarly, the Court of Appeals identified nine ways in which different lawyers might handle a trial "differently"—*i.e.*, nine ways in which a lawyer's absence could prejudicially affect a trial—and suggested that Ms. Quagliana's absence had little effect on those factors. 3/4/14 Op. at 16. But *Gonzalez-Lopez* squarely rejected the argument that the constitutional right to counsel of choice—as opposed to effective assistance—"is not 'complete' until the defendant is prejudiced." 548 U.S. at 147-48 (contrasting two constitutional rights). The denial of counsel of choice is structural and does *not* require a showing of prejudice. 548 U.S. at 148-51. The Court of Appeals' analysis is irreconcilable with *Gonzalez-Lopez* because it required Mr. Huguely to show prejudice in order to establish a violation of the right in the first place, despite the undeniable fact that he was forced to proceed, over his personal objection, on one of the most critical days of his murder trial in the absence of Ms. Quagliana.

The Court of Appeals further concluded that there was no Sixth Amendment violation because Mr. Huguely continued to be represented by Mr. Lawrence while Ms. Quagliana was ill. *See* Opinion at 18 (Va. Ct. App. Mar. 4, 2014) (noting that Mr. Lawrence "was still in the courtroom and assuring the court that he felt comfortable with examining witnesses that he was prepared to examine"). But in *Gonzalez-Lopez*, the Supreme Court squarely rejected the notion

that a violation of the right to counsel of choice can be excused as long as the defendant received effective representation from *any* lawyer. As the Court explained, that argument—which was advanced by the *dissenting* Justices—is based on a "misunderstanding of the nature of the right to counsel of choice" and "confus[es] … this right with the right to *effective* assistance of counsel." 548 U.S. at 151 n.5 (emphasis added). Indeed, the defendant in *Gonzalez-Lopez* continued to be ably represented by constitutionally adequate "substitute counsel," but this did not in any way excuse the trial court's violation of the defendant's right to be represented by his counsel of choice.

The Third Circuit similarly emphasized even before *Gonzalez-Lopez* that it is not "decisive" that the defendant "continued to have the services of" one attorney when the defense team was "composed of two attorneys who may have served distinct and important functions." *United States v. Laura*, 607 F.2d 52, 58 (3d Cir. 1978). When the defendant "wished to retain both attorneys," the court must "presume that she felt that she needed both attorneys." *Id.* That choice is "[the defendant's] to make and not the court's, unless some appropriate justification for the dismissal is provided." *Id.* Put simply, as long as a retained attorney "perform[s] a defense function," the defendant need not prove "the importance of his assistance" in order to establish a Sixth Amendment violation. *Id.*; *see also Rodriguez v. Chandler*, 492 F.3d 863, 865 (7th Cir. 2007) (Easterbrook, J.) (explaining that *Gonzalez-Lopez* "does not distinguish among degrees of preference," and that a court violates the Sixth Amendment when the defendant "found two lawyers [he] trusted but [was] allowed to use the services of only one").

Finally, it is equally irrelevant that Mr. Lawrence "represented to the trial judge that he was prepared to examine those witnesses" after the circuit court made clear that it was going to deny a continuance. 3/4/14 Op. at 17. Notwithstanding Mr. Lawrence's representation, Mr. Huguely himself personally objected to proceeding without Ms. Quagliana present. 2/17/12 Tr. 8-9. And

the right to counsel-of-choice clearly belongs to Mr. Huguely and is uniquely not subject to forfeiture by the lawyer who is present. *See Gonzalez v. United States*, 553 U.S. 242, 254 (2008) (Scalia, J., concurring in the judgment) ("action taken by counsel over his client's objection" is not a valid waiver because it "would have the effect of revoking the agency with respect to the action in question"). Indeed, the Court of Appeals' emphasis on Mr. Lawrence's representation underscores the incompatibility of the court's analysis with the Sixth Amendment right to counsel when the accused has two counsel of choice. If only Ms. Quagliana had represented Mr. Huguely, proceeding in her absence simply would not have been practical. By using the presence of a different attorney as an excuse to move forward, the circuit court effectively denied Mr. Huguely of his right to be represented by two attorneys of choice, including Ms. Quagliana.

*   *   *

In sum, the defense faced an unfortunate turn of events in the middle of trial when one of Mr. Huguely's chosen attorneys—who had been a trusted counselor and advisor since the day of his arrest—became too sick to be present in court. This was the defense's first request for a continuance, and there was no suggestion whatsoever that Ms. Quagliana's illness was not legitimate or that the defense was acting in bad faith to gain some tactical advantage. *See* 2/17/12 Tr. 87 (court stating that "no one in the room has misrepresented … ever anything to me," and that all counsel have been "just exemplary in terms of being honest and forthright with the Court"). Under these circumstances, the refusal to grant a short continuance to protect Mr. Huguely's right to counsel of choice rested on a decision that is contrary to and an unreasonable application of clearly established federal law and an unreasonable determination of the facts.

## V.     The Circuit Court Violated Mr. Huguely's Right to a Fair and Impartial Jury Under the Sixth Amendment

### A.     The State Courts Unreasonably Applied Clearly Established Federal Law by Refusing to Order Individualized, Sequestered Voir Dire

As the Supreme Court has explained, there is a "presumption of openness" in all criminal proceedings, but that presumption may be "overcome" if "closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) (citation omitted). The "selection of a fair and impartial jury is a right protected by the Sixth Amendment and is one of the 'high values'" that may trump the presumption of open proceedings. *In re South Carolina Press Ass'n*, 946 F.2d 1037, 1043 (4th Cir. 1991). "Full and frank answers from potential jurors … are essential to the process of selecting such a jury," and "fear of publicity that might be given to answers of venirepersons during *voir dire* may so inhibit or chill truthful responses that an accused is denied the fair trial to which he is entitled under the Fourteenth Amendment." *Id.*

In a high-profile criminal case, *in camera voir dire* of potential jurors may be necessary to ensure "frank and forthcoming" responses. *In re Greensboro News Co.*, 727 F.2d 1320, 1321-23 (4th Cir. 1984). Closed *voir dire* can be used to ensure that "defendants will be tried by an impartial jury which will render its verdict on the basis of evidence adduced at trial rather than information from the newspapers or television." *Id.* at 1325.

The Fourth Circuit has found closed *voir dire* to be appropriate in a criminal case involving "many highly charged and emotional issues," that had been covered extensively in the media. *South Carolina Press Ass'n*, 946 F.2d at 1041. As a result, the *voir dire* necessarily elicited "very personal and emotional responses from potential jurors," many of whom were "reluctant to speak frankly" in open court. *Id.* at 1042. The district court concluded that "the presence of the press and others creates a substantial probability that the candor of the venire would be impaired and would

impinge on the Sixth Amendment rights of the defendant." *Id.* In determining whether pretrial proceedings such as *voir dire* should be closed to the public, courts must consider whether: (1) there is a "substantial probability that the defendant's right to a fair trial will be prejudiced by publicity"; (2) there is a substantial probability that "closure would prevent that prejudice"; and (3) reasonable alternatives to closure "cannot adequately protect the defendant's fair trial rights." *Id.* at 1041 (quoting *In re State Record Co.*, 917 F.2d 124, 128 (4th Cir. 1990)).

In this case, each of those factors strongly counseled in favor of closed *voir dire*. As Mr. Huguely explained in his pretrial motion, this case attracted a staggering amount of press coverage from both the local and national media. Between May 2010 and July 2011, the local ABC, CBS, and FOX stations had covered this case more than 100 times. R.174-76. And, as of late 2011, there had been 144 articles about this case in the *Charlottesville Daily Progress*, 45 in the *Cavalier Daily*, 90 in the *Richmond Times-Dispatch* and 84 in the *Washington Post*. R.177-96. Many of those articles contained highly sensationalist and inflammatory rhetoric about Mr. Huguely. *See*, *e.g.*, R.144-45 (Mr. Huguely was "an Anger Prone Scion of Prominent DC Family," "Students at All-Boys Landon School Planned Sex Parties, Sources Say," "More Drunken Violent Episodes Emerge," "Source: Huguely Attacked Teammate"). Others provided extensive coverage of earlier alleged "bad acts" by Mr. Huguely, R.149, or attempted to inject into this case issues of class, wealth, race, and domestic violence, R.150-51. And these media reports contained a number of demonstrably false statements, such as the suggestion that a "bloody shirt" had been found in Mr. Huguely's apartment. R.148.

In addition to the round-the-clock media coverage, this case was also addressed extensively by the University of Virginia, which has long played an outsized role in the Charlottesville community. Shortly after Ms. Love's death, the University held a vigil in her memory, with

University President John Casteen delivering an impassioned speech calling students to action on issues of domestic violence. R.204-06. Even though the police investigation had barely begun, Mr. Casteen stated—falsely—that Ms. Love had been "attacked and beaten" and "thrown against [the] wall[]." R.205; *see id.* (referring to the "blows and abuse" that "ended Yeardley's life" and her "attacker's advantage or arrogance or mindless sense of right to abuse"). Although the evidence presented at trial flatly contradicted Mr. Casteen's statements, those were the initial characterizations of the incident that colored the perception of the Charlottesville community in the days after Mr. Huguely was arrested.

The April 11, 2011 preliminary hearing in this case produced a flood of local and national media far beyond anything previously seen in Charlottesville. The courtroom was packed with reporters from virtually every media outlet in the United States, and the hearing had to be moved to a larger venue to accommodate the overwhelming media presence.

Under these unique circumstances, the circuit court unreasonably applied clearly established federal law by denying Mr. Huguely's motion for sequestered *voir dire* of prospective jurors. There were likely few, if any, citizens of Charlottesville who were not familiar with this case through the University, discussions with family and friends, or the non-stop media coverage. And this case implicated extremely sensitive and emotionally charged issues involving domestic violence, alcohol use, wealth, and college sports. Prospective jurors would be justifiably tentative about answering questions about their experiences with these deeply personal topics in front of a packed courtroom.

Indeed, the circuit court itself recognized the outsized media coverage and attendant risks by the need to threaten criminal prosecution of anyone who published the names or photographs of the jurors. That was not an idiosyncratic view. For example, "several" of the jurors noted to the

court that they were "concerned about the Cavalier Daily publishing their names … if they're on the jury." 2/9/12 Tr. 129. Sequestered *voir dire* was needed to ensure that potential jurors would provide truthful and candid answers about their backgrounds, views, or connections to the case, and would not be swayed by how their responses would be perceived by the public and the media.

**B.   The State Courts Unreasonably Applied Clearly Established Federal Law by Refusing to Allow the Defense to Ask Questions During Voir Dire That Were Directly Relevant to Jurors' Ability to Remain Impartial**

As the Supreme Court has explained, *voir dire* "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Without adequate *voir dire*, "the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* Moreover, peremptory challenges to prospective jurors are widely seen as a "necessary part of trial by jury," *Swain v. Alabama*, 380 U.S. 202, 219 (1965), and a "lack of adequate *voir dire* impairs the defendant's right to exercise" those challenges, *Rosales-Lopez*, 451 U.S. at 188.

Thus, "a suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." *Connors v. United States*, 158 U.S. 408, 413 (1895). A court abuses its discretion if *voir dire* does not provide "'a reasonable assurance that prejudice would be discovered if present.'" *United States v. Lancaster*, 96 F.3d 734, 740 (4th Cir. 1996) (*en banc*).

In this case, certain evidence that was critical to Mr. Huguely's defense involved unflattering and unfavorable facts about Ms. Love, such as the couple's "on-and-off" relationship and the fact that Ms. Love was herself extremely intoxicated on the night of May 2, 2010. The defense was justifiably concerned that jurors' emotional reaction to such evidence would hinder

their ability to weigh the facts impartially. Mr. Huguely thus submitted to the circuit court a *voir dire* question asking whether potential jurors would have difficulty considering evidence that was seen as "blaming the victim." The court approved this question in advance of trial.

The usefulness of that question in identifying jurors excusable for cause was borne out in practice. On the first day of *voir dire*, several prospective jurors expressed reservations about how they would handle evidence that was seen as "blaming the victim." *See* Feb. 6-8 Tr. 75 (juror would "have to think about it"). Indeed, Juror 34 stated that his reaction to evidence that was seen as blaming the victim "might depend on how you presented it," *id.* at 327-28, 375-76, and the court granted the defense's motion to strike this juror for cause based on his answer. *Id.* at 376. On the second day of jury selection, several other prospective jurors indicated that they, too, might have difficulty with evidence that was seen as blaming the victim. *Id.* at 572-73 (some jurors "responded affirmatively" to question about whether unfavorable evidence about Ms. Love would be seen as blaming the victim).

Despite the demonstrably relevant evidence that this question was eliciting, the circuit court—in the middle of *voir dire*—granted the Commonwealth's motion to prevent defense counsel from continuing to ask it. *Id.* at 575-76. The court held that the question was not "helpful" because it could not be fully answered unless the juror "[knew] what the evidence shows." *Id.* at 575. There was subsequently a discussion of whether the question could be rephrased, but the court's interest in forging ahead without delay took precedence, as the court stated that "we don't have time to do it." *Id.* at 596.

These rulings were an unreasonable application of clearly established federal law and deprived Mr. Huguely of his constitutional right to ensure that all jurors seated on the panel were truly impartial. There is no doubt that the question about "blaming the victim" was helpful and

relevant, as dramatically illustrated by the court's willingness to strike at least one juror for cause based on his answer to this very question. Any juror who was unable to fairly and impartially consider evidence that might have cast Ms. Love in an unfavorable light should not have been seated on the panel, and the circuit court violated Mr. Huguely's constitutional rights by prohibiting the defense from inquiring about this matter during *voir dire*.

**C.     Mr. Huguely's Sixth Amendment Right to an Impartial Jury Was Violated When the Circuit Court Refused to Strike for Cause a Juror Whose Answers During Voir Dire Revealed Serious Doubts about Her Impartiality**

"[T]rial by jury in criminal cases is fundamental to the American scheme of justice." *Duncan v. State of La.*, 391 U.S. 145, 149 (1968). Given that, "[a] criminal defendant in a state court is guaranteed an 'impartial jury' by the Sixth Amendment as applicable to the States through the Fourteenth Amendment. Principles of due process also guarantee a defendant an impartial jury." *Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976) (citations omitted). To that end, each individual juror "must be as 'indifferent as he stands unsworne.'" *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citation omitted); *see also Morgan v. Illinois*, 504 U.S. 719, 727 (1992) ("[T]he jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment."). Each juror's "verdict must be based upon the evidence developed at the trial," not based on any outside information or swayed by any personal affiliations. *Id.* That is because "a juror who has formed an opinion cannot be impartial." *Morgan*, 504 U.S. at 727.

Such preconceived opinions may arise because a juror was exposed to outside information about a case. The Supreme Court has held that a new trial may be warranted where a juror has been exposed to outside information about a case, such as a prejudicial news article, even where the jurors insist that they "would not be influenced" by it. *See Marshall v. United States*, 360 U.S. 310, 312 (1959). Bias may also arise out of affiliations that a juror has with family or an employer.

*See Clark v. United States*, 289 U.S. 1, 7 (1933) (upholding a contempt judgment against a juror who falsely concealed her connections to and former employment at a company where the defendants had been officers, suggesting impermissible bias); *Williams*, 529 U.S. at 440 (petitioner entitled to a hearing to develop facts showing bias arising out of a juror's previous marriage with a witness and prior representation by one of the prosecutors).

The circuit court violated Mr. Huguely's right to an impartial jury by refusing to strike Juror 211, who was ultimately seated on the trial jury and participated in the determination of Mr. Huguely's guilt or innocence. Juror 211 was a professor at the University of Virginia who taught a close friend of Ms. Love and excused this student from her final exam for Ms. Love's funeral. Feb. 6-8 Tr. 268-75. She had also read "memos" from the University about the case and Ms. Love, and she remembered hearing that there was a "break in" and "blunt trauma." *Id.* at 268-69, 274. Although Juror 211 claimed that she could render an impartial judgment, *see id.*, her close connections to this case and the University clearly raised at least a reasonable doubt about her impartiality.

Given the inordinately high profile of this case within the Charlottesville community, the circuit court should have been especially vigilant about the need to ensure an impartial jury. Yet the court instead chose to disregard responses during *voir dire* that raised serious doubts about Juror 211's ability to remain impartial. Juror 211 should have been struck for cause, and the state courts' refusal to grant Mr. Huguely relief on this claim rested on an unreasonable application of federal law.

## VI.   There Was Insufficient Evidence Offered at Trial to Support Mr. Huguely's Conviction for Second-Degree Murder.

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if, based on the evidence adduced at trial, viewed in the light most favorable to the

prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court must "reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1165 (9th Cir. 2010) (citing *Jackson*).

As noted above, malice is "an essential element of murder and is what distinguishes it from the crime of manslaughter." *Canipe*, 25 Va.App. at 642. To elevate a homicide to second-degree murder, "the defendant must be shown to have willfully or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm." *Essex*, 322 S.E. 2d at 220; *see also* Groot, Criminal Offenses §6 (second-degree murder requires "a mental state of extreme recklessness—proceeding with conduct in the face of a known, very significant risk that death will occur"). That distinction is "close but crucial" and must be enforced with vigilance. *Essex*, 322 S.E. 2d at 222.

At trial, the Commonwealth abandoned any claim that Mr. Huguely acted with *express* malice—that is, that he killed Ms. Love "with a sedate, deliberate mind, and formed design." *Canipe*, 25 Va. App. at 642 (citation omitted). The evidence flatly refuted any "design" to kill: Mr. Huguely went to talk with Ms. Love, while heavily intoxicated, only after being turned away at the door of his friend Chris Clements, who was too busy to get together. He was dressed casually in tennis shoes, shorts, and a t-shirt. He brought no weapon, object, or bag. He also chose a well-lit, busy path to the apartment. Indeed, in acquitting Mr. Huguely of burglary with the intent to commit assault and battery, the jury specifically concluded that he did *not* enter Ms. Love's apartment with any intent to commit assault or battery.

The Commonwealth nonetheless sought to establish *implied* malice, which may be inferred from "conduct likely to cause death or great bodily harm, willfully or purposefully undertaken." *Essex*, 322 S.E. 2d at 220; *Perricllia v. Commonwealth*, 229 Va. 85, 91, 326 S.E.2d 679 (1985). Based on the evidence at trial, however, no reasonable factfinder could have concluded beyond a reasonable doubt that Mr. Huguely's conduct during his altercation with Ms. Love rose to that level.

Abundant evidence supported Mr. Huguely's account that, though he briefly wrestled with Ms. Love on the floor, he never applied a degree of force likely to cause serious injury. The walls revealed no dimples or marks. The furniture was in order. Anna Lehmann, who lived downstairs and heard Mr. Huguely's footsteps on the stairs and a single crash near the door, heard no other hitting or banging sounds. Ms. Love had no injuries to her left side. Nor did she have any skull fracture, grab marks, or bleeding in the carotic sheath, all of which would have indicated greater applications of force. And Mr. Huguely had no blood on his person or his clothes. Ex.152; Ex.143.

Moreover, there was insufficient evidence from which to infer that Mr. Huguely acted with willful, malicious intent. Mr. Huguely described Ms. Love as his best friend and one of the people he loved and cared for most. Ex.21. He was seen holding her hand just a day before. When approached by police, he believed he was being investigated for an assault and was in a state of shock and disbelief upon hearing of Ms. Love's death. Mr. Huguely was also heavily intoxicated both before and after his altercation with Ms. Love; he had written months before that he was "scared to know that I can get that drunk to the point where I cannot control the way I behave or act." Ex.21. As the Virginia Supreme Court has stated in no uncertain terms, "if a killing results from negligence, however gross or culpable, and the killing is contrary to the defendant's intention, malice cannot be implied." *Essex*, 228 Va. at 280.

In sum, substantial facts corroborated Mr. Huguely's claim that his actions were not so cruel as to amount to malicious conduct. *See Haywood v. Commonwealth*, 20 Va. App. 562, 567, 458 S.E.2d 606 (1995) ("while the evidence may support a hypothesis that [the defendant] acted with malice and intended to run over or through anyone or anything that got in his way," the evidence did not exclude a reasonable hypothesis of innocence). In light of the evidence offered at trial, no reasonable jury could have convicted Mr. Huguely of any offense more serious than manslaughter. His conviction and sentence rest on an unreasonable determination of the facts and an unreasonable application of clearly established federal law and should be vacated.

## PRAYER FOR RELIEF

For the foregoing reasons, Mr. Huguely respectfully requests that this Court grant the petition, vacate the conviction and sentence, and take such other and further action as it deems reasonable and appropriate. In the alternative, this Court should order an evidentiary hearing to ensure the development of a full record regarding Mr. Huguely's claims of external influence on the jury, ineffective assistance of counsel, and violations of the *Brady* doctrine.

Respectfully submitted,

/s/ Bryan K. Weir

Jonathan P. Sheldon (VA Bar #66726)
Sheldon & Flood, PLC
10621 Jones Street, Suite 301A
Fairfax, VA 22030
(703) 691-8410
jsheldon@sfhdefense.com

Jeffrey M. Harris* (VA Bar #93883)
Bryan K. Weir (VA Bar #82787)
Jordan M. Call*
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
bryan@consovoymccarthy.com
jordan@consovoymccarthy.com

Dated:  April 29, 2020

*  *Pro hac vice application pending*

## VERIFICATION

Pursuant to 28 U.S.C. §2242 and Federal Habeas Rule 2(c)(5) I, George W. Huguely V,

hereby attest under penalty of perjury that I have reviewed this petition and that the statements

and facts provided herein are true and accurate to the best of my knowledge.

4/23/20

Date

George W. Huguely, V

### CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was sent via first class mail postage prepaid this 29th day of April, 2020, to Leah Darron, Senior Assistant Attorney General, Office of the Attorney General, 202 North Ninth Street, Richmond, VA 23819, and a PDF copy emailed to oagcriminallitigation@oag.state.va.us.

*/s/ Bryan K. Weir*