**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

**GEORGE WESLEY HUGUELY, V, No. 1458946,**

        **Petitioner,**

  **v.**                             **Civil Action No. 7:20cv30021**

**HAROLD W. CLARKE, Director, Virginia
    Department of Corrections,**

      **Respondent.**

**BRIEF IN SUPPORT OF MOTION TO DISMISS
<u>AND RULE 5 ANSWER</u>**

Respondent, by counsel, submits the following brief in support of his Motion to Dismiss and Rule 5 Answer:

### *Procedural History*

1.    The petitioner, George Huguely, is detained pursuant to an August 31, 2012 final judgment of the Circuit Court for the City of Charlottesville.  Following a 12-day jury trial, petitioner was convicted of second-degree murder in violation of Virginia Code § 18.2-32, for which he was sentenced to serve 23 years in prison, and grand larceny in violation of Code § 18.2-95, for which he was sentenced to serve one year in prison. The trial court ordered the sentences to run concurrently. The petitioner was represented at trial by Rhonda E. Quagliana and Francis McQ. Lawrence. (CR11-102-1).

2.    The petitioner appealed only the murder conviction to the Court of Appeals of Virginia. (Respondent's Exhibit 1).

3.    By orders entered on April 23, 2013, and June 14, 2013, the Court of Appeals of Virginia granted Huguely a limited appeal. (Respondent's Exhibits 2 and 3, Orders).

4.    The assignments of error for which an appeal was not granted were decided in the April 23, 2013 and June 14, 2013 denial orders and were not addressed in the subsequent published opinion. *See Huguely v. Commonwealth*, 63 Va. App. 92, 98 n.2, 754 S.E.2d 557, 559, n.2 (2014) (Respondent's Exhibit 4). The following claims were denied by the Court of Appeals of Virginia at the petition stage:

> I.    The trial court violated petitioner's constitutional rights by refusing to order individualized, sequestered *voir dire*.
>
> II.    The trial court violated petitioner's constitutional rights by refusing to sequester the jury during trial.
>
> III.    The Commonwealth violated due process and *Brady* by failing to disclose the material fact that the victim's family intended to file a multi-million-dollar civil action against petitioner.
>
> IV.    The evidence was insufficient to convict petitioner of second-degree murder because the evidence failed to prove malice and supported a degree of homicide no greater than manslaughter.

5.    The Court of Appeals granted Huguely's petition for appeal on the following issues:

I.     The circuit court violated Huguely's right to counsel under the Sixth Amendment and the Virginia Constitution by requiring him to proceed with trial in the absence of one of his attorneys.

II.    The circuit court violated Huguely's Sixth Amendment right to a trial by a fair and impartial jury by:

   A.   refusing to allow the defense to ask questions during *voir dire* that were directly relevant to whether prospective jurors could remain impartial.

   B.   refusing to strike for cause a number of jurors whose answers during *voir dire* raised serious doubts about their ability to remain impartial.

III.   The circuit court did not adequately instruct the jury on the meaning of "malice" under Virginia law.

6.     The petitioner's conviction was affirmed in the subsequent published opinion of the Court of Appeals of Virginia.  *See Huguely*, 63 Va. App. 92, 754 S.E.2d 557.

7.     In his subsequent petition for appeal to the Supreme Court of Virginia, (Respondent's Exhibit 5) petitioner raised the following claims:

   a.   The circuit court violated Huguely's right to counsel by forcing him to proceed in the absence of his retained counsel of choice;

   b.   The circuit court violated Huguely's right to a fair and impartial jury under the Sixth Amendment and the Virginia Constitution by:

      i.   Refusing to allow the defense to ask questions during *voir dire* that were relevant to the jurors' ability to remain impartial;

ii.      Refusing to strike for cause a number of jurors whose answers during *voir dire* revealed serious doubts about their impartiality;

c.      The circuit court did not adequately instruct the jury about the definition of "malice" under Virginia law.

8.      Huguely's petition for appeal was denied by the Supreme Court of Virginia on November 19, 2014 (Respondent's Exhibit 6) and his petition for rehearing (Respondent's Exhibit 7) was refused on January 15, 2015. (Respondent's Exhibit 8).   The petitioner was represented in his state court direct appeal proceedings by Craig S. Cooley and Paul D. Clement.

9.      On October 5, 2015, the United States Supreme Court refused Huguely's petition for certiorari on his claim that the circuit court denied his right to counsel by forcing him to proceed in the absence of his retained counsel of choice.   The petitioner was represented in this proceeding by Paul D. Clement. (Case No. 14-1474).

10.      On January 19, 2016, petitioner, by counsel Jonathan P. Sheldon, timely[a] filed a state petition for a writ of habeas corpus in the Circuit Court for the

---

[a] Respondent's footnotes will be designated alphabetically. Footnotes contained in the state court opinion will be numbered numerically as they appear in the state court record. As to the filing of the state habeas petition, intervening holidays resulted in the timely filing of the petition within the state statute of limitations. Virginia Code § 8.01-654(A)(2).

City of Charlottesville in which he attacked the validity of his murder conviction

raising twelve claims:

I.  Huguely's rights to a fair trial before an impartial jury, due process, and to confront witnesses against him were violated pursuant to the Sixth and Fourteenth amendments to the United States Constitution and Virginia Constitution Art. I and § 8, when a court officer gave the jury a dictionary during deliberations and the jury consulted the dictionary for the meaning of malice, the main issue at trial.

II.  Trial counsel provided ineffective assistance of counsel by inadvertently keeping expert testimony from the jurors on the key issue of cause of death when their violation of the rule on witnesses led to the exclusion of expert testimony regarding CPR and reperfusion.

III.  Trial counsel provided ineffective assistance of counsel by failing to provide crucial available expert testimony on the key issue of cause of death when-either because of a failure to appropriately prepare or because of their violation of the rule on witnesses-they failed to call John S. Daniels, III, M.D.

IV.  Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel when his trial attorneys failed to request a jury instruction that directed the jury it must find that any wrongful conduct was "likely to cause death or great bodily harm" in order to find malice.

V.  Trial counsel's numerous evidentiary, factual, and legal deficiencies with respect to the distinction between malice and manslaughter have created a reasonable probability that, had these errors not occurred, Mr. Huguely would have been convicted of a lesser charge or been found not guilty.

VI.  Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel, his Fifth Amendment right against self-incrimination and Fourteenth Amendment right to due process by the prosecution's impermissible comment during closing argument on Mr. Huguely's invocation of his right to not testify at trial and trial counsel's failure to object.

vii.   Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel when his counsel moved into evidence an exhibit with the label "type of offense: murder."

viii.   Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to make use of a lacrosse video to demonstrate how Mr. Huguely received bruises and swelling on his hand.

ix.   Trial counsel's failure to investigate and develop evidence of Mr. Huguely's blood-alcohol content and degree of impairment at the time of the offense denied him his Sixth Amendment right to the effective assistance of counsel because that evidence supported a finding that Yeardley Love's death was accidental or negligent and a finding of diminished capacity at sentencing.

x.   Trial counsel provided ineffective assistance of counsel in failing to object and rebut the Commonwealth's argument that Mr. Huguely's state of intoxication could be used to prove an element of the murder.

xi.   The cumulative prejudice caused by the many "merits" phase errors in this case requires a new trial.

xii.   Mr. Huguely was deprived of an impartial sentencing jury when a juror used her own experiences with alcohol to recommend a long sentence for Mr. Huguely, and/or trial counsel was ineffective for failing to *voir dire* this juror on her experiences with alcohol.

(Respondent's Exhibit 9).

11.   The respondent filed a motion to dismiss and exhibits (Respondent's Exhibit 10A and 10B) and the circuit court dismissed Huguely's habeas petition by final order dated August 17, 2018, incorporating the trial court's letter opinion dated August 10, 2018.  (Respondent's Exhibit 11).  Petitioner filed a petition for appeal in the Supreme Court of Virginia (Respondent's Exhibit 12), a brief in opposing was filed

(Respondent's Exhibit 13) and petitioner filed a reply brief (Respondent's Exhibit 14). The Supreme Court of Virginia refused the petition for appeal by order dated September 3, 2019. (Respondent's Exhibit 15).

### *Petitioner's Current Claims*

12.     Petitioner's petition for writ of habeas corpus was timely filed[b] by counsel on April 29, 2020.  In his federal petition, petitioner raises claims that were raised in the Supreme Court of Virginia in the direct appeal and habeas proceedings:

I.     Mr. Huguely's due process and Sixth Amendment rights were violated when the jury consulted a dictionary regarding the meaning of malice;

II.     Mr. Huguely's Sixth Amendment rights were violated when he received ineffective assistance of counsel at trial:

a.     Mr. Huguely's Sixth Amendment right to effective assistance of counsel was violated when trial counsel violated the rule on witnesses, thereby causing crucial expert testimony to be excluded;

b.     Mr. Huguely's Sixth Amendment right to effective assistance of counsel was violated when his counsel failed to call crucial expert John S. Daniel, III, M.D.;

---

[b] Pursuant to 28 U.S.C. § 2244(d) of the AEDPA, a petitioner must file his federal habeas petition within one year from the date his direct appeal proceeding is concluded, not including the time petitioner's properly filed state habeas proceeding was pending. Here, the direct appeal proceeding concluded when the United States Supreme Court denied certiorari on October 5, 2015. *Lawrence v. Florida*, 549 U.S. 327, 333 (2007).  Huguely filed his state habeas petition 106 days later, on January 19, 2016. Petitioner's state habeas proceedings concluded on September 3, 2019, when the Supreme Court of Virginia refused his petition for appeal and petitioner filed his current petition 239 days later, on April 29, 2020. Thus, a total of 345 days elapsed of the total 365 days, and the petition is therefore timely filed.

III.    Mr. Huguely's rights under the due process clause and *Brady v. Maryland* were violated when the Commonwealth failed to disclose the Love's family imminent $30 million civil suit against Mr. Huguely;

IV.    The circuit court violated Mr. Huguely's Sixth Amendment right to counsel by forcing him to proceed in the absence of his retained counsel of choice;

V.    The circuit court violated Mr. Huguely's right to a fair and impartial jury under the Sixth Amendment:

a.    The state courts unreasonably applied clearly established federal law by refusing to order individualized, sequestered *voir dire*;

b.    The state courts unreasonably applied clearly established federal law by refusing to allow the defense to ask questions during *voir dire* that were directly relevant to jurors' ability to remain impartial;

c.    Mr. Huguely's Sixth Amendment right to an impartial jury was violated when the circuit court refused to strike for cause a juror whose answers during *voir dire* revealed serious doubts about her impartiality;

VI.    There was insufficient evidence offered at trial to support Mr. Huguely's conviction for second-degree murder.

## EXHAUSTION

13.    In order to meet the exhaustion requirement, a petitioner "must have presented to the [state's highest] court 'both the operative facts and the controlling legal principles.'" *Kasi v. Angelone*, 300 F.3d 487, 501-02 (4th Cir. 2002) (quoting *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997)). The purpose of the exhaustion doctrine is to give "state courts a full and fair opportunity to resolve

federal constitutional claims before those claims are presented to the federal courts."
*O'Sullivan v. Boerckel*, 526 U.S. 838, 846 (1999).

14.     Where questions concerning exhaustion arise, the petitioner bears the
burden of demonstrating that he properly presented his claim to the state courts in
accordance "with the state's chosen procedural scheme." *Mallory v. Smith*, 27 F.3d
991, 995 (4th Cir. 1994).  *See also Pruett v. Thompson*, 771 F. Supp. 1428, 1436
(E.D. Va. 1991), aff'd, 996 F.2d 1560 (4th Cir. 1993) (citing *Picard v. Connor*, 404
U.S. 270, 275-76 (1971) (The exhaustion requirement is satisfied only when the
"essential legal theories and factual allegations advanced in federal court . . . [are]
the same as those advanced at least once to the highest state court."). *See also*
*Whitley v. Bair*, 802 F.2d 1487, 1500-02 (4th Cir. 1986) ("failure to appeal claims
disposed of by state habeas trial court constitutes a procedural bar to further federal
review of such claims."); *Bennett v. Angelone*, 92 F.3d 1336, 1343-1344 (4th Cir.
1996) (same);  *Desper v. Woodson*, 2015 U.S. Dist. LEXIS 137919, *10-11, 2015
WL 6024885 (same).

15.     Stated differently, in order for a claim to be exhausted, both the same
legal argument and factual support raised in the Petitioner's § 2254 application must
have been presented to the Supreme Court of Virginia on direct appeal, or in an
original jurisdiction state habeas corpus petition filed in the Supreme Court of
Virginia or, for a petitioner such as Huguely who elected to file his state habeas

9

petition in the circuit court in which he was convicted, during a habeas appeal from the circuit court's denial of habeas relief. *See* 28 U.S.C. § 2254(b); *Duncan v. Henry*, 512 U.S. 364, 365 (1995); *Picard*, 404 U.S. at 275-76; *Clagett v. Angelone*, 209 F.3d 370, 378 (4th Cir. 2000). "A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000) (citing *Gray v. Netherland*, 518 U.S. 152, 161 (1996)). Here, Huguely's direct appeal is now final and any subsequent habeas petition would be procedurally defaulted pursuant to Virginia Code §§ 654(A)(2) and (B)(2).

16.     Huguely's Claim III, the *Brady* claim; Claim V(a), that the court should have ordered sequestered, individual *voir dire*; and Claim VI, that the evidence was insufficient to support the conviction of second-degree murder were raised on direct appeal in the Court of Appeals of Virginia but petitioner did not raise these claims in his petition for appeal (or at any point) in the Supreme Court of Virginia. These claims are not exhausted, and they should be deemed defaulted. *Kasi*, 300 F.3d at 501-02; *Burket v. Angelone*, 208 F.3d 172, 183 n.11 (4th Cir. 1999).[c]

---

[c] Further, Claims III, V(a), and VI are without merit for the reasons stated by the Court of Appeals of Virginia in its April 23, 2013 order. (Respondent's Exhibit 2). The Court of Appeals of Virginia's resolution of these claims is entitled to deference as it was not contrary to, or an unreasonable application of, a clearly established United States Supreme Court decision, or based on an unreasonable determination

17.     Petitioner's remaining claims were raised in the Supreme Court of Virginia.   They are exhausted and ripe for review to the extent that petitioner's supporting facts and arguments are the same as those raised in state court. *Kasi*, 300 F.3d at 501-02; *Mallory*, 27 F.3d at 995; *Pruett*, 771 F. Supp. at 1436 (citing *Picard*, 404 U.S. at 275-76).   Respondent will respond to the claims as they were presented in the Virginia Supreme Court and note where the petitioner's facts and arguments in this Court vary.   Those newly minted aspects of the petitioner's claims are exhausted and defaulted because they were not presented to the Supreme Court of Virginia and it is too late to do so now. *Id.*

---

of facts.  *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 403-13 (2000); *see also Booth-El v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002) (same).

## MERITS STANDARD OF REVIEW

18.     Review of petitioner's claims on the merits is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA).  The AEDPA standard requires deference to the state court's merits decision unless the decision was (1) contrary to, or an unreasonable application of, a clearly established United States Supreme Court decision, or (2) based on an unreasonable determination of facts.  *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 403-13 (2000); *see also Booth-El*, 288 F.3d at 575.

19.     The "'contrary to' and 'unreasonable application' clauses have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  The *Williams* Court explained the standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Appleby v. Warden*, 595 F.3d 532, 535 (4th Cir. 2010). "[T]o obtain federal habeas relief, 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in the existing law beyond any possibility for fair-minded disagreement.'" *Jackson v.*

*Kelly*, 650 F.3d 477, 492 (4th Cir. 2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101. By design, this highly deferential standard is "difficult to meet," and governs this Court's review of all legal determinations made on the merits by state habeas courts. *Id*. at 102.  For a state court's factual determination to be held unreasonable under § 2254(d)(2), "[the determination] must be more than merely incorrect or erroneous." *Williams v. Stirling*, 914 F.3d 302, 312 (4th Cir. 2019) (citation omitted). The state court's finding must be "sufficiently against the weight of the evidence that it is objectively unreasonable." *Id.* (citation omitted). AEDPA also provides that "a determination of a factual issue made by a state court shall be presumed to be correct" absent "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1). These provisions of AEDPA, "operating in tandem," require that a petitioner seeking relief under Section 2254(d)(2) establish that the state court's factual finding was "incorrect by clear and convincing evidence, and that the corresponding factual determination was objectively unreasonable in light of the record before the court."  *Merzbacher v. Shearin*, 706 F.3d 356, 364 (4th Cir. 2013) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003) (internal quotation marks omitted)).

## INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD OF REVIEW

20.   Some of petitioner's grounds contain allegations of ineffective assistance of counsel.  The state court's decision on these claims was not contrary to, or an unreasonable application of a United States Supreme Court decision, nor was the decision based on an unreasonable determination of facts.  Therefore, this Court should defer to the decision of the state court.

21.   The petitioner cannot meet the highly demanding standard set forth for such claims in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, he has the burden to show that his attorney's performance was deficient and that he was prejudiced as a result.  *See Strickland*, 466 U.S. at 687.

22.   In determining whether counsel's performance was deficient "judicial scrutiny of counsel's performance must be highly deferential."  *Strickland*, 466 U.S. at 688.  Accordingly, "a (habeas) court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.*

> Without proof of ***both*** deficient performance ***and*** prejudice to the defense, we concluded it could not be said that the sentence or conviction "resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable," and the sentence or conviction should stand.

*Cone*, 535 U.S. at 695 (emphasis added) (quoting *Strickland*, 466 U.S. at 687).

23.    "The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).   "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *see also Burket*, 208 F.3d at 189 (reviewing court "must be highly deferential in scrutinizing [counsel's] performance and must filter the distorting effects of hindsight from [its] analysis").

24.    The first prong of the *Strickland* test, the "performance" inquiry, "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The second prong of the *Strickland* test, the "prejudice" inquiry, requires showing that there is a "***reasonable probability*** that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added).  A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*  That requires a "substantial," not just "conceivable," likelihood of a different result. *Richter,* 562 U.S. at 112*, see also  Cullen v. Pinholster,* 563 U.S. 170, 189-190 (2011).

25.    An ineffective counsel claim may be disposed of on either prong because deficient performance and prejudice are "separate and distinct elements." *Spencer v. Murray*, 18 F.3d 229, 232-33 (4th Cir. 1994); *Strickland*, 466 U.S. at 697.

26.    Finally, when evaluating claims of ineffective assistance of counsel, federal habeas relief:

> may be granted only if the state-court decision unreasonably applied the more general standard for ineffective-assistance-of-counsel claims established by *Strickland*, in which this Court held that a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel.

*Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).

27.    "Under the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard," "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" *Id.* at 122 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)); *see also Pinholster,* 563 U.S. at 189-190.  "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

28.    Furthermore, under Virginia law, given the collateral nature of a habeas proceeding, the state's strong interest in achieving finality in judgments and the need to punish offenders, a habeas trial court is entitled "to minimize the burdens" of the

proceeding by employing "simplifying procedures" such as the use of affidavits from trial counsel or other witnesses as well as dismissing a habeas petition without an evidentiary hearing.  *Yeatts v. Murray*, 249 Va. 285, 289, 455 S.E.2d 18, 21 (1995) and *Smith v. Brown*, 291 Va. 260, 264, 781 S.E.2d 744, 747 (2016) ("Code § 8.01-660 grants the habeas court discretion to consider 'affidavits of witnesses' as substantive evidence.").

29.    Indeed, the Fourth Circuit has recognized: "A state habeas court need not hold an evidentiary hearing in every case to make reasonable fact determinations." *Strong v. Johnson*, 495 F.3d 134, 139 (4th Cir. 2007). "[T]here is no prohibition," . . . "against a court making credibility determinations based on competing affidavits." *Strong,* 495 F.3d at 139.  *See also Gray v. Zook*, 806 F.3d 783, 792 (4th Cir. 2015).

30.    In evaluating a federal habeas petitioner's claims, the Court must look to the last reasoned state court decision; in this case, the final orders entered by the Court of Appeals of Virginia on direct appeal and the Circuit Court for the City of Charlottesville in the state habeas proceeding.  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Ylst v. Nunnemaker*, 501 U.S. 797 (1991); *Bush v. Legursky*, 966 F.2d 897 (4th Cir. 1992).

**Facts Adduced at Trial**

31.      In the spring of 2010, George Huguely and Yeardley Love were 22-year-old students at the University of Virginia (UVA), anticipating graduation in early May.  Both were UVA lacrosse players.  The pair had been in an "on-and-off" romantic relationship for two years. (2/8/12 Tr. 93-95, 97-99, 112-114, 162-165, 186-188, 208; App. 1596-1598, 1601-1603, 1620-1622, 1684-1686, 1714-1716, 1741).[d]

32.      On February 27, 2010, during a men's lacrosse post-game party at the upstairs apartments of Huguely and his roommate, Kevin Carroll, and two lacrosse teammates, Brian Carroll and William Thompson, (2/9/12 Tr. 155-160; App. 2001-2006), a woman's cry for help was heard coming from Huguely's bedroom.  When the bedroom door was opened, Huguely was observed restraining Love from behind with his arm "around her neck."  (2/9/12 Tr. 159-162, 169-170; App. 2006-2009, 2019-2020).    Huguely released Love and she ran out of the room "crying hysterically."   She said she "could not breathe." (2/9/12 Tr. 159-162; App.

---

[d]  To assist this Court in locating citations in the record, respondent cites to both the official transcript pages as well as pages of the direct appeal appendix record. Petitioner's counsel did not use the official transcript record when preparing the direct appeal appendix. The transcript page numbers contained in the appendix do not correlate with the transcript page numbers of the official transcript record. A word search is required to rectify the pagination. Respondent relies on the official transcript pagination, but has attempted to provide appendix page citations after conducting a word search.

2006-2009).  In an email Love wrote to Huguely, she stated Huguely "strangled" her.  (App. 4622; CW's Ex. 132).

33.    The next day, Huguely told a friend he "was trying to talk to [Love] and . . . and he was not letting her leave the room." (2/9/12 Tr. 192-198, 204-206; App. 2048-2054, 2063-2064).  Later, Huguely did not deny he had choked Love, and he said he would write her a letter about it.  (2/8/12 Tr. 167-171; App. 1690-1694).

34.    In a handwritten letter found in Love's bedroom, Huguely wrote:

I'm horrified with the way I behaved and treated you.  I'm scared to know that I can get . . . drunk to the point . . . I cannot control the way I behave or act . . ..  I'm horrified to think that I was using physical force to keep you in my room.

(App. 4608-4610; CW's Ex. 21).

35.    On Tuesday evening, April 27, 2010, Love was drinking at a bar when another student mentioned that Huguely had been seeing one of Love's sorority sisters, S.A.  Love was surprised, angry and upset by this news. (2/9/12 Tr. 173-176, 200-202, 252-255; App. 2024-2027, 2058-2060, 2124-2126).  Love left the bar and walked to Huguely's apartment.  (2/8/12 Tr. 102-108, 170-172; App. 1607-1614, 1694-1696).  Huguely and two high school-aged girls were in the living room of the apartment when Love entered without knocking.  Love was heard "scolding" Huguely and asking Huguely if these were his "new girlfriends." (2/9/12 Tr. 216-220; App. 2078-2082).  She repeatedly struck Huguely with her purse.  (2/9/12 Tr. 216-220, 2/15/12 Tr. 38; App. 2078-2082, 3759).   After Love left Huguely's

apartment, Huguely went to see S.A. at her apartment.  (2/9/12 Tr. 262; App. 2135-2136).

36.     Love emailed Huguely the following morning, Wednesday, April 28, 2010, apologizing for her actions.  Huguely replied.  He remarked about Love's sexual relations with a male lacrosse player from the University of North Carolina. (2/9/12 Tr. 162-163; App. 2009-2011, 4621; Ex. 132).

37.     The ensuing email exchange culminated on Friday, April 30, 2010, with three emails from Huguely.  In the first he said, "u know I don't like u with those Carolina guys."  In the second he said, "A week ago u said u would get back together with me if I stopped getting so drunk then u go and fuck [the North Carolina lacrosse player], attack me, and in the midst of the attack say [the North Carolina lacrosse player] [f]ucked [you] better than [me].  That is [f]ucked up on so many levels.  *I should have killed you*." (emphasis added).  In the third email, Huguely said, "we should talk tonight." (App. 4621-4625; Ex. 132).

38.     Love received these emails while in Chicago for a lacrosse game.  Love and her teammates returned to UVA from Chicago around noon on Saturday, May 1, 2010, the date of the men's lacrosse team's last home game.  Love and Huguely were together that evening.  (2/8/12 Tr. 108-113, 2/9/12 Tr. 322-326; App. 1615-1620, 2210-2215).

39.     By 9:00 a.m. on Sunday, May 2, 2010, Huguely was drinking beer and "slurring his words." (2/9/12 Tr. 197-198, 2/15/12 Tr. 72-73, 96-99, 121; App. 2054, 3315-3316, 3346-3349, 3377).  At a men's lacrosse team golf tournament during the day, Huguely continued drinking heavily, made inappropriate comments, and his speech was so slurred that at times he was incoherent.  (2/9/12 Tr. 187, 198-201; App. 2041, 2056-2058).  During dinner that evening with his father and several teammates, Huguely knocked over a bottle of wine on the table, dinner was cut short due to Huguely's behavior, and he urinated in public against the outside wall of the restaurant before his father drove him home.  (2/9/12 Tr. 184-188, 196-201, 2/15/12, Tr. 123-124; App. 2038-2042, 2053-2058, 3380-3381).  Upon returning to his apartment at 10:30 p.m., Huguely's teammates described him as drunk and incoherent.  (2/15/12 Tr. 58-59, 77-78, 125-126; App. 3298, 3322, 3382-3383).

40.     On that same day, after studying for several hours, Love and a roommate attended an evening birthday celebration. (2/8/12 Tr. 159-160, 178-186; App. 1680-1681, 1704-1714).  Love consumed alcohol.  Her blood alcohol level, taken several hours later, was 0.14 to 0.18. (2/8/12 Tr. 211-214, 2/15/12 Tr. 185-186; App. 1746-1748, 3458, 4619; Ex. 105).  Love and her roommate returned to their apartment and planned to go back out again that evening.  Love had no visible injuries to her body.  (2/8/12 Tr. 188-190; App. 1715-1718).

41.    Later, Love decided to stay home.  Love was last seen by her roommate asleep on her bed, wearing only her underwear.  (2/8/12 Tr. 190-192; App. 1719-1720).  Love's roommate departed their apartment at approximately 10:40 p.m.  (2/8/12 Tr. 192; App. 1721).

42.    Huguely's roommates left their apartment that evening at 11:40 p.m. to buy beer.  They were gone 20 minutes and Huguely was not present when they returned. (2/15/12 Tr. 59-61; App. 3299, 3301).  Anna Lehmann lived downstairs from Love.  At 11:40 p.m., she heard footsteps ascend the stairs to Love's apartment.  After a brief period, she heard a "really loud" sound "like slamming a [car] trunk if you really slammed it."  (2/8/12 Tr. 136-142, 151-153; App. 1651-1658, 1669-1672).  After ten minutes, Lehmann heard footsteps coming out of Love's apartment and down the steps.  A stocky male walked away from the apartment.  The person was "either going or gone by 11:50."  (2/8/12 Tr. 142-146, 152-153, 156-158; App. 1658-1663, 1671-1672, 1676-1679).

43.    Huguely returned to his apartment close to midnight and Kevin Carroll asked Huguely where he had been.  (2/15/12 Tr. 61; App. 3301).  Huguely said he had been downstairs with Will Bolton at Chris Clements' apartment.  He added that Clements was drunk.  Carroll, however, knew that Clements was working on a term paper that evening and that he had not been drinking.  Carroll determined Bolton

22

was not in Clements' apartment. Kenneth Clausen recalled that Carroll pointed this out to Huguely.  (2/15/12 Tr. 62-64, 81-82; App. 3302-3304; 3327).

44.    Because there was no apparent reason for Huguely to lie about being with Clements and Bolton, Clausen followed up with Huguely.  Clausen testified:

> I looked at him for a bit.  I noticed there was a change in his demeanor, kind of a blank stare on his face.  I asked him what was wrong with him.  I said, "George, what's wrong with you?"  He looked at me and said nothing.…  I asked him – I continued to look at him and observe him.  I asked him two more times.  I said, "George, what's wrong with you?"  Got no response.

(2/15/12 Tr. 82; App. 3327-3328).

45.    Love's roommate returned to their apartment at approximately 2:20 a.m., Monday, May 3, 2010.  She saw a hole in the door to Love's bedroom. She entered and saw Love lying under her comforter face down on the bed with her arms to her sides, palms facing upwards. (2/8/12 Tr. 193-195, 199; App. 1722, 1724, 1730).  She moved Love's hair and saw injuries to Love's face and a large blood stain on the pillow under her head. Emergency 911 was contacted. (2/8/12 Tr. 195-198, 203-206; App. 1725-1728, 1735-1738).

46.    At the request of 911 personnel, Love was placed on her back on the floor and CPR chest compressions were administered to revive Love.  (2/9/12 Tr. 198-199; App. 1729; 2/8/12 Tr. 229-232, 2/9/12 Tr. 10-12; App. 1766, 1816-1817). Efforts at resuscitation were extensive, but unsuccessful.  At no point was any sign of life detected.  Had there been any electrical activity involving Love's heart, the

monitor emergency responders used would have detected it. (2/8/12 Tr. 196-199, 202, 228-231, 2/9/12 Tr. 28-70; App. 1726-1729, 1730-1733, 1767-1770, 1838-1892).

47.    The medical examiner determined Yeardley Love died from blunt force trauma to the head that caused injuries to her brainstem.  The mechanism of death was lack of oxygen to the brain precipitated by cardiac arrhythmia and damage to the area of the brain that regulates cardiac and respiratory functioning.  (2/14/12 Tr. 61-62, 168-169, 210-213; App. 2872-2873, 3008-3009, 3061-3066; Ex. 104, Ex. 140, Ex. 145).

48.    A minimum of eighteen nonfatal contusions to Love's head, face, neck, trunk, left arm, left hand, and both of her legs were consistent with a physical, hands-on attack.  (2/13/12 Tr. 164-168, 170-188; App. 2706-2734; Ex. 104, Photo No. 214-227).  The contusion to her right eye was consistent with a blow that was struck by Huguely or impact with the floor.  (2/13/12 Tr. 192-193; App. 2738-2739).  The size and pattern of contusions to her chest, neck, and the back of her right calf were consistent with finger marks from being grabbed.  (2/13/12 Tr. 176-186; App. 2720-2731; Ex. 104, Photo No. 228-230).  Other injuries were consistent with vigorous exterior pressure administered against her mouth.  (2/13/12 Tr. 188-190; App. 2734-2736; Ex. 104, Photo No. 231-237)  Photos taken at the scene by police showed the significant degree to which the right side of Love's face and head bulged out from

her injuries in comparison to the uninjured left side of her face and head. (2/10/12 Tr. 138-143; App. 2397-2402; Ex. 104, Photo No. 76-79). Exposure during the autopsy of tissue under Love's scalp revealed a broad area of contusion above and to the rear of Love's right eye and additional contusions toward the back of her head. The broad area of contusion was consistent with her head forcibly impacting a broad, stationary surface such as the floor. (2/13/12 Tr. 194-198, 211-212; App. 2740-2745, 2759-2761; Ex.104, Photo No. 238-240).

49.   Two neuropathologists, Dr. Christine Fuller, M.D., and Dr. Maria-Beatriz Lopes, M.D., assisted in the autopsy conducted by the Chief Medical Examiner, Dr. William Gormley, M.D. (2/13/12 Tr. 153-154, 205; 2/14/12 Tr. 14-17, 119-121; App. 2693-2695, 2753, 2811-2815, 2945-2948).

50.   Drs. Fuller and Lopes testified that trauma caused readily visible contusions to the underside of Love's brain and contusions consisting of hemorrhaging within the brain tissue consistent with a torsional or shear force mechanism of injury, such as when a person's head or neck is being twisted or turned when impact occurs with a stationary structure such as a floor. (2/14/12 Tr. 38-57, 68-69,130-140; App. 2841-2867, 2880-2882, 2959-2972; Ex. 140, Ex. 145). Drs. Fuller and Lopes found that a shear force or torsional mechanism caused hemorrhaging in Love's brainstem, causing injuries to fragile specialized cells in the brain critical to cardiac and respiratory functioning, and that damage to these special

25

brain cells can result in cardiac arrest or cardiac arrhythmia and loss of consciousness. (2/14/12 Tr. 57-69, 140-156; App. 2866-2882, 2972-2993; Ex. 140, Ex. 140F-140H, Ex. 145-145J; 2/9/12 Tr. 72-106, 2/10/12 Tr. 7-49; App. 1894-1937, 2230-2284; Ex. 104, Ex.131, Ex.140, Ex.145, Ex.149, Ex.150, Photo No. 2; Ex.149-149F).

51.    In a police interview that was videotaped and introduced by the Commonwealth at trial, (2/10/12 Tr. 62, 66-67; App. 2301, 2305-2306; Ex. 26 at 00:00 to 1:03:28), Huguely said he went to Love's apartment.  (Ex. 26 at 5:30, 25:20).  He punched a hole in her locked bedroom door and entered because he "wanted to talk to her."  (Ex. 26 at 15:14, at 16:54).  He said he was "so pissed" because she would not talk to him. (Ex. 26 at 26:45).

52.    Huguely who was 6'2" tall and weighed 220 pounds, while Love was 5'4" tall and weighed 117 pounds, repeatedly stated Love was "freaked out" by his being in her bedroom.  (Ex. 26 at 5:30-6:00, Ex. 26 at 8:00, Ex. 26 at 46:56).  He demonstrated how he shook Love.  (Ex. 26 at 20:00-21:00).  He admitted that he may have grabbed Love about the neck "a little bit."  (Ex. 26 at 21:58).  Huguely said he wrestled Love to the floor and held her face down as her head rolled over from left to right.  (Ex. 26 at 10:00-11:00, 20:00 -21:15).  He said the bruising of Love's face resulted from being rolled over against the floor beneath Huguely's weight and the force he exerted on her head and neck.  He said her nose started

bleeding. (Ex. 26 at 21:00).  Huguely described that after they were "wrestling" they "stood up," he "tossed" her onto the bed.  He admitted grabbing Love's laptop as he left her bedroom and throwing it into a dumpster outside her apartment building. (Ex. 26 at 21:15, Ex. 26 at 47:33).

53.     Huguely's defense expert forensic neurologist Dr. Jan Leestma, testified extensively, "unhindered and unconstrained." (Respondent's Exhibit 11, letter opinion at 11-12). He concluded that the hemorrhaging in Love's brain was an "artifact" caused by CPR (reperfusion) rather than the result of blunt force trauma. (2/13/12 Tr. 193, 2/14/12 Tr. 69-73, 79-83, 102-104, 107, 156-158, 163-170, 173-175; App. 2739, 2881-2887, 2894-2899, 2923-2927, 2929-2930, 2992-2996, 3001-3011, 3014-3018; Ex. 104).

54.     Two days after Dr. Leestma testified, the Commonwealth learned that Huguely's trial counsel was violating a "rule on witnesses" by providing substantive updates regarding the trial testimony of Commonwealth experts, to Drs. Leestma, Ronald Uscinski and Dr. Daniel, a consulting pathologist who did not testify.

55.     Dr. Uscinski was allowed to testify over objection of the Commonwealth, but not regarding reperfusion.  Dr. Uscinski testified that Love did not die from blunt force trauma.  (2/18/12 Tr. 9-54, 79, 90-91; App. 3889-3947, 3979-3981, 3993-3994; Exs. A-D).

## *Claim I*

56.     In Claim I, petitioner alleges that his constitutional rights were violated when the deliberating jury obtained a dictionary from a court officer and consulted that dictionary regarding the meaning of malice.  The juror's affidavit upon which petitioner bases his claim uses the word "deputy."

57.     The Circuit Court for the City of Charlottesville considered this claim on the merits in state habeas and held petitioner was not entitled to relief.  (Exhibit 8, Final Order at 7-10).  The state court determined:

> Petitioner asserts that because a bailiff gave a juror a dictionary to refer to, on the issue of malice, this was an improper external influence and is presumptively prejudicial and requires his conviction for second-degree murder to be overturned.[1]

> I will deny the relief requested on this claim for two reasons. First, and most importantly, I cannot find by a preponderance of the evidence that the incident occurred at all, or at least not as Petitioner describes.

> There were twelve jurors. Only one juror (Juror #42) purports to remember an incident regarding a dictionary. She simply says, "During the jury deliberations the jury had an issue with the definition of the word 'malice'. The jury dealt with the issue by getting a dictionary. The dictionary was obtained by a juror knocking on the door to the jury room and asking a deputy for a dictionary.... A deputy returned with the dictionary...Another juror read out of the dictionary." However, she has no recollection of any specifics or details. She continues:

---

[1] This claim does not appear to be "ineffective assistance in the strict sense, in that I do not believe there is an allegation that the attorneys knew of the alleged incident at the time.  It is in the nature of an impermissible "external influence". The rest are true ineffective assistance claims.

"I am not sure which juror asked the deputy for the dictionary. I cannot recall which deputy the juror spoke with.... I do not know which deputy brought the jury the dictionary. I cannot describe the dictionary because I never had it. I cannot say if the dictionary was thick, thin, a hard back book, a soft back book, large, small, *a single sheet of paper,* whether it was a Webster's dictionary, or what color it was....I do not know which juror had the dictionary and read from it. I do not recall what the juror did with the dictionary after reading from it or what was done with the dictionary after the jury used it."

This juror's statement certainly raises a question. However, there were also affidavits filed from ten other jurors. Not one of them remembers anything about a dictionary being asked for, obtained, or read from.[2]  Their various responses were:

"I do not remember the jury ever asking for a dictionary.  I do not remember ever seeing a juror use a dictionary in the jury room at any time during jury deliberations. I also do not remember any of the deputies bringing the jury a dictionary." (Juror #9).

"I do not think the jury ever asked for a dictionary.  I do not remember seeing any of the other jury members using a dictionary during the jury deliberation.  I do not remember any of the deputies bringing the jury a dictionary during jury deliberations." (Juror #17)

"I do not remember a dictionary ever coming into the jury room." (Juror #27)

"I do not recall the jury ever asking for a dictionary. I do not recall the jury ever using a dictionary. I do not recall a dictionary ever being present in the jury room." (Juror #63)

"The jury did not ask for a dictionary but, we did send a note out asking for clarification on the word "malice". I think the note went to the judge. None of the jurors used a dictionary during deliberations." (Juror #117)

---

[2] Apparently one of the jurors refused or failed to submit an affidavit.  Motion to Dismiss, page 37, footnote 6.

"During jury deliberations the jury had some questions for the Judge but, I do not remember what they were. I am not sure whether the questions dealt with a dictionary.... I do not recall a deputy ever bringing the jury a dictionary. I do not remember ever seeing a jury member using a dictionary during jury deliberations." (Juror #127)

"I do not recall the jury ever asking for a dictionary. None of the deputies brought the jury a dictionary. I never saw any member use a dictionary during the deliberations. We did not have anything unless the Court approved it.... l am 100% sure nobody brought a dictionary into the jury deliberations and 99% sure if the jury ever had a dictionary it was provided by the court." (Juror #130)

"I do not remember having a dictionary in the jury room. The jury was given the definitions of the words manslaughter, first-degree murder and second-degree murder. I believe the definitions were on *a sheet of paper* provided by the court." (Juror #211) [Emphasis added].

"I do not remember a dictionary ever being used by the jury. I do not remember a dictionary being in the jury room." (Juror #217)

"I am not sure whether the jury asked for a dictionary or not. My memory is very "fuzzy" on whether a dictionary might have been provided at some point. If the jury was provided a dictionary it was obtained from a written question to the judge, and it would have come from the judge." (Juror #310)

Further, of the nine deputies who served as bailiffs who submitted affidavits, not one of them indicated they were asked to get a dictionary, or that they got a dictionary, or gave a dictionary to the jury or a juror, or that they recall any other bailiff or deputy or anyone else giving the jury a dictionary, or that they remember seeing a juror with a dictionary. (It is of note, however, that one of the bailiffs Deputy Rose Clark, did remember one occasion where a jury asked for a dictionary, but she did not believe it was the Huguely trial, and she recalled that the request was denied by the Court after the judge consulted with counsel, and no dictionary was provided.)

So I find that the Attorney General is correct in asserting that, on this issue, a sufficient ruling can be made from the affidavits without a further evidentiary hearing, and that the factual basis for this claim is not made out by a preponderance of the evidence.[3] (See Conclusion, page 16 this letter).  In fact the Court finds the opposite-that it would appear much more likely that the  one juror  is mistaken and has confused something else with a dictionary (perhaps a note being sent back by the judge, which everyone said was how their questions were submitted and answered, or the single sheet of paper remembered by Juror #211), or perhaps confused the incident with another case, than that a dictionary was used and not a single other juror--not even the one who supposedly had or read from it--or any bailiff remembers such. So, I will dismiss this claim for that reason.

However, even if there were a dictionary requested and brought into the jury room, I also would find that there is insufficient evidence or specifics in the Petition, affidavits, or record of what if anything was read. The reason I mention this is that if, for example, a definition were read from Black's Law Dictionary that tracked the language of an instruction, then it would be of no import, or if some other definition were consistent with and not contradictory of or in conflict with the instruction given, then such would be harmless. If we do not know any of the content, I cannot find that such "external influence" would be prejudicial.  Petitioner asserts that such is presumed to be prejudicial, under *Remmer v. U.S.* 347 U.S. 227 (1954). But most of the other instances cited involved actual external "evidence" (newspaper, almanac, viewing a crime scene, or photos). *See Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014); *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 207 (1987). While Petitioner cites two Fourth Circuit cases and one New Jersey Circuit Court case from 1940 regarding *dictionaries--McNeill v. Polk*, 476 F.3d 206, 226 (4th Cir. 2007); *U.S. v. Duncan*, 598 F.2d 839, 866 (4th Cir. 1979); *In re Collins' Will*, 15 A.2d 98, 99 (N.J. Cir. Ct. 1940)--I am not convinced that

---

[3] If the issue were anything else—for example, whether a traffic light was red or green, whether the car was white or blue, whether "Joseph" was at the party—a similar collection of sworn statements clearly would not be sufficient to establish the affirmative assertion by a preponderance.

consulting a dictionary on the meaning of a word[4] would be tantamount to insertion of external evidence into the case. *See U.S. v. Henley*, 238 F.3d 1111, 1115-16 (9th Cir. 2001); *Riner v. Commonwealth*, 268 Va. 296, 316 (2004), citing *Remmer*, above. I do not find Petitioner's argument persuasive on this point. I do not find that simply having a dictionary-which the evidence does not establish-without more, would be prejudicial *per se* or presumptively prejudicial.

Also, the jury was specifically instructed to make their ruling based only on the evidence and law given to them in the courtroom.[5] There is a presumption that the jury followed the instructions.

But the primary reason I am dismissing this claim is that the proffered evidence does not establish that a dictionary was brought into the jury room or used by the jury.

(Respondent's Exhibit 11).

58.     The state court's decision did not result in a legal conclusion that is directly opposite to a Supreme Court decision nor did the state court reach the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts. *Williams*, 529 U.S. at 405. The state court's decision was not an "unreasonable application" of federal law "so lacking in justification that there was an error well understood and comprehended in existing

---

[4] This is something appellate courts do regularly, outside of the record. In addition, jurors also bring their knowledge of the meaning of words—no doubt often learned from dictionaries—into the jury room every day.

[5]  Motion to Dismiss, page 36, para. 60; 2/28/12 Tr. 789, App. 1467-68. Judge Hogshire instructed the jury. "You as jurors must decide this case based on the evidence presented [in] this courtroom….[Y]ou must not conduct any independent research about the case, the matters in the case, the individuals involved in the case; …you should not consult dictionaries or reference materials…to obtain information about the case to help you decide the case."

law beyond any possibility of fairminded disagreement." *Richter*, 562 U.S. at 103.

*See also Coleman v. Clarke*, Civil Action No. 7:19-cv-00386, 2020 U.S. Dist.

LEXIS 104567, at *38 (W.D. Va. June 15, 2020). This Court should defer to the

state court judgment and Claim I should be dismissed.[e]

### Claim II(a)

59.     In Claim II(a) (state habeas Claim II), the petitioner asserts trial counsel

were ineffective for violating the rule on witnesses thereby causing expert testimony

to be excluded.   The state habeas court denied this claim, making the following

findings:

> Petitioner asserts that trial counsels' action in communicating the substance of trial testimony to another witness in violation of the Rule on Witnesses was deficient, and that such hampered the defense in keeping Dr. Uscinski (and possibly Dr. Daniel) from testifying as to reperfusion.

> I agree that the violation on the rule on witnesses (exclusion of witnesses from the courtroom when they are not testifying, and not discussing the substance of any other witness's testimony) was deficient performance.   I want to note that it is not uncommon for experts to be exempted from the Rule and be allowed to remain in the

---

[e] In his federal petition, Huguely argues for the first time that a different court employee—a law clerk, courtroom clerk or clerk's office employee—could have brought the dictionary. (Petition at 26). Juror 42 upon whose affidavits petitioner relies to  make out the dictionary claim uses the word, "deputy."  Petitioner is not entitled to expand the factual basis for his claim now. *Picard*, 404 U.S. at 275-76; *Clagett*, 209 F.3d at 378.  "Provisions like §§ 2254(d)(1) and (e)(2) ensure that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Pinholster*, 563 U.S. at 186 (citations omitted). In addition, all affidavits cited by the state habeas court are attached to Respondent's Exhibit 10.

courtroom, because they are not fact witnesses but are giving their professional opinion based on evidence presented. However, such an exemption was not requested in this case. The witnesses did not remain in the courtroom to hear the testimony of other witnesses, though counsel did communicate with them what other witnesses had said, but without the Court's permission. Attorneys are allowed to speak with witnesses under the rule, and talk about their testimony, and it would have been permissible and appropriate for counsel to ask them questions based on what the other witnesses testified to, but not to give them the content of such testimony. The only issue regarding whether such was ineffective is whether, taking the case as a whole, the defendant was prejudiced by the inability to call Dr. Uscinski to testify on reperfusion. This is a close case on this point.

But I cannot say, taking all of the evidence as a whole, that it is reasonably likely that the outcome in this case would have been different if Dr. Uscinski had testified. I conclude this for two main reasons. First, Dr. Leestma was the defense's main witness on cause of death and reperfusion and he was the most qualified and had the most experience and expertise of all of the experts in the case. He was a forensic neurologist. The numbers of autopsies he had performed and the number of brains he had examined (over 20,000) were extraordinary and impressive. 2/15/12 Tr. 260, 272, App. 3484, 3496. Dr. Uscinski, on the other hand, was a neurosurgeon whose area of expertise was brain trauma. The main substance of his anticipated testimony was that the evidence did not show blunt force brain trauma to be the cause of death. Quag. Aff. ¶ 11. He was allowed to testify to this. Counsel stated that he "testified before the jury to the things we thought most important". Quag. Aff. ¶ 25. (Reperfusion was not the main thing he was being called for, but the lack of evidence of brain trauma.) His testimony, combined with Dr. Leestma's (Amended Petition pp. 22-23, ¶¶ 38-39) and Dr. Poklis (a toxicologist testifying about intoxication), gave the defense all that it needed to argue their theory. Dr. Uscinski was not an expert in reperfusion, and could only testify that such was consistent with his findings, but counsel was able to argue that in any event. The Commonwealth had four witnesses to address reperfusion, who all gave reasons why Ms. Love's brain injury was not due to reperfusion. None of them had the credentials that Dr. Leestma had, and trial counsel was not relying on Dr. Uscinski or Dr. Daniel to prove their reperfusion theory. Quag. Aff. ¶ 4. The jury, presumably based

on all of the other evidence in the case, [Huguely's highly intoxicated state, prior choking incident, recent statement that he should have killed her, his own damning videotaped statements to police, and descriptions of Huguely's demeanor right after the murder from the roommates] rejected his conclusions and found the defendant guilty of second-degree murder.  It is unlikely that having a less qualified doctor testify to corroborate Dr. Leestma would then have made a significant difference. It is certainly possible that I would have had a different view if Dr. Uscinski had been the one to testify as to reperfusion but that Dr. Leestma, the more qualified expert, had been precluded.  In that case, Dr. Leestma would not merely have been corroborative and cumulative, but would actually have been, with more expertise, the main witness on the topic and supplied information and testimony that Dr. Uscinski could not. I do not know how I would rule in that case, but that is not the situation before the court.  Certainly, corroboration is something that most attorneys like to have in a case, but in effect Dr. Uscinski's testimony as to reperfusion would have been cumulative, and the failure to offer cumulative evidence is not a basis for finding prejudice. Additional cumulative evidence is not a basis for finding a reasonable likelihood of a different outcome if it had been given.

In fact, the Attorney General is correct that Petitioner has proffered no specific testimony, by affidavit or otherwise, as to what exactly Dr. Uscinski would have said about reperfusion, other than that it would be consistent with his opinion about lack of brain trauma, so that in itself is inadequate. Dr. Uscinski said in *voir dire* that he did not come prepared to talk about "blood pressure in remote areas of the body established by CPR."  Tr. 2/18/1225  App. 3904.  It is not at all clear that this was because of the violation of the rule.  His testimony on CPR would have been just from general training. 2/18/12 Tr. 27, App. 3906. He further said: "I understand the concepts of reperfusion injury and am ***somewhat*** familiar with that concept." 2/18/12 Tr. 30, App. 3909. [Emphasis added]. He said he had not been prepared, prior to Ms. Quagliana's email, to talk about reperfusion and bleeding in the "watershed" area. 2/18/12 Tr. 30-32, App. 3909-11. The formal proffer (App. 4758) of Dr. Uscinski's precluded testimony says "As to reperfusion, that at least in certain medical settings, reperfusion injury is a known phenomenon." That, I believe, is not in dispute, and would not really add anything. It also says of

cardiopulmonary resuscitation ("CPR") that "the purpose of CPR is to reperfuse organs of the body, including the brain, with blood and that following the deprivation of blood and oxygen, the brain is susceptible to injury." See also 2/18/12 Tr. 27, App. 3906. This too is general information, covered by other witnesses, not case specific and could not be the basis for a finding of a reasonable likelihood of a different result had it been presented. I agree that, in addition to the cumulative nature of his proffered testimony, this is a fatal omission.

Dr. Uscinski's not being allowed to testify about reperfusion does not undermine confidence in the trial outcome. As is commonly iterated, a defendant is entitled to a fair trial by competent counsel, not a perfect trial by perfect counsel. As stated in *Harrington v. Richter,* 562 U.S. 86, 105 (2011), the question is whether counsel's performance is incompetent, not whether it is best practices. The court must consider the overall performance of counsel. Mr. Huguely received good, diligent representation by experienced, competent, and diligent counsel. Of import they amply and adequately cross-examined each of the Commonwealth's medical experts, obtaining several concessions supporting or consistent with the defense theory of the case. Quag. Aff. ¶ 13. This was not from happenstance or lack of preparation or competence.

I will dismiss Claim II on the affidavits, transcript, and record because I do not believe a case is made out that if Dr. Uscinski had testified as to reperfusion or related matters that there is a reasonable likelihood, in light of all of the evidence, that the outcome would have been different, and I do not think that an evidentiary hearing would add anything on this point beyond what has been presented.

(Respondent's Exhibit 11, Opinion Letter at 13-14).

60. The state court's decision did not result in a legal conclusion that is directly opposite to a Supreme Court decision nor did the state court reach the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts. *Williams*, 529 U.S. at 405. The state court's

decision was not an "unreasonable application" of federal law "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Richter*, 562 U.S. at 103. *See also Coleman v. Clarke*, Civil Action No. 7:19-cv-00386, 2020 U.S. Dist. LEXIS 104567, at *38. This Court should defer to the state court judgment. Claim II(a) should be dismissed.

### *Claim II(b)*

61.     In Claim II(b) (state habeas claim III) the petitioner asserts trial counsel were ineffective for failing to call John S. Daniel, III, M.D. as a witness and this was an error of constitutional proportion.[f] The state court dismissed petitioner's claim finding:

> [A]s with the presentation of evidence in general, above (claim VII [regarding additional evidence and argument on Huguely's blood alcohol content]), [w]hether to call a witness or not

---

[f] *See Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) ("calling some witnesses and not others is the epitome of a strategic decision"); *Crane v. Johnson*, 178 F.3d 309, 313-315 (5th Cir. 1999); *United States v. Kozinski,* 16 F.3d 795, 813 (7th Cir. 1994) (decision not to call witness entitled to "enormous deference" and decision was objectively reasonable in any event); *Walls v. United States*, 773 A.2d 424, 434 (D.C. 2001) ("the decision to call witnesses is a judgment left almost exclusively to counsel"). A fundamental reality of trial practice is that "often, a weak witness or argument is not merely useless but, worse than that, may detract from the strength of the case by distracting from stronger arguments and focusing attention on weaknesses." *Epsom* v. *Hall*, 330 F.3d 49, 53 (1st Cir. 2003). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

is . . . left to the discretion and judgment of experienced trial counsel, and is a matter of trial strategy and tactics.

Dr. Daniel was primarily a consultant and advisor to the defense team in their preparation for trial. Quag. Aff. ¶¶ 6, 7; Declaration of John S. Daniel, Ill, M.D. ¶ 4. He referred them to other witnesses in particular areas or fields. Quag. Aff., ¶¶ 7, 8. It was logical to have him present for trial in case there came up something he might be helpful on. But they determined they did not need to call him. Quag. Aff. ¶¶ 17,18; Lawr. Aff. ¶¶ 6, 7.

It is certainly not unusual for trial counsel to subpoena a witness to have him or her available "just in case". Also, it is not uncommon to have a witness present that counsel actually expects, intends, and plans to call, but something that happens at trial, during the proceedings, causes counsel to reconsider and alter his plans. Good, experienced trial counsel are always evaluating and re-evaluating the need for certain witnesses or evidence as a case develops and a trial proceeds. Quag. Aff. ¶¶ 18, 20. There could be information or evidence that another witness covers adequately, or an issue that becomes less important in light of evidence already given or other developments at trial,[6] or a witness whose testimony may be seen to be of such minimal value that it is not worth the time and possible exposure to cross-examination, or simply a conclusion that the witness is just not needed and would not be that helpful, if at all. Counsel may come to believe that the jury would not accept or value portions or all of a witnesses' testimony. Ms. Quagliana and Mr. Lawrence explicitly address some of these concerns in their affidavits. Quag. Aff. ¶¶ 13, 20; Lawr. Aff. ¶¶ 6, 7. Here counsel also obtained several "concessions" from prosecution witnesses that further reduced the role Dr. Daniel might play as a witness or the reasons he might be called.

Petitioner says trial counsel "failed to produce the best available witness and evidence to counter the prosecution's theory

---

[6] One example in this case was that Dr. Daniel originally was expected to testify about the potential effect or impact of Adderall on a person and the likelihood of asphyxiation, but other evidence made that not a tenable avenue of defense, which initially was one of the main foci of his testimony. Quag Aff. ¶ 6.

[on the] cause of death". Pet. 57, ¶104. But this again seems to be second guessing and Monday-morning quarterbacking.

Dr. Leestma clearly had the most expertise on the cause of death and reperfusion. Dr. Daniel was not a brain specialist (not a neurologist, neurosurgeon, or neuropathologist). Quag. Aff. ¶ 7. Dr. Leestma testified unhindered and unconstrained.

As to the cause of death, Dr. Daniel's testimony would have been cumulative. He was not an expert on reperfusion. Trial counsel was concerned about his vulnerability on cross-examination on three points-his prior career in the Chief Medical Examiner's office, his lack of expertise in reperfusion, and his high level of compensation compared to the other experts. Quag. Aff. ¶ 19; Lawr. Aff.  ¶ 7. Again, they felt he might do more harm than the good he could do. It is possible that it could affect his credibility or that of the whole defense case. Both Ms. Quagliana and Mr. Lawrence thought that he was not needed, given the issues and other evidence and witnesses' testimony and in fact that calling him would be a mistake. Quag. Aff. ¶ 19; Lawr. Aff.  ¶ 7.

But counsel did give this significant and measured consideration. They concluded they did not need his testimony and decided not to call him for articulated reasons. It is a matter of trial strategy and tactics. This was not plainly wrong, deficient performance, or ineffective assistance. So I do not find that the first prong of *Strickland* is met, and I further cannot find that calling Dr. Daniel, as a second medical examiner, was reasonably likely to produce a different result, so in any event there is no prejudice either.

(Respondent's Exhibit 11, Letter Opinion at 11-12).

62.    The state court's decision did not result in a legal conclusion that is directly opposite to a Supreme Court decision nor did the state court reach the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts. *Williams*, 529 U.S. at 405. The state court's

decision was not an "unreasonable application" of federal law "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Richter*, 562 U.S. at 103. *See also Coleman v. Clarke*, Civil Action No. 7:19-cv-00386, 2020 U.S. Dist. LEXIS 104567, at *38. This Court, therefore, should defer to the state court judgment. Claim II(b) should be dismissed.

### *Claim IV*

63.     In Claim IV (direct appeal claim a) petitioner alleges that the trial court violated his Sixth Amendment right to counsel by forcing him to proceed in the absence of one of his two retained counsel. In the last reasoned state court opinion on this issue, the Court of Appeals of Virginia denied this claim, holding:

> Huguely was represented by two defense attorneys — Rhonda Quagliana, Esq., and Francis McQ. Lawrence, Esq., whom were privately retained by Mr. Huguely. Neither Ms. Quagliana nor Mr. Lawrence was designated as lead counsel, although each attorney assumed different responsibilities during the trial. In particular, it was Ms. Quagliana's responsibility to examine two medical experts, Jan Leestma, M.D. and Ronald Uscinski, M.D., whose testimony was offered to contradict the Commonwealth's theory that Love's death was caused by blunt force trauma to the head. As a matter of trial strategy, Ms. Quagliana and Mr. Lawrence decided that this expert testimony would be more effective if Dr. Leestma and Dr. Uscinski testified in succession, one after the other.

> On Wednesday, February 15, 2012, the Commonwealth concluded its case-in-chief. The defense's case-in-chief then began that day with Ms. Quagliana's examination of Dr. Leestma — the last witness of the day. However, Ms. Quagliana became very ill due to a stomach virus before the trial proceedings resumed on Thursday,

February 16. Ms. Quagliana could not attend court on February 16, and, therefore, she could not examine Dr. Uscinski as the defense had anticipated.

Due to Ms. Quagliana's illness, the trial judge decided to excuse the jury for the entire day on February 16. Mr. Lawrence alone addressed some matters with the trial judge and the prosecutor, including the instructions to be given to the jury, outside the presence of the jury.

On the morning of Friday, February 17, Ms. Quagliana remained too ill to attend court. Mr. Lawrence indicated that the nature of Ms. Quagliana's illness was "a day-to-day thing" and that he was "optimistic" that she would be able to return to court the following day. Mr. Lawrence stated that he was not prepared to examine Dr. Uscinski and also asserted that it would be unfair to Huguely if Dr. Uscinksi's examination proceeded without Ms. Quagliana. The trial judge asked Mr. Lawrence, "Now, today what can you accomplish from your perspective?" Mr. Lawrence replied, "Judge, we have other witnesses today that we are prepared to put on. They are all back there waiting and we're ready to go." The trial judge accepted Mr. Lawrence's offer to examine those defense witnesses on the morning of February 17. The trial judge also indicated that, if Ms. Quagliana could not return to court by the afternoon to examine Dr. Uscinski, then the jury would likely need to be excused for the remainder of the day.

Following a short recess, however, Mr. Lawrence actually moved for a continuance until Ms. Quagliana was able to return to court. According to Mr. Lawrence, Huguely did not feel comfortable with the taking of any evidence until Ms. Quagliana returned. Mr. Lawrence acknowledged that "the Commonwealth has pointed out the stress on the people on [the Commonwealth's] side of the courtroom by these delays and we have sympathy for that" problem. However, Mr. Lawrence added, "[W]e haven't looked at the case law on [the issue of] if you have two lawyers, do you have the right to both of them? I think you probably do, so [Huguely] objects to proceeding at all until he has his full defense team." In response, the trial judge asked Mr. Lawrence, "Well, do you feel competent proceeding this morning? I guess you did or you wouldn't be offering to do it, right?" Mr. Lawrence replied, "That's correct." The trial judge denied the motion for a continuance,

commenting that Mr. Lawrence was "about as capable as any lawyer in the town to handle something like this, and I have no doubt that you're capable of handling these witnesses today in competent fashion."

Mr. Lawrence then examined those defense witnesses whom he had initially offered to examine — but not Dr. Uscinski. When the trial judge learned that Ms. Quagliana was unable to return to court at all that day, the trial judge excused the jury for the remainder of the day. On the next morning, Saturday, February 18, the trial resumed. Ms. Quagliana was in court, and she examined Dr. Uscinski that morning.

(Respondent's Exhibit 4, *Huguely*, 63 Va. App. at 103-05, 754 S.E.2d at 562-63).

Huguely argued that the United States Supreme Court's decision in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006), requires that this Court grant him a new trial. Id. at 754 S.E.2d at 563.  (2014).

*The Result in Gonzalez-Lopez Does Not Require a New Trial Here*

In *Gonzalez-Lopez*, 548 U.S. at 150, the United States Supreme Court held that the erroneous denial of a defendant's Sixth Amendment right to a retained attorney of choice constitutes structural error. "[S]tructural error is reserved for the 'limited class 'of errors that 'defy analysis by harmless error standards.'" *Ray v. Commonwealth*, 55 Va. App. 647, 651, 688 S.E.2d 879, 881-82 (2010) (quoting *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). Put another way, an *"automatic reversal" is required when there is structural error. Neder*, 527 U.S. at 8. However, no structural error exists in this case, and the decision in *Gonzalez-Lopez* does not compel a new trial here.

In short, this case is not like *Gonzalez-Lopez* because the circumstances here are very different than the circumstances in *Gonzalez-Lopez*, as We note below. Beyond such factual differences, however, the United States Supreme Court's decision in *Gonzalez-Lopez* did not squarely address *the very legal issue* that we must deal with here — i.e., specifically, how to determine whether a criminal defendant, such as Huguely, actually has been deprived of his Sixth Amendment right to representation by a retained attorney. In *Gonzalez-*

42

*Lopez*, the prosecution *conceded* error on that issue, and the Supreme Court accepted that concession as appropriate without further analysis. Thus, the Supreme Court only addressed the proper *remedy* for a Sixth Amendment violation of this type of conceded structural error.

Before being entitled to the remedy of a new trial, Huguely must first show that there actually was some error that requires a new trial. *See Johnson*, 51 Va. App. at 376, 657 S.E.2d at 815 ("*Gonzalez-Lopez* clearly applies only to situations where a trial court *erroneously* denies a defendant his right to counsel of his choice."). As this Court explained in *Johnson v. Commonwealth*, 50 Va. App. 600, 652 S.E.2d 156 (2007), when discussing structural error under the Sixth Amendment:

The "structural" adjective merely denotes that the violation of the right cannot be subjected to the harmless error doctrine on appeal. *Id.* Whether the right has been violated in the first place is not affected by the structural classification of the alleged violation. A constitutional defect, in other words, must first be shown to exist before its structural or nonstructural qualities become relevant. *Id*. at 604, 652 S.E.2d at 158. Stated more simply, Huguely's argument on *Gonzalez-Lopez* here places the cart before the horse.

Neither *Gonzalez-Lopez* nor any other decision Huguely relies upon actually supports Huguely's claim that the trial judge committed Sixth Amendment *error* here. Those cases have significant factual differences from this case. The commonality in those cases — but not in this case — was a ruling *by a trial court* that essentially *barred* a retained attorney from representing the defendant in the first place. In *Gonzalez-Lopez*, 548 U.S. at 144, due to an erroneous application of the local rules of court by the trial judge in that case, one of the defendant's retained attorneys was actually prohibited from examining witnesses, arguing the case at trial, or even sitting at the counsel table — and could not even meet with the defendant until the last night of trial. In *London v. Commonwealth*, 49 Va. App. 230, 239, 638 S.E.2d 721, 725 (2006), the defendant's family had retained an attorney sixteen days before trial, and the trial judge was notified of that fact only four days later; however, the trial judge there nevertheless denied a continuance to permit the retained attorney to prepare for

trial. In *United States v. Laura*, 607 F.2d 52, 54-55 (3d Cir. 1979), the trial judge erred by summarily ruling that one of the defendant's retained attorneys could not represent the defendant simply because of a perceived conflict of interest between that attorney and the trial judge. In short, the trial judge barred the defendant from the defendant's retained attorney of choice rather than deciding whether transferring the case or reassigning it to a different judge was appropriate. *Id.* at 57-58. Likewise, in *Rodriguez v. Chandler*, 492 F.3d 863, 864 (7th Cir. 2007), the trial judge there erroneously barred a retained attorney from even representing the defendant.

Here, however, the trial judge never *barred* Ms. Quagliana from representing Mr. Huguely at trial. The issue here arose due to Ms. Quagliana's untimely illness. The trial judge was simply responding to Ms. Quagliana's absence. He did not create it. Furthermore, the trial judge actually accommodated Ms. Quagliana's absence — excusing the jury during an already lengthy trial for the entire day on February 16 and for the afternoon on February 17 so that Ms. Quagliana could return to examine Dr. Uscinski. It is true that Ms. Quagliana was not present when testimony was heard by the jury on the morning of February 17. However, surely the Sixth Amendment does not impose an absolute requirement, when a defendant is represented by two or more retained attorneys, that a jury trial must completely grind to a halt, as a matter of constitutional law, simply because *one* of the defendant's retained attorneys has become ill.

## No Abuse of Discretion by the Trial Judge Here

Huguely recognizes there is language in the *Gonzalez-Lopez* decision explaining that a trial judge retains discretion "to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." *Gonzalez-Lopez*, 548 U.S. at 152. Huguely contends that the trial judge here was required to balance Huguely's right under the Sixth Amendment with the court's scheduling concerns. He argues that no such balancing occurred here.

Viewing the record in the light most favorable to the Commonwealth, however, as we must since the Commonwealth prevailed at trial, the record shows that the trial judge's decision here was reasonable. First, we note that the trial judge excused the jury for *the entire day* on Thursday, February 16, when Ms. Quagliana's

illness first arose as an issue in this case. When the trial judge first learned of Ms. Quagliana's illness on the morning of February 16, he ordered a recess without any such request by Mr. Lawrence even appearing in the record. Explaining to the jury why the court was recessing until 12:30 p.m., the trial judge indicated that he hoped to proceed with the trial at that time *if* Ms. Quagliana was able to return to court by then. When it became clear that Ms. Quagliana could not return at all on February 16, Mr. Lawrence moved to adjourn until 9:00 a.m. the next day. The trial judge granted this request without at all questioning the need to adjourn at that time. The record reflects that the parties and the trial judge hoped that Ms. Quagliana would be able to return to court the next day.

When Ms. Quagliana was unable to attend court for a second consecutive day on Friday, February 17, 2012, the continuing nature of Ms. Quagliana's illness meant that the issue needed to be dealt with somewhat differently as her illness persisted. The record suggests that the attorneys present and the trial judge recognized that the circumstances had changed. Thus, Mr. Lawrence himself offered first to question those defense [lay] witnesses whom he was prepared to examine. Mr. Lawrence then retracted this offer and moved for a continuance after speaking with Huguely during a short recess. Mr. Lawrence suggested that there was authority stating that a defendant who has hired two lawyers has a right to have both lawyers present. Mr. Lawrence contended that this right "probably" exists, although he was vague concerning the source of authority for his contention. Mr. Lawrence's argument in support of the motion instead essentially concerned Huguely's level of comfort with having both of his attorneys present. Furthermore, even as he sought a continuance, Mr. Lawrence still acknowledged the Commonwealth's interests and expressed "sympathy" for "the stress" put on the Commonwealth "by these delays" resulting from Ms. Quagliana's illness. Moreover, Mr. Lawrence also candidly represented to the trial judge that he still felt capable of examining the defense witnesses whom he had initially offered to examine that morning.

As an appellate court, "we do not substitute our judgment for that of the trial court" when a matter is discretionary and we "consider only whether the record fairly supports the trial court's action." *Beck v. Commonwealth*, 253 Va. 373, 385, 484 S.E.2d 898, 906 (1997). Based

on the totality of the circumstances here, we hold that the trial judge's decision to proceed with the examination of defense witnesses by Mr. Lawrence on February 17, 2012 must be affirmed because it was supported by the record on appeal. *Id*. The record supports a conclusion that the trial judge thoughtfully considered Huguely's right to Ms. Quagliana's presence in the courtroom against other concerns that Mr. Lawrence himself recognized — i.e., the need to proceed with the trial in a timely manner and Mr. Lawrence's ability to examine those witnesses he was already prepared to examine.

In support of this conclusion, we rely on the United States Supreme Court's own explanation in *Gonzalez-Lopez* of why the erroneous deprivation of a defendant's Sixth Amendment right to the retained counsel of choice is so significant that it constitutes structural error defying the normal harmless error review. The Supreme Court there discussed the many aspects of a criminal case that might be handled differently depending on a defendant's choice of retained counsel, which includes (in the words of the Supreme Court in *Gonzalez-Lopez*):

- "investigation and discovery";
- "development of the theory of defense";
- "selection of the jury";
- "presentation of the witnesses";
- "style of witness examination";
- "jury argument";
- "whether and on what terms the defendant cooperates with the prosecution";
- "plea bargains"; and
- "the framework within which the trial proceeds" — or "whether it proceeds at all."

*Gonzalez-Lopez*, 548 U.S. at 150 (internal quotation marks and citations omitted).

Almost none of these considerations apply to Ms. Quagliana's absence in this case while she was ill. Furthermore, while the examination of some defense witnesses proceeded in Ms. Quagliana's absence, Mr. Lawrence represented to the trial judge that he was prepared to examine those witnesses — and he actually reaffirmed this representation even after seeking a continuance on Huguely's behalf. *See Morris*, 461 U.S. at 12 ("In the face of the unequivocal and

uncontradicted statement by a responsible officer of the court that he was fully prepared and 'ready' for trial, it was far from an abuse of discretion to deny a continuance. On this record, it would have been remarkable had the trial court not accepted counsel's assurances."). There is no indication that Ms. Quagliana's absence had a meaningful effect on the style or manner in which those defense witnesses were examined by defense counsel. Indeed, it appears from the record that Mr. Lawrence would have been the retained defense attorney examining those witnesses even if Ms. Quagliana had been present in court on the morning of February 17. Given all of the circumstances in the record of this case, the nature of Ms. Quagliana's absence from the trial was not so pervasive as to render its effect essentially unquantifiable and thereby create structural error under the United States Supreme Court's application of the Sixth Amendment. *See Gonzalez-Lopez*, 548 U.S. at 150 (when the Supreme Court said, after the government conceded Sixth Amendment error, "It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings.").

Simply put, the trial judge here did not display an "*unreasoning and arbitrary* insistence upon expeditiousness in the face of a justifiable request for delay." *Morris,* 461 U.S. at 11-12 (emphasis added). The trial judge certainly did not arbitrarily disregard Huguely's right to Ms. Quagliana's presence at trial. Given the way the trial court handled Ms. Quagliana's absence, it appears that he actually gave the request to have Ms. Quagliana present in the courtroom significantly *greater* weight than the other concerns which he had to consider. As a result, the trial judge excused the jury for the entire day of February 16 and for the afternoon of February 17. However, the trial judge was also entitled to find that Ms. Quagliana's presence at trial did not necessarily outweigh any and every other concern at all times. This is especially true since Huguely was represented by two retained attorneys of equal authority — one of whom was still in the courtroom and assuring the court that he felt comfortable with examining witnesses that he was prepared to examine and would have examined anyway. Otherwise, we would be obligated to hold as a matter of law that Ms. Quagliana's illness completely bound the trial judge's hands and required that the trial come to a standstill for a second consecutive day. That holding would remove any discretion from the trial judge —

47

which would contradict established case law interpreting the Sixth Amendment. *See Gonzalez-Lopez*, 548 U.S. at 152; *Morris*, 461 U.S. at 11-12; *Johnson*, 51 Va. App. at 374, 657 S.E.2d at 814.

Based on our review of the record, the trial judge only ordered the trial to proceed in Ms. Quagliana's absence when doing so had the least impact on her role as co-counsel at trial. Especially given the uncertainty of when Ms. Quagliana actually would return to court, we cannot say that the trial judge abused his discretion. Huguely was not *erroneously* deprived of his Sixth Amendment right. *See Johnson*, 51 Va. App. at 376, 657 S.E.2d at 815. Accordingly, despite Huguely's request for a new murder trial on this basis, a new trial simply is not required under the circumstances of this case.

(Respondent's Exhibit 4, *Huguely*, 63 Va. App. at 108-15, 754 S.E.2d at 564-68).

64.     The state court's decision did not result in a legal conclusion that is directly opposite to a Supreme Court decision nor did the state court reach the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts. *Williams*, 529 U.S. at 405. The state court's decision was not an "unreasonable application" of federal law "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Richter*, 562 U.S. at 103. *See also Coleman v. Clarke*, Civil Action No. 7:19-cv-00386, 2020 U.S. Dist. LEXIS 104567, at *38. Claim IV should be dismissed.

### *V(b)*

65.     In claim V(b), the petitioner alleges that the state courts unreasonably applied clearly established federal law by refusing to allow the defense to ask

questions during *voir dire* he alleges were directly relevant to jurors' ability to remain impartial, namely petitioner's "blame the victim" inquiry.

66.    Here, petitioner sought to inquire whether presentation of evidence that was "unflattering" to the victim, such as the dynamics of the couples' relationship and that Love was herself intoxicated, would cause a juror to perceive that as petitioner's attempt to "blame the victim."  As the Court of Appeals noted:

> Trial courts must afford a part a "full and fair" opportunity to ascertain whether prospective jurors "stand indifferent in the cause." *LeVasseur v. Commonwealth*, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983) *cert denied*, 464 U.S. 1063 (1984).  However, it is within the trial court's sound discretion to decide when the defendant has had such an opportunity.  *Id.  Buchanan*, 238 Va. at 401, 384 S.E.2d at 764. "'[A]party has no right, statutory, or otherwise, to propound any question he wishes, or to extend *voir dire* questioning *ad infinitum*.'" *Skipper v. Commonwealth*, 23 Va. App. 420, 427, 477 S.E.2d 754, 757-58 (1996) (quoting *Chichester v. Commonwealth*, 248 Va. 311, 325, 448 S.E.2d 638, 647 (1994) *see also* Code § 8.01-358 (counsel has right to ask "any relevant question to ascertain whether [a prospective juror] is related to either party, or has any interest in the cause, or has expressed or forms any opinion, or is sensible of any bias or prejudice herein").
>
> Further, trial courts are not required to allow counsel to ask questions which are so ambiguous as to render the answer meaningless. *See LeVasseur*, 225 Va. at 579, 304 S.E.2d at 652-53. To be permissible, counsel's questions must be relevant in that they are such as would necessarily disclose or clearly lead to the disclosure of relationship, interest, opinion, or prejudice.  *See* Code § 8.01-358. Where a trial court affords ample opportunity to counsel to ask relevant questions and where the questions actually propounded by the trial court were sufficient to preserve a defendant's right to trial by a fair and impartial jury, We will generally not reverse a trial court's decision to limit or disallow certain questions from defense counsel. *See LeVasseur*, 225 Va. at 582, 304 S.E.2d at 653; *Mackall v.*

*Commonwealth*, 236 Va. 240, 251, 372 S.E.2d 759, 766 (1988) […], *Buchanan*, 238 Va. at 401, 384 S.E.2d at 764-65.

The objecting party bears the burden of demonstrating that the trial court abused its discretion in limiting the scope of *voir dire*, *see Chichester*, 248 Va. at 325, 448 S.E.2d at 647, and must show that the jury panel lacked impartiality or that the jury selection process the court employed was prejudicial. *See Beavers v. Commonwealth*, 245 Va. 268, 277, 427 S.E.2d 411, 418, *cert. denied*, 510 U.S. 859 (1993). *Skipper*, 23 Va. App. at 427-28, 477 S.E.2d at 758.

(Respondent's Exhibit 4, *Huguely,* 63 Va. App. at 114-117, 754 S.E.2d at 567-569).

While the questions had been approved prior to trial, on the second day of *voir dire*, the trial judge sustained the Commonwealth's objection to the question, stating, "I don't think the question is really a helpful one because I think it all has to do with what the evidence actually shows, and I think without them knowing what the evidence shows, it's hard for them to know whether or not it's going to appear to be blaming the victim or not."

\*\*\*

Although the trial court struck Juror 34 for cause after an exchange prompted by the line of questioning sought by appellant, the juror's answers demonstrated the ambiguity of the question. As the trial court noted, the juror was not certain whether the hypothetical unflattering evidence would cause him to view appellant in a negative light and candidly stated it would be dependent on the type of evidence and the manner in which it was presented. When the Commonwealth did not object to striking that particular juror, the trial court granted appellant's motion. That the trial court struck this juror, however, does not suggest that the jurors were giving definitive answers that would "necessarily disclose or clearly lead to the disclosure of relationship, interest, opinion, or prejudice." *Buchanan*, 238 Va. at 401, 384 S.E.2d at 764. This same juror's response exemplified the ambiguity and meaningless nature of the answers obtained from the question. The record does not establish the jury panel lacked impartiality, that the process was prejudicial, or that the trial court abused its discretion. Accordingly, the trial court did not err by refusing to allow appellant to pose the question during *voir dire*.

(Respondent's Exhibit 4, *Huguely,* 63 Va. App. at 114-117, 754 S.E.2d at 567-569).

67.     The state court's decision did not result in a legal conclusion that is directly opposite to a Supreme Court decision nor did the state court reach the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts. *Williams*, 529 U.S. at 405. The state court's decision was not an "unreasonable application" of federal law "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Richter*, 562 U.S. at 103. *See also Coleman v. Clarke*, Civil Action No. 7:19-cv-00386, 2020 U.S. Dist. LEXIS 104567, at *38.  Claim V(b) should be dismissed.

### *V(c)*

68.     In allegation V(c) petitioner claims the trial court erred by refusing to strike for cause juror 211.  Petitioner maintains that her answers during *voir dire* revealed doubts about her impartiality.

69.     Huguely argues that the Court erred by not striking Juror 211 for cause because she was a professor at UVA and one of her students was a friend of the victim.  Contrary to Huguely's contention, she did not excuse the student from taking her final exam. (P.Br. 35).  The exam was scheduled at the same time as the funeral and Juror 211 allowed the student to postpone the exam in order to attend the funeral. She did not know the student well and she could not recall the student's name.  Juror

211 said she could be impartial and base a decision on the law and evidence produced at trial. She unequivocally stated the relationship with the student, her affiliation with UVA, and nothing she had read or heard about the case or the memorial service for the victim from any source would impact her ability to be impartial. (TT., Vol II, p. 268-275; App. 805-813). Indeed, the motion to strike Juror 211 was made without any rational basis in fact or law. Counsel rose and stated that she would make a motion to strike Juror 211 for the record in essence because the Juror 211 was employed by the University of Virginia. (TT., Vol II, p. 276). The statement by counsel that the motion to strike was "for the record" was a tacit acknowledgment that there was no legal basis for the motion to exclude Juror 211. Juror 211 did not provide an answer that placed into question her ability to listen to the evidence and decide the case upon that basis alone. The motion to strike Juror 211 was made by counsel "for the record" based on her long-time affiliation with UVA. (TT., Vol II, p. 276, App. 813).

70. The state court held:

Huguely moved to strike Juror 211 based on her affiliation with the University of Virginia, including the fact that one of Love's friends was enrolled in a class taught by Juror 211 at the time of Love's death. Juror 211 stated during *voir dire* that she helped the student to get a postponement of the final exam so that the student could attend Love's funeral. However, Juror 211 also stated that she did not know Love's friend well at all — adding that she was mortified because she could not even remember the name of the student during *voir dire*.

Juror 211 asserted plainly that having Love's friend in her class "has not" had any impact on how she viewed Huguely's case and also denied that her status as an employee of the university would affect her view of the case. In response to the following question by defense counsel, Juror 211 replied:

Q: Was there anything about anything that's gone on at the university with respect to this case, including information you've received, e-mails you've received, information you received from [University of Virginia President] Teresa Sullivan, any of those things, that has caused you to form any opinions or understanding or sympathies or anything of that nature?

A: Not at all, no. I read the memos but I did not participate in any of the activities.

Defense counsel sought to strike Juror 211 "just for the record," and the trial judge denied this request, finding that "there's not a shred of indication that this juror cannot be objective." We must defer to the trial judge's finding because it was not plainly wrong or unsupported by the record. *See Lovos-Rivas*, 58 Va. App. at 61-62, 707 S.E.2d at 30.

Respondent's Exhibit 4; *Huguely,* 63 Va. App. at 127, 754 S.E.2d at 574.

The constitutional guarantee of an impartial jury does not contemplate excluding those who have read or heard news accounts concerning the case or even exclusion of those who may have formed an opinion based on such accounts. . . . The test, instead, is whether a juror is capable of laying aside a preconceived opinion and rendering "a verdict solely on the evidence."

*Cressell v. Commonwealth*, 32 Va. App. 744, 755, 531 S.E.2d 1, 6 (2000). The Supreme Court's ruling in *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) holds that the constitutional requirement of impartiality does not require that the jurors are entirely ignorant of the facts or issues of the case. *Id.*

71.    The state court's decision did not result in a legal conclusion that is directly opposite to a Supreme Court decision nor did the state court reach the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts. *Williams*, 529 U.S. at 405. The state court's decision was not an "unreasonable application" of federal law "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Richter*, 562 U.S. at 103. *See also Coleman v. Clarke*, Civil Action No. 7:19-cv-00386, 2020 U.S. Dist. LEXIS 104567, at *38. Claim V(c) should be dismissed.

## Conclusion

72.    The lack of merit of petitioner's claims is ascertainable from the record, and an evidentiary hearing in this Court is not necessary. *See* 28 U.S.C. § 2254(e)(l) and (e)(2).

73.    Petitioner argues this in his prayer for relief that he should be granted habeas relief outright but at the very least this Court should grant an evidentiary hearing to ensure development of a full record on his "dictionary" claim, "*Brady*" claim, and what prejudice he incurred as a result of Dr. Uscinski being precluded from testifying on reperfusion and Dr. Daniel not being called to testify at all. (Petition at 19, 56). He relies upon the holdings in *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (citing *Winston v. Kelly*, 592 F.3d 535, 555 (4th Cir. 2010)),

while alleging the state court decided these claims on a "materially incomplete record," because the state habeas court refused to grant an evidentiary hearing and further, that its rulings should not be given AEDPA deference.

74.    The state habeas court's refusal to grant an evidentiary hearing does not necessitate *de novo* review or an evidentiary hearing. In *Stoffa v. Kiser*, No. 2:16cv207, 2016 U.S. Dist. LEXIS 103351, at *22 (E.D. Va. July 8, 2016) the Court held that "*de novo* review does not apply 'every time the state court declines to hold a hearing on a defendant's evidentiary proffer.'" *Id*. citing *Wilson v. Sirmons*, 536 F.3d 1064, 1079 (10th Cir. 2008). Rather, where, as in this case, "a state court evaluates 'the non-record evidence in its denial of [petitioner's] *Strickland* claim and his request for an evidentiary hearing,'" AEDPA's deferential standard should apply. *Id.*

75.    It cannot be seriously contended that the record on these claims is materially incomplete. At the threshold, petitioner's *Brady* claim was raised on direct appeal but was defaulted when petitioner subsequently failed to raise the claim in the Supreme Court of Virginia. It was not the subject of habeas review. Regarding the "dictionary" claim, the state habeas court relied upon the affidavits of bailiffs who had contact with the jury and the affidavits of all but one juror when denying that claim. Regarding the medical expert testimony claim, the state habeas court

considered the proffered testimony and affidavits of defense experts, the affidavits of trial counsel, and an exhaustive review of the trial record when denying that claim.

76.     Moreover, the premise of *Gordon* and *Winston* is that "new, material evidence, introduced for the first time during federal habeas proceedings[,]" and which the Petitioner was precluded from developing by the state court, "may require a *de novo* review of petitioner's claim." *Winston,* 592 F.3d at 556.  Petitioner does not point to any "new, material evidence, introduced for the first time during federal habeas proceedings" that he was precluded from developing by the state court. Thus, even if *Gordon* should be applied there has been no proffer of new evidence that the state court should have considered but did not.

77.     Finally, petitioner's argument seems to be that failing to hold an evidentiary hearing was a defect of Constitutional proportion. Again, "there is no prohibition," . . . "against a court making credibility determinations based on competing affidavits." *Strong*, 495 F.3d at 139; *Gray*, 806 F.3d at 792. In this case, based upon the records and affidavits upon which the state court was entitled to rely, there was no need for an evidentiary hearing in state court, and there is no need for one in this Court either.

78.     As held in *Powell v. Kelly*, 531 F. Supp. 2d 695, 736 (E.D. Va. 2008), aff'd, 562 F.3d 656 (4th Cir. 2009):

> To receive an evidentiary hearing in a federal forum, a petitioner must show that, if proved, 'the facts underlying the claim would be

sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense.'   § 2254(e)(2).   Importantly, where 'the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.'   *Schriro v. Landrigan*, 550 U.S [at 473].

WHEREFORE, the respondent asks this Court to deny and dismiss the petition for a writ of habeas corpus without an evidentiary hearing because petitioner's claims are defaulted and/or without merit, particularly when the proper standard of deference is applied to the state court rulings.

Respectfully submitted,

HAROLD W. CLARKE,
    Respondent herein.

By: _____/s/_____
           Counsel

LEAH A. DARRON
Senior Assistant Attorney General
Virginia State Bar # 23823
Attorney for Respondent
OFFICE OF THE ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
Telephone:  (804) 786-2071
Facsimile:  (804) 371-0151
ldarron@oag.state.va.us
OAGCriminalLitigation@oag.state.va.us

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2020, I have electronically filed the foregoing

Brief in Support of Motion to Dismiss and Rule 5 Answer with the Clerk of the Court

using the CM/ECF system, which will notify electronically the following CM/ECF

participant and other counsel:

Jonathan P. Sheldon
Sheldon & Flood, PLC
10621 Jones Street, Suite 301A
Fairfax, VA 22030
jsheldon@sfhdefense.com

Jeffrey M. Harris
Bryan K. Weir
Jordan M. Call
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA  22209
jeff@consovoymccarthy.com
bryan@consovoymccarthy.com
jordan@consovoymccarthy.com

_____/s/_____
LEAH A. DARRON
Senior Assistant Attorney General
Virginia State Bar # 23823
Attorney for Respondent
OFFICE OF THE ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
Telephone:  (804) 786-2071
Facsimile:  (804) 371-0151
ldarron@oag.state.va.us
OAGCriminalLitigation@oag.state.va.us