

# COURT OF APPEALS OF VIRGINIA



RECEIVED
CLERK'S OFFICE
JAN 2 2 2013
COURT OF APPEALS OF VIRGINIA
RICHMOND, VIRGINIA



RESPONDENT'S EXHIBIT **1**

GEORGE WESLEY HUGUELY V,

*Appellant,*

v.

COMMONWEALTH OF VIRGINIA,

*Appellee.*

---

Court of Appeals Record No. 1697-12-2
Circuit Court Nos. 11-102-1, 11-102-5

---

## PETITION FOR APPEAL

---

Craig S. Cooley (VSB 16593)
3000 Idlewood Avenue
P.O. Box 7268
Richmond, VA 23221
(804) 358-2328
(804) 358-3947 (fax)
(Retained)

cooleycs@msn.com

Paul D. Clement (VSB 37915)
BANCROFT PLLC
1919 M Street, NW, Suite 470
Washington, D.C. 20036
(202) 234-0090
(202) 234-2806 (fax)
(Retained)
pclement@bancroftpllc.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

NATURE OF THE CASE ..................................................................1

STATEMENT OF FACTS ...................................................................1

PROCEEDINGS IN THE TRIAL COURT .................................................7

ASSIGNMENTS OF ERROR..............................................................8

SUMMARY OF ARGUMENT ..............................................................9

ARGUMENT ................................................................................16

I.   THE CIRCUIT COURT VIOLATED MR. HUGUELY'S RIGHT TO
     COUNSEL BY FORCING HIM TO PROCEED IN THE ABSENCE OF
     HIS RETAINED COUNSEL OF CHOICE...........................................16

II.  THE CIRCUIT COURT VIOLATED MR. HUGUELY'S RIGHT TO A
     FAIR AND IMPARTIAL JURY UNDER THE SIXTH AMENDMENT
     AND VIRGINIA CONSTITUTION....................................................24

     A.   The Circuit Court Abused Its Discretion by Refusing to Order
          Individualized, Sequestered *Voir Dire* ...................................24

     B.   The Circuit Court Abused its Discretion by Refusing to Allow
          the Defense to Ask Questions During *Voir Dire* That Were
          Directly Relevant to Jurors' Ability to Remain Impartial...........29

     C.   The Circuit Court Erred by Refusing to Strike for Cause a
          Number of Jurors Whose Answers During *Voir Dire*
          Revealed Serious Doubts about Their Impartiality .................32

     D.   The Circuit Court Abused Its Discretion by Refusing to
          Sequester the Jury During Trial .......................................39

III. THE COMMONWEALTH VIOLATED THE DUE PROCESS CLAUSE
     AND *BRADY V. MARYLAND* BY FAILING TO DISCLOSE THE
     LOVE FAMILY'S IMMINENT $30 MILLION CIVIL SUIT AGAINST
     MR. HUGUELY........................................................................40

IV.  THE CIRCUIT COURT DID NOT ADEQUATELY INSTRUCT THE
     JURY ABOUT THE DEFINITION OF "MALICE" UNDER VIRGINIA
     LAW.................................................................................................46

V.   THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A
     CONVICTION FOR SECOND-DEGREE MURDER IN THAT
     THE EVIDENCE FAILED TO ESTABLISH MALICE AND
     SUPPORTED A DEGREE OF HOMICIDE NO GREATER
     THAN MANSLAUGHTER. ...............................................................49

CONCLUSION..........................................................................................54

REQUIRED STATEMENTS......................................................................56

CERTIFICATE OF SERVICE...................................................................57

CERTIFICATE OF COMPLIANCE ..........................................................57

## TABLE OF AUTHORITIES

*Banks v. Comm.*, 16 Va. App. 959, 434 S.E.2d 681 (1993)........................44

*Brady v. Maryland*, 373 U.S. 83 (1963)..............................................40

*Breeden v. Comm.*, 217 Va. 297, 227 S.E.2d 734 (1976).........................32

*Brown v. Comm.*, 29 Va. App. 199, 510 S.E.2d 751 (1999)................33,37

*Canipe v. Comm.*, 25 Va. App. 629, 491 S.E.2d 747 (1997)....................50

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1998).......16

*Cherricks v. Comm.*, 11 Va. App. 96, 396 S.E.2d 397 (1990)..................41

*Clements v. Comm.*, 21 Va. App. 386, 464 S.E.2d 534 (1995)...........32,36

*Clinton v. Comm.*, 161 Va. 1084, 172 S.E. 72 (1934)............................49

*Coffey v. Comm.*, 202 Va. 185, 116 S.E.2d 257 (1960)..........................54

*Cone v. Bell*, 556 U.S. 449 (2009).....................................................45

*Connors v. United States*, 158 U.S. 408 (1895)...................................30

*Corell v. Comm.*, 232 Va. 454, 352 S.E.2d 352 (1987)..........................40

*DeHart v. Comm.*, 19 Va. App. 139, 449 S.E.2d 59 (1994)................33,35

*Essex v. Comm.*, 228 Va. 273, 322 S.E.2d 216 (1984)..................50,51,53

*Fletcher v. Comm.*, 209 Va. 636, 166 S.E.2d 269 (1969).......................48

*Green v. Comm.*, 262 Va. 105, 546 S.E.2d 446 (2001)...........................33

*In re Greensboro News Co.*, 727 F.2d 1320 (4th Cir. 1984)....................24

*Haywood v. Comm.*, 20 Va. App. 562, 458 S.E.2d 606 (1995)................54

*Hegedus v. Comm.*, 1997 WL 359283 (Va. Ct. App. 1997)....................49

*Jiminez v. Comm.*, 241 Va. 244, 402 S.E.2d 678 (1991).........................46

*Justus v. Comm.*, 220 Va. 971, 266 S.E.2d 87 (1980)...................33,34,35

*London v. Comm.*, 49 Va. App. 230, 638 S.E.2d 721 (2006)...................19

*Morris v. Slappy*, 461 U.S. 1 (1983)...................................................23

*Moten v. Comm.*, 14 Va. App. 956, 420 S.E.2d 250 (1992)................34,38

*Paris v. Commonwealth*, 9 Va. App. 454, 389 S.E.2d 718 (1990)............17

*People v. Wallert*, 98 A.D.2d 47 (N.Y. 1983)……………….…..……………42

*Perricllia v. Comm.*, 229 Va. 85, 326 S.E.2d 679 (1985)……………….…51

*Powell v. Alabama*, 287 U.S. 45 (1932).  ……………………….…………16

*Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984)……..…..24, 28

*Rodriguez v. Chandler*, 492 F.3d 863 (7th Cir. 2007)………..…………..23

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981)…………………..29

*Shimhue v. Comm.*, 1998 WL 345519 (Va. Ct. App. 1998)………………48

*In re South Carolina Press Ass'n*, 946 F.2d 1037 (4th Cir. 1991)……..24,25

*Stokes v. Warden*, 226 Va. 111, 306 S.E.2d 882 (1983)………………….46

*Stockton v. Comm.*, 227 Va. 124, 314 S.E.2d 371 (1984)……………......39

*Strickler v. Greene*, 527 U.S. 263 (1999)…..…………………….………40

*Swain v. Alabama*, 380 U.S. 202 (1965)……………………….………….29

*Taylor v. Comm.*, 61 Va. App. 13, 733 S.E.2d 129 (2012)………….…..37

*Thomas v. Comm.*, 186 Va. 131, 41 S.E.2d 476 (1947)……………….…48

*United States v. Dansker*, 565 F.2d 1262 (3d Cir. 1977)………………..46

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)……….………*passim*

*United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996) *(en banc)*……..30

*United States v. Laura*, 607 F.2d 52 (3d Cir. 1978)……………………..22

*United States v. White*, 492 F.3d 380 (6th Cir. 2007)…………………..45

*Workman v. Comm.*, 272 Va. 633, 636 S.E.2d 368 (2006)……………...41

*Wright v. Comm.*, 73 Va. 941, 943 (1879)………………………………32


Va. Code § 19.2-264……………………………………………………39

Roger D. Groot, *Criminal Offenses and Defenses in Virginia* (2006)….48,50

Ronald J. Bacigal, *Virginia Practice Jury Instructions*..………………….48

TO THE HONORABLE CHIEF JUDGE AND ASSOCIATE JUDGES:

## NATURE OF THE CASE

This is an appeal from a verdict in a jury trial in the Circuit Court of the City of Charlottesville on February 22, 2012, finding the defendant guilty of second-degree murder and grand larceny, and to his sentences of 23 years and 1 year, respectively, as imposed on August 30, 2012 by the Hon. Edward L. Hogshire.

## STATEMENT OF FACTS

In spring 2010, George Huguely and Yeardley Love were 22-year-old seniors at the University of Virginia nearing graduation. Both lacrosse players, they had been in an "on-and-off" romantic relationship for approximately two years. 2/8/12 Tr. 113-14 (Duff); *id.* at 187-88 (Whiteley). The relationship was tumultuous (both had been unfaithful to the other), but they remained friends and intended to continue their friendship after graduation.

On February 27, 2010, Mr. Huguely and Ms. Love had an altercation about text messages she had found on his phone. 2/9/12 Tr. 233 (Carroll). A visiting lacrosse player, Michael Burns, testified that he saw Mr. Huguely using his arm to hold Ms. Love down on top of him on the bed as she sought to get away. *Id.* at 182-83 (Burns). Two days later, however, Ms. Love told Burns that everything was fine with Mr. Huguely, and she

expressed no fear or concern about him. *Id.* 193. Mr. Huguely later gave Ms. Love an apology letter stating that she was his "best friend," that he was "horrified with the way I behaved and treated you," and that he was "scared to know that I can get that drunk to the point where I cannot control the way I behave." Ex.21.

On April 27th, Ms. Love had four or five drinks while out with friends and became angry when someone mentioned that Mr. Huguely was seeing and texting another woman, Stephanie Aladj. 2/8/12 Tr. 140 (Duff); *id.* at 198-99 (Whiteley). Around 2:00am, she entered Mr. Huguely's room without knocking and saw two visiting female high school seniors; Mr. Huguely had allowed them to stay at his apartment as a favor until they were able to locate their host. Ms. Love demanded to know whether these were the women he had been texting, and hit Mr. Huguely repeatedly with her purse. 2/9/12 Tr. 267-69 (McLean); *id.* at 208-10 (Fuchs); 2/17/12 Tr. 29-31 (Billmire); *id.* at 42-44 (Wattenmaker). Ms. Love also told him that she had "hooked up" with Michael Burns earlier that week.

Ms. Love later emailed Mr. Huguely an apology, writing that she was "sorry [I] went crazy." Ex.132. The emails descended into a vitriolic exchange in which Mr. Huguely fumed at Ms. Love for "hooking up with [B]urns then attacking me." Ex.132; *see* 2/8/12 Tr. 141-42 (Duff); 2/9/12 Tr.

314-15 (Leightly).  On April 30th, Mr. Huguely sent Ms. Love an email that read in its entirety, "We should talk tonight."  Ex.132.    One day later, on May 1st, Ms. Love and Mr. Huguely appeared cordial and were seen holding hands at a gathering of lacrosse players and their families.  2/17/12 Tr. 86-88 (Massaro).

On Sunday May 2nd, Mr. Huguely began drinking early in the morning, and was already "slurring his words" by 9:00am.  2/9/12 Tr. 225-26 (B. Carroll); 2/15/12 Tr. 83 (Clausen); *id.* at 136-37 (Thompson) (drank "three or four" beers early in the morning).    At a lacrosse team golf tournament later that morning, Mr. Huguely continued to drink heavily and became increasingly intoxicated and uncoordinated.  2/15/12 Tr. 112-13 (Clements); *id.* at 137 (Thompson).  At a post-tournament reception, Mr. Huguely was slurring and inarticulate.  2/9/12 Tr. 227-28 (B. Carroll); *id.* at 213 (Fuchs).

Mr. Huguely, his father, and some teammates subsequently went to a restaurant, where they continued to drink wine.  Mr. Huguely tipped over a bottle of wine and later urinated on the side of the building.  2/15/12 Tr. 86 (Clausen); *id.* at 139-40 (Thompson).  Around 10:30pm, Mr. Huguely met teammates Kevin Carroll, Ken Clausen, and Mikey Thompson in his

3

apartment; he was visibly drunk and incoherent. 2/15/12 Tr. 66-67
(K. Carroll); *id.* at 88 (Clausen); *id.* at 142 (Thompson).

Around 11:40pm, Carroll and Clausen went out for beers and
Thompson went back to his apartment. 2/15/12 Tr. 89 (Clausen); *id.* at 142
(Thompson). At roughly the same time, Mr. Huguely walked downstairs to
the apartment of teammate Chris Clements, who was working and told
Huguely to go away. *Id.* at 115-16 (Clements). Mr. Huguely—dressed in
tennis shoes, cargo shorts, and a golf shirt—then walked across a well-lit
path to Ms. Love's apartment. He carried no bag, weapon, or object.
According to Mr. Huguely, he wanted to talk to Ms. Love about the dramatic
events and emails from earlier that week. Ex.26.

After a day of drinking, Ms. Love ended the day by celebrating a
friend's birthday from around 5:00pm to 10:00pm, where she consumed at
least four drinks. 2/8/12 Tr. 213, 243 (Whiteley). Ms. Love and her
roommate, Caitlin Whiteley, then returned to their apartment, intending to
shower and go back out. As Whiteley prepared to leave, however, she
found Ms. Love lying in bed in just her underwear. *Id.* at 218-219.
According to Whiteley, Ms. Love was drunk and seemed like she might
"pass out," but said she would consider meeting up later. *Id.* at 245-46.

Ms. Love's blood alcohol level was between 0.14 and 0.18. Ex.105; 2/15/12 Tr. 209-10 (Poklis).

According to Mr. Huguely, when he arrived at Ms. Love's door around 11:40pm, she told him to go away. He then kicked a hole in the paper composite door and reached through to let himself in. The two had an altercation on the bed and ended up wrestling on the floor. Ms. Love stood up, and Mr. Huguely tossed her on the bed. When he left, she was conscious, with her nose bleeding. Ex.26. Anna Lehmann, a student in the downstairs apartment, heard Mr. Huguely's steps on the stairs and one loud noise by the door, but no running, yelling, banging, or hitting of the walls or floor. 2/8/12 Tr. 174-77 (Lehmann). Lehmann also saw Mr. Huguely walking away at a normal pace and in a normal manner roughly ten minutes after he had arrived. *Id.* 181. On his way out of Ms. Love's apartment, Mr. Huguely took her laptop computer, which he threw in a nearby dumpster as he was walking home.

Once home, around midnight, Mr. Huguely sat with Clausen and Carroll in the living room drinking beer for around 15 minutes; he did not appear injured or disheveled. 2/15/12 Tr. 74 (K.Carroll); *id.* at 98-101 (Clausen). Carroll, Thompson, and Will Bolton—who arrived shortly after Mr. Huguely returned—noted that Mr. Huguely was intoxicated but

otherwise saw nothing unusual. *Id.* at 132 (Bolton); *id.* at 77-78 (K. Carroll); *id.* at 152-53 (Thompson). Mr. Huguely went to bed by 12:30am. *Id.* at 74 (K.Carroll).

On May 3rd, at 2:15am, Caitlin Whiteley found Ms. Love under her comforter in her usual sleeping position on her bed, face down on her left-hand pillow. 2/8/12 Tr. 223, 252 (Whiteley). Whiteley testified that Ms. Love's body was still warm. *Id.* at 230. Ms. Love had injuries around her eye, frenulum, chin, inside her mouth, and around the hyoid bone. She had no injuries to her left side. There were no dents or marks on the walls. 2/10/12 Tr. 224-27, 233 (Flaherty). The wall art and furniture, including Ms. Love's personal effects on top of the furniture, appeared undisturbed. *Id.* at 127-29.

Around 6:30am, police woke up Mr. Huguely, who was fully cooperative. The officers took him to the police station and read him his *Miranda* rights. When, after an hour of police questioning, the detective informed Mr. Huguely that Ms. Love was dead, Mr. Huguely reacted with shock and disbelief, exclaiming repeatedly, "She's not dead," "She's dead?," "How is she dead?," "Tell me she's not dead," "There is no way she's dead," and "She cannot be dead." Ex.26. Forensic testing revealed

6

no blood on Mr. Huguely or his clothes, or at his apartment.    Ex.152;
Ex.143

## PROCEEDINGS IN THE TRIAL COURT

On April 18, 2011, Mr. Huguely was indicted on six counts of first-degree murder, robbery, burglary in the nighttime, statutory burglary, grand larceny, and murder in the commission of a robbery.  R.126-131.

On October 25, 2011, Mr. Huguely filed a pre-trial motion for individual sequestered *voir dire* and sequestration of the jury during trial. R.143, R.336, R.364.  The court took these issues under advisement on November 18, 2011, R.373, and Mr. Huguely renewed his motion shortly before trial, R.413.  On January 26, 2012, the court denied the motion for sequestered *voir dire* and to sequester the jury, although it granted the motion to the extent it requested individual *voir dire*.  R.456.  *Voir dire* was conducted from February 6-8, 2012.

The trial took place over twelve days between February 8th and 22nd.   On February 22, 2012, the jury returned a verdict finding Mr. Huguely guilty of second-degree murder and grand larceny, and not guilty of robbery, burglary, statutory burglary and first-degree felony murder. R.622-23.  The jury recommended a sentence of 25 years imprisonment on

7

the second-degree murder count and one year imprisonment on the grand larceny count. R.623-24.

On May 25, 2012, Mr. Huguely filed a motion to set aside the verdict and for a new trial. R.632-703. The circuit court denied that motion on August 13, 2012. R.1364. Mr. Huguely also filed a supplemental motion for a new trial based on violations of the *Brady* doctrine on June 5, 2012, R.705, R.1376, which the court denied on August 29, 2012, R.1463, R.1365.

On August 30, 2012, the court sentenced Mr. Huguely to 23 years imprisonment on the second-degree murder charge and one year imprisonment on the grand larceny count, with the sentences to run concurrently. R.1474-78.

Mr. Huguely filed a timely notice of appeal on September 25, 2012. R.1479.

## ASSIGNMENTS OF ERROR

I.    The circuit court violated Mr. Huguely's right to counsel under the Sixth Amendment and Virginia Constitution by forcing him to proceed with trial in the absence of his retained counsel of choice. [Issue preserved at 2/17/12 Tr. 9-11, 97-100; R.650-664].

II.   The circuit court violated Mr. Huguely's right to a trial by a fair and impartial jury under the Sixth Amendment and Virginia Constitution by:

A.    Refusing to order individualized, sequestered *voir dire*. [Issue preserved at R.157-59, R.336-43, R.413, R.680-85]

B.    Refusing to allow the defense to ask questions during *voir dire* that were directly relevant to whether prospective jurors could remain impartial. [Issue preserved at Feb. 6-8 Tr. 663-65, 687-88; R.676-80].

C.    Refusing to strike for cause a number of jurors whose answers during *voir dire* raised serious doubts about their ability to remain impartial. [Issue preserved at Feb. 6-8 Tr. 71-72, 90-94, 264-66, 319, 631-33, 873-75; R.664-76].

D.    Refusing to sequester the jury during trial. [Issue preserved at R.159-170, R.413].

III.  The Commonwealth violated the Due Process Clause and *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the material fact that the Love family was planning to bring a $30 million civil suit against Mr. Huguely. [Issue preserved at R.705-09, 773-845, 1339-55, 1376-77, 1463-64.]

IV.   The circuit court did not adequately instruct the jury about the meaning of "malice" under Virginia law. [Issue preserved at 2/16/12 Tr. 56-57, R.555-58, R.687-92].

V.    The evidence was insufficient to support a conviction for second-degree murder in that the evidence failed to establish malice and supported a degree of homicide no greater than manslaughter. [Issue preserved at R.699-703].

## SUMMARY OF ARGUMENT

This was a remarkably high-profile case in Charlottesville that implicated a number of sensitive and emotionally charged issues, and received unprecedented coverage in the local and national media. It was thus critically important for the circuit court to ensure that Mr. Huguely

received a fair trial from an impartial jury, based on the facts and evidence presented in court rather than the sensationalist media coverage that surrounded this case from day one.   Unfortunately, the circuit court's response to the intense media interest was to rush through the trial, rather than to ensure that the accused received a fair trial.   The court made a number of erroneous rulings that valued expediency and convenience over Mr. Huguely's right to a fair trial.  Those errors, individually and collectively, require that Mr. Huguely's second-degree murder conviction be vacated, and the case remanded for a new trial with appropriate procedural safeguards.

I.   A criminal defendant's ability to be represented by his counsel of his choice is at the very core of the Sixth Amendment.  From the start of this case, Mr. Huguely chose to be represented by two lawyers, Fran Lawrence and Rhonda Quagliana, who served as equal partners in his defense and consulted each other on all major tactical and strategic decisions.

Nine days into the trial, Ms. Quagliana developed stomach flu and became severely ill.  Even though she still had not recovered by the next day, the circuit court refused to grant an additional continuance and forced the defense to proceed in her absence.  That holding was a clear violation

10

of Mr. Huguely's Sixth Amendment rights.   The Supreme Court recently reaffirmed that a trial court violates the Sixth Amendment when the defendant "is erroneously prevented from being represented by the lawyer he wants, *regardless of the quality of the representation he received*." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (emphasis added).

A court's denial of the defendant's right to be represented by his counsel of choice is a structural error that requires reversal without any additional showing of prejudice.  But even if prejudice were required, that standard would be readily satisfied.  Because the circuit court insisted on proceeding in Ms. Quagliana's absence, the defense was forced to call its expert medical witnesses out of order, thus undermining its strategic trial goals.   Ms. Quagliana also missed an entire day of observing the proceedings, and her standing before the jury was surely diminished by the suggestion that she was not essential to the defense team.  The circuit court's unyielding insistence on meeting its self-imposed deadlines in the face of a reasonable request for a short continuance (the defense's first such request) violated Mr. Huguely's right to counsel and requires a new trial.

11

II.    At trial, Mr. Huguely requested a number of safeguards to ensure that he would receive a fair trial from an impartial jury despite the extremely high profile of this case in Charlottesville.   In particular, Mr. Huguely requested that the trial court conduct individualized, sequestered *voir dire* of prospective jurors to ensure that these individuals would be frank and candid about whether they could remain impartial while considering the many emotionally charged issues in this case.  The circuit court clearly erred by denying that reasonable request, as well as Mr. Huguely's request to sequester the jurors during trial to prevent them from being exposed to the daily barrage of media coverage.

Worse yet, after initially allowing the defense to ask prospective jurors about whether they could impartially evaluate evidence that could be seen as "blaming the victim" *and striking one prospective juror for cause based on his answer*, the circuit court erroneously reversed course and barred further use of that plainly relevant question.   The court did so largely because of timing concerns, once again putting expedience above the accused's right to a fair trial.

The circuit court further erred by refusing to strike for cause at least six jurors whose answers during *voir dire* raised serious doubts about whether they could impartially evaluate the facts and evidence of this case.

12

Some of those jurors had already formed opinions about this very case. Others had deeply rooted views about alcohol use or student athletes, or fears about how this case would affect the reputation of the University of Virginia. And the Commonwealth's attempts to rehabilitate these jurors through leading questions about their self-assessed ability to remain impartial were often met with equivocation. When it comes to ensuring an impartial jury, both the U.S. Constitution and the Virginia Constitution leave nothing to chance, and the circuit court erred by refusing to strike these jurors for cause.

III.    The Commonwealth violated the Due Process Clause and the *Brady* doctrine by failing to disclose the fact that the Love family was planning to bring a $30 million civil suit against Mr. Huguely after the completion of the criminal trial. The defense learned for the first time at a post-trial hearing that the Loves' civil attorneys had been in contact with the prosecution, and had postponed bringing the civil suit at the prosecution's request. Yet, despite the Commonwealth's "open file" policy, the prosecution did not disclose either the imminent civil suit or the contacts between the prosecutors and the Love family's civil attorneys.

This information was plainly material to the criminal case against Mr. Huguely. The civil case advanced a negligence theory and characterized

13

Ms. Love's death as an "accident." That view of the facts is flatly inconsistent with the Commonwealth's theory of the criminal case—namely, that Mr. Huguely should be convicted of first- or second-degree murder because he acted with malice. Moreover, Sharon and Lexie Love (Yeardley Love's mother and sister) testified at both the guilt/innocence and sentencing phases of Mr. Huguely's trial, and the imminent civil suit would have been a critical subject for cross-examination. The civil suit was also squarely relevant to the jury's determination of an appropriate sentence, as it reflected an additional way in which Mr. Huguely is being held accountable for his actions.

IV.    The circuit court also erred by refusing to give an additional instruction regarding the "malice" element of second-degree murder. Mr. Huguely requested an additional sentence in the jury instruction clarifying that malice requires "a wicked or corrupt motive" or an "evil mind." The circuit court rejected that request even though this Court and the Virginia Supreme Court have repeatedly included this language in the definition of malice. The excluded language was critical to Mr. Huguely's defense, as the existence of malice is what separates second-degree murder from manslaughter. Indeed, during deliberations, the jury requested additional clarification about the definition of malice, thus making clear that the issue

14

was important to their deliberations, and that the instructions given by the court were inadequate.

**V.**     The Commonwealth was unable to carry its burden of proving beyond a reasonable doubt that Mr. Huguely was guilty of second-degree murder.    To elevate a homicide from manslaughter to second-degree murder, the Commonwealth must prove the existence of "malice"—namely, that the defendant willfully or purposefully, rather than negligently or recklessly, engaged upon a course of conduct likely to result in death or great bodily harm.

The evidence offered at trial plainly did not meet that standard.  The Commonwealth's medical witnesses failed to exclude the possibility that Ms. Love's fatal injuries were caused by a fall to the floor, without any additional application of force by Mr. Huguely.  Moreover, ample evidence supported Mr. Huguely's account that, though he wrestled with Ms. Love on the floor, he never applied a degree of force likely to cause death or serious bodily harm.  The room was mostly undisturbed, and Ms. Love did not have the types of injuries that would have been consistent with a greater application of force by Mr. Huguely.  And Mr. Huguely's shock and disbelief when he was informed that Ms. Love had died—as well as his actions immediately before and after the altercation—thoroughly refute any

15

suggestion that he intended to kill or seriously injure Ms. Love. The evidence was thus insufficient to support a conviction for any offense more serious than manslaughter.

## ARGUMENT

I.   **THE CIRCUIT COURT VIOLATED MR. HUGUELY'S RIGHT TO COUNSEL BY FORCING HIM TO PROCEED IN THE ABSENCE OF HIS RETAINED COUNSEL OF CHOICE**

A.   The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. A critical component of that right is the "right of a defendant who does not require appointed counsel to choose who will represent him." *Gonzalez-Lopez*, 548 U.S. at 144. As the Supreme Court has explained, "[i]t is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53 (1932). That is, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1998). The Virginia Constitution similarly protects "the right of any accused, if he can provide counsel for himself by his own resources . . . to be represented by an attorney of his own

16

choosing." *Paris v. Commonwealth*, 9 Va. App. 454, 459-60, 389 S.E.2d 718 (1990) (citation omitted).

From the day of his arrest, Mr. Huguely chose to be represented by two retained attorneys, Fran Lawrence and Rhonda Quagliana.   Mr. Huguely decided that he wanted two attorneys with their specific and complementary skills and outlooks to represent him at trial.   Neither Mr. Lawrence nor Ms. Quagliana was designated as "lead counsel," and they served as equal partners throughout the representation.

Both attorneys participated extensively in the trial.   Ms. Quagliana conducted *voir dire* of potential jurors over a two-day period, handled the examinations of police, rescue squad, and medical witnesses, and addressed the jury regarding sentencing.   Mr. Lawrence gave the opening and closing statements and examined a number of other witnesses. Throughout the trial, Mr. Lawrence and Ms. Quagliana repeatedly sought each other's advice and conferred with one another regarding strategic decisions and the examination of witnesses.

On the ninth day of trial, February 16, 2012, Ms. Quagliana developed stomach flu and was unable to attend court because she was extremely ill.   Ms. Quagliana's illness is well-documented and is not in

17

dispute.[1]  That morning, Mr. Lawrence represented to the court that Ms. Quagliana was too sick to continue with trial in her condition.  The court recessed the proceedings until 12:30 p.m.  2/16/12 Tr. 3-4.  Ms. Quagliana was still "not doing terribly well" at that time, and the court granted Mr. Lawrence's request to adjourn for the day.  *Id.* at 6-9.

The next day, February 17th, Ms. Quagliana continued to be actively ill and unable to attend court; she was admitted to the infusion center at Martha Jefferson Hospital that afternoon.  Mr. Lawrence again objected to proceeding in Ms. Quagliana's absence, explaining that Mr. Huguely "has been surrounded by two counsel [who] for the last two weeks and for the last two years who have been his team who have assisted him," and that he "objects to proceeding at all until he has his full defense team."  2/17/12 Tr. 9-10.  The court nonetheless overruled this objection, asserting that "this case is going forward this morning with these witnesses."  *Id.* at 10.

Mr. Lawrence was thus forced to examine a number of witnesses in Ms. Quagliana's absence.  And, because Mr. Lawrence was not prepared to examine the medical witnesses who were scheduled to testify on February 17th, *id.* at 4-6, the defense was forced to call its witnesses out of

---

[1]  *See* 8/22/12 Tr. 137 (THE COURT:  "Let me just state this.  I never doubted you were sick. . . . You have never, ever misrepresented anything to the Court.");  R.1417-1431 (sworn affidavits documenting Ms.

order.  Even then, the court continued to insist on expeditiousness above all else, emphasizing throughout the day on the 17th that "[t]he defense needs to be ready to go tomorrow." *Id.* at 162-63; *see id.* at 101 (Court stating that "I'm trying to avoid going into next week with the case and . . . I'm going to do everything in my power to keep the case moving quickly and on time").

The circuit court's insistence that Mr. Huguely proceed in the absence of his retained counsel of choice violated his Sixth Amendment right to counsel and requires a new trial.  As the Supreme Court has emphasized, the Sixth Amendment commands "not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended *by the counsel he believes to be best*."  *Gonzalez-Lopez*, 548 U.S. at 146 (emphasis added).  Thus, "[w]here the right to be assisted by counsel of one's choice is wrongly denied . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation."  *Id.* at 148.  The constitutional violation is "complete" when the defendant "is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received."  *Id.*; *see also id.* at 148-51 (violation of the right to counsel of choice is "structural" and is not subject to harmless-error review); *London v.*

19

*Commonwealth*, 49 Va. App. 230, 239, 638 S.E.2d 721 (2006) (holding that *Gonzalez-Lopez* "calls into question our prior holdings requiring prejudice be shown" in order to prove a violation of the defendant's right to counsel of choice).

This rule makes good sense.  The choice of an attorney is an inherently subjective and personal one, and it would be extremely difficult to "assess[] the effect of the error" when a defendant is denied his counsel of choice.  *Gonzalez-Lopez*, 548 U.S. at 149 n.4.  Different attorneys "will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, [ ] style of witness examination, and jury argument."  *Id.* at 150.  It is simply "impossible to know what different choices the [alternative] counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceeding."  *Id.*  The Supreme Court thus had "little trouble" concluding that "erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'"  *Id.*

Indeed, even if Mr. Huguely were required to demonstrate prejudice, that standard is readily satisfied.  When Ms. Quagliana returned to court on

20

the morning of Saturday, February 18th, she was forced to examine several witnesses even though she had not seen the testimony or cross-examinations of the five critical defense witnesses who had testified the day before. And the defense was forced to call its witnesses out of order. The defense planned to have its two medical experts, Dr. Jan Leestma and Dr. Ronald Uscinski, testify back-to-back, in order to give the jury a cohesive picture of the medical evidence. But because of the court's refusal to grant a short continuance to accommodate Ms. Quagliana's illness, the defense was forced to call several other witnesses in between the two medical experts, thus undermining counsels' strategic goals and theory of the case. Proceeding in Ms. Quagliana's absence also undermined her status as an equal partner in the defense by suggesting to the jury that her presence was not necessary to the defense team.

B.    The circuit court apparently agreed with the Commonwealth's position that there was no Sixth Amendment violation because Mr. Huguely continued to be represented by Mr. Lawrence while Ms. Quagliana was ill. *See* 2/17/2012 Tr. 10 (Commonwealth asserting that "this will be entirely fair and [ ] Mr. Huguely will be effectively represented by the attorney who has prepared this particular part of their case"). But in *Gonzalez-Lopez*, the Supreme Court squarely rejected the notion that a violation of the right to

21

counsel of choice can be excused as long as the defendant received effective representation from *any* lawyer. As the Court explained, that argument—which was advanced by the dissenting Justices—is based on a "misunderstanding of the nature of the right to counsel of choice" and "confus[es] this right with the right to *effective* assistance of counsel." 548 U.S. at 151 n.5 (emphasis added). Indeed, the defendant in *Gonzalez-Lopez* continued to be ably represented by constitutionally adequate "substitute counsel," but this did not in any way excuse the trial court's violation of the defendant's right to be represented by his counsel of choice.

The Third Circuit similarly emphasized even before *Gonzalez-Lopez* that it is not "decisive" that the defendant "continued to have the services of" one attorney when the defense team was "composed of two attorneys who may have served distinct and important functions." *United States v. Laura*, 607 F.2d 52, 58 (3d Cir. 1978). When the defendant "wished to retain both attorneys," the court must "presume that she felt that she needed both attorneys." *Id.* That choice is "[the defendant's] to make and not the court's, unless some appropriate justification for the dismissal is provided." *Id.* Put simply, as long as a retained attorney "perform[s] a defense function," the defendant need not prove "the importance of his assistance" in order to establish a Sixth Amendment violation. *Id.*; *see also*

22

*Rodriguez v. Chandler*, 492 F.3d 863 (7th Cir. 2007) (Easterbrook, J.) (explaining that *Gonzalez-Lopez* "does not distinguish among degrees of preference," and that a court violates the Sixth Amendment when the defendant "found two lawyers [he] trusted but [was] allowed to use the services of only one").

\* \* \*

In sum, the defense faced an unfortunate turn of events in the middle of trial when one of Mr. Huguely's chosen attorneys—who had been a trusted counselor and advisor since the day of the arrest—became too sick to be present in court. This was the defense's first request for a continuance, and there was no suggestion whatsoever that Ms. Quagliana's illness was not legitimate or that the defense was acting in bad faith to gain some tactical advantage. *See* 2/17/12 Tr. 99 (court stating that "no one in the room has misrepresented . . . ever anything to me," and that all counsel have been "just exemplary in terms of being honest and forthright with the Court"). Under these circumstances, the circuit court erred by refusing to grant a short continuance to protect Mr. Huguely's Sixth Amendment right to be represented by his counsel of choice. *See Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (right to counsel is violated by

23

an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'").

## II. THE CIRCUIT COURT VIOLATED MR. HUGUELY'S RIGHT TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH AMENDMENT AND VIRGINIA CONSTITUTION

### A. The Circuit Court Abused Its Discretion by Refusing to Order Individualized, Sequestered *Voir Dire*

As the Supreme Court has explained, there is a "presumption of openness" in all criminal proceedings, but that presumption may be "overcome" if "closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) (citation omitted). The "selection of a fair and impartial jury is a right protected by the Sixth Amendment and is one of the 'high values'" that may trump the presumption of open proceedings. *In re South Carolina Press Ass'n*, 946 F.2d 1037, 1043 (4th Cir. 1991). "Full and frank answers from potential jurors . . . are essential to the process of selecting such a jury," and "fear of publicity that might be given to answers of venirepersons during *voir dire* may so inhibit or chill truthful responses that an accused is denied the fair trial to which he is entitled under the Fourteenth Amendment." *Id.*

In a high-profile criminal case, *in camera voir dire* of potential jurors may be necessary to ensure "frank and forthcoming" responses. *In re*

24

*Greensboro News Co.*, 727 F.2d 1320, 1321-23 (4th Cir. 1984). Closed *voir dire* can be used to ensure that "defendants will be tried by an impartial jury which will render its verdict on the basis of evidence adduced at trial rather than information from the newspapers or television." *Id.* at 1325.

The Fourth Circuit has found closed *voir dire* to be appropriate in a criminal case involving "many highly charged and emotional issues," that had been covered extensively in the media. *South Carolina Press Ass'n*, 946 F.2d at 1041. As a result, the *voir dire* necessarily elicited "very personal and emotional responses from potential jurors," many of whom were "reluctant to speak frankly" in open court. *Id.* at 1042. The district court concluded that "the presence of the press and others creates a substantial probability that the candor of the venire would be impaired and would impinge on the Sixth Amendment rights of the defendant." *Id.*

In determining whether pretrial proceedings such as *voir dire* should be closed to the public, courts must consider whether: (1) there is a "substantial probability that the defendant's right to a fair trial will be prejudiced by publicity"; (2) there is a substantial probability that "closure would prevent that prejudice"; and (3) reasonable alternatives to closure "cannot adequately protect the defendant's fair trial rights." *South Carolina*

25

*Press Ass'n*, 946 F.2d at 1041 (quoting *In re State Record Co.*, 917 F.2d 124, 128 (4th Cir. 1990)).

In this case, each of those factors strongly counseled in favor of closed *voir dire*. As Mr. Huguely explained in his pretrial motion, this case has attracted a staggering amount of press coverage from both the local and national media. Between May 2010 and July 2011, the local ABC, CBS, and FOX stations had covered this case more than 100 times. R.174-76. And, as of late 2011, there had been 144 articles about this case in the *Charlottesville Daily Progress*, 45 in the *Cavalier Daily*, 90 in the *Richmond Times-Dispatch* and 84 in the *Washington Post*. R.177-96. Many of those articles contained highly sensationalist and inflammatory rhetoric about Mr. Huguely.[2] Others provided extensive coverage of earlier alleged "bad acts" by Mr. Huguely, R.149, or attempted to inject into this case issues of class, wealth, race, and domestic violence, R.150-51. And these media reports contained a number of demonstrably false statements, such as the suggestion that a "bloody shirt" had been found in Mr. Huguely's apartment. R.148.

---

[2] *See, e.g.,* R.144-45 (Mr. Huguely was "an Anger Prone Scion of Prominent DC Family," "Students at All-Boys Landon School Planned Sex Parties, Sources Say," "More Drunken Violent Episodes Emerge," "Source: Huguely Attacked Teammate")

26

In addition to the round-the-clock media coverage, this case was also addressed extensively by the University of Virginia, which has long played an outsized role in the Charlottesville community.  Shortly after Ms. Love's death, the University held a vigil in her memory, with University President John Casteen delivering an impassioned speech calling students to action on issues of domestic violence.   R.204-06.  Even though the police investigation had barely begun, Mr. Casteen stated that Ms. Love had been "attacked and beaten" and "thrown against [the] wall[]."  R.205; *see id.* (referring to the "blows and abuse" that "ended Yeardley's life" and her "attacker's advantage or arrogance or mindless sense of right to abuse").

The April 11, 2011 preliminary hearing in this case produced a flood of local and national media far beyond anything previously seen in Charlottesville.  The courtroom was packed with reporters from virtually every media outlet in the United States, and the hearing had to be moved to a larger venue to accommodate the overwhelming media presence.

Under these unique circumstances, the trial court erred by denying Mr. Huguely's motion for sequestered *voir dire* of prospective jurors.  There were likely few, if any, citizens of Charlottesville who were not familiar with this case through the University, discussions with family and friends, or the non-stop media coverage.  And this case implicated extremely sensitive

and emotionally charged issues involving domestic violence, alcohol use, wealth, and college sports.  Prospective jurors would be justifiably tentative about answering questions about their experiences with these deeply personal topics in front of a packed courtroom.

Indeed, the court itself recognized the outsized media coverage and attendant risks by the felt-need to threaten criminal prosecution of anyone who published the names or photographs of the jurors.  That was not an idiosyncratic view.  For example, "several" of the jurors noted to the court that they were "concerned about the Cavalier Daily publishing their names . . . if they're on the jury."  2/9/12 Tr. 147.  Sequestered *voir dire* was needed to ensure that potential jurors would provide truthful and candid answers, and would not be swayed by how their responses would be perceived by the public and the media.

At the very least, the circuit court should have attempted to strike an appropriate balance between the competing interests at stake by, for example, conducting in-chambers *voir dire* then releasing a transcript to the public after the jury was seated (with the jurors' names withheld).  *See Press-Enterprise*, 464 U.S. at 512 ("[T]he constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time.").

28

This middle path would have allowed jurors to provide candid and forthcoming answers to *voir dire* away from the swarm of reporters in the courtroom, while still advancing the public interest in full disclosure of trial proceedings.

**B.   The Circuit Court Abused its Discretion by Refusing to Allow the Defense to Ask Questions During *Voir Dire* That Were Directly Relevant to Jurors' Ability to Remain Impartial**

As the Supreme Court has explained, *voir dire* "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Without adequate *voir dire*, "the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* Moreover, peremptory challenges to prospective jurors are widely seen as a "necessary part of trial by jury," *Swain v. Alabama*, 380 U.S. 202, 219 (1965), and a "lack of adequate *voir dire* impairs the defendant's right to exercise" those challenges, *Rosales-Lopez*, 451 U.S. at 188.

Thus, "a suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." *Connors v. United*

29

*States*, 158 U.S. 408, 413 (1895). A court abuses its discretion if *voir dire* does not provide "a reasonable assurance that prejudice would be discovered if present." *United States v. Lancaster*, 96 F.3d 734, 740 (4th Cir. 1996) (*en banc*).

In this case, certain evidence that was critical to Mr. Huguely's defense involved unflattering and unfavorable facts about Ms. Love, such as the couple's "on-and-off" relationship and the fact that Ms. Love was herself extremely intoxicated on the night of May 2, 2010. The defense was justifiably concerned that jurors' emotional reaction to such evidence would trump their ability to weigh the facts impartially. Mr. Huguely thus submitted to the circuit court a *voir dire* question asking whether potential jurors would have difficulty considering evidence that was seen as "blaming the victim." The court approved this question in advance of trial.

The usefulness of that question in identifying jurors excusable for cause was borne out in practice. On the first day of *voir dire*, several prospective jurors expressed reservations about how they would handle evidence that was seen as "blaming the victim." *See* Feb. 6-8 Tr. 87 (juror would "have to think about it"). Indeed, Juror 34 stated that his reaction to evidence that was seen as blaming the victim "might depend on how you

30

presented it," *id.* at 378, 428, and the court granted the defense's motion to strike this juror for cause based on his answer. *Id.* at 433-34.

On the second day of jury selection, several other prospective jurors indicated that they might have difficulty with evidence that was seen as blaming the victim. *Id.* at 660-61 (some jurors "responded affirmatively" to question about whether unfavorable evidence about Ms. Love would be seen as blaming the victim).

Despite the demonstrably relevant evidence that this question was eliciting, the circuit court—in the middle of *voir dire*—granted the Commonwealth's motion to prevent defense counsel from continuing to ask it. *Id.* at 663-65. The court held that the question was not "helpful" because it could not be fully answered unless the juror "[knew] what the evidence shows." *Id.* at 663-64. There was subsequently a discussion of whether the question could be rephrased, but the court's interest in forging ahead without delay took precedence, as the court stated that "we don't have time to do it." *Id.* at 688.

These rulings were a clear abuse of discretion. There is no doubt that the question about "blaming the victim" was helpful and relevant, as dramatically illustrated by the court's willingness to strike at least one juror for cause based on his answer to this very question. Any juror who was

31

unable to fairly and impartially consider evidence that might have cast Ms. Love in an unfavorable light should not have been seated on the panel, and the circuit court clearly erred by prohibiting the defense from inquiring about this matter during *voir dire*.

### C. The Circuit Court Erred by Refusing to Strike for Cause a Number of Jurors Whose Answers During *Voir Dire* Revealed Serious Doubts about Their Impartiality

The right to be tried by an impartial jury is a fundamental guarantee of both the United States Constitution and the Virginia Constitution. *Clements v. Commonwealth*, 21 Va. App. 386, 392, 464 S.E.2d 534 (1996). Every prospective juror must be "indifferent to the cause," and "any reasonable doubt as to a juror's qualifications must be resolved in favor of the accused." *Id.* (quoting *Breeden v. Commonwealth*, 217 Va. 297, 298, 227 S.E.2d 734 (1976)). That is, any reasonable doubt about whether a juror can remain impartial "is sufficient to insure his exclusion" because "it is not only important that justice should be impartially administered, but it also should flow through channels as free from suspicion as possible." *Wright v. Commonwealth*, 73 Va. 941, 943 (1879).

Because of the foundational importance of an impartial jury, these principles must be "strictly applied." *Clements*, 21 Va. App. at 392. When a prospective juror "equivocates about whether he or she has formed a

32

fixed opinion, the prospective juror should be stricken by the trial court."
*Id.*; *see also Green v. Commonwealth*, 262 Va. 105, 118, 546 S.E.2d 446
(2001) (juror's ability to give the defendant a fair trial "must not be left to
inference or doubt").  And the fact that a prospective juror was ultimately
struck from the panel using a peremptory challenge does not in any way
excuse an erroneous refusal to strike that juror for cause.  *See Brown v.
Commonwealth*, 29 Va. App. 199, 203, 510 S.E.2d 751 (1999) (holding that
"[i]t is prejudicial error . . . to force a defendant to use [a] peremptory strike
. . . to exclude a venireman who is not free from exception") (citation
omitted); *DeHart v. Commonwealth*, 19 Va. App. 139, 142, 449 S.E.2d 59
(1994) (fact that the prosecution agrees to waive one of its peremptory
strikes does not excuse erroneous denial of a motion to strike for cause).

A trial court's erroneous failure to strike a juror for cause is structural
error that requires a new trial, without any showing of prejudice.  *See
DeHart*, 19 Va. App. at 142 (reversing conviction and ordering new trial
based on one erroneous denial of a motion to strike a juror for cause);
*Justus v. Commonwealth*, 220 Va. 971, 980, 266 S.E.2d 87 (1980) (same).

Applying these principles, the circuit court erred by refusing to strike
for cause several jurors whose answers during *voir dire* raised serious
doubts about their impartiality.  The most glaring error involved Juror 32,

33

who should have been struck for cause on multiple grounds. This juror openly admitted in her questionnaire that she "felt that Mr. Huguely was guilty." Feb. 6-8 Tr. 61-62. She further asserted that she had been following this case "very closely," and had discussed the case with a number of friends and family members, a "majority" of whom thought Mr. Huguely was "[p]robably guilty." *Id.* at 65-67. When asked the bottom-line question whether she could "maintain an open mind," Juror 32 equivocated, responding: "Well, yes. I do have, of course, you know, my daughter was in JMU whatever and I mean, as, I'm saying I know that, yes, I still feel that anyone could be objective until shown otherwise through actual, you know, what, in other words, what I see as far as before me, evidence and proof or whatever." *Id.* at 63.

The circuit court denied Mr. Huguely's motion to strike Juror 32, finding that she was "very clear and very vocal about her ability to be fair." *Id.* at 72. But it is well-established that a juror's self-assessment of *her own* ability to be fair is not dispositive. *See Justus*, 220 Va. at 978 ("Whatever confidence [a juror] may have in his ability" to remain impartial, "the law has no confidence in him," and "however willing he may be to trust himself, the law will not trust him."); *Moten v. Commonwealth*, 14 Va. App. 956, 959, 420 S.E.2d 250 (1992) (juror's "expected answers to leading questions"

34

about her impartiality were insufficient to "rehabilitate" her) (citation omitted). Juror 32 acknowledged that she followed this case closely in the media, and that she—and a majority of her friends and family—believed Mr. Huguely was guilty. Because this juror had "formed and expressed a decided opinion, that the prisoner is guilty or innocent of the offense for which he [was] about to be tried," she was plainly "not fit to sit upon his trial." *Justus*, 220 Va. at 977; *see DeHart*, 19 Va. App. at 140-42 (juror should have been struck for cause where she was already familiar with the case from the media, even though she claimed she would do her "best" to remain impartial).

Juror 35 should have been struck for cause for the same reasons. This juror also admitted that he had "opinions" about Mr. Huguely's guilt or innocence, and that he had been "party to conversations everywhere" about this case. Feb. 6-8 Tr. 74, 79. Moreover, Juror 35 had been a professor at the University of Virginia since 1971, and he had serious "concerns" about how this case might affect the University's reputation. *See id.* at 81 ("I can't say I know anyone who is totally unconcerned including me."); *id.* ("Well, [this case] gets my institution in the news in an unfavorable light and that can't be good."). When asked whether he would have reservations about returning a "not guilty" verdict, he stated that "I

think I could handle it," but that it would be "the center of discussion" among his friends and colleagues. *Id.* at 82. He also believed that male athletes were "violent" and conceded that he could not "divorce" himself from his "opinions and knowledge" on this topic. *Id.* at 83-84. In response to a direct question about whether he could give Mr. Huguely a fair trial, Juror 35 responded: "I think I could. I've never been asked to do that before but I'll do as well as I can." *Id.* at 75; *see id.* at 88 ("I think I could remain objective but I've never been tested on that in the past.").

This Court has found reversible error in extremely similar circumstances. In *Clements*, the juror in question admitted that he had "heard something about the case" through conversations at his place of business. 21 Va. App. at 393. That juror also had strong views about certain issues in the case that—like Juror 35's views about "violent" male athletes and his concern about the reputation of the University of Virginia— had resulted in a "predisposition against" the defendant. *Id.* Perhaps most important, the juror in *Clements* merely asserted that he would "try" to give the defendant a fair trial—a response nearly identical to Juror 35's equivocal assertion that he "think[s]" he could remain impartial. *See also Brown*, 29 Va. App. at 208 (finding reasonable doubt about juror's impartiality based on ambiguous responses such as "I think," "I don't know,"

and "I would try"); *Taylor v. Commonwealth*, 61 Va. App. 13, 25, 733 S.E.2d 129 (2012) (witness "continued to equivocate" even in response to "leading questions" about whether he could remain impartial).

Juror 182 also expressed strong feelings about the issues in this case and equivocated about whether he could remain impartial. He, too, was an employee of the University and acknowledged that had heard about the case "quite often" in both the local media and the University media. Feb. 6-8 Tr. 865. He believed that the "Corner" area (near where the events of this case occurred) was a "dangerous place to be after a certain time at night." *Id.* at 867. Juror 182 also admitted that he was "more sensitive than not" to issues of domestic violence based on his family history. *Id.* at 864. When asked whether he had any reservations about serving on the jury, Juror 182 ambiguously asserted: "I don't think so, no." *Id.* at 872; *see id.* at 870 (juror would "not necessarily" be more likely to believe a witness who was affiliated with the University).

Jurors 36 and 72 should have been struck for cause based on their strong personal feelings about alcohol use among young people. Juror 36 acknowledged that she would have "second thoughts" about these issues because "a lot of young people, you know, it's just out of control with them." Feb. 6-8 Tr. 259, 262. Juror 72 similarly testified that the "abuse of alcohol"

37

among young people is "unfortunate," and that she "think[s] alcohol use is serious." *Id.* at 624-25. Her father was an alcoholic who became crippled after falling and breaking his neck while drunk. *Id.* at 625. Based on these experiences, Juror 72 acknowledged that "I can't say I don't bring what I bring," and that "I'm a complete human being and I come to this with experience." *Id.* at 630-31. These strongly held views about alcohol use— an issue that was central to this case—should have been more than sufficient to disqualify Jurors 36 and 72. *See Moten*, 14 Va. App. at 957-59 (juror should have been struck for cause where she found drug use to be a "touchy" subject based on past family problems, even though she claimed she could have remained impartial).

Finally, the circuit court erred by refusing to strike Juror 211, who was ultimately seated on the trial jury and participated in the determination of Mr. Huguely's guilt or innocence.[3]   Juror 211 was a professor at the University of Virginia who taught a close friend of Ms. Love and excused this student from her final exam for Ms. Love's funeral. Feb. 6-8 Tr. 311-14. She had also read "memos" from the University about the case and

---

[3] As noted above, *any* erroneous denial of a motion to strike a juror for cause violates the defendant's right to a trial by an impartial jury, even if the juror is ultimately struck using a peremptory challenge. But the fact that a juror who should have been struck for cause was *actually seated* on the jury is self-evidently prejudicial to the defendant.

38

Ms. Love, and she remembered hearing that there was a "break in" and "blunt trauma." *Id.* at 310-11, 317. Although Juror 211 claimed that she could render an impartial judgment, *see id.* at 314, 317, her close connections to this case and the University clearly raised at least a reasonable doubt about her impartiality.

\* \* \*

Given the inordinately high profile of this case within the Charlottesville community, the circuit court should have been especially vigilant about the need to ensure an impartial jury. Yet the court instead chose to disregard a number of responses during *voir dire* that raised serious doubts about prospective jurors' ability to remain impartial. Each of the six jurors identified above should have been struck for cause, and the trial court's failure to do so is structural error that requires a new trial.

### D.   The Circuit Court Abused Its Discretion by Refusing to Sequester the Jury During Trial

Virginia courts have discretion to order a jury to be sequestered during trial. *See* Va. Code § 19.2-264; *Stockton v. Commonwealth*, 227 Va. 124, 138, 314 S.E.2d 371 (1984). Under the extraordinary circumstances of this case, the circuit court erred by summarily denying Mr. Huguely's motion to sequester the jury. R.456.

39

As noted above, this case received a staggering amount of attention from the local and national media.  R.172-202.  It was simply impossible for a resident of Charlottesville to avoid hearing about this case on television, in the newspaper, on blogs or social media sites, or through discussions with friends, family, and co-workers.  And much of the coverage portrayed Mr. Huguely as a cold-blooded killer and included factually inaccurate evidence or discussion of his other alleged "bad acts."  R.147-153.  Under these circumstances, the circuit court abused its discretion by refusing to sequester the jury throughout trial.

III.   **THE COMMONWEALTH VIOLATED THE DUE PROCESS CLAUSE AND *BRADY V. MARYLAND* BY FAILING TO DISCLOSE THE LOVE FAMILY'S IMMINENT $30 MILLION CIVIL SUIT AGAINST MR. HUGUELY**

The Due Process Clause of the U.S. Constitution requires the prosecution to disclose to the defense any evidence in its possession that is favorable to the accused and "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  That obligation applies even when there has been "no request by the accused," and it "encompasses impeachment evidence as well as exculpatory evidence."  *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted); *see Corell v. Commonwealth*, 232 Va. 454, 465, 352 S.E.2d 352 (1987).  When a jurisdiction adopts an "open file" policy—as the Commonwealth has done—

40

the defendant may reasonably assume that the file contains all potentially exculpatory evidence known to the prosecution. *Workman v. Commonwealth*, 272 Va. 633, 644-50, 636 S.E.2d 368 (2006).

This Court has emphasized that full disclosure is the best policy for the Commonwealth to follow, even if there are doubts over whether the *Brady* doctrine mandates disclosure. As the Court explained, "[w]hen the Commonwealth elects to withhold exculpatory evidence on the ground that it is not material, it does so at its own peril and with the realization that the trial court or an appellate court may hold otherwise, thereby invalidating a conviction." *Cherricks v. Commonwealth*, 11 Va. App. 96, 102, 396 S.E.2d 397 (1990).

Just weeks after the conclusion of Mr. Huguely's criminal trial, Sharon and Lexie Love—Yeardley Love's mother and sister—filed a civil complaint against Mr. Huguely seeking more than $30 million in damages. R.886-92. The core theory of their suit is that Ms. Love's death was an "accident," and that Mr. Huguely is civilly liable for negligence. R.887.

In anticipation of that suit, one of the Loves' attorneys, Mahlon Funk, appeared in circuit court on April 19, 2012, in an attempt to obtain exhibits and trial materials from the criminal case for use in the civil suit. *See* 4/19/12 Tr. 49-67. At that hearing, Mr. Huguely's attorneys were surprised

41

to hear Mr. Funk describe a nearly two-year-long relationship with the City Commonwealth's office. *Id.* at 54-55. Most notably, the Loves' civil attorneys had apparently agreed to "hold any and all civil proceedings and investigations ... until after the criminal trial was over." *Id.* at 51-52; *see also* R.1093 (sworn affidavit from Mr. Funk stating that the Commonwealth asked "that we await the conclusion of the criminal trial so as not to interfere with witnesses and the like"). The civil attorneys "complied with every request of [] the Commonwealth to make sure nothing . . . in any way could have at all affect[ed] adversely [] any aspect of [the] criminal proceedings." 4/19/12 Tr. 52.

The Commonwealth's failure to disclose the Loves' imminent civil suit against Mr. Huguely plainly ran afoul of the *Brady* doctrine. *See, e.g., People v. Wallert*, 98 A.D.2d 47, 48-50 (N.Y. 1983) (finding a "clear *Brady* violation" where the prosecution "knew prior to trial that the complainant had consulted a [civil] attorney who was but awaiting the outcome of the criminal action," but "felt no duty to disclose this information to defendant's counsel"). For nearly two years, the Commonwealth had been aware that the Loves were working with attorneys on a civil suit. Yet the Commonwealth did not disclose either this fact or that prosecutors had

42

been coordinating with those attorneys on major strategic decisions, such as the timing of the civil suit.

The Commonwealth has argued that it discharged any *Brady* obligations through a January 30, 2012 letter in which it noted that the Loves have a "potential cause of action" against Mr. Huguely.  R.898.  But a boilerplate reference to a "potential" cause of action is a far cry from confirmation that the Loves had *already* engaged civil attorneys—and that those attorneys were coordinating case strategy with the prosecution. Indeed, in light of the Commonwealth's "open file" policy, this statement was not just incomplete but an affirmative misrepresentation, as it suggested that the Commonwealth *did not* have any additional information about the Loves' civil claims.

The Loves' imminent civil suit was plainly "material" to the criminal case, for several independent reasons.  First, and most important, the theory of the case underlying the Loves' civil complaint is flatly inconsistent with the theory under which the Commonwealth prosecuted Mr. Huguely in the criminal case.  From the very start of this case, the Commonwealth has argued that Mr. Huguely should be convicted of first- or second-degree murder because he acted with malice.  In contrast, the civil suit rests on a negligence theory—namely, that Mr. Huguely *did not* intentionally cause

43

Ms. Love's death, and that she died as the result of an "accident." R.887. Under that view of the facts, Mr. Huguely would be guilty of, at most, involuntary manslaughter. Had the imminent civil suit been disclosed under *Brady*, the defense could have highlighted for the jury the significant disparities between the Commonwealth's arguments in this case and the Love family's arguments in the civil suit. Indeed, it is likely because of this inconsistency that the prosecution asked the civil attorneys to "await the conclusion of the criminal trial" before filing their suit. R.1093.

Moreover, Sharon and Lexie Love—the plaintiffs in the civil suit— testified in both the guilt/innocence and sentencing phases of Mr. Huguely's trial. The Loves were the sole witnesses for the Commonwealth at sentencing, and the defense did not cross-examine them. And Sharon Love provided fact testimony about an earlier alleged altercation between Yeardley Love and Mr. Huguely. *See* 2/8/12 Tr. 85-88. Had defense counsel been aware that the Loves were about to file a $30 million civil suit against Mr. Huguely, they surely would have raised this issue on cross-examination of the Loves. Under Virginia law, the right to cross-examine witnesses to show potential bias is "absolute." *Banks v. Commonwealth*, 16 Va. App. 959, 962, 434 S.E.2d 681 (1993). Inquiries of this nature are "always relevant," and the factfinder must "consider the evidence of bias

44

and motivation in assigning the weight to be accorded to the testimony of the witness." *Id.* (citation omitted).

Finally, without information about the Loves' imminent $30 million civil suit, the jury did not have a full and accurate picture of how Mr. Huguely would be punished for his actions on May 3, 2010. This information was unquestionably relevant to the jury's determination of an appropriate sentence. *See*, *e.g.*, *Cone v. Bell*, 556 U.S. 449, 475 (2009) (finding withheld evidence to be material to "the jury's assessment of the proper punishment," even if it was not relevant to guilt or innocence). Had the jurors been aware of the impending civil suit, they could have considered the financial ramifications of that suit as part of Mr. Huguely's overall punishment.

\* \* \*

For all of these reasons, the Commonwealth's failure to disclose its knowledge of the Loves' imminent civil suit violated Mr. Huguely's rights under the Due Process Clause and the *Brady* doctrine. At a minimum, the circuit court should have held an evidentiary hearing to assess both the scope of the withheld information and its materiality to this case. *See United States v. White*, 492 F.3d 380, 413 (6th Cir. 2007) (failure to conduct an evidentiary hearing for "serious" *Brady* claims would "effectively

45

permit the government to ride roughshod over the accused, stripping the accused of both sword and shield"); *United States v. Dansker*, 565 F.2d 1262, 1264 (3d Cir. 1977) (court should hold a hearing whenever the *Brady* claims are "neither frivolous nor palpably incredible").   Mr. Huguely expressly requested an evidentiary hearing to further explore these issues, R.1351-54, yet the circuit court erroneously refused to take even that modest step, R.1374.

## IV.   THE CIRCUIT COURT DID NOT ADEQUATELY INSTRUCT THE JURY ABOUT THE DEFINITION OF "MALICE" UNDER VIRGINIA LAW

The circuit court further erred by rejecting Mr. Huguely's request for additional, court-approved language in the jury instructions that would have clarified the meaning of "malice."

A trial court "has an affirmative duty properly to instruct a jury" about any "principle of law [that] is vital to a defendant in a criminal case." *Jiminez v. Comm.*, 241 Va. 244, 250, 402 S.E.2d 678 (1991).   A proper description of the elements of the offense is critical because the jury, as finder of fact, must determine whether the prosecution has met its "burden of proving all elements of the offense beyond a reasonable doubt." *Stokes v. Warden*, 226 Va. 111, 117, 306 S.E.2d 882 (1983) (citation omitted).

When a principle of law is "materially vital to a defendant in a criminal case," it is "reversible error" for the trial court to refuse to instruct the jury about the relevant legal principles.     *Jiminez*, 241 Va. at 251 (citation omitted).  Even if the requested instruction is somehow "defective," the trial court has a duty to "correct[] it and giv[e] it in the proper form" because the jury "should not be left in the dark on the subject." *Id.*

Mr. Huguely requested a jury instruction ("BB") that would have provided important, court-approved clarifying language about the meaning of "malice."   That instruction would have modified the Commonwealth's proposed instruction by inserting the sentence highlighted in bold:

> Malice is that state of mind which results in the intentional doing of a wrongful act to another, without legal excuse or justification, at a time when the mind of the actor is under the control of reason.  Malice may result from any unlawful or unjustifiable motive, including anger, hatred or revenge. ***It is not confined to ill will to any one or more particular persons, but is intended to denote an action flowing from a wicked or corrupt motive, done with an evil mind and purpose and wrongful intention, where the act has been attended with such circumstances as to carry in them the plain indication of a heart regardless of social duty and fatally bent on mischief.***  Malice may be inferred from any deliberate, willful, and cruel act against another, however sudden.

The additional sentence requested by Mr. Huguely provides an important, pro-defendant qualification on the meaning of "malice" by making clear that malice requires a "wicked or corrupt" motive, done with an "evil mind."  A clear statement of the law was critical to Mr. Huguely's

defense, given the "elusive" difference between second-degree murder (which requires malice), and manslaughter (which does not). *See* Roger D. Groot, *Criminal Offenses and Defenses in Virginia*, § 6, pp. 557, 600 (2006) ("Groot, *Criminal Offenses*"). The Commonwealth's proposed instruction contained an incomplete definition of malice that referred only to a "wrongful" or "deliberate" act, and provided little guidance to the jury about how they should apply that standard.

The circuit court erroneously rejected the additional language sought by Mr. Huguely, derisively asking what "century" it was taken from. 2/16/12 Tr. 56-57. But this instruction is not just some anachronism. It is included in the *Virginia Practice Jury Instructions*, drafted by Ronald J. Bacigal, the reporter of criminal decisions of the Virginia Court of Appeals. And Virginia courts have given this instruction or relied on this definition of malice in many previous cases. *See, e.g., Shimhue v. Comm.*, No. 1736-97-2, 1998 WL 345519, at *3 (Va. Ct. App. June 30, 1998); *Hegedus v. Comm.*, No. 1759-96-2, 1997 WL 359283, at *2 (Va. Ct. App. July 1, 1997); *Fletcher v. Comm.*, 209 Va. 636, 640, 166 S.E.2d 269 (1969) (noting that this instruction has been "approved by [the Supreme Court] in many cases");

48

*Thomas v. Comm.*, 186 Va. 131, 139, 41 S.E.2d 476 (1947); *Clinton v. Comm.*, 161 Va. 1084, 1088, 172 S.E. 72 (1934).[4]

Mr. Huguely was clearly prejudiced by the circuit court's rejection of the requested instruction.  During closing arguments, the defense and prosecution disputed the level of intent required to show malice.  2/18/12 Tr. 290-91, 299-300.  And, during deliberations, the jury asked the court to clarify the interplay of the instructions on "malice" and "accidental killing," thus making clear that the jurors found the original instructions to be confusing.  2/22/12 Tr. 28-34.  Without proper instruction on the critical element of malice, the jury's conviction of Mr. Huguely for second-degree murder must be vacated.

## V.   THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION FOR SECOND-DEGREE MURDER IN THAT THE EVIDENCE FAILED TO ESTABLISH MALICE AND SUPPORTED A DEGREE OF HOMICIDE NO GREATER THAN MANSLAUGHTER.

As noted above, malice is "an essential element of murder and is what distinguishes it from the crime of manslaughter."   *Canipe v. Commonwealth*, 25 Va. App. 629, 642, 491 S.E.2d 747 (1997).  To elevate a homicide to second-degree murder, "the defendant must have been

---

[4] Courts in other jurisdictions have also given this instruction.  *See, e.g., Thornton v. State*, 570 N.E.2d 35, 37 (Ind. 1991); *Hill v. Maloney*, 927 F.2d 646, 647-48 (1st Cir. 1990).

shown to have willfully or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm." *Essex v. Commonwealth*, 228 Va. 273, 280-81, 322 S.E.2d 216 (1984); *see also* Groot, Criminal Offenses § 6 (second-degree murder requires "a mental state of extreme recklessness—proceeding with conduct in the face of a known, very significant risk that death will occur"). That distinction is "close but crucial" and must be enforced with vigilance. *Essex*, 228 Va. at 284.

At trial, the Commonwealth downplayed any claim that Mr. Huguely acted with *express* malice—that is, that he killed Ms. Love "with a sedate, deliberate mind, and formed design." *Canipe*, 25 Va. App. at 642; 2/18/12 Tr. 214 ("if you find that it was a malicious killing ... this element, that is causation, not, did he intend to kill Yeardley Love? Did he, in fact, cause a chain of events that led to her death?"). The evidence flatly refuted any "design" to kill: Mr. Huguely went to talk with Ms. Love, while heavily intoxicated, only after being turned away at the door of his friend Chris Clements, who was too busy to get together. He was dressed casually in tennis shoes, shorts, and a t-shirt. He brought no weapon, object, or bag. He also chose a well-lit, busy path to the apartment. Indeed, in acquitting Mr. Huguely of burglary with the intent to commit

assault and battery, the jury specifically concluded that he did *not* enter Ms. Love's apartment with any intent to commit assault or battery.

The Commonwealth nonetheless sought to establish *implied* malice, which may be inferred from "conduct likely to cause death or great bodily harm, willfully or purposefully undertaken"—for instance, the deliberate use of a deadly weapon. *Essex*, 228 Va. at 281; *Perricllia v. Commonwealth*, 229 Va. 85, 91, 326 S.E.2d 679 (1985). The evidence at trial, however, did not establish beyond reasonable doubt that Mr. Huguely's conduct during his altercation with Ms. Love rose to that level.

The Commonwealth's witnesses failed to exclude the reasonable hypothesis that Ms. Love's fatal injuries were caused by a fall to the floor, without any additional application of force by Mr. Huguely.   It was undisputed that the mechanism that caused Ms. Love's death was force from a broad, flat surface like a floor, not a fist, object, or piece of furniture. 2/13/12 Tr. 241-42 (Gormley); 2/14/12 Tr. 102-03 (Fuller); 2/10/12 Tr. 143-44 (Flaherty).  The Commonwealth inferred malice from that evidence only through conjecture that Mr. Huguely must have been "grinding her face into the ground." 2/18/12 Tr. 215.  But the Commonwealth's own witness, Dr. Gormley, testified that the area of injury to Ms. Love's mouth and chin and the area of injury to the side of Ms. Love's head and eye were consistent

with a single impact event such as a fall. 2/13/12 Tr. 251 (Gormley). Dr. Gormley further testified that the hemorrhaging on Ms. Love's neck could have been caused by even slight pressure; that stimulation of Ms. Love's carotid sinus was consistent with even an unintentional "quick grab"; and that the abrasions on Ms. Love's face could have been caused by contact with a surface less rough than even a carpet. *Id.* at 208, 244-49, 255-58. Another Commonwealth witness, Dr. Lopes, similarly testified that contusions in Ms. Love's brain were consistent with circumstances unrelated to blunt force trauma. 2/14/12 Tr. 216-17 (Lopes).

In fact, ample evidence supported Mr. Huguely's account that, though he wrestled with Ms. Love on the floor, he never applied a degree of force likely to cause death or great bodily harm. The walls revealed no dimples or marks. The furniture was in order. Anna Lehmann, who lived downstairs and heard Mr. Huguely's footsteps on the stairs and a single crash near the door, heard no other hitting or banging sounds. Ms. Love had no injuries to her left side. Nor did she have any skull fracture, grab marks, or bleeding in the carotic sheath, all of which would have indicated greater applications of force. Ms. Love's brain stem had not twisted, which would have suggested blunt force trauma. 2/18/12 Tr. 97-103 (Uscinski). And Mr. Huguely had no blood on his person or his clothes. Ex.152;

52

Ex.143. Ms. Love was also alive when Mr. Huguely left the apartment—a fact the Commonwealth glosses over by speculating that Love must have been "effectively disabled." 2/18/12 Tr. 201 ("How hard would it be to take something and throw it against a window? … Who wouldn't crawl to get help if they could?").

Moreover, there was insufficient evidence from which to infer that Mr. Huguely acted with willful, malicious intent. Mr. Huguely described Ms. Love as his best friend and one of the people he loved and cared for most. Ex.21. He was seen holding her hand just a day before. When approached by police, he believed he was being investigated for an assault and was in a state of shock and disbelief upon hearing of Ms. Love's death. Mr. Huguely was also heavily intoxicated both before and after his altercation with Ms. Love; he had written months before that he was "scared to know that I can get that drunk to the point where I cannot control the way I behave or act." Ex.21. As the Virginia Supreme Court has stated in no uncertain terms, "if a killing results from negligence, however gross or culpable, and the killing is contrary to the defendant's intention, malice cannot be implied." *Essex*, 228 Va. at 280.

In sum, substantial facts corroborated Mr. Huguely's claim that his actions, however reckless, were not so cruel as to amount to malicious

conduct. *See Haywood v. Commonwealth*, 20 Va. App. 562, 567, 458 S.E.2d 606 (1995) ("while the evidence may support a hypothesis that [the defendant] acted with malice and intended to run over or through anyone or anything that got in his way," the evidence did not exclude a reasonable hypothesis of innocence). It is elementary that a conviction "cannot rest upon conjecture." *Coffey v. Commonwealth*, 202 Va. 185, 188, 116 S.E.2d 257 (1960). The evidence at trial was insufficient to establish malice beyond a reasonable doubt, and Mr. Huguely therefore should not have been convicted of any offense more serious than manslaughter.

## CONCLUSION

For the foregoing reasons, Mr. Huguely urges this Court to reverse the convictions of which he complains and to take such other and further actions as it deems reasonable and appropriate.

January 22, 2013

Respectfully submitted,

GEORGE WESLEY HUGUELY V

By: _____

Counsel

Paul D. Clement (VSB No. 37915)
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090
(202) 234-2806 (fax)

pclement@bancroftpllc.com

Craig S. Cooley (VSB No. 16593)
3000 Idlewood Avenue
P.O. Box 7268
Richmond, VA 23221
(804) 358-2328
(804) 358-3947 (fax)

cooleycs@msn.com

55

## REQUIRED STATEMENTS

I hereby certify, pursuant to Rule 5A:12 of the rules that:

A. The name of the Appellant is George Wesley Huguely V, who is incarcerated at Keen Mountain Correctional Center, State Route 629, P.O. Box 860, Oakwood, VA 24631. The counsel for the Appellant are Paul D. Clement of Bancroft PLLC, 1919 M Street, NW, Suite 470, Washington, DC 20036, telephone number (202) 234-0090, fax number (202) 234-2806, and Craig S. Cooley of 3000 Idlewood Avenue, P.O. Box 7268, Richmond, VA 23221, telephone number (804) 358-2328, fax number (804) 358-3947.

B. Counsel for the Commonwealth is Warner D. Chapman, City of Charlottesville Commonwealth Attorney's Office, 605 East Main Street, P.O. Box 911, Charlottesville, VA 22902, telephone number (434) 970-3176.

C. This petition is to be filed with the Clerk of the Court of Appeals of Virginia at her office in Richmond, Virginia and copies were mailed on January 22, 2013 to all counsel of record.

D. Counsel does desire to state orally in person the reasons for granting this petition.

E. That a supersedeas is required.

F. Counsel for Appellant is retained.

## CERTIFICATE OF SERVICE

This is to certify that the original and three copies of this petition have been filed with the Clerk of the Court of Appeals of Virginia, and that a copy has been mailed to all counsel of record this 22nd day of January, 2013.

Paul D. Clement

## CERTIFICATE OF COMPLIANCE

I do hereby certify that the above Petition for Appeal has a word count of 12,274 words and does not exceed the required word count of 12,300 set by Rule 5A:12(e).

Paul D. Clement

57