

RESPONDENT'S
EXHIBIT
9

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

| | | |
|---|---|---|
| **GEORGE W. HUGUELY V,** | : | |
| | : | |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | Civ. Case No. CL16-23 |
| | : | |
| **JOHN A. WOODSON, WARDEN,** | : | |
| | : | |
| **Respondent.** | : | |

## FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS[1]

Jonathan P. Sheldon, VSB #66726
Joseph T. Flood, VSB #71716
Sheldon, Flood & Haywood, PLC
10621 Jones Street, Suite 301A
Fairfax, VA 22030
Phone (703) 691-8410
Fax (703) 251-0757
JSheldon@SFHDefense.com

Bernadette M. Donovan
Donovan & Engle, PLLC
1134 East High Street, Unit A
Charlottesville, VA 22902
Phone (571) 377-8527
Fax (571) 295-8679
Bernadette@donovanengle.com

---

[1] Huguely has not changed the appendix he filed with his petition on January 19, 2016, and rather than re-filing it, relies on that appendix. Huguely has added no new claims or facts to this petition, but has deleted two claims.

## TABLE OF CONTENTS

Introduction..................................................................................................1

Procedural and Substantive History of the Case.................................................2

Standard of Review.........................................................................................32

Argument

     Claim I: Huguely's Rights to a Fair Trial before an Impartial Jury, Due Process, and to Confront Witnesses against Him were Violated Pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Virginia Constitution Art. I § 8, when a Court Officer Gave the Jury a Dictionary During Deliberations and the Jury Consulted the Dictionary for the Meaning of Malice, the Main Issue at Trial...............................................................................32

     Claim II: Trial Counsel Provided Ineffective Assistance When Their Violation of the Rule on Witnesses Resulted in the Exclusion of Critical Defense Evidence Regarding CPR and Reperfusion That Was Central to the Defense Theory of Cause of Death........................................................................................40

     Claim III: Trial Counsel Provided Ineffective Assistance of counsel by Failing to Provide Crucial Available Expert Testimony on the Key Issue of Cause of Death When They Failed to Call John S. Daniel, III, M.D...............................................51

     Claim IV: Trial Counsel Was Ineffective When They Failed to Request a Jury Instruction That Directed the Jury It Must Find That Any Wrongful Conduct Was "Likely to Cause Death or Great Bodily Harm" in Order to Find Malice.............62

     Claim V: Trial counsel Deprived Huguely of his Sixth Amendment Right to the Effective Assistance of Counsel, His Fifth Amendment Right Against Self-Incrimination, and Fourteenth Amendment Right to Due Process by Failing to Object to the Prosecution's Impermissible Comment During Closing Argument on Huguely's Invocation of his Right to not Testify at Trial..................................69

     Claim VI: Trial counsel deprived Huguely of his Sixth Amendment Right to the Effective Assistance of Counsel when they Moved into Evidence an Exhibit with the Label "Type of Offense: Murder."...................................................................74

     Claim VII: Trial Counsel's Failure to Investigate, Develop and Present Evidence of Huguely's Blood-Alcohol Content and Degree of Impairment at the Time of the Offense Denied Him His Sixth Amendment Right to the Effective Assistance Of Counsel Because That Evidence Supported a Finding That Love's Death Was Accidental and a Finding of Diminished Capacity at Sentencing..........................76

Claim VIII: Trial Counsel's Numerous Evidentiary, Factual, and Legal
Deficiencies with Respect to the Distinction Between Malice and Manslaughter
Have Created a Reasonable Probability That, Had These Errors Not Occurred,
Huguely Would Have Been Convicted of a Lesser Charge or Been Found Not
Guilty................................................................................................................86

Conclusion...............................................................................................................87

Certificate.................................................................................................................88

## INTRODUCTION

1.      Petitioner George Huguely asks this Court to grant a writ of habeas corpus overturning his conviction for second-degree murder and/or his sentence of twenty-three years.[2]  This case arose from a May 2, 2010 altercation between Huguely and Yeardley Love, and received overwhelming and highly misleading media coverage.  At trial, the Commonwealth did not contest that Huguely had no intent to kill Love when he went to her apartment or while he was there, that he was severely intoxicated when the incident occurred, that he never hit her head against the wall, that Love was not dead when he left the apartment, that the 911 call reported Love was suffering from alcohol poisoning and not trauma, that Huguely admitted the altercation to the police when questioned hours later, and that he was shocked and devastated when he learned that Love had died.  The evidence before the jury presented an extremely close case between second-degree murder and manslaughter.  The serious constitutional errors in this case—including the exclusion of crucial expert witness testimony regarding the cause and severity of Love's injuries, the omission of crucial language from the malice instruction that Huguely must have intended "death or great bodily harm" to be convicted of second-degree murder, and the use by the jury of an impermissible external influence (a dictionary) to define "malice"—inevitably and prejudicially tipped the scales against Huguely.  Thus, Huguely was highly prejudiced in the two central issues of this case: cause of death and whether he acted with malice.  Because of these and other constitutional errors discussed below,

---

[2] Huguely is not challenging his conviction for grand larceny.

1

Huguely asks this Court to vacate his conviction for second-degree murder or grant him a new sentencing hearing.[3]

## PROCEDURAL AND SUBSTANTIVE HISTORY OF THE CASE

### Summary of the Offense

2.      Shortly before midnight on May 2, 2010, after a full day of extremely heavy drinking, a severely intoxicated George Huguely wandered down the street to talk to Love about problems in their relationship.  He made no attempt to hide, stopping at and being shooed away from a friend's apartment on the way.  Huguely entered Love's apartment through the unlocked exterior door and knocked on her bedroom door.  When Love responded but did not let him in, Huguely kicked a hole in the door and then entered the bedroom.  Huguely and Love talked and then argued and ended up falling to the floor.  On the floor Huguely noticed Love's nose was bleeding.  He stopped wrestling with her, pushed her back onto the bed, and left the apartment.  Love was lying on her back in bed when Huguely left.

---

[3] Huguely's claims are not isolated constitutional errors in an otherwise well-tried case. Rather, trial counsel committed many serious errors that Huguely has not briefed as state habeas claims, and those errors provide a more complete context for evaluating this Court's confidence in the verdict.  For example, trial counsel failed to strike or even question Juror 63, who sat on the jury, about his affirmative answer to the defense inquiry on his juror questionnaire whether he had been placed in danger of great bodily harm as a result of the actions of someone who was intoxicated; Juror 32 expressed strong bias during voir dire, but the Court of Appeals found trial counsel waived consideration of the issue because they failed to object to the Commonwealth's improper use of leading questions to rehabilitate the juror; the trial judge had an impermissible *ex parte* meeting in chambers with a juror during trial without informing trial counsel; trial counsel incorrectly calculated the guidelines for manslaughter, erroneously inflating Huguely's potential sentence far above his actual exposure for that crime, yet presented the erroneous sentencing range to the court as a reason to *reduce* Huguely's sentence; and trial counsel failed to elicit compelling evidence of bias involving the victim's intent and preparation to bring a civil lawsuit—in which their primary claim was that Huguely acted with negligence, not malice—in the death of Love.

3.      Approximately two hours later, Love's roommate and a friend found her lying on her bed face down in a pillow.  Although she had a black eye and an abrasion on her chin, her injuries did not appear serious.  The medical examiner later determined that Love had no fractures.  Love's roommate and the friend called 911 and informed the first responders that Love was suffering from alcohol poisoning.  The friend then attempted to perform cardiopulmonary resuscitation ("CPR") on Love while the first responders arrived at the apartment.  Rescue personnel responded and continued performing CPR for twenty-four minutes but could not resuscitate Love.  Hours later, the police roused Huguely from his sleep and requested that he come to the station for questioning. Huguely's subsequent videotaped interrogation reveals he was cooperative, and then genuinely shocked and overwhelmed with grief when told Love had died.  Huguely told police about their fight but insisted he had done nothing that could have resulted in Love's death.  Huguely also admitted taking Love's laptop because he was angry she would not talk to him—a drunken action he described as "not reasonable logic"—and throwing it in a dumpster shortly after leaving her apartment.[4]

<u>Sensational Pretrial Publicity</u>

4.      Following his interrogation, police arrested Huguely, who then retained Francis McQ. Lawrence and Rhonda Quagliana of 416 Park Street, Charlottesville, Virginia 22902.  A grand jury indicted Huguely for one count each of first-degree premeditated murder and felony murder in violation of Va. Code § 18.2-32, one count of

---

[4] The laptop, which was recovered from the top of the dumpster, was the basis of the robbery charges for which Huguely was acquitted, as well as the grand larceny charge for which he was convicted. Tr. 2/9/2012 at 296-99, Tr. 2/13/2012 at 98-99, Tr. 2/15/2012 at 6-13, Tr. 2/17/2012 at 43-50; JA 2179–82, 2631–32, 3231–40, 3764–72.

robbery in violation of Va. Code § 18.2-58, one count of statutory burglary in violation of Va. Code § 18.2-89, one count of burglary in violation of Va. Code § 18.2-91, and one count of grand larceny in violation of Va. Code § 18.2-95(ii).  JA 7–12.

5.    From the outset Huguely's case attracted widespread, sensationalized, and prejudicial media attention.  Huguely and Love were both lacrosse players nearing graduation from the University of Virginia ("UVA"), and national news and sports outlets aired numerous reports about the allegations.  The media saturated the community with false and damaging assertions that went straight to the heart of the case.  *See* JA 13–143 (Defense Motion for Use of a Juror Questionnaire; for Sequestered Individual Voir Dire; and to Sequester the Jurors).  These included sensational and false characterizations of Huguely—such as headlines referring to him as "an Anger Prone Scion of Prominent DC Family" and "a Man of Privilege, Rage"—and inaccurate, inadmissible reports of past violent behavior.  JA 14–15.  Wildly inaccurate "facts" were disseminated broadly.  For example, a CBS headline falsely claimed a "Bloody T-Shirt" had been found in Huguely's apartment.  JA 14.

6.    Importantly, news media widely and incorrectly reported that Huguely had beaten Love's head against the wall.  Even the then President of UVA repeated this inflammatory and erroneous allegation in a high-profile vigil shortly after the incident.  JA 22–23 (noting "Casteen then stated that he hoped Love's death would remind the crowd that no woman deserves to be 'beaten, thrown against walls . . . .'").  Forensic evidence, however, flatly contradicted this allegation, and the prosecution later abandoned it at trial.  Tr. 2/10/12 at 157–58, 197–98, 205, Tr. 2/13/12 at 16–17, Tr. 2/14/12 at 226–31, 320–21; JA 2421–22, 2472, 2482, 2538–39, 3083–89, 3202.  In fact,

the evidence clearly showed that there had been no violent beating, that Love suffered no fractures, that there were no signs of struggle, that a witness who overheard the incident heard no yelling or hitting, and that the witnesses who found Love concluded she was suffering from alcohol poisoning.

Evidence of Huguely's Intoxication and Lack of Intent

7.      Huguely pled not guilty to all charges and was tried by a jury. Despite charging Huguely with premeditated murder, the prosecution acknowledged in opening that he "had been drinking . . . virtually nonstop since early that Sunday morning . . . all the way up until he ends up over at Yeardley Love's apartment." Tr. 2/8/2012 at 16; JA 1497–98. A number of the prosecution's own witnesses then testified to Huguely's high level of intoxication on May 2, 2010. The truth was very different from the headlines, and showed that Love's death had been tragic but clearly not intentional.

8.      Prosecution witnesses testified that May 2nd was the day of the lacrosse team's father-son golf tournament and Huguely was already drunk by early morning. Brian Carroll, a teammate who lived across the hall, observed Huguely drinking, slurring, and appearing to be drunk at 9:00 a.m. that morning. Tr. 2/9/2012 at 194, 197–98; JA 2050, 2054. Brian's twin brother, Kevin Carroll, was Huguely's roommate and he and his girlfriend, Elizabeth McLean, testified they saw Huguely at home that morning drinking beer. Tr. 2/9/2012 at 242, Tr. 2/15/2012 at 49, 55–56; JA 2110, 3285, 3294. Teammate Timothy Fuchs testified that he saw Huguely drinking around 9:00 a.m. and noticed he already was acting differently. Tr. 2/9/2012 at 185–86; JA 2039–40. Similarly, Chris Clements, a teammate who lived downstairs, testified that when Huguely woke him up around 9:30 a.m., he observed that Huguely had been drinking. Tr.

2/15/2012 at 96–99, 106; JA 3346–49, 3358.  Around 11:00 a.m., teammate Kenneth

Clausen saw Huguely drinking in the parking lot with "glossy eyes."  Tr. 2/15/2012 at 73;

JA 3315–16. Mikey Thompson, who lived with Brian Carroll across from Huguely, rode

to the golf tournament with Huguely and concluded that he "was clearly still fairly drunk

from the night before . . . ."  Tr. 2/15/2012 at 120–21; JA. 3376–77. Thompson witnessed

Huguely drink three or four beers while Huguely's father drove and also saw him put

several beers in his golf bag.  Tr. 2/15/2012 at 121–22; JA 3377–78.  Thereafter,

Clements golfed with Huguely and observed him drink throughout the day.  By the last

three holes, Huguely was so intoxicated that he was unable to fully participate.  Tr.

2/15/2012 at 100; JA 3350.

   9. Around 5:00 p.m., Fuchs and Kevin Carroll attended a reception with

Huguely in the golf clubhouse and observed that he was drunk, slurring his words, and

making inappropriate jokes. Tr. 2/9/2012 at 186–87, Tr. 2/15/2012 at 57; JA 2040–41,

3295–96. Brian Carroll noticed Huguely was significantly more intoxicated than earlier,

testifying that he observed him slurring, interrupting, telling a nonsensical story, and

being incapable of holding a conversation. Tr. 2/9/2012 at 199–200; JA 2056–57.

Clausen also heard Huguely telling incoherent stories, Tr. 2/15/2012 at 75–76; JA 3318–

19, and Thompson testified that Huguely was "clearly fairly drunk" at the reception,

incapable of "walking straight, slurring his words a little bit, and saying a few things that

were fairly embarrassing . . . ."  Tr. 2/15/2012 at 121–22; JA. 3377–79.

   10. After the reception, the Huguelys dropped Brian Carroll at home and went

to dinner with Clausen and Thompson. Huguely continued to drink on the drive and

argued with his father about the volume of music. Tr. 2/9/2012 at 200, Tr. 2/15/2012 at

75; JA 2057–58, 3318–19.  The small group then drank two bottles of wine at dinner and at one point Huguely drunkenly dropped a bottle of wine, creating a scene. He may have also knocked over a glass of wine. Huguely then argued with his father.  Tr. 2/15/2012 at 76, 123–24; JA 3320, 3379–80.  The group ended dinner early because they did not want to be in public with Huguely while he was so drunk. Tr. 2/15/2012 at 124; JA 3380.  On the way out of the restaurant, Huguely urinated in public. Tr. 2/15/2012 at 124; JA 3381.

11.     When they returned home, Huguely stayed in the car with his father for a time, and then rejoined his teammates around 10:30 p.m.  Clausen and Thompson observed that Huguely appeared frustrated and nonsensical.  Clausen could not understand Huguely and Thompson described him as "a little more out of it than he seemed even at dinner. He was clearly upset about something that had happened with his dad and wasn't really making any sense."  Tr. 2/15/2012 at 77–78, 124–25; JA 3321–23, 3381–83.  Kevin Carroll also testified that when Huguely returned, he was drunk and irritated about some papers his father wanted him to sign.  Tr. 2/15/2012 at 58–59; JA 3297–98.

12.     Clements, who left the reception early and did school work until 10:30 p.m., then went to Huguely's apartment and saw that he was visibly drunk.  Tr. 2/15/2012 at 100–01; JA 3350–52.  The other four teammates shared a few beers at the apartment over the next hour or so.  Around 11:45 p.m., Kevin Carroll and Clausen left for fifteen to twenty minutes to buy more beer and Thompson crossed the hall to his apartment and got in bed.  Tr. 2/15/2012 at 59–60, 77, 79; JA 3297–300, 3321, 3324.  Around that time, Clements heard Huguely come to his door downstairs. Clements would not allow Huguely into his apartment: Clements yelled that he was working on a paper, and

Huguely said something and appeared to leave. Tr. 2/15/2012 at 102–03; JA 3353–54. About twenty minutes later, Huguely stopped by Thompson's apartment, saw him in bed, used the bathroom, and returned to his apartment. Thompson testified that Huguely was drunk but that there was nothing unusual. Tr. 2/15/2012 at 126–29, 134–35; JA 3383–86, 3394–95.[5]

13.   When Clausen and Carroll returned from the store, Huguely was gone, but returned at about 12:15 a.m.  They asked what Huguely had been doing and he said he had been downstairs with Clements and Will Bolton, and that Clements was drunk.  JA 3301–02, 3324–25.  Clausen asked Huguely what was wrong and he said that nothing was wrong.  Tr. 2/15/2012 at 81–82; JA 3327–28.  Kevin Carroll testified Huguely "was really, really drunk" when he returned to the apartment.  Tr. 2/15/2012 at 67–68; JA 3309.  He did not notice any cuts, bruises, or dishevelment; just that Huguely appeared tired and intoxicated.  Tr. 2/15/2012 at 68–69; JA 3310–11. Huguely sat on the couch for about fifteen minutes and then went to bed around 12:30 a.m.  Tr. 2/15/2012 at 65–66; JA 3306–07. Kevin Carroll then called Bolton and invited him over. Bolton was at his apartment and had not had contact with Clements that day. Tr. 2/15/2012 at 112–113; JA 3365–66.[6]  When he arrived at Huguely's apartment fifteen to twenty minutes later, Huguely was drunk and using the bathroom with the door open. Huguely then went to his bedroom. Tr. 2/15/2012 at 80–81, 112–117; JA 3324–27, 3366–72.

---

[5] The prosecution's theory, based on police speculation, was that Huguely stopped by Thompson's on his way home from Love's apartment to wash blood off himself. Thompson provided no testimony to support this theory and his drains were tested and no trace of blood was found. Tr. 2/15/2012 at 129, 136-37; JA 3387, 3396–97.

[6] Clements also confirmed that he had not been drinking or seen Bolton that day. Tr. 2/15/2012 at 61-62, 79-80; JA 3301–02, 3324–25.

14.     Several prosecution witnesses also testified that Huguely's drinking had developed into a serious problem by the time of the offense.  In fact, Huguely's drinking had become so serious that his friends had discussed staging an intervention when the lacrosse season ended.  Tr. 2/15/2012 at 85–86; JA 3332.  Brian Carroll testified Huguely's drinking had grown more frequent and intense, with Huguely getting intoxicated at least four times a week.  Tr. 2/9/2012 at 207–08; JA 2067.  Similarly, Clausen testified Huguely had been drinking a lot and always to the point of being affected.  Clausen described Huguely, in general, as "sloppy, incoherent, not cohesive, not speaking clearly, just not together" when he drank.  Tr. 2/15/2012 at 84–85, 89–90; JA 3331–32, 3337.

15.     Elizabeth McLean, who spent considerable time at Huguely's apartment, also testified his drinking had become an issue.  According to McLean, Huguely had lost control of his drinking and of his behavior when he was drinking.  He often drank to excess and his drinking affected his behavior and mood. Tr. 2/9/2012 at 230–31, 243–45, Tr. 2/15/2012 at 50; JA 2096, 2111–14, 3287.  Mikey Thompson testified that Huguely's drinking had become out of control and that he needed to stop.  Huguely drank three or four times per week to the point of his behavior being affected.  Huguely's drinking resulted in "off-putting" behavior, and Thompson opined that alcohol had become more important to him than other things. Tr. 2/15/2012 at 129–34; JA 3387–94.

16.     Thus, while Huguely was charged with premeditated murder, the evidence made clear that he had no intent to kill Love.  Rather Huguely had walked into Love's apartment in a highly intoxicated state and only for the purpose of talking to her.  Clements testified that Huguely first had tried to come into his apartment.  Thereafter,

Huguely was gone only twenty minutes before drunkenly stopping by Thompson's apartment.  Huguely had made no effort to hide his presence at Love's apartment.  The neighborhood was well lit and full of activity until midnight or later.  *See* Tr. 2/8/2012 at 127–128, 157, Tr. 2/9/2012 at 203–04; JA 1639–40 (Kaitlin Duff); 1677 (Anna Lehmann); 2062 (Brian Carroll).

17.     Moreover, Huguely's drunken desire to talk to Love about their problems occurred in the context of a relationship already strained by drinking and mutual recriminations.  Huguely and Love had been in an off-and-on relationship since shortly after they arrived at UVA, but it had disintegrated into alcohol-fueled infidelities and arguments.  Tr. 2/8/2012 at 99, 125, 163–64; JA 1603, 1636, 1684–85.  In spring 2010, Love began a romantic relationship with Mike Burns, a University of North Carolina lacrosse player with whom she had "hooked up" in 2008.  Tr. 2/8/2012 at 165, Tr. 2/9/2012 153–54, 164; JA 1687, 1998–99, 2011–12.  In February 2010, Burns visited UVA and attended a party held between the Huguely/Carroll and Carroll/Thompson apartments.  Tr. 2/9/2012; JA 2004–05.  Burns testified that he was standing in the hallway talking to Fuchs when he heard a yell, entered Huguely's apartment, and opened his bedroom door.  Tr. 2/9/2012 at 159–60; JA 2006.  Huguely was lying in bed with Love on top of him.  Burns testified he observed Huguely's arm around Love's neck, but acknowledged previously telling police that Huguely's arm was around her chest.  Tr. 2/9/2012 at 160, 166–70; JA 2007, 2015–20.  Huguely let go and Love left crying.  Tr. 2/9/2012 at 160–61; JA 2008–09.  That night, Burns "hooked up" with Love.  Tr. 2/9/2012 at 165–66; JA 2014.  A few days later, Burns called Love, who said that

everything was fine and she did not seem concerned or afraid.  Tr. 2/9/2012 at 169; JA 2019.

18.      Fuchs testified that at the time of this incident he was standing near Huguely's room and noticed nothing out of the ordinary; he just saw Burns open the door and Love exit.  Love "kind of looked like she was a little bit freaked out" and left without saying anything.  Tr. 2/9/2012 at 177–80; JA 2029–32.  McLean, Duff, and Whiteley all witnessed Love crying after this event. Tr. 2/8/2012 at 100–01, 165–67, Tr. 2/9/2012 at 240; JA 1605–06, 1687–89, 2108.  A few days later, Huguely told Whiteley he did not really remember the incident and was angry Love claimed he had choked her.  Tr. 2/8/2012 at 168–71; JA 1691–94.  Huguely told Whiteley he would write Love a letter. Tr. 2/8/2012 at 170; JA 1694.  In that letter, Huguely expressed great remorse and reflected on his struggle with alcohol:

> I cannot describe how sorry I am for what happened this past weekend.  I am horrified with the way I behaved and treated you.  I'm scared to know that I can get that drunk to the point where I cannot controll [sic] the way I behave or act.  It is clearly an issue that I need to look deeply into and address.  Alcohol is ruining my life, my relationships, and I'm hurting not only myself but the people I love and care for most and this weekend is a direct example of this.  Because I don't know what happened in my room I will not even say anything but that I'm so so sorry and would never hurt you or any girl for that matter. . . .

JA 4609–10.[7]  Love "hooked up" with Burns again on April 25, 2010.  Tr. 2/9/2012 at 169; JA 2019.

19.      Huguely's relationship with Love continued to deteriorate over the next several weeks.  For instance, despite having recently "hooked up" with Burns, Love angrily entered Huguely's apartment on the Wednesday before her death and began

---

[7] The jury later asked to review this letter during deliberations.  Tr. 2/22/2012 at 32; JA 4259.

beating him with her purse.  Duff and Whiteley testified that earlier that day, they had been out with some friends who mentioned seeing Huguely with a woman named Stephanie Aladj, and this caused Love to be surprised and upset.  Tr. 2/8/2012 at 103–08, 122, 171–73; JA 1607–14, 1632, 1695–97.  Later that night, two prospective students were waiting at Huguely's apartment at the request of their escort, Kate Kamber's, request.  Tr. 2/9/2012 at 182–83, 215–17; JA 2035–36, 2076–78.  When Kamber walked in,  Huguely and the visitors were sitting on separate couches talking.  Soon after, Love entered and raised her voice at Huguely.  Tr. 2/9/2012 at 184, 191–92, 217–18; JA 2037–38, 2047, 2079–80.  Love asked if the young women were Huguely's "new girlfriends" or if he had been texting them.  Tr. 2/9/2012 at 218; JA 2081.  Love then began yelling at Huguely and hitting him with her purse.  Tr. 2/17/2012 at 37–38; JA 3758–59.  Huguely calmly rose from the couch and backed away from Love while asking her to leave.  Tr. 2/17/2012 at 39; JA 3760.

20.     McLean was in another room when this incident occurred and heard Love yelling and hitting Huguely with her purse.  McLean heard Huguely tell Love to stop, and the contents of Love's purse spill onto the floor.  Tr. 2/9/2012 at 233–36, 247–48; JA 2099–2102, 2117–18.  McLean helped Love pick up her belongings and walked her out of the building.  Love "was angry and she had been drinking."  Tr. 2/9/2012 at 236; JA 2102–03.  Kamber testified Huguely appeared "[c]alm, collected . . . not confused, but startled I guess when she came in and embarrassed."  Tr. 2/9/2012 at 219; JA 2082.  Kamber testified Huguely had been gentlemanly to help out and that it "was . . . almost funny how innocent it was."  Tr. 2/9/2012 at 223, 225; JA 2087, 2089. The two prospective students testified Huguely was nice, courteous, appropriate, and helpful to

allow them to use his apartment and phone charger while they waited for Kamber. Tr. 2/17/2012 at 19–42; JA 3737–63.

21.     The next day, a Thursday, Love left for a game with the rest of the women's lacrosse team. During the trip Love borrowed phones to communicate with Huguely because she had lost hers. Tr. 2/8/2012 at 108–10, 174–75; JA 1614–18, 1698–99. They also exchanged angry emails in which both called each other names. Tr. 2/8/2012 at 178–79; JA 1703–04; 4621–25. The emails continued over the next couple days. In one, Huguely wrote,

> A week ago u said u would get back together with me if I stopped getting so drunk then u go fuck burns attack me and in the midst of the attack say burns is fucked me better than you. That is so so fucked up on so many levels. I should have killed you. I'm still in utter disbelief at everything that has happened recently and how u handle this.

Love responded, "you should have killed me? youre so fucked up." JA 4624.

22.     The women's lacrosse team played a game Friday. On Saturday, they went to Boylan Heights, a local bar, where members of the men's lacrosse team and their families were also present. Tr. 2/8/2012 at 110–12, 179–81; JA 1618–20, 1705–07. Alina Massaro, Huguely's aunt, testified she saw Love and Huguely interact at Boylan. Tr. 2/17/2012 at 76-79; JA 3802–05. Massaro walked the jury through a video security footage, pointing out that Love approached and hugged Huguely's cousins, that Love and Huguely appeared cordial, and that they even held hands. Tr. 2/17/2012 at 71–79; JA 3796–3805. Still, no evidence was presented regarding Huguely's drinking that day, despite the fact that one witness testified that on Sunday, he seemed drunk from the night before.

<u>Lay Evidence Regarding the Cause and Circumstances of Love's Death</u>

23.     On Sunday, Love and her roommates went to Boylan Heights for about three hours.  They then did schoolwork and returned to the bar around 5:00 p.m.  Tr. 2/8/2012 at 113–14, 182–86; JA 1621–22, 1709–13.  Love was drinking.  Tr. 2/8/2012 at 115, 124; JA 1623, 1635.  Around 10:00 p.m., Love and Whiteley went to their apartment, planning to shower and again return to Boylan Heights.  When Whiteley checked to see if Love was ready, Love was in bed wearing only underwear.  Love said she was tired, had a lot of work to do the next day, and would consider coming later.  Tr. 2/8/2012 at 188–91; JA 1715–20.  Whiteley left the apartment door unlocked.  Tr. 2/8/2012 at 192; JA 1721.  Around 2:15 a.m., Whiteley and Philippe Oudshoorn returned to the apartment, entered Love's bedroom, and observed her facedown on her pillow, under the covers.  Tr. 2/8/2012 at 193–95, 226–28; JA 1721–24, 1764-66.  Although there was a small amount of blood on the sheets and pillow, they concluded Love might have alcohol poisoning.

24.     Oudshoorn called 911, reported that Love was suffering from alcohol poisoning, and moved Love to the floor to attempt CPR.  Tr. 2/8/2012 at 196–201, 211–15, 228–33; JA 1725–32, 1745–50, 1767–72.  Police arrived and took over resuscitation efforts, using firm compressions.  Tr. 2/8/2012 at 245–46, Tr. 2/9/2012 at 10–11; JA 1787–89, 1816–17.  They noticed Love had a bruised and swollen eye, dried blood on her nose and mouth, and an abrasion under her chin.  Tr. 2/9/2012 at 12, 24; JA 1818, 1833.  Police noticed a hole in the bedroom door and an apparent blood spot on the floor near the foot of the bed.  Tr. 2/8/2012 at 246, Tr. 2/9/2012 at 12, 111–12, 116; JA 1789, 1817,

1945, 1951. Rescue arrived and ventilated and intubated Love, causing blood spatter on her mouth, neck, shoulder, and the bed apron. Tr. 2/9/2012 at 13, 34–38, 47, 49–60; JA 1819, 1846–51, 1862, 1865–78. They attempted resuscitation for approximately twenty-five minutes with no signs of life. Tr. 2/9/2012 at 42–43, 67; JA 1856–57, 1888. During CPR, they compressed Love's chest 100 times per minute to cause her sternum to touch her heart. Tr. 2/9/2012 at 48; JA 1863. The point of CPR is to perfuse blood, and because of this CPR can cause bruises to blacken and open wounds to bleed. Tr. 2/9/2012 at 49–50; JA 1865–67.

25.     Whiteley led police to Huguely's apartment around 7:00 a.m. Tr. 2/8/2012 at 202–04; JA 1734–35. Detective Lisa Reeves told Huguely they were investigating a crime and asked him to accompany them to the station, and he was cooperative. Tr. 2/10/2012 at 56–59; JA 2293–97. In the police station, Detective Reeves noticed some bruising on Huguely's knuckles and read him his *Miranda* rights, which he waived. Tr. 2/10/2012 at 61–66; JA 2299–2306. Huguely was fully cooperative and grief-stricken when interviewed. JA 2296, 2306–13, 2620. Huguely told police that he and Love had been talking about their issues when she told him she no longer wanted to talk and to leave. Huguely then grabbed Love by the upper arms and she attempted to wriggle away from him. They eventually were wrestling on the floor, and Love's face rolled on the ground. Huguely noticed that her nose was bleeding. They stopped and stood up, and Huguely tossed Love on the bed and left. When he left, he believed she was on her back on the bed.

26.     Anna Lehmann, a student who lived below Love, testified the "walls were very thin" and one could hear yelling in other apartments. Tr. 2/8/2012 at 135–36; JA

1649–51.  Lehmann heard heavy footsteps go up and into Love's apartment, and later heard a single loud noise she likened to a stereo or bookshelf falling.  Tr. 2/8/2012 at 137–38; JA 1652.  Despite the thin walls, Lehmann heard no voices, arguing, things hitting the floor, or banging walls.  Tr. 2/8/2012 at 142, 153–54; JA 1658, 1672–73.  Lehmann heard only some footsteps.  Tr. 2/8/2012 at 153; JA 1672.  No more than ten minutes later she heard heavy footsteps exit and walk downstairs.  She looked out the window and saw a male student wearing a blue t-shirt, shorts, and tennis shoes walk by at a normal pace, not acting fidgety, guilty, or nervous.  Tr. 2/8/2012 at 138, 141–44, 158; JA 1653, 57–60, 1678.

<u>Forensic Evidence Regarding the Cause and Circumstances of Love's Death</u>

27.   Love's injuries were entirely consistent with the fall to the floor from the bed.  Tr. 2/13/2012 at 192, 213, Tr. 2/14/2012 at 46–48, 86–90; JA 2739, 2762, 2852–54, 2904–08.  Love's room was orderly; its contents were not overturned or ransacked.  Tr. 2/10/2012 at 92-129; JA 2339–85.  Lightweight objects—including a vase, cup, and photos on the wall and bookcase—were intact.  Tr. 2/10/2012 at 199–203; JA 2475–79.  Detectives inspected for signs of impact but found no dimples, marks, or indications of anything hitting the wall.  A "small smudge above the bed" tested negative for blood or cosmetics.  Tr. 2/10/2012 at 157–58, 197–98, 205, Tr. 2/13/2012 at 16–17, Tr. 2/14/2012 at 227–31, 320–21; JA 2421–22, 2472, 2482, 2538–39, 3083–88, 3202.  Although this evidence contradicted the widespread story that Huguely had hit Love's head into the wall, the prosecution failed to inform its experts there was no damage to the walls.  Tr. 2/13/2012 at 233, Tr. 2/14/2012 at 90, 182; JA 2785 (Gormley); 2909 (Fuller); 3026 (Lopes).

28.     Similarly, blood and DNA evidence did not suggest a beating.  The prosecution's bloodstain pattern analyst testified that the stain on the carpet was a drip and that stains on the bedspread, sheet, and pillows were from transfer or movement.  Tr. 2/14/2012 at 248, 256–61, 273–76; JA 3110, 3120–26, 3142–45.  Angie Rainey, the prosecution's DNA analyst, testified that Huguely and Love could not be eliminated from DNA under each other's right fingernails.  Tr. 2/14/2012 at 294–95, 301–02; JA 3169, 3178.  Investigators did collect a 1 cm spot on Huguely's shorts containing foreign DNA, but it was determined to be of no value.  Tr. 2/14/2012 at 307–10; JA 3185–88.  Neither Huguely's nor Love's blood was found on the numerous swabs and items collected from Huguely's apartment.  Tr. 2/14/2012 at 325–29; JA 3208–13.

29.     The lack of signs of struggle or beating corroborated Huguely's statement to police that there had been an altercation but he had done nothing that could have caused her death.  Therefore, much of the trial was a battle of the experts regarding cause of death.  The prosecution asserted during opening arguments that Love died of brain injuries related to blunt force trauma to the head and also argued an injury to Love's carotid sinus was consistent with a hand on her throat, and that pressure on that artery could have caused her heart to stop.  Tr. 2/8/2012 at 18–19; JA 1500–01.[8]  The

---

[8] The prosecution received virtually no evidentiary support for this argument.  Dr. Gormley testified that a small area of hemorrhage on Love's neck suggested blunt force pressure, which could cause the heart to slow or stop, but that there was no way to tell how much pressure was applied to the "carotid body" or what effect, if any, it had.  Tr. 2/13/2012 at 181-185; JA 2726–30.  Moreover, stimulation of the carotid body could occur due to incidental factors and Love lacked bleeding that would have suggested greater pressure.  In sum, these injuries could have been unintentional or due to a quick grab.  Tr. 2/13/2012 at 226-27; JA 2777–78.  Dr. Gormley admitted that the alleged neck bruises were not documented as bruises in his first report, that he could not say they were finger marks, and that there were no injuries consistent with uniform pressure or two hands exerting force.  Tr. 2/13/2012 at 221-23; JA 2772–73.  Furthermore, he saw no

Commonwealth later contradicted this theory, however, when it made clear during closing both that Love was alive when Huguely left the apartment, and that he was genuinely upset when he was told during his interrogation that she had died. Tr. 2/18/2012 at 182, 185-86.

30.     In contrast, the defense contended Love likely died from positional asphyxia, also known as accidental smothering, because she was injured, very intoxicated, and ended up facedown on her pillow. Tr. 2/8/2012 at 57–58; JA 1550–51. The defense argued Huguely and Love fell on the floor while wrestling and, thereafter, Huguely pushed Love on the bed and left her apartment. It was not disputed that when Huguely left he had no reason to think his actions could cause death. The defense further argued there was significant controversy about the amount of force required for fatal injury and promised to present expert testimony that would demonstrate that the blood found in Love's brain resulted from reperfusion caused by CPR. Tr. 2/8/2012 at 48, 59–60; JA 1539, 1553–54.

31.     The prosecution called several experts who opined not only that Love's death had been caused by blunt force trauma, but also that CPR could not have caused her brain injuries. Dr. William Gormley, then Assistant Chief Medical Examiner, conducted Love's autopsy. Tr. 2/13/2012 at 149, 170; JA 2689, 2713. He testified Love's body showed bruising consistent with grabbing, but no large pattern of injuries suggesting significant grabbing. Dr. Gormley testified it is impossible to determine the age or amount of force from a bruise, and that he doubted every identified bruise

---

bruising in the neck muscles, fractured neck bones, or damage to the windpipe or larynx. Tr. 2/13/2012 at 223-25; JA 2774–75.

occurred near Love's death.  Tr. 2/13/2012 at 172–75, 176–77, 180, 227–32; JA 2715–19, 2721, 2724–25, 2778–83.

32.    Dr. Gormley testified Love's facial injuries could be consistent with smothering, but opined that other indications of asphyxia were absent.  Tr. 2/13/2012 at 188–93; JA 2734–39.  Critically, Dr. Gormley testified Love experienced no skull fractures and that the injuries to Love's face and mouth were consistent with a single impact event, such as falling on the floor.  Tr. 2/13/2012 at 192, 218–21; JA 2739, 2768–72.  Dr. Gormley opined Love's subscapular bruising was consistent with blunt force injury to her skull and that she could have died from a head injury.  Dr. Gormley testified it was difficult to determine the magnitude of force, and acknowledged that a person was more likely to have a fracture with more force. Tr. 2/13/2012 at 201–03, 208–12, 216–217; JA 2749–50, 2757–60, 2766–67.  Moreover, the lack of injury to the brain at the site of the subscapular injury suggested pressure over a relatively broad area, again consistent with falling on the floor.  Tr. 2/13/2012 at 209–10, 211–13; JA 2758, 2760–62. Additionally, all of the injuries were to the right side of Love's face, and a contusion and abrasion under her chin were consistent with carpet. Tr. 2/13/2012 at 214–15; JA 2763–65.  Dr. Gormley ultimately opined that Love likely died from blunt force injury to the head, which caused brain injuries that resulted in cardiac arrhythmia, which then caused death.  Tr. 2/14/2012 at 210–13; JA 3062–66.

33.    When Dr. Gormley examined Love's brain, he identified only a small subarachnoid hemorrhage around the base, as opposed to the type of massive hemorrhage that could cause death.  Tr. 2/13/2012 at 202–05; JA 2749–53.  Neuropathologist Dr. Christine Fuller testified she cut the brain with CME staff, Tr. 2/14/2012 at 8–16; JA

2803–14, and observed a contusion to the left temporal lobe that she opined was caused by blunt force trauma like a fall or being slammed against a wall. Tr. 2/14/2012 at 41–52; JA 2846–60. The hemorrhage was not significant enough to "cause a problem" for Love. Tr. 2/14/2012 at 52–53; JA 2861–62. Dr. Fuller admitted Love had no skull fractures, brain lacerations, or subdural hematomas. Tr. 2/14/2012 at 85–86; JA 2902–04. She testified a bruise to the eye could be consistent with a punch or contact with the floor. Tr. 2/14/2012 at 87–90; JA 2905–08.

34.     Dr. Fuller observed a contusion on the opposite side of the brain. Tr. 2/14/2012 at 53–55; JA 2862–64. There were small dots of hemorrhage (petechial hemorrhage) in the area connecting the pons and cerebellum and a smaller hemorrhage to the brain stem. Tr. 2/14/2012 at 58–60, 62–74; JA 2868–70, 2874–87. Dr. Fuller testified contusions in the brain stem could be significant, because there are vital structures there, and injury could cause death due to respiratory or cardiac arrest. Death would be immediate or within a couple of hours. Dr. Fuller did not have access to a particular stain, however, so Dr. Lopes became involved in the case. Tr. 2/14/2012 at 61–62, 77–79, 96–98; JA 2872–73, 2892–94, 2917–19.

35.     Dr. Maria-Beatriz Lopes, an expert neuropathologist, testified she was asked to review the case after Dr. Fuller. Tr. 2/14/2012 at 114–20; JA 2939–47. Dr. Fuller had looked for evidence that Love's brain contusions were associated with trauma—such as axonal swelling and retraction balls—but when she was unable to find such evidence she utilized a beta-APP staining to look for axonal damage. Tr. 2/14/2012 at 124, 85–87; JA 2952, 3030–32. Notably, although axonal damage is common in trauma patients, beta-APP staining simply identifies ischemic neurons (ones that lack

oxygen or blood flow and thus are not working properly).  Tr. 2/14/2012 at 141–42, 147–50; JA 2974–75, 2981–84.  For this reason, there was no way to discriminate between axonal damage resulting from trauma or from the lack of oxygen.  In other words, as Dr. Lopes testified, the exact same changes could occur without trauma "in many situations." *See* Tr. 2/14/2012 at 187–89; JA 3032–34.

36.     Dr. Lopes noted that there was edema (swelling or excess collection of fluid in the tissues of the body) in the brain caused by the cells lacking oxygen, Tr. 2/14/2012 at 125–28; JA 2953–57, which could be due to hemorrhage, dysfunction of other organs, or injuries to the brain, including areas of the brain stem affecting the heart. Tr. 2/14/2012 at 129–30; JA 2958–60.  Dr. Lopes opined that contusions in the brain stem could be from rotation of the brain or the brain stem, and that the brain stem is very sensitive to axon rotation, which could cause edema.  Tr. 2/14/2012 at 133–41; JA 2963–73.  Edema could damage stimulation of the cardiac and respiratory areas and cause arrhythmia or arrest.  Tr. 2/14/2012 at 142–45; JA 2975–79.  Dr. Lopes opined Love's lesions resulted from trauma but—like Dr. Gormley and Dr. Fuller—could not say the mechanism or degree of force.  Tr. 2/14/2012 at 168–69, 177–79; JA 3009, 3019–22.  Dr. Lopes conceded edema could occur independent of trauma and, as such, she could not rule out other causes of death such as cardiac arrhythmia or pulmonary and respiratory failure.  She declined to offer an opinion as to whether Love's death was inevitable.  Tr. 2/14/2012 at 185, 188–89; JA 3030, 3034–35.  In sum, the totality of the prosecution's medical evidence left open the possibility that Love's death resulted from a fall to the floor and was not inevitable.

37.     On February 15, 2012, the prosecution presented testimony from ten more witnesses and rested.  The defense began its case that afternoon with the testimony of Dr. Alphonse Polkis, a toxicology expert who opined Love's blood alcohol content at approximately 11:45 p.m. was at least .16, and likely .17–18.  Tr. 2/15/2012 at 185; JA 3458.  Dr. Polkis testified Love would have been drunk and had severe impairment of judgment, decision-making, reasoning, and emotional control.  Additionally, Dr. Polkis testified that Love's psychomotor coordination would have been affected, her words likely would have been slurred, she would have had issues with her balance, and she would "stagger" if walking all due to the effect of alcohol on her cerebellum.  Tr. 2/15/2012 at 185-86; JA 3459–60.

38.     Expert neuropathologist Jan Leestma, M.D. also testified for the defense Tr. 2/15/2012 at 199–211; JA 3476–91.  Dr. Leestma, who examined Love's brain, testified that most of the injuries to her head and face were caused by blunt force trauma but that the brain bleeding and swelling would have taken time to occur.  Tr. 2/15/2012 at 220–24, 232–37; JA 3502–08, 3518–24.  Additionally, Love's corpus callosum was intact, although it is often lacerated and hemorrhaged in people dying from closed head trauma.  Similarly, Love exhibited no hemorrhages in the white matter under the cerebral cortex.  This lack of hemorrhaging is uncommon in people who die from head trauma.  Importantly, Dr. Leetsma testified the petechial hemorrhage in Love's brain stem appeared to be due to swelling and not a fast, concussive force.  Tr. 2/15/2012 at 237–45; JA 3524–34.  Love also lacked signs of shear force injury.  Tr. 2/15/2012 at 245–47; JA 3534–36.

39.     Dr. Leestma opined none of Love's external injuries were severe enough to cause a fatal brain injury. Tr. 2/15/2012 at 259; JA 3551–52. Love lacked the pattern, extent, and typicality of intracranial pathology to explain death. Dr. Leestma opined that the changes to her brain were caused by a lack of blood flow and oxygen, and the position of her body most logically contributed to that. Tr. 2/15/2012 at 273; JA 3569. Thus, Dr. Leestma concluded Love died from the deprivation of blood flow and oxygen to the brain, probably because of asphyxia. He testified that breathing in through a wet surface—like Love's pillow, which had secretions and blood—could cause asphyxia. Tr. 2/15/2012 at 270–72; JA 3566–67.

40.     The defense told the jury during opening arguments that it would show that the hemorrhage in Love's brain was caused by reperfusion, which is the flow of blood back into the brain caused by CPR, and not by blunt force trauma. Tr. 2/12/2012 at 59-60. As discussed below, however, Dr. Leestma was the only witness who testified in support of this conclusion. Dr. Leestma opined that restoring circulation into an empty and damaged blood vessel system caused hemorrhage, and that it was not true that reperfusion injuries would only show up in "watershed areas" of the brain. Tr. 2/15/2012 at 260–69; JA 3552–64. Moreover, beta-APP testing has no forensic value because there is no way to tell if the changes are due to trauma or hypoxia, as Dr. Lopes admitted. Tr. 2/15/2012 at 254–56; JA 3545–48. Because several prosecution experts had testified it was impossible that Love's injuries had been caused by reperfusion, Tr. 2/14/2012 at 68–83, 100–05, 156–58, 163–76, Tr. 2/9/2012 at 72–92, Tr. 2/10/2012 at 40–41, 48-49 ; JA 2881–99, 2922–27 (Fuller); 2993–95, 3001–18 (Lopes); 1895–1920 (Dr. William Brady);

2273–75, 2283–84 (Virmani), compelling rebuttal evidence on this point was central to the defense case.

41.     Quagliana, who was responsible for all of the medical witnesses, was sick the morning after Dr. Leestma testified. Tr. 2/16/2012 at 3–10; JA 3624–32.[9] In her absence, the parties argued jury instructions. Tr. 2/16/2012 at 10–83; JA 3633–3716. The following day, Lawrence took the position that he could go forward on other aspects of the case without co-counsel. Lawrence then went back on the record to state that Huguely disagreed and objected to proceeding without co-counsel. The Court overruled Huguely's objection. Tr. 2/17/2012 at 4–10; JA 3720–27. The defense—which had presented only two witnesses before counsel became sick—was forced to examine five of its eight witnesses without her. Tr. 2/17/2012 at 4–94; JA 3720–3822. Thus the majority of Huguely's defense was presented without half his legal team, forcing counsel to abandon their plan to present the expert medical witnesses in a particular, coherent order.

42.     In counsel's absence, the defense evidence included very limited testimony from biomechanical consultant Dr. Michael Woodhouse, who had inspected and scanned the drywall from Love's apartment. Tr. 2/17/2012 at 11–13; JA 3728–30. Dr. Woodhouse testified that there was no evidence of any type of impact, including contact with a head. Tr. 2/17/2012 at 13–16; JA 3730–34.

43.     The next morning, the prosecution objected to any testimony from Dr. Ronald Uscinski, a clinical neurosurgeon, because defense counsel admittedly violated the rule on witnesses by emailing defense experts Dr. Uscinski, Dr. Leestma, and Dr. Jack Daniel about the substance of prosecution experts' testimony. (Dr. Leestma had

---

[9] The defense produced affidavits attesting to counsel's sickness. JA 405–19 (affidavits).

testified without the prosecution knowing this.) Tr. 2/18/2012 at 4; JA 3884. The

defense argued the violations were curable, unintentional, and that they were not

"conscious" of the violations until the day prior, when they got an unspecified

communication from a witness. Tr. 2/18/2012 at 5–8; JA 3885–89; *see also* JA 4753–57

(relevant emails). In fact, Dr. Daniel—a planned expert witness who was then not called

to testify—had notified counsel of the violation.

44.    After voir dire and argument, the Court precluded Dr. Uscinski from

testifying about reperfusion, reperfusion injuries caused by CPR, or the concept that

cerebral-vascular damage makes people susceptible to reperfusion injury. Tr. 2/18/2012

at 44–45; JA 3934–35. The Court stated, "[t]his is very troublesome and I wouldn't have

expected this from counsel and I'm incredibly disappointed with it, but this is an

incredibly important issue for the parties and I'm not going to bar him from testimony

generally, but I'm not going to let him testify about reperfusion . . . ." Tr. 2/18/2012 at

44–45; JA 3934–35.

45.    The defense then presented testimony from Dr. Uscinski as their last

witness. Tr. 2/18/2012 at 54; JA 3947. Dr. Uscinski testified that Love suffered external

impact injuries, but no skull injuries and had a relatively normal looking brain. Tr.

2/18/2012 at 63–65, 66–70; JA 3959–60, 3962–67. Love had no subdural bleeding or

significant bleeding around the brain's surface, nor brain contusions. Although there was

certainly head trauma, there was no significant brain trauma. Tr. 2/18/2012 at 70–71; JA

3967–68. The hemorrhage on Love's temporal lobe was an insignificant hernia not likely

caused by trauma. Tr. 2/18/2012 at 73–76, 82–83; JA 3971–75, 3983–84. It would take

a big hit to injure the pons directly, and there was not enough evidence of external injury

for the pons to have been injured by traumatic force. Tr. 2/18/2012 at 85–87; JA 3986–88. Dr. Uscinski further testified that none of the findings were consistent with blunt force trauma. He noted that the hemorrhages were all towards the base of the brain at or near bony structures, and that there was no bleeding inside the head. Furthermore, Dr. Uscinski pointed out that beta-APP identifies only axonal dysfunction, not necessarily injury. Tr. 2/18/2012 at 91, 101, 103–06; JA 3994, 4007, 4009–13. After Dr. Uscinski's testimony, the defense rested and made a brief motion to strike. Tr. 2/18/2012 at 124–26; JA 4036–39. Later, the defense submitted a sparse proffer on Uscinski's excluded testimony. Tr. 2/22/2012 at 13–16; JA 4237–41, 4758.

46.     In closing, the prosecution abandoned its theory of premeditated first-degree murder. The prosecution argued that Huguely:

> had an extraordinary amount to drink that day beginning from an early hour following drinking the night before. By this time in his life, drinking to excess as many as four to five times per week, it wasn't merely noticeable. It was affecting his behavior . . . . It was such that his friends were concerned enough to know that they needed to do something about it.

Tr. 2/18/2012 at 159–60; JA 4081–82. The prosecution noted that there was "clear evidence that under the influence of alcohol [Huguely] can and will behave aggressively with callous disregard for the consequences," and that Huguely had personally acknowledged in a letter to Love that alcohol was ruining his life. Tr. 2/18/2012 at 160–61; JA 4082–83. The prosecution argued that malice could be found in the distorted logic of an abuser, and that the case was really about whether Huguely should be found guilty of felony murder or second-degree murder. Tr. 2/18/2012 at 188, 196–97; JA 4118, 4128–30.

47.     In response, the defense argued that Huguely's relationship with Love was volatile but not abusive.  The defense's argument was disjointed and occasionally offensive.  Trial counsel argued, "it's unlikely that none of us have never touched somebody that they love in a rude manner," and that "I should have killed you is just the same as my telling my child, I'm going to crush you."  JA 4142–43.  Counsel referred to the area where Love and Huguely lived as "the men's and women's lacrosse ghetto," and argued there is "almost a twenty-something ghetto of these young kids, and there's just lots and lots of drama going around and we've seen a bunch of really attractive people come here and you kind of wonder, I guess—maybe you don't wonder.  I mean, we were in college it was the same thing."  JA 4139, 4146.  The defense further argued that involuntary manslaughter was the only charge the jury should consider.  Tr. 2/18/2012 at 249–51; JA 4196–98.  The defense emphasized that Love's injuries were just as likely to have happened in a low-force event and that falling off the bed would have been enough.  Tr. 2/18/2012 at 222–26; JA 4161–66.  In sum, the defense argued, it could not be inferred from the level of force that Huguely had intended to kill Love.  Tr. 2/18/2012 at 224–25, 230; JA 4164, 4172.  Notably, in arguing cause of death, the defense pointed out that Dr. Leetsma "holds the opinion that the blood, *and this is a different than [sic] Dr. Uscinski holds*, but that the blood in the lower brain/upper brain was the result of the reperfusion."  Tr. 2/18/2012 at 226; JA 4167 (emphasis added).  Of course, Dr. Uscinski's opinion did *not* contradict the defense's theory to which Dr. Leetsma alone had testified.  Rather, Dr. Uscinski agreed with Dr. Leetsma but was barred from presenting such testimony because of trial counsel's violation of the rule on witnesses.

48.     The prosecution argued in rebuttal that there was no intent requirement for second-degree murder, and the defense asked the Court to allow them to respond on the issue. The Court denied that motion but directed the jurors to the malice instruction and re-read part of it to them. Tr. 2/18/2012 at 261–65; JA 4211–16. During deliberations, the jury clearly struggled with the issues related to mens rea and requested a definition of reason as it pertained to "malice"— i.e., instruction 21. Tr. 2/22/2012 at 22–24; JA 4247–50. Later, the jury sent a note to the Court stating instruction 23 (all degrees of homicide) appeared to contradict instructions 14 (indirect causation) and 15 (direct causation). Rather than answer the inquiry, the Court asked the jury to clarify its question. The jury did not answer, and the defense later raised a concern about following up on the unanswered question. Tr. 2/22/2012 at 25–31, 34–36; JA 4251–58, 4262–64.

49.     The jury found Huguely guilty of second-degree murder and grand larceny. Tr. 2/22/2012 at 46–47; JA 4276. They acquitted him of first-degree premeditated and felony murder, robbery, burglary with the intent to commit larceny, and statutory burglary with the intent to commit assault and battery. Tr. 2/22/2012 at 46–47; JA 4276. The jury was not polled. Tr. 2/22/2012 at 47; JA 4276.

50.     Sentencing was brief and began immediately. The prosecution introduced certified convictions from a single January 2009 event for resisting arrest and drunk in public, and then offered testimony from Love's mother and sister. Tr. 2/22/2012 at 54–68; JA 4284–4300. In argument, the prosecution again argued Huguely's intoxication as aggravating, saying, "to say highly intoxicated only begins to describe it, but he's so intoxicated that he's unable to be an accurate observer of what-all he did and what-all those circumstances were but you know what the result was." Tr. 2/22/2012 at 75; JA

4308.  After deliberations, the jury returned sentencing recommendations of twenty-five

years on second-degree murder and one year on grand larceny.  Tr. 2/22/2012 at 86; JA

4320.  The jury's sentencing verdict was heavily influenced by unrebutted beliefs about

the length of time it would take Huguely to overcome alcoholism.

51.     On May 25, 2012, the defense filed a Motion to Set Aside the Verdict and

For a New Trial.  JA 234–307.  The motion alleged a Sixth Amendment violation for

forcing Huguely to proceed without one of his lawyers, voir dire and jury selection

claims, failure to sequester the jury, denial of a jury instruction on malice, the limitation

of Dr. Uscinski's testimony, and sufficiency of the evidence claims regarding both

charges.  JA 251–52.  On June 5, 2012, the defense filed a Supplemental Motion to Set

Aside the Verdict and for a New Trial, raising the prosecution's failure to disclose

favorable information as required by *Brady v. Maryland*, 373 U.S. 83 (1963).  JA 308–

12, 377–403.  Prior to trial, the defense had received a letter stating only that the Loves

would be witnesses and that "a potential cause of action may be available to either or

both the Loves under the circumstances."  JA 310.  The prosecution had not disclosed

that civil attorneys had been retained and that preparations for a civil negligence suit

against Huguely were being made.  JA 310.

52.     This *Brady* violation emerged when, after trial, the Loves filed a wrongful

death suit against Huguely and then filed a motion requesting access to exhibits and trial

materials.  During the motion hearing, the Loves' attorney referred to "a longstanding

relationship with the Commonwealth's Attorney's Office."  JA 308.  Huguely requested a

hearing to develop evidence on this *Brady* issue.  JA 311.  On August 13, 2012, the Court

denied the defense's motion for a new trial and motion for a continuance.  JA 404.  On

August 15, 2012, the Court issued a letter opinion denying the defense's Supplemental Motion and an evidentiary hearing in support of that motion. JA 432–33.

53.     On August 30, 2012, the Court sentenced Huguely to concurrent terms of twenty-three years for second-degree murder and one year for grand larceny. JA 434–36. At sentencing, the prosecution presented evidence about prior incidents in which Huguely's alcohol problem had led to altercations. In one incident, Huguely was intoxicated and attempted to punch someone. Tr. Aug. 30, 2012 at 243–53. In another incident, Huguely assaulted a teammate because he had "hooked up" with Love; his teammate took responsibility for the inappropriate behavior, and both men eventually apologized to each other. *Id.* at 271–309. Claire Bordley, the daughter of Huguely's high school lacrosse coach, testified Huguely became angry with her because she told her father about Huguely's excessive drinking at UVA. *Id.* at 253–71. Huguely approached her at a bar while very intoxicated and put his hands around her throat but did not choke or strangle her. *See id.* The defense presented character testimony from a family friend, an aunt and uncle, and a priest who ministered to him in jail. These witnesses testified to Huguely's loyalty, faith, honesty, talents, and caring nature. *Id.* at 313–64. The defense also presented alternative guidelines to argue at sentencing with the point of showing the court that if Huguely had been convicted of manslaughter instead of murder, his sentence would be vastly different. But trial counsel calculated those guidelines improperly as having a mid-point of three years and four months; when calculated correctly the guidelines suggest a sentence of probation. *See id.* at 309–10, 375. Again, the defense failed to present mitigating evidence of Huguely's struggle with alcoholism. And in fact, the Court noted,

> The jury heard virtually nothing in the way of mitigation. Alcohol was a complicating factor. Today the presentence report . . . there's no development of any alcohol issues, so I don't—other than seeing the evidence in the case we have very little information about what alcohol has been to Mr. Huguely. There is no mental health or substance abuse evaluation here.

*Id.* at 391.

54.     On appeal, Huguely retained Craig S. Cooley of 3000 Idlewood Avenue, Richmond, VA 23211 and Paul D. Clement of Bancroft PLLC, 1919 M Street NW, Suite 470, Washington, D.C 20036.  JA 437–38.  Huguely filed a petition for appeal on January 22, 2013, raising five assignments of error.  First, that the trial court "violated Huguely's right to counsel . . . by forcing him to proceed with trial in the absence of his retained counsel of choice."  Pet. App. at 8, 10–11, 16–24.  Second, that the trial court "violated Huguely's right to a trial by a fair and impartial jury" by refusing to order individual sequestered voir dire, limiting relevant questions in voir dire, refusing to strike jurors for cause, and declining to sequester the jury.  Pet. App. at 8–9, 12–13, 24–40.  Third, Huguely assigned error to the *Brady* violation.  App. at 9, 13–14, 40–46.  Fourth, the trial court failed to "adequately instruct the jury about the meaning of 'malice' under Virginia law."  Pet. App. at 9, 14–15, 46–49.  Finally, Huguely raised sufficiency of the evidence of second-degree murder.  Pet. App. 9, 15–16, 49–54.

55.     The Court of Appeals awarded Huguely an appeal on two assignments of error: the violation of his right to counsel, and the trial court's error in refusing to strike a single juror (Juror 32) for cause.  *Huguely v. Commonwealth*, No. 1697-12-2 (Va. Ct. App. April 23, 2013).  A three-judge panel then granted Huguely an appeal on his claims that the trial court refused relevant questions on voir dire, refused to strike for cause all of the jurors raised in Huguely's petition, and failed to adequately instruct the jury on the

meaning of "malice." *Huguely v. Commonwealth*, No. 1697-12-2 (Va. Ct. App. June 14, 2013).

56.     On March 4, 2014, the Court of Appeals issued a published opinion denying Huguely's appeal. *Huguely v. Commonwealth*, 754 S.E.2d 557 (Va. Ct. App. 2014). The Court denied a petition for rehearing on March 27, 2014. *Huguely v. Commonwealth*, No. 1697-12-2 (Va. Ct. App. March 27, 2014). Huguely then filed a petition for appeal in the Supreme Court of Virginia on April 25, 2014. The Court denied the petition on November 19, 2014. *Huguely v. Commonwealth*, No. 140678 (Va. Nov. 19, 2014). Huguely filed a petition for rehearing, which was also denied. *Huguely v. Commonwealth*, No. 140678 (Va. Jan. 15, 2014).

57.     On June 12, 2015, Huguely filed a petition for a writ of certiorari in the United States Supreme Court. Clement, Jeffrey M. Harris, and C. Harker Rhodes IV of Bancroft PLLC, 500 New Jersey Ave. NW, Washington, D.C. 20001 represented Huguely. On October 5, 2015, the United States Supreme Court declined to hear Huguely's case. This timely habeas petition follows. Huguely has not filed any other post-conviction applications.

## STANDARD OF REVIEW

58.     The burden is on the petitioner to prove his habeas claims by a preponderance of the evidence. *Green v. Young*, 571 S.E.2d 135 (Va. 2002). This Court may grant discovery for good cause. Va. Code §§ 8.01-654(A) & B(4); 8.01-660.

## CLAIMS

**Claim I: Huguely's Rights to a Fair Trial before an Impartial Jury, Due Process, and to Confront Witnesses against Him were Violated Pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Virginia Constitution Art. I § 8, when a Court Officer Gave the Jury a Dictionary During**

32

**Deliberations and the Jury Consulted the Dictionary for the Meaning of Malice, the Main Issue at Trial.**[10]

59.     Without the knowledge of Huguely, the jury used a dictionary provided by a court officer to define "malice."  This was a close case and the main issue was clearly malice.  If malice were proven beyond a reasonable doubt, Huguely was guilty of second-degree murder; if not, manslaughter.  The trial judge's jury instructions, informed by consultation with the parties, were the only permissible source of instruction on legal terms.  When an external influence may have affected jury deliberations, prejudice is presumed.  Unless the Warden can show the error was harmless beyond a reasonable doubt, the only remedy is to grant the writ for a new trial.  Because the external influence in this case concerns the single most important legal issue at trial, the Warden cannot show harmless error.

    i.     *The Jury Used a Dictionary Provided by a Court Officer to Define Malice*

60.     During deliberations a juror asked for and was provided a dictionary from a court officer without Huguely's knowledge.  Juror 42 Decl. ¶ 7.  At least one juror used this dictionary to look up the word "malice," and then continued deliberating.  *Id.*  At least one juror concluded that using the dictionary to define "malice" "helped in deciding if there was malice and whether it had been shown in these charges."  *Id.*  The jury then convicted Huguely of second-degree murder.

    ii.     *The Issue of Malice was the Most Hotly Contested Issue at Trial*

---

[10] Huguely believes there is no evidence that could have alerted trial counsel to this claim previously.  If, however, this Court finds that the issue is defaulted or that trial counsel should have raised this issue, then Huguely also contends that the failure of trial counsel to raise this claim deprived him of his Sixth Amendment right to the effective assistance of counsel.

61.     Opening arguments of both sides focused on malice.  Most of the evidence— including the expert medical evidence, Huguely's interrogation video, and much of the lay witness testimony—was elicited solely to support the Commonwealth's theory of malice or to negate Huguely's theory that he did not act with malice.  During arguments on jury instructions, the longest and most heated battle was over the definition of malice.  During closing arguments, the defense and prosecution hotly disputed the level of intent required to show malice.  Tr. 2/18/2012 at 244–49, 261–65; JA 4190–95, 4211–16.  In fact, defense counsel objected several times to the Commonwealth's interpretation of malice during closing and made a rare request to be allowed sur-rebuttal to re-argue the malice instruction.  Tr. 2/18/2012 at 262–63; JA 4212–14.

62.     Apparently recognizing the importance of this issue, the Court took the highly unusual step of directing the jurors' attention only to the instruction on malice, #21, and *re-reading part of the malice instruction* to the jury after closing arguments, ensuring that the jury knew that this was the key issue for its deliberations.  Jury deliberations were difficult, and took more than nine hours.  During deliberations the jury asked for a "definition of reason as it pertains to" "malice".  Tr. 2/22/2012 at 22; JA 4247–48.  The jury also asked for assistance because it interpreted instruction 23 (all degrees of homicide) to contradict instructions 14 (indirect causation) and 15 (direct causation). Tr. 2/22/2012 at 25–30; JA 4251–57.  Rather than providing guidance, however, the court sent the jurors back a question asking, "Can you please clarify your question."  Tr. 2/22/2012 at 31; JA 4258.  Significantly, the jury never responded.

63.     The importance of the dispute about malice was not lost on the jury.  After the verdict, the jury forewoman explained that malice was the most important issue during deliberations:

> "We had two big argument points in the jury room," says [Serena] Gruia, one being the nature of the computer theft and the other being related to the difference between second-degree murder and voluntary manslaughter.  The distinction the jury had to parse was between malice, which is a factor in second-degree murder, and the heat of passion.  "Part of the instructions we had were that inherent in malice are deliberate, willful, and cruel actions.  With several academics on the jury, there was a lot of stress on words, at sometimes maybe too much."[11]

     *iii.     An External Influence on Jury Deliberations Must Result in a New Trial Unless the Commonwealth Can Prove That the Error Was Harmless Beyond a Reasonable Doubt*

64.     "The right of an accused to a fair trial before an impartial jury is a fundamental precept in our jurisprudence, protected by both state and federal constitutions."  *Scott v. Commonwealth*, 399 S.E.2d 648, 650 (Va. Ct. App. 1990) (en banc).  "No right touches more the heart of fairness in a trial."  *Id.* (quoting *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988)).  "Private communications, possibly prejudicial, between jurors and third persons . . . or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."  *Id.* (quoting *Mattox v. United,* 146 U.S. 140, 150 (1892) (noting that whether the influence is a court officer present in the jury room, an unauthorized communication, the reading of a newspaper about the case or other "objectionable matter" the rule is the same)).

---

[11] Cathy Harding, *Inside the Jury That Convicted UVA Student George Huguely of Murder*, SLATE (Feb. 23, 2012, 8:28 PM), http://www.slate.com/articles/news_and_politics/crime/2012/02/george_huguely_convict ed_of_second_degree_murder_in_yeardley_love_case_how_the_jury_decided_.html

65.    External influences on the jury violate a defendant's right to trial by an impartial jury. *See* U.S. CONST. amends. VI, XIV; VA. CONST. art. I, § 8; *see also Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."). Indeed, the right to a fair trial is completely eviscerated by the introduction of external information:

> The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury . . . . In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.

*Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965); *see also Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014) ("An impartial jury is one that arrives at its verdict 'based upon the evidence developed at trial' and without external influences." (quoting *Turner v. Louisiana*, 379 U.S. 466, 471–73 (1965))); *see also Thompson v. Commonwealth*, 70 S.E.2d 284 (Va. 1952) (citation omitted).

66.    The exposure of a jury to external information is such a serious constitutional flaw that prejudice is presumed. The United States Supreme Court has held that "'any private communication, contact, or tampering, *directly or indirectly*, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed *presumptively prejudicial* . . . .'" *Remmer v. United States*, 347 U.S. 227, 229–30 (1954) (emphasis added). A credible allegation of external influence on the jury establishes "not only a presumption of prejudice, but also a defendant's entitlement to an evidentiary hearing . . ." *Id.*

67.     Over fifty years after its decision in *Mattox*, the Supreme Court again addressed the "allocation of the burden" in "external influences" cases, *Scott*, 399 S.E.2d at 650, and made clear that:

> any tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, *but the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant.*

*Id.* (quoting *Remmer*, 347 U.S. at 229) (emphasis added).

68.     In *Scott*, the defendant was convicted of robbery and after conviction discovered several jurors heard a jury officer make improper comments, jokingly referring to juries as too "lenient." *Id.* at 649.  The trial judge denied Scott's motion for a new trial, stating he "failed to meet the burden of proving harmful influence." *Id.* at 650. The Court of Appeals, sitting en banc, ordered a new trial, holding the trial court misapplied the presumption of prejudice and that the comment was "patently improper" and "posed a potential for prejudice that was not overcome on this record." *Id.*  The court reasoned the potential harm was worse due to the "official nature by which the message was conveyed" by a court officer. *Id.* at 651.  Scott met his burden by "showing that the jury officer made these improper comments to the potential jurors," and so that "was sufficient to shift a heavy burden upon the Commonwealth to prove that the comments were harmless." *Id.*

69.     The *Scott* court found irrelevant the fact that only three of the twelve jurors testified that they heard the comments and that all stated the comments did not influence their deliberations.  "Scott was entitled to be tried by 12, not 9 or even 10,

37

impartial and unprejudiced jurors." *Id.* The test is not "whether the jurors were actually prejudiced by the extraneous matter, but whether they might have been so prejudiced." *Id.* (quoting *Evans-Smith v. Commonwealth*, 361 S.E.2d 436, 447 (Va. Ct. App. 1987) (reversing for a new trial because defendant proved that an external influence—an almanac—was used by some jurors to determine sunrise on the day of the crime and the defendant "might have been so prejudiced" because "the purpose for which the evidence, *aliunde,* was considered went to an ultimate issue in the case.")).

     iv.     *Huguely is Entitled to a New Trial Because his Jury Used a Dictionary to Define Malice and Decide the Ultimate Issue in his Case*

70.     In this case, Huguely's jury requested and received a dictionary without his knowledge. Juror 42 declaration, filed under seal. A dictionary is an unauthorized external influence. *McNeill v. Polk*, 476 F.3d 206, 226 (4th Cir. 2007) (use of a dictionary an external influence); *United States v. Duncan*, 598 F.2d 839, 866 (4th Cir. 1979) (same). The influence of the dictionary in Huguely's case is far more harmful than the jury's use of the almanac in *Evans-Smith* for several reasons. First, the dictionary used in this case was provided by a court officer and thus carried the imprimatur of the Court. Second, the issue of malice in this case was much more central than the issue of sunrise in *Evans-Smith*. Here, the jury used the dictionary to define the ultimate and most contentious issue in the case: whether the killing of Love was done with malice, the requisite mens reas for second-degree murder.

71.     "If a killing results from negligence, however gross or culpable, and the killing is contrary to the defendant's intention, malice cannot be implied." *Essex v. Commonwealth*, 322 S.E.2d 216, 280 (Va. 1984); *see also Marino v. Vasquez*, 812 F.2d 499, 506 (9th Cir. 1987) (observing that the "concept of malice goes to the very heart of

the deliberative process of a jury in a murder case."). In this case, the evidence and law of malice were vigorously contested. Significant evidence supported the conclusion that Huguely acted without malice, and thus a jury finding only of manslaughter. Evidence supporting the inference the killing was contrary to Huguely's intention included the tape of his interrogation, which shows his genuine shock and disbelief upon hearing of Love's death. In that interrogation, Huguely described Love as his best friend and one of the people he loved and cared for most. Similarly, the Boylan Heights video from the night before Love's death showed Huguely and Love holding hands. Undisputed evidence also proved Huguely was heavily intoxicated at the time of the altercation with Love. The Commonwealth's medical experts' testimony was heavily disputed at trial, and except for the forced entry at the bedroom door, Love's bedroom showed no signs of a struggle. Because the jury could have easily found that malice was lacking based on this evidence, the meaning of "malice" was vital to the case. Further, in the thirty-eight pages of jury instructions there is, without a doubt, no more important word than "malice" in this case. Malice is a legal term of art that no common dictionary definition would properly define.

72.     The inherent prejudice caused by allowing the jury to seek guidance for defining critical legal terms is powerfully demonstrated in *In re Collins' Will*, 15 A.2d 98, 99 (N.J. Cir. Ct. 1940), where a court officer brought the jurors a dictionary when requested. Describing the court officer's act as "unjustifiable", the court made clear there is no legitimate purpose for allowing a jury access to a dictionary during deliberations:

> The dictionary was incompetent evidence and if offered in evidence at the trial to aid the jury, it would have been excluded. Here no use of the dictionary could be proper. Where an inadmissible writing, book or article improperly reaches the jury during their deliberations, the primary inquiry is whether such extraneous object was of a character likely to prejudice, influence or mislead the jurors in their deliberations. Assuredly, the use of

39

> a simplified English dictionary to explicate established principles of law as expressed in language approved by our courts is beyond the avowed scope of such a work and in such use, misguidance is more than probable.

*Id.* (internal citations omitted).

73.     In Huguely's case, the jury used an improper external influence to define malice and determine the central issue in this case.  There can be no doubt Huguely might have been prejudiced.  Under the unique and compelling facts of the importance of malice in this case, the Warden cannot show the error was harmless.  Because the use of this external influence violated Huguely's rights to a fair trial before an impartial jury, due process, and to confront witnesses against him, this Court must grant the writ and provide Huguely a new trial.  In the alternative, this Court should hold an evidentiary hearing at which Huguely will prove that an external influence was used to determine a matter at issue in this case.

**Claim II: Trial Counsel Provided Ineffective Assistance When Their Violation of the Rule on Witnesses Resulted in the Exclusion of Critical Defense Evidence Regarding CPR and Reperfusion That Was Central to the Defense Theory of Cause of Death.**

### The Legal Standard of Ineffective Assistance of Counsel ("IAC")

74.     The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 684–86 (1984).  To establish an ineffective-assistance claim, the defendant must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense."  *Id.* at 687.  In assessing whether counsel provided deficient performance, reviewing courts judge "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id.* at 690.  Thus, although "a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance," a court must look ultimately to the reasonableness of counsel's performance in light of contemporary professional norms. *Id.* at 689–90 *see Padilla v. Kentucky*, 559 U.S. 356, 366-67 (2010) (citing to indigent defense performance guidelines, law journals, bar standards, and practice manuals to assess prevailing professional norms).

75.     To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The standard is *lower* than "more likely than not." *Holland v. Jackson*, 542 U.S. 649, 654 (2004); *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (noting that *Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered").

76.     In this case, trial counsel were ineffective in violating the rule on witnesses and causing the exclusion of vital expert testimony from trial. Cause of death was the central issue in this case and the focus of expert testimony. From the beginning, the prosecution asserted that Love died from brain injuries caused by blunt force trauma to the head, and promised expert testimony on those brain injuries. Tr. 2/8/2012 at 18–19; JA 1500–01. The defense countered that Love probably had died from accidental asphyxia. Tr. 2/8/2012 at 57–58; JA 1550–51. The asphyxia theory required, however, that defense counsel also explain what caused Love's brain injury (specifically, the subarachnoid hemorrhage), if not blunt force trauma. Expert testimony on reperfusion injury was the defense's entire plan for doing so. Yet trial counsel hamstrung their own

strategy when they violated the rule on witnesses by emailing their own medical experts about testimony on reperfusion issues that had been given by prosecution experts, leading to the exclusion of Dr. Uscinski's testimony on the issue of reperfusion. Violating the rule was obviously deficient, and the resulting deprivation of evidence was clear prejudice because it effectively precluded serious consideration of the defense's theory of cause of death.

### i. Factual Background of the Issue

77.     Prior to the presentation of any evidence, the parties agreed to the imposition of the rule on witnesses and the trial court ordered it. Inexplicably, defense counsel did not seek an exemption from the rule for its experts, but thereafter violated the rule on witnesses by relaying critical testimony to the defense experts on the central issue of reperfusion. "Reperfusion" is the restoration of blood flow to a tissue or organ, and "reperfusion injury" is injury caused by the blood flow restoration process. In opening argument, the defense promised the jury expert testimony that:

> the blood that they find in the base of the brain is a result of the thirty (30) minute CPR which caused what is called reperfusion and as the body, basically, you'll know from the EMT people that CPR, and you may know it, those of you who know how to do it. CPR is incredibly forceful and I think they'll tell you an inch or an inch and a half of the chest is done and that happens a hundred (100) times a minute for thirty (30) minutes to that's not—the blood at the bottom of the brain way more likely came from that than from anything that George did and it couldn't have come from anything that George did.

Tr. 2/8/2012 at 59–60; JA 1553–54.

78.     In response to the defense's announced theory, the prosecution used its numerous medical experts not only to opine that blunt force trauma was the cause of death, but also to counter reperfusion as a possible explanation for Love's brain injuries. This included testimony from Dr. William Brady, an expert in CPR and emergency

medical services, who was called almost solely to rebut the anticipated reperfusion evidence. Tr. 2/9/2012 at 72–80; JA 1895–1904. Dr. Brady testified CPR had been appropriately conducted and could not have caused bleeding in Love's brain. Dr. Brady also testified that chest compressions could create a blood pressure of only 80–100, which was too low to cause brain injury, and that blood pressure decreases away from the place of compression, making it very unusual to achieve elevated blood pressure throughout the body. Tr. 2/9/2012 at 81–84, 87–90; JA 1905–09, 1914–17. Dr. Brady stated he had read animal studies regarding reperfusion injury, but not human studies. He explained that he had read one or two case reports noting hemorrhage or contusion in remote areas of the body due to CPR, "but in the grand scope and landscape of international resuscitation, it is not a recognized entity." Tr. 2/9/2012 at 89–91; JA 1916–18.[12]

79.     Before 9:00 a.m. on February 10, the day after Dr. Brady testified, trial counsel sent the following email about Dr. Brady's testimony to Drs. Leestma, Uscinski, and Daniel:

> They had a cardiac/er guy testify yesterday that CPR would produce blood pressures of 80 to 100, but that BP would not be that high in the extremities (meaning the brain). He acknowledged that organs would be damage by lack of blood and oxygen; brain is particularly susceptible; vascular system was possibly damaged, but he said he didn't have any experience with such a thing. Let me know your thoughts. More this afternoon re scheduling.

JA 4755. Dr. Daniel responded directly to counsel. JA 4755.

---

[12] Notably Dr. Brady did acknowledge that Love had a focal epicardial hemorrhage (a hemorrhage in one small area of the exterior muscle of her heart), and that this was an unusual effect of CPR. 2/9/2012 at 92; JA 1920.

80.     Later that morning, the prosecution offered testimony from Dr. Virmani, a cardiologist, to contradict the reperfusion theory.  Dr. Virmani testified that if CPR had caused hemorrhage in Love's brain, one would see much more hemorrhage in her heart.  Tr. 2/10/2012 at 40–41; JA 2273–74.  Virmani stated that she had never seen hemorrhage from CPR in remote parts of the body, but acknowledged that she is not a neuropathologist.  Tr. 2/10/2012 at 41–42, 48–49; JA 2274–75, 2283–84.  Shortly before 1:00 p.m. on February 10, trial counsel sent an email to the three defense medical experts with the subject line "dr. Virmani."  The email read in relevant part:

> She ended up testifying that cpr caused the small area of bleed on the heart and did not attribute the small area of bleeding to trauma (which is what I feared).  They used her to say this girl's heart wasn't defective or diseased to rule out that she died of some natural cause.
>
> She said that if you had reperfusion injury anywhere, it would be in the heart and that she's never seen that kind of injury.  She said that you can have bleeding on the heart with brain injury but not the other way around.  I pointed out in my cross the obvious—this isn't "her area" of expertise.  *However, the jury is waiting to hear from someone with the right expertise that CPR creates enough blood pressure in the body to sufficiently perfuse the brain with blood so as to potentially cause injury.*  We don't have a cardiologist or ER guy, so one of you will have to talk about this.  Any volunteers?

JA 4735 (emphasis added).  This time, Dr. Daniel sent his reply to all parties included in the email, instead of only responding directly to counsel.

81.     On February 14, the prosecution presented testimony from two neuropathologists, Drs. Fuller and Lopes, proactively contradicting the anticipated defense evidence of reperfusion.  Dr. Fuller testified that reperfusion injury is a controversial concept that posits little blood reaches the brain during CPR and the blood that does has almost no pressure.  Consequently, cells lack oxygen and can be injured.  When blood returns, those injured cells can be further damaged by oxygen.  Tr.

2/14/2012 at 78–81; JA 2894–97.  Dr. Fuller opined that there was no evidence of reperfusion injury in this case because it usually causes a swollen brain and discoloration. Tr. 2/14/2012 at 82; JA 2898–99.  She further testified that petechial hemorrhages within the brain have never been associated with CPR, and the distribution of Love's hemorrhages is associated with blunt force trauma to the head.  Tr. 2/14/2012 at 68–72; JA 2881–85.  Finally, there was no evidence that Love had ever independently resumed cardiac rhythm.  Tr. 2/14/2012 at 81–82; JA 2898.  Dr. Fuller acknowledged, however, that Dr. Lopes had referred to reperfusion research at the end of her report.  Tr. 2/14/2012 at 101–05; JA 2922–27.

82.    Dr. Lopes testified that Dr. Gormley asked her to look for cases of patients surviving CPR with subarachnoid hemorrhage, and that she had found two.  Tr. 2/14/2012 at 156–57, 169–75; JA 2993–94, 3009–18.  Like Dr. Fuller, however, she testified that reperfusion lesions tend to occur when someone is resuscitated and that there is no sign Love ever resumed cardiac rhythm.  Tr. 2/14/2012 at 158, 162–66; JA 2995, 3001–05.  She also testified that reperfusion lesions tend to be in boundary zones ("watershed areas") that are sensitive to low oxygen, and that Love had no lesions in those zones.  Tr. 2/14/2012 at 163–66; JA 3001–06.  That afternoon, counsel sent a third email to their medical experts about witness testimony on reperfusion:

> Testimony that was offered today included that all the areas of bleeding were at locations near a bony structure or a "leathery" type structure so the brain was bouncing off or being scraped by these areas, which is why they seem to be contusions.  There was a lot of testimony about sheer [sic] force injury from turning or torsion.  There was testimony that the fact that the lesions were at the surface of the gyrus means they were from trauma.  Dorso lateral injury always means trauma.  There was testimony that while there have been 2 cases documented of reperfusion injury resulting in subarachnoid hemorrhage, there are no cases involving bleeding into the interperenchymal (sp) area.  *Dr. Lopes testified that true reperfusion*

> *injury involves bleeding only into "watershed" areas of the brain.* She
> had a picture of such an event (brain that was autopsied). There was
> testimony about the blood brain barrier and ostrocites (I think). Thoughts?

JA 4756 (emphasis added). Both Dr. Uscinski and Dr. Daniel replied all to the email, and

Dr. Daniel later emailed counsel a separate response. JA 4756–57.

83.    Dr. Uscinski's response made clear that he was capable of responding on

the issue of reperfusion, including Dr. Lopes's assertion that reperfusion injuries tended

to be present only in the "watershed zones":

> Reperfusion in the "watershed area" may lead to bleeding if that alone is
> the area deprived of enough oxygen for neurons to die. This case involves
> an individual who was found without no pulse or blood pressure, no
> respirations, and no evidence of any clinical brain activity. That would
> not be expected to involved only the watershed area, the whole brain has
> been deprived, else there would have been a pulse and blood pressure and
> therefore some form of perfusion, ie a different clinical scenario. Sounds
> OK in a superficial sense but not on when subjected to a little more
> thinking.
> I suspect the pathologists will agree to that (the defense ones, that is).

JA 4756.

84.    After these email exchanges, Dr. Daniel notified counsel of his concern

that they may have violated the rule on witnesses. Declaration of Dr. John S. Daniel, III,

M.D. at 7. Trial counsel then brought the emails to the attention of the prosecution and

provided them with copies. When the parties returned to court on February 18, the

prosecution objected to Dr. Uscinski's testimony. The defense argued that the violations

were curable and that they had not been "conscious" of the violations until the day prior,

when they got a communication from an unspecified witness. Tr. 2/18/2012 at 5–8; JA

3885–89. During voir dire on this issue, Dr. Uscinski stated he did not recall knowing

about the rule on witnesses. Upon review of the emails, Dr. Uscinski testified he had

received them but did not recall reading them. Tr. 2/18/2012 at 10–19; JA 3891–3903.

Dr. Uscinski acknowledged, however, that he had replied to an email regarding prosecution evidence on reperfusion in watershed areas. Dr. Uscinski stated he had been prepared already to talk about reperfusion, but not in watershed areas. Dr. Uscinski added that he was no more prepared to testify now about reperfusion than he would have been in the first place because this was background knowledge. Tr. 2/18/2012 at 23–26, 34-35; JA 3908–12, 3923. Uscinski also testified when working with a lawyer, he assumes the lawyer is acting properly. Tr. 2/18/2012 at 31; JA 3919.

85.    After argument, the Court barred Dr. Uscinski from testifying about reperfusion, reperfusion related injuries caused by CPR, or the concept that cerebral-vascular damage makes someone susceptible to reperfusion injury. Tr. 2/18/2012 at 44–45; JA 3934–35. In ordering this relief, the Court made clear it was based on counsel's error: "This is very troublesome and I wouldn't have expected this from counsel and I'm incredibly disappointed with it, but this is an incredibly important issue for the parties and I'm not going to bar him from testimony generally, but I'm not going to let him testify about reperfusion . . . ." Tr. 2/18/2012 at 44–45; JA 3934–35. Significantly, trial counsel failed to offer the Court alternative sanctions that would have been less prejudicial to Huguely, thereby depriving him of the testimony of an expert clinical neurosurgeon and forensic pathologist on the topic of reperfusion injury.

        ii.    *Deficient Performance*

86.    The most basic standard of defense representation during a criminal trial is to present a defense—not get a defense barred. Thus the well-established standards are that attorneys must be aware of and follow rules and rulings, Virginia State Bar, Professional Guidelines Rule 3.4, and that defense counsel must advocate the defense. ABA STANDARDS: DEFENSE, Standard 4-1.2(b), at 120; *see Strickland*, 466 U.S. at 688.

In this case it is clear that trial counsel's actions both violated the rules and deprived Huguely of a crucial part of his defense rather than advocating his defense, constituting deficient performance.

### iii.   Prejudice

87.     Trial counsel's violation of the rule on witnesses eviscerated the planned and promised defense on cause of death—a key issue in the case—by barring testimony on reperfusion.  As a direct result of trial counsel's actions, the trial court barred Huguely from presenting testimony concerning reperfusion.  JA 4758.  But, as discussed in more detail *infra* Claim III, ¶¶ 106-13, an indirect but equally prejudicial result was defense counsel's failure to present testimony from Dr. Daniel, who would have also testified about Love's reperfusion injury.  Because the defense did not call Dr. Daniel as a witness, the Court was never asked to rule on whether he could testify about reperfusion.  From trial counsel's email exchanges, however, it is evident defense counsel intended to call Dr. Daniel to testify about reperfusion before the Court's ruling on Uscinski.  Given the Court's ruling on Dr. Uscinski, however, it is indisputable that the Court also would have barred defense counsel from presenting testimony from Dr. Daniel about reperfusion—and thus trial counsel did not call him.

88.     Like Dr. Uscinski, Dr. Daniel would have provided helpful testimony on reperfusion.  When trial counsel emailed the medical experts concerning Dr. Virmani, she wrote, "We don't have a cardiologist or ER guy, so one of you will have to talk about this [reperfusion].  Any volunteers?  We need you all to be here Wednesday; Jack, if needed, could you come over Tues. afternoon?"  Dr. Daniel had replied with his thoughts on Dr. Virmani's testimony, concluding, "I do not believe there is an adequate evidence base currently available to show either generally that CPR cannot cause hemorrhages like

48

these in persons recently deceased from asphyxia, or especially to establish that CPR did not cause the hemorrhages in this particular case." JA 4753. Dr. Daniel had responded similarly to emails concerning Dr. Brady's and Dr. Lopes's testimony. JA 4755–57.

89.     Thus, the effect of trial counsel's violation of the rule was that only one of the defense's three expert witnesses—Dr. Leestma—testified about reperfusion, and he did so in very cursory fashion because counsel planned to develop this testimony primarily through Drs. Uscinski and Daniel. This was significant because cause of death was one of the most important issues in Huguely's case, and was the focus of the vast majority of expert testimony. In opening arguments, both sides offered competing theories of how Love had died, and both of these theories included an explanation of what had caused her brain injuries. Because the prosecution presented expert testimony in support of the theory that blunt force trauma caused the brain hemorrhage, it was crucial for the defense to offer evidence in support of the alternate explanation it had promised at the beginning of trial, i.e., that reperfusion caused these injuries. Indeed, the very emails that violated the rule on witnesses made clear how important the issue was to the defense. *See, e.g.*, JA 4753 ("[T]he jury is waiting to hear from someone with the right expertise that CPR creates enough blood pressure in the body to sufficiently perfuse the brain with blood so as to potentially cause injury.").

90.     Because trial counsel failed to fulfill its promise to support the reperfusion theory, the prosecution exploited that blunder by arguing in closing that "[t]here's no medical evidence supporting the theory that intraparenchymal, petechial hemorrhages are caused by anything else than trauma." Tr. 2/18/2012 at 179; JA 4106 (citing the testimony of Drs. Fuller, Lopes, and Brady). Prior to violating the rule on witnesses trial

counsel planned to call Dr. Daniel to give that exact testimony.  If he had been called and allowed to testify on reperfusion, Dr. Daniel would have testified that intraparenchymal petechial hemorrhages are not specific for trauma and can certainly be caused by other things besides trauma, including increases in intracranial pressure.  Dr. Daniel's Declaration at 6.

91.     Counsel's deficient performance created an imbalance of expert opinion that was particularly prejudicial given that this was a very close case in which the prosecution's experts agreed that Love was intoxicated and that her head injury could have been caused by a fall.  "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  *Strickland*, 466 U.S. at 696.  "In a close case, the failure of defense counsel to present certain evidence or effectively challenge the state's evidence on important issues can be particularly prejudicial."  *Dugas v. Coplan*, 428 F.3d 317, 335–36 (1st Cir. 2005). This is particularly true when viewed in light of the defense's unfulfilled promise to present a reperfusion theory.  *See Miller v. Senkowski*, 268 F. Supp. 2d 296, 313–15 (E.D. N.Y. 2003) (finding cumulative prejudice in a close case where the defense attorney failed to produce expert testimony and failed to "follow[] through on the theory espoused during his opening as the key to Petitioner's defense," and noting that "[i]n a close case such as this one . . . these errors take on a special importance.").  "This case lay on a knife edge, and it would not have taken much to sway at least some jurors towards acquittal.  Accordingly, the threshold for prejudice is comparatively low because less would be needed to unsettle a rational jury."  *Dugas*, 428 F.3d at 336.

92.     In sum, trial counsel's conduct resulted in a wholly lopsided battle of the experts.  Without Dr. Uscinski's and Dr. Daniels's testimony on reperfusion, counsel produced only the testimony of Dr. Leestma, a neuropathologist.  In contrast, the prosecution provided testimony from a number of witnesses—including two neuropathologists, a cardiac pathologist, and an expert in CPR and emergency medicine—to contradict the defense's announced but unsupported theory.  Significantly, trial counsel's deficient performance not only deprived Huguely of Dr. Uscinski's and Dr. Daniel's testimony on reperfusion, but also undermined Dr. Leestma's testimony and credibility because it created the misleading impression that the defense's own doctors did not agree.  Barred from presenting Dr. Uscinski's full testimony, the defense argued in closing that Dr. Leetsma "holds the opinion that the blood, *and this is a different than [sic] Dr. Uscinski holds*, but that the blood in the lower brain/upper brain was the result of the reperfusion."  Tr. 2/18/2012 at 226; JA 4167 (emphasis added).  Thus trial counsel's performance left Dr. Leestma appearing to be an outlier with whom no other expert agreed.[13]  Trial counsel thus was ineffective in taking actions that barred the defense from presenting crucial expert testimony.

**Claim III: Trial Counsel Provided Ineffective Assistance of counsel by Failing to Provide Crucial Available Expert Testimony on the Key Issue of Cause of Death When They Failed to Call John S. Daniel, III, M.D.**

   *i.       Deficient Performance*

93.     Trial counsel also performed deficiently by failing to call Dr. Jack Daniel to testify as an expert.  The defense retained Dr. Daniel, a highly respected forensic

---

[13] Of course, Dr. Uscinski *did* agree with Dr. Leestma, and there was no reason for the defense to assert otherwise in closing.  Trial counsel could have simply not discussed Dr. Uscinski's views on reperfusion, since they were not in evidence.  Thus the prejudice was compounded by trial counsel's ineffective closing argument.

pathologist and attorney, to testify about cause of death. Dr. Daniel conducted a forensic

analysis, prepared to testify in this case, traveled to Charlottesville for the trial, was

excluded from trial along with the other testifying experts, but was not called as a

witness. This was a surprise to Dr. Daniel, because trial counsel repeatedly informed him

he would likely testify, probably as the last medical expert to give "an overview of all the

forensic medical information to assist in tying the evidence together into a single

coherent theory." *See* Declaration of John S. Daniel, III, M.D. at 7. Specifically, Dr.

Daniel intended to testify that Love died of asphyxia rather than blunt force trauma,

bleeding on her brain was caused by reperfusion from CPR, and there were significant

issues with the medical examiner's analysis. *Id.* at 4–7.

94.     Prior to trial, counsel informed Dr. Daniel that he was a likely witness for

the defense. Dr. Daniel also testified at a pretrial hearing from which it is evident that

trial counsel knew Dr. Daniel was a key defense witness. Tr. Dec. 15, 2010. As trial

counsel stated at that hearing, Dr. Daniel has "a very impressive resume . . . "

Furthermore, trial counsel recognized the importance of Dr. Daniel's experience,

background, and perspective on cause of death, and knew that Dr. Daniel rejected the

medical examiner's explanation:

> He will say based on his extensive background, training, and experience as
> a medical examiner he does not accept on face value that Love died of
> blunt force trauma to the head. He questions the finding based in part on
> the unusual pattern of intracranial injury is not clearly that of trauma. The
> intracranial injury does not have the features that we would expect in
> exclusive traumatic intracranial injury. He will say that he finds unusual
> the absence of a skull fracture, cerebral contusions in any areas of impact
> and the absence of any subdural hematoma. The absence of these findings
> calls into question the medical examiner's conclusion. He will say that the
> pattern of injury in this case does not have features that allow it to be
> distinguished from non-traumatic causes, Your Honor. Dr. Daniel will
> further state the cause of death investigation requires—and this is, sort of,

helping us, this is really our final argument—requires considering aspects of Love's medical history . . . . With all due respect, the Court nor counsel, except for Dr. Daniel, who is both counsel and a doctor, are not in a position to determine their importance.

Tr. Dec. 15, 2010 at 6–7.

95.     At that same hearing, Dr. Daniel testified to his preliminary findings regarding Love's cause of death.  Dr. Daniel testified that he had been an Assistant Chief Medical Examiner, like Dr. Gormley, and that he had performed "[a] couple thousand" autopsies in his career.  *Id.* at 43–44.  At the time of his testimony, he had reviewed the autopsy, Fuller's report, toxicology reports, photographs, and other information.  *Id.* at 44.  He also had examined Love's brain with Dr. Gormley and Dr. Leestma.  *Id.* at 45. Dr. Daniel testified that he was not satisfied with the conclusion of blunt force trauma because "the pattern of brain findings is unusual for a death related to blunt force trauma to the head."  *Id.* at 46.  Specifically, Love's external injuries "in and of themselves, would not ordinarily be expected to be lethal."  *Id.* at 47.  Moreover, Dr. Daniel testified Love's brain hemorrhage and contusions "are attributable to the absence of enough oxygen getting to the brain."  *Id.* at 48.  This could occur because oxygen was not reaching the bloodstream or because blood, which has oxygen in it, was not reaching the brain.  Dr. Daniel explained, "if it's not getting to the brain the primary reason for that is cardiac arrhythmia."  *Id.* at 49.

96.     Critical to the defense theory at trial, Dr. Daniel also testified about the likelihood of reperfusion injury, setting forth the defense that was planned before trial counsel violated the rule on witnesses.  Dr. Daniel testified that brain hemorrhage could be caused by traumatic force, but "could also be from an increase in pressure in a damaged vessel, so that you have a weak blood vessel that has a lot of . . . blood coming

into it under pressure that can then leak and cause some bleeding in that local area." *Id.* at 49–50. According to Dr. Daniel, Love's brain bleeding was "characterized as cortical contusions," which is typical of reperfusion injury. *Id.* at 50. Dr. Daniel explained reperfusion injury is commonly caused by CPR, and that CPR in this case had been conducted not only for twenty-four minutes by the rescue squad, but also for a period of time by a bystander. *Id.* Dr. Daniel opined Love's injuries were "in an atypical location to have resulted from the impact to the right side of the head . . . . But they are in the characteristic locations for reperfusion injury." *Id.* at 51–52.

97.     Because the defense was still seeking medical records at the time of the pretrial hearing, Dr. Daniel did not give a final opinion on cause of death, but did offer his preliminary assessment:

> That Love suffered a . . . cardiac arrhythmia that caused insufficient blood to get to her head. That during that period of time the vascular tree within the head was sustaining ongoing damage because of the lack of oxygen, to a point at which she died from a lack of oxygen, and then in the immediate perimortem period thereafter rescue efforts included vigorous CPR, which caused these reperfusion injuries, which then were interpreted by Dr. Gormley as . . . traumatic contusions.

*Id.* at 53.

98.     By the time of trial, Dr. Daniel had sufficient information to provide the opinion "that the postmortem findings were consistent with Huguely's account to police of his final encounter with Love, and that the postmortem findings did not clearly or specifically indicate either intentionally inflicted traumatic injury or traumatic injury of any kind as the cause of death." Daniel Declaration at 3. Dr. Daniel disagreed with the medical examiner's opinion that Love had died from blunt force trauma and "concluded that the probable cause of death was asphyxiation due to airway obstruction." *Id.* As a

former medical examiner, Dr. Daniel was particularly prepared to critique the medical examiner's findings in this case.

99.     Dr. Daniel's testimony would not have been cumulative to Dr. Leestma's and Dr. Uscinski's, as he planned to testify to matters outside the scope of neuropathology.  Dr. Daniel was the only forensic pathologist retained by the defense, and his purpose was to tie together expert testimony specific to the brain with a more holistic view of Love's cause of death.  For example, Dr. Daniel would have testified that intoxication "is a known risk factor for asphyxia deaths of various types, and an intoxicated individual may become asphyxiated accidentally when their face and air passages become buried in a pillow or other bedclothes." *Id.*  Additionally, Dr. Daniel would have explained the connection between asphyxia and reperfusion, setting out that lack of oxygen to the brain causes damage to the blood vessels, and those vessels then become vulnerable to reperfusion injury when CPR is later administered. *Id.* at 3–4.

100.    Furthermore, Dr. Daniel would have testified that the risk for death from lack of oxygen is greater in persons who are "predisposed to the development of a cardiac arrhythmia such as with sensitization of heart tissue related to amphetamine usage, including even legal and properly prescribed preparations such as the Adderall taken by Love." *Id.* at 4.  Finally, Dr. Daniel's testimony would not have been cumulative because, as a former medical examiner, he was positioned to critique Dr. Gormley's overall findings, including the lack of consideration for Love's positioning, intoxication, amphetamine prescription, "extensive postmortem CPR," or the possibility "that the history provided by Mr. Huguely might in fact be true and that Love died an unconscious asphyxia death and not a traumatic death at all." *Id.* at 5.

101.    The jury never heard Dr. Daniel's compelling testimony because trial counsel violated the rule on witnesses by emailing the defense's medical expert about the prosecution's evidence. To the extent that Dr. Daniel would have been barred from presenting any of his intended testimony by the trial court, the deprivation of his testimony simply compounds the prejudice discussed *supra* ¶¶ 87-92. Assuming Dr. Daniel would have been allowed to testify to reperfusion issues, however, his responses to counsel's emails actually make clear that he had the expertise to counter the prosecution's most important points—points that were never countered by other witnesses.

102.    For example, when counsel emailed concerning Dr. Brady, Dr. Daniel quickly countered the contention that CPR could not cause elevated blood pressure in the brain by pointing out that the "whole purpose of CPR is to get blood to the brain" and that CPR would be pointless if it could not achieve effective blood pressure in the brain. JA 4755.

103.    Similarly, in response to counsel's email regarding Dr. Virmani, Dr. Daniel responded that he did not "think anybody knows exactly how much BP is (or is not) enough to cause reperfusion brain injury in this context." Moreover, he pointed out that the prosecution's case depended on disproving the hypothesis that "Intracerebral hemorrhages like these *cannot* be produced by CPR in persons recently deceased from asphyxia." In sum, Dr. Daniel opined that there is not "an adequate evidence base currently available to show either generally that CPR cannot cause hemorrhages like these in persons recently deceased from asphyxia, or especially to establish that CPR did not cause the hemorrhages in this particular case." JA 4753. These are points that Dr.

Daniels was prepared to present to the jury in his testimony had he been asked to do so. To date, Dr. Daniel holds the opinion that there are a numerous facts supporting the conclusion that reperfusion and not blunt force injury caused Love's brain hemorrhage. Daniel Declaration at 4. Moreover, Dr. Daniel believes that the jury may never have learned crucial information about reperfusion. *Id.* at 8.

104.    "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." *Harrington v. Richter*, 562 U.S. 86, 106 (2011). Although *Harrington* recognizes that an expert-focused defense might not always be desirable, that is in large part because trial attorneys are "entitled . . . to balance limited resources in accord with effective trial tactics and strategies." *See id.* at 107.  In Huguely's case, however, trial counsel balanced these concerns in favor of presenting a defense that hinged on expert testimony, including from Dr. Daniel.  Trial counsel hired Dr. Daniel, consulted with him, paid him, brought him to Charlottesville during trial and had him excluded from trial along with the other testifying experts.  In other words, trial counsel did not make a tactical decision to avoid science or a battle of the experts.  In contrast, at the outset of the case the defense promised to present scientific evidence to the jury, thereby opening the door to extensive contradictory evidence from the prosecution.  Thereafter, due only to their violation of the rule on witnesses, they failed to produce the best available witness and evidence to counter the prosecution's theory regarding Love's cause of death.

105.    In *Williams v. Martin*, 618 F.2d 1021, 1025 (4th Cir. 1980), the Court recognized the particular need for expert witnesses where cause of death is "an essential

element of the state's case." *Id.* at 1026.  The Court acknowledged that cause of death "could be established by the prosecution only through the testimony of an expert witness," and that case presented "a substantial question over the cause of death which required expert testimony for its explication." *Id.*  Moreover, the Court recognized "[j]ust as the state needed an expert to prove the cause of death, [the defendant] needed an expert to present his defense." *Id.*  In this case, Huguely's defense team presented very limited testimony from a neuropathologist and neurosurgeon.  They failed to present, however, a forensic pathologist and former medical examiner, who was paid, prepared and present, who would have provided context for the brain-based testimony and given additional reasons to conclude Love died of asphyxia.  This was deficient performance.

 *ii.*  *Prejudice*

   106. In this case, the defense intended to present testimony from three medical experts, Drs. Leestma, Uscinski, and Daniel, each of whom came from a different specialty and had a distinct role in the defense.  While two of the doctors are brain specialists, Dr. Daniel is an experienced forensic pathologist uniquely positioned to tie together the medical testimony, critique the work of the prosecution's forensic pathologist, and testify to findings outside the brain that would support accidental asphyxia as the cause of death.  Thus Dr. Daniel would have covered important areas the other experts did not, such as analysis of the overall scene, specific problems with the medical examiner's analysis of the overall scene, and the role of intoxication and amphetamines in asphyxiation.

   107. Dr. Leestma, a neuropathologist, was retained to examine Love's brain and opine only on her brain injuries.  Dr. Leestma testified that Love lacked the

intracranial pathology that would explain death.  He opined reperfusion caused Love's brain hemorrhages, and that she may have died of asphyxia due to her position.  He did not mention, however, her amphetamine usage or intoxication as factors in asphyxia.  Tr. 2/15/2012 at 248–52, 260–67, 273; JA 3538–42, 3552–62, 3569.  Dr. Uscinski, a clinical neurosurgeon, also focused on Love's brain.  He testified that Love's injuries were not consistent with blunt force trauma, but was barred from offering testimony on reperfusion.

108.    In contrast to these two brain specialists, Dr. Daniel would have testified to a much broader set of issues, including vital information missing from the other doctors' testimony.  As a forensic pathologist, Dr. Daniel had reviewed a much wider variety of sources, including the autopsy report, neuropathological report, crime scene and autopsy photos, slides, and transcripts of police interview with  Huguely.  Daniel Declaration at 2.  He had consulted not only with Dr. Leestma and Dr. Uscinski, but also with Dr. Polkis (the defense toxicologist) and Dr. Allen Burke, a cardiovascular pathologist.  *Id.*  Like Drs. Leestma and Uscinski, Dr. Daniel concluded Love was lacking intracranial findings consistent with blunt force trauma.  *Id.* at 3.  But unlike the other doctors, he would have tied that together with findings outside the brain to offer a fact-based opinion on cause of death.  Unlike Dr. Leestma, who opined that asphyxia was possible due to Love's positioning, Dr. Daniel would have testified that there were other known risk factors for asphyxiation.  For example, Dr. Daniel would have testified that "[a]lcohol intoxication is a known risk factor for asphyxia deaths of various types, and an intoxicated individual may become asphyxiated accidentally when their face and air passages become buried in a pillow or other bedclothes."  *Id.* at 3.  Similarly, Dr. Daniel

would have testified that amphetamine use such as Love's compounds the risk of asphyxia by sensitizing heart tissue and, thereby, predisposing the person to heart arrhythmia. *Id.* at 4.

109.    As an experienced medical examiner, Dr. Daniel also would have critiqued Dr. Gormley's analysis. Dr. Daniel would have pointed out Dr. Gomley failed to "recognize or acknowledge or consider the significant mismatch between the catastrophic lethal outcome and the extremely limited volume and distribution of intracranial bleeding" and "other usual indicia of lethal head trauma . . . ." *Id.* at 5. In addition, Dr. Daniel would have critiqued Dr. Gormley's "apparent failure to consider that unexpected cardiac arrhythmia might have caused or contributed to death by non-traumatic means such as asphyxia . . . ." *Id.* Dr. Daniel also would have criticized Dr. Gormley's refusal to consider the possibility that Huguely's account "might in fact be true" given Love's position, intoxication, amphetamine usage, and long period of CPR. *Id.* at 5.

110.    Finally, if allowed to testify to reperfusion, Dr. Daniel would have rebutted the prosecution's assertion that such bleeding was seen only in the "watershed" areas of the brain. Dr. Daniel would have critiqued Dr. Gormley's "apparent failure to consider that the 'watershed' theory apparently propounded by one or more [] prosecution experts . . . might in fact be inapplicable in instance of global hypoxia or in the postmortem setting at all . . . ." *Id.* at 5. In fact, Dr. Daniel would have testified, there are several strong reasons to "believe that the very limited bleeding present in the brain is from reperfusion instead of from blunt force trauma:"

> (a) the intracranial hemorrhage was extremely limited both in terms of volume and distribution of bleeding; (b) the types of hemorrhage

60

present were characteristic for reperfusion damage and for increased intracranial pressure but were unusual for trauma; (c) there were no associated scalp lacerations, no skull fractures, no epidural or subdural blood collections, no brain tissue tears, and no obvious coup or contrecoup cerebral contusions; and (d) the findings are present in the context of vigorous CPR sustained for a significant period of time during the postmortem period.

*Id.* at 4.

111.    The prejudice caused by counsel's failure to call Dr. Daniel was significantly exacerbated by trial counsel's promise to the jury that they would be provided an explanation for Love's brain hemorrhages, and that the explanation would be reperfusion. Because trial counsel failed to fulfill this promise, the prosecution was able to argue that "[t]here's no medical evidence supporting the theory that intraparenchymal, petechial hemorrhages are caused by anything else than trauma." Tr. 2/18/2012 at 179; JA 4106 (citing the testimony of Drs. Fuller, Lopes, and Brady). Had Dr. Daniel been called, however, he would have testified that "[i]ntraparenchymal petechial hemorrhages are not specific for trauma and can certainly be caused by other things besides trauma, including increases in intracranial pressure." Daniel Declaration at 6.

112.    This was a case in which both sides focused heavily on cause of death. Both sides intended to present a forensic pathologist as well as specialists, including neurpathologists. Only the prosecution, however, presented the necessary breadth and depth of medical testimony, giving the jury brain-focused testimony by Drs. Fuller and Lopes, CPR-focused testimony by Dr. Brady, and a holistic perspective from Dr. Gormley. Meanwhile, the defense prepared to present Dr. Daniel's holistic perspective but completely failed to do so. Moreover, the defense promised the jury that the medical issues were very much in dispute in this case, and that they would be presented with

61

proof that Love likely died from asphyxia.  Instead, the evidence they presented was incomplete, missing several key points on both asphyxia and reperfusion.

113.    The resulting imbalance of expert opinion was devastating to Huguely's defense because this was a very close case in which the prosecution's experts conceded Love was intoxicated, a contributing factor to accidental asphyxia, and that her head injury could have been caused by a fall.  Because this was a very close case on the issue of malice, whether Love died of asphyxia or blunt force trauma to the head was critical not only to ultimately assessing responsibility for her death, but also to evaluating Huguely's actions before and after her death.  Consequently, it would not have taken much to convince at least some of the jurors that he was not guilty of second-degree murder.  Under these circumstances, trial counsel's failure to call Dr. Daniel caused undeniable prejudice.  In addition, trial counsels' deficiencies in claims II and III combined clearly prejudiced Huguely.

**Claim IV: Trial Counsel Was Ineffective When They Failed to Request a Jury Instruction That Directed the Jury It Must Find That Any Wrongful Conduct Was "Likely to Cause Death or Great Bodily Harm" in Order to Find Malice.**

114.    Virginia's appellate courts have repeatedly and consistently made clear that a critical aspect of proving malice, for purposes of second-degree murder, is establishing a defendant's conduct was "likely to cause death or great bodily harm." *Essex v. Commonwealth*, 322 S.E.2d 216, 220 (Va. 1984); *Knight v. Commonwealth*, 733 S.E.2d 701, 705 (Va. Ct. App. 2012); *Elliott v. Commonwealth*, 517 S.E.2d 271, 274 (Va. Ct. App. 1999); Ronald Bacigal, CRIMINAL OFFENSES AND DEFENSES at 342 (2015–16). Trial counsel was well aware of this requirement prior to Huguely's trial but inexplicably failed to request an instruction that included this materially vital principle, *Jimenez v.*

*Commonwealth*, 402 S.E.2d 678, 681 (1991), and instead asked for an instruction containing confusing and outdated language that prompted the prosecutor to ask "What century is that" from and the Court to ask, "What in the world does this mean?" Tr. 2/16/2012 at 49–50; JA 3677. Consequently, because the malice instruction provided by the trial court omitted this critical language and clear evidence exists showing the jury was confused about the meaning of the term "malice", and likely misunderstood the proper definition of that term during its deliberations, *see* Claim I, *supra*, ¶¶ 60-63, trial counsel's deficiency proved fatally prejudicial.

     *i.     Deficient Performance*

115.    It is well established that trial courts have "an affirmative duty properly to instruct a jury" about any principle of law "vital to a defendant in a criminal case." *Jimenez*, 402 S.E.2d at 681. A proper description of the elements of the offense charged is critical because the jury, which is the finder of fact, must determine whether the prosecution has satisfied its "burden of proving all elements of the offense beyond a reasonable doubt." *Stokes v. Warden*, 306 S.E.2d 882, 885 (Va. 1983). Critically, when a principle of law is "'materially vital to a defendant in a criminal case,'" a trial court's refusal to instruct the jury about that relevant legal principle constitutes reversible error. *Jimenez*, 402 S.E.2d at 681 (quoting *Whaley v. Commonwealth*, 200 S.E.2d 556, 558 (Va. 1973)).

116.    Prior to Huguely's trial, trial counsel knew Virginia law required that to prove malice—and, thereby, elevate Love's killing to second degree murder—the Commonwealth was obligated to show that Huguely "embarked on a course of wrongful conduct likely to cause [her] death or great bodily harm." *Essex*, 322 S.E.2d at 220.

Despite knowing this, trial counsel failed to include this language in their proposed jury instruction on malice. JA 212–16. This omission was not strategic. Rather, the record is clear that trial counsel was concerned with how the jury would apply the legal concept of malice to the facts of this case. For example, counsel argued in summation that proving "malice . . . involves an intent to kill and there simply was no intent to kill at all", Tr. 2/18/2012 at 248–49; JA 4195. Counsel then begged the jury to read the instructions repeatedly, suggesting that issues related to the culpable mental states would be clarified by a review of the written instructions, but they were not. Tr. 2/18/2012 at 216; JA 4153. Subsequently, however, in their post-trial motion to set aside the verdict, trial counsel argued Huguely's conviction could not stand because the evidence was insufficient, and their legal argument was mainly grounded on *Essex*'s requirement that the Commonwealth prove Huguely engaged in "wrongful conduct likely to cause death or great bodily harm." JA 302 (quoting *Essex*, 322 S.E.2d at 220); *see also id.* (same); JA 303 (same) (citing Roger D. Groot, CRIMINAL OFFENSES AND DEFENSES IN VIRGINIA § 6, pp. 557–58 (2006)); JA 305 (same).

117.    Where trial counsel fails to request a particular jury instruction related to an important aspect of the case, including elements of a crime or defense, and a reasonably competent attorney would have requested an instruction on that matter, deficient performance is established. *Lee v. Clarke*, 781 F.3d 114, 123–24 (4th Cir. 2015). In *Lee*, trial counsel failed to request an instruction on the issue of heat of passion in a first degree murder case where the defendant and victim had had a series of disputes over a period of days culminating in a fight where Lee stabbed the victim multiple times with a pocket knife, and the victim tried to obtain a gun. *Id.* at 117–18. At trial the

central issue was whether the crime was murder or manslaughter, but trial counsel failed to request an instruction on heat of passion. *Id.* at 120. Lee was convicted of second-degree (malice) murder.

118.    Lee exhausted his direct appeals and unsuccessfully petitioned for habeas corpus in state and federal court alleging, among other issues, that trial counsel had been ineffective for failing to request a heat of passion instruction. *Id.* at 121. The Fourth Circuit reversed, holding that because there was "'a question of fact whether the defendant committed the homicide before or after his passion had cooled,'" and because "trial counsel had no strategic reason for failing to request a heat of passion jury instruction," counsel's performance was deficient. *Id.* at 124–25; *see also United States v. Luck*, 611 F.3d 183, 188 (4th Cir. 2010) (finding trial counsel provided deficient performance in drug case for failing to request an "informant instruction" where government's evidence consisted only of the investigating officer and two paid informants); *Baker v. Horn*, 383 F. Supp. 2d 720, 762–71, 779–80 (E.D. Pa. 2005) (finding counsel performed deficiently in murder trial by failing to object to the trial court's instructions that permitted the jury to convict the petitioner of first-degree murder under an accomplice liability theory without finding that the petitioner himself possessed the specific intent to kill, a required element under Pennsylvania law).

119.    Huguely's trial counsel provided deficient performance by failing to request a malice instruction that required the jury to find that he had "embarked on a course of wrongful conduct likely to cause death or great bodily harm," as required by *Essex* and its progeny. Because trial counsel had no strategic reason for omitting this critical language from a proposed jury instruction, their performance was deficient.

ii.     *Prejudice*

120.    To determine whether trial counsel's deficient performance in failing to request a particular instruction was prejudicial, the reviewing court must answer two questions: "(1) whether the instruction, if requested, should have been given; and (2) if the instruction had been given, was there a reasonable probability that the outcome of the proceedings would have been different." *Luck*, 611 F.3d at 188.  Here, the answer to both questions is "yes" because malice is "an essential element of murder and is what distinguishes it from the crime of manslaughter." *Canipe v. Commonwealth*, 491 S.E.2d 747, 753 (1997).  Because that distinction is "elusive," *see* Groot, CRIMINAL OFFENSES AND DEFENSES IN VIRGINIA § 6, 557, 600 (2006), and "close but crucial," to distinguishing between manslaughter and second-degree murder, *Essex*, 322 S.E.2d at 222, Huguely inarguably would have been entitled to such an instruction.

121.    In *Essex*, the Virginia Supreme Court considered whether the operation of a motor vehicle, under circumstances of intoxication and extreme recklessness, resulting in a fatal accident could support a second-degree murder conviction.  While intoxicated, Essex drove his vehicle at high speed, crossing back and forth over the center line of the road for a distance of several miles, ran a red light, and eventually collided head-on with an oncoming vehicle, killing two passengers in that vehicle and a passenger in his.

122.    Finding that evidence insufficient and reversing Essex's conviction for second-degree murder, the Supreme Court held:

> Malice, a requisite element for murder of any kind, is unnecessary in manslaughter cases and is the touchstone by which murder and manslaughter cases are distinguished. Malice may be either express or implied by conduct. …"Express malice is evidenced when 'one person kills another with a sedate, deliberate mind, and formed design'…. Implied malice exists when any purposeful, cruel act is committed by one

individual against another without any, or without great provocation;"

The authorities are replete with definitions of malice, but a common theme running through them is a requirement that a wrongful act be done "wilfully or purposefully." This requirement of volitional action is inconsistent with inadvertence. Thus, if a killing results from negligence, however gross or culpable, and the killing is contrary to the defendant's intention, malice cannot be implied. In order to elevate the crime to second-degree murder, the defendant must be shown to have wilfully or purposefully, rather than negligently, *embarked upon a course of wrongful conduct likely to cause death or great bodily harm.*

In the absence of express malice, *[malice] may only be implied from conduct likely to cause death or great bodily harm, wilfully or purposefully undertaken.* Thus, for example, one who deliberately drives a car into a crowd of people at a high speed, not intending to kill or injure any particular person, but rather seeking the perverse thrill of terrifying them and causing them to scatter, might be convicted of second-degree murder if death results. One who accomplishes the same result inadvertently, because of grossly negligent driving, causing him to lose control of his car, could be convicted only of involuntary manslaughter. In the first case the act was volitional; in the second it was inadvertent, however reckless and irresponsible.

322 S.E.2d at 219–20 (emphasis added). *Essex*, therefore, makes clear that mere action is

insufficient to find malice. Rather, the action must be motivated by the culpable mental

state and be of the type likely to cause death or great bodily harm. *Id.*

123. At trial Huguely relied on evidence, including his statement to police,

tending to show Love's injuries were accidental and resulted from a struggle in her room.

Huguely's evidence was that he and Love had fallen to the floor, and that after seeing she

was injured, he lifted or pushed her onto the bed, where she later suffocated. Although

there was no dispute he entered her room by kicking a hole in the door, the defense

strongly challenged the Commonwealth's assertion that Huguely ever acted with malice

toward Love. Because Huguely could only have been found guilty of second-degree

murder if his malicious intention (1) existed when he engaged in conduct that led to

Love's death, (2) motivated his actions, and (3) motivated actions that were of are the

type "likely to cause death or great bodily harm," *Essex*, 322 S.E.2d at 219–20, the trial court would have been required to provide an instruction that included this vitally material language in its definition of malice. *Jimenez*, 402 S.E.2d at 681.

124.  The malice instruction actually provided to the jury, however, allowed it to convict if it believed Huguely acted maliciously at any point in the chain of events—such as when he kicked in the door——or even if his conduct was not "likely to cause death or great bodily harm." If a proper instruction had been given, there is a reasonable probability Huguely would not have been convicted of second-degree murder. As discussed previously, the facts before the jury presented an extremely close case, amplifying the need for clear and accurate jury instructions. This case concerned only Huguely's mental state and Love's cause of death. In its summation, however, the Commonwealth essentially conceded that it lacked evidence of first-degree murder, making malice the central issue for jury deliberations. *See* Tr. 2/18/2012 at 185; JA 4114; *see also* Tr. 2/18/2012 at 175–76, 184–85, 190–91, 196-97, 260; JA 4102, 4113–14, 4121, 4129, 4210. Indeed, during closing arguments, the defense and prosecution sharply disputed the level of intent required to show malice, Tr. 2/18/2012 at 254–56, 261–65; JA 4202–04, 4211–16, and then during deliberations, the jury asked the court to clarify the meaning of the malice instruction, making clear that the jurors found the original instructions to be confusing. Tr. 2/22/2012 at 22–30; JA 4247–57.

125.  The closeness of this case and the jury's request for reinstruction on the definition of "reason", Tr. 2/22/2012 at 22; JA 4247–48, alone establish that the absence of the *Essex* language was outcome-determinative. That the jury struggled with the evidence and meaning of malice is also demonstrated by what actually happened in the

jury room.  Juror Serena Gruia, who was the jury forewoman, reported the jury

eliminated "first-degree murder … from the discussion fairly quickly," but reported there

"was a huge discussion" and "a really long debate" when the jury "came to malice."

Samantha Koon, *Jurors discuss deciding Huguely's fate*, THE DAILY PROGRESS, Feb. 24,

2012.  Ultimately, because the jury became "'hung up' on the term" "'reason' during its

deliberations," it was also forced to request reinstruction on that term.  *Id.*  Critically, at

least one of the jurors continued to be confused about the definition of "malice" and

requested a dictionary from the court bailiff, which she consulted before voting to

convict.  *See* Claim I, *supra*, at ¶ 60.

   *iii.*      *Conclusion*

   126.   In this case, there was no question that Love's death followed an

altercation with Huguely.  The only issues were whether Huguely's actions had caused

Love's death and whether Huguely had the requisite mental state to be convicted of

second-degree murder, given that the Commonwealth essentially conceded he was not

guilty of first-degree murder.  Thus, whether the Commonwealth could establish Huguely

acted with malice was one of the central issues at trial.  Trial counsel knew that to prove

malice the Commonwealth must establish he "embarked upon a course of wrongful

conduct likely to cause death or great bodily harm" in causing Love's death.  And in fact,

trial counsel recognized in a post-trial filing that the prosecution did not meet this

standard, belying any argument that trial counsel made a strategic decision not to request

such an instruction.  Because malice was a significant issue with which the jury

admittedly struggled with during deliberations, there is a reasonable probability that

Huguely would not have been convicted if a proper instruction had been requested and provided.

**Claim V: Trial counsel Deprived Huguely of his Sixth Amendment Right to the Effective Assistance of Counsel, His Fifth Amendment Right Against Self-Incrimination, and Fourteenth Amendment Right to Due Process by Failing to Object to the Prosecution's Impermissible Comment During Closing Argument on Huguely's Invocation of his Right to not Testify at Trial.**

127.    In closing, the Commonwealth argued: "You saw Ken Clausen here testifying.  You could see him.  You could hear him.  You could assess his credibility, his involvement, if any, and weigh his input accordingly.  Ladies and gentlemen, *that's the point at which it was fair to expect some explanation for the lie that he* [Huguely] *told and you have none*, and the explanation is that . . . he sure as heck knew that he had hurt her badly."  Tr. 2/18/2012 at 260; JA 4209–10 (emphasis added).  This was not an accidental reference to Huguely's constitutional right not to testify; rather the Commonwealth blatantly contrasted someone who actually testified at trial (Clausen) with Huguely's failure to take the stand.  The Commonwealth then invited the jury to conclude that Huguely had not testified because "he sure as heck knew that he had hurt [Love] badly."  This inference went to the heart of Huguely's defense strategy—that this was a case of manslaughter, not second-degree murder—and contributed to the jury's finding of malice.  Trial counsel was ineffective when they failed to object, failed to ask for a mistrial, and failed to ask for a curative instruction.  These failures prejudiced Huguely, and violated his Sixth Amendment right to counsel as well as his rights under the Self-Incrimination Clause of the Fifth Amendment, the Fourteenth Amendment, and Virginia law.  *Shipwash v. Collins*, 475 F. Supp. 1000, 1003 (W.D. Va. 1979).

128.    The Code of Virginia provides that a defendant's "failure to testify shall create no presumption against him, nor be the subject of any comment before the court or jury by the prosecuting attorney." Va. Code § 19.2-268. In *Griffin v. California*, 380 U.S. 609 (1965), the Supreme Court expressly held that any comment to the jury by a prosecutor concerning the defendant's failure to testify "as to matters which he can reasonably be expected to deny or explain because of facts within his knowledge" is constitutionally forbidden. Ineffective assistance of counsel may be established where a defense counsel fails to object to the prosecutor's "very serious instances of prosecutorial misconduct," including an "argument which invited the jury to consider constitutionally protected silence as evidence of [the defendant's] guilt." *Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996).

129.    In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Supreme Court recognized that a comment on a defendant's post-arrest silence violates due process of law. Therefore, when the Commonwealth's reference to the defendant's failure to testify is so blatant, it is incumbent on counsel to object. Even courts that "recognize[] . . . defense counsel may not have wished to highlight Petitioner's silence by objecting and requesting a jury instruction," still find that where there has been "significant discussion of Petitioner's decision to invoke his right to silence, it would have been incumbent upon a reasonably competent attorney to raise an objection." *Prevatte v. French*, 459 F. Supp. 2d 1305, 1353 (N.D. Ga. 2006).

130.    The test the Virginia Court of Appeals has adopted for determining whether remarks by the prosecutor unconstitutionally refer to a defendant's right not to testify, "is whether, in the circumstances of the particular case, 'the language used was

manifestly intended *or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify*.'" *Kearney v. Commonwealth*, No. 1078-00-1, 2002 Va. App. LEXIS 40, at *7 (Va. Ct. App. Jan. 29, 2002) (quoting *Hines v. Commonwealth*, 234 S.E.2d 262, 263 (Va. 1977) (emphasis added)). In *Kearney*, the prosecutor referred to the absence of any testimony contradicting a prosecution witness named Boothe.  Because there was no third participant in the conversation between the defendant and Boothe, the Virginia court held that "the prosecutor's argument . . . referenced the inescapable conclusion that only defendant could 'contradict' Boothe's testimony, thereby 'naturally and necessarily' resulting in the jury 'tak[ing] it to be a comment on the failure of the accused to testify.'" *Id.* (quoting *Hines*, 234 S.E.2d at 263). The statements made by the Commonwealth regarding Huguely's knowledge of the seriousness of Love's injuries invite the same unconstitutional inference from the jury.  In *Kearney*, the Virginia Court of Appeals held that the Commonwealth's similar impermissible arguments to the jury warranted a mistrial. *Id.* The closing argument statements of the Commonwealth in Huguely's trial likewise prejudiced his right to a fair trial.

131.     The Fourth Circuit has stated, "Few mistakes by criminal defense counsel are so grave as the failure to protest evidence that the defendant exercised his right to remain silent.  Such evidence plants in the mind of the jury the dark suspicion that the defendant had something to hide and that any alibi which is subsequently proffered is pure fabrication." *Alston v. Garrison*, 720 F.2d 812, 816 (4th Cir. 1983).

132.     In *Combs v. Coyle*, 205 F.3d 269, 286 (6th Cir. 2000), the Sixth Circuit held that trial counsel's failure to object to similar comments was constitutionally

deficient and prejudicial. In *Combs*, the government solicited testimony that the defendant, when approached by a police officer pre-arrest, said, "Talk to my lawyer." In closing, the prosecutor argued that "Talk to my lawyer" demonstrated the defendant's criminal intent, and an innocent person with a story to tell of accident or self-defense would not say, "Talk to my lawyer." The attorney for the defense failed to object. The court stated that "Not only did the failure to object ensure that the jury could use Combs's protected silence against him, but it also guaranteed that both the admission of the statement and the trial court's instruction would be analyzed on review only for plain error. Counsel's performance with respect to this issue was constitutionally deficient under the *Strickland* standard." *Id.* The Sixth Circuit concluded that trial counsel had rendered constitutionally deficient performance, and remanded the case to the district court with instructions to issue a writ of habeas corpus. *Id.*

133.   Trial counsel's failure to object in this case prejudiced Huguely in several ways. First, like the petitioner in *Combs*, Hugueley was cheated of the ability to have the issue reviewed on direct appeal under a favorable standard. Had this issue been subjected to direct review, the Commonwealth would have had to prove that this constitutional error was "'harmless beyond a reasonable doubt.'" *Hazel v. Commonwealth*, 524 S.E.2d 134, 138 (Va. Ct. App. 2000) (quoting *Taylor v. Commonwealth*, 495 S.E.2d 522, 529 (Va. 1998) (citations omitted)). The failure of Huguely's attorneys to object has thus prejudiced Huguely on direct appeal. Second, had Huguely's attorneys objected, they could have then requested a mistrial. This would have afforded the trial court an opportunity to immediately assess the harm caused by the impermissible argument. Huguely thus was prejudiced because the trial court could have granted the mistrial. *See,*

*e.g.*, *Sluder v. Commonwealth*, No. 2531-02-3, 2003 Va. App. LEXIS 605, at *9 (Va. Ct. App. Nov. 25, 2003).  Even if the Court had not granted the mistrial, as in *Sluder*, defense counsel would have had an opportunity to seek a curative instruction, thus preventing the impermissible prejudice.  By failing to request a mistrial or even object, Huguely's attorneys prejudiced his right to a fair trial. In short, had defense counsel provided Huguely with the necessary assistance, there is a reasonable probability that his trial would have had a different outcome.  *Hazel v. Commonwealth*, 524 S.E.2d 134, 139 (Va. Ct. App. 2000) ("Hazel was prejudiced by the Commonwealth having been allowed to call attention to his exercise of his constitutional right to remain silent.").

**Claim VI: Trial counsel deprived Huguely of his Sixth Amendment Right to the Effective Assistance of Counsel when they Moved into Evidence an Exhibit with the Label "Type of Offense: Murder."**

134.    Trial counsel performed deficiently by introducing into evidence an exhibit with the label "Type Offense: Murder." During Massaro's testimony, *see supra* ¶ 22, the defense moved a DVD video into evidence. Def. Ex. 124; JA 4752 (picture of exhibit).  It appears that trial counsel failed to examine the exhibit, which declared "Type Offense: Murder."[14]  The jury used this exhibit during deliberations.  Attorneys should carefully examine all exhibits before they are entered into evidence and given to the jury during deliberations.  *See, e.g.*, *Virgin Islands v. Joseph*, 685 F.2d 857, 864 (3d Cir. 1982) (holding it is "the responsibility of counsel to check the exhibits . . . Undoubtedly, defendant's counsel should have carefully checked each exhibit."); *United States v. Strassman*, 241 F.2d 784, 786 (2d Cir. 1957) (same); *People v. Bieber*, 835 P.2d 542, 547 (Colo. Ct. App. 1992) (same).

---

[14] Indeed, other exhibits were entered into evidence with "Type of Offense" labels, but most of them used numerical codes instead of the word "Murder."

> We note, first, that it is the responsibility of counsel for both sides in a trial to examine the items to be presented to the jury for their consideration to ensure that the jury is not exposed to matters not admitted into evidence . . . . In a criminal case, defense counsel may have a heavier burden to guard against such exposure, since failure to object to the inclusion of non-evidentiary material may constitute a waiver.

*Hawaii v. Joseph*, 883 P.2d 657, 660-61 (Haw. Ct. App. 1994)).  In this case, the defense's argument was that the crime was manslaughter, not murder; thus, trial counsel's performance was deficient when they moved into evidence an exhibit that told the jurors to reach the exact opposite conclusion: that the "Type of Offense" was "Murder."

135.     This exhibit, with its conclusion of murder, was an impermissible external influence on the jury.  *See Barnes*, 751 F.3d at 245 (defining external influence as "either 'extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case,' or . . . 'an outside influence upon the partiality of the jury . . .'") (quoting *Robinson*, 438 F.3d 350, 363 (4th Cir. 2006)); *see Evans-Smith v. Commonwealth*, 361 S.E.2d 436 (Va. Ct. App. 1987) (consultation with almanac warrants examination of jurors to determine extent of resulting prejudice). *Brittle v. Commonwealth*, 281 S.E.2d 889 (Va. 1981) (prejudice found where numerous photographs not entered into evidence mistakenly included among exhibits placed in jury room and examined by jury); *Gilliland v. Singleton*, 129 S.E.2d 641, 646 (Va. 1963) (new trial ordered where the jury was permitted to read pleadings and "might well have concluded that the court believed the allegations had been proved as the court specifically told the jury they could read the motion for judgment.").[15]

---

[15] *See, e.g.*, *United States v. Bradshaw*, 281 F.3d 278 (1st Cir. 2002) (unredacted copy of indictment containing text of severed counts accidentally left in jury room); *Williams v.*

136.    There is a reasonable probability that the "Murder" label influenced the jury. First, the exhibit was delivered to the jury by the Court and had both parties' exhibits numbers, giving the exhibit the imprimatur of the Court and parties. Second, the exhibit's conclusion: "murder" went to the heart of the main issue of the case. *See supra* ¶¶ 61-63. Third, the court had instructed the jury that murder has a specific meaning distinct from manslaughter, and had given them four options—first degree murder, second degree murder, voluntary manslaughter, or involuntary manslaughter. But the Court then gave the jury an exhibit that had been entered into evidence *by the defense*— and approved by the Commonwealth—that characterized the offense as "Murder". Consequently, there is a reasonable probability that the jury erroneously presumed that the offense was murder and that Huguely had to prove otherwise. *See Gilliland*, 204 Va. at 121–22 (holding that jury may have been confused by the court allowing them to read the pleadings, and may have erroneously concluded that the "court believed the allegations" described in the pleadings had been proven). Finally, this case was exceptionally close and the resulting verdict was only weakly supported by the totality of the record, making it more likely the jury was affected by trial counsel's error. *See supra* ¶ 91. Accordingly, under these circumstances of this case, the admission of the exhibit announcing that the Offense was a "Murder" prejudiced Huguely.

**Claim VII: Trial Counsel's Failure to Investigate, Develop and Present Evidence of Huguely's Blood-Alcohol Content and Degree of Impairment at the Time of the Offense Denied Him His Sixth Amendment Right to the Effective Assistance Of**

---

*Florida*, 448 So.2d 49 (Fla. Dist. Ct. App. 1984) (jury's surprise discovery of incriminating bloody paper in glove admitted as evidence); *Merritt v. Maryland*, 785 A.2d 756 (Md. 2001) (presumptive prejudice found where jury mistakenly given search warrant affidavit that had not been admitted as evidence); *Joseph*, 883 P.2d 657 (finding prejudice had been cured by special instruction where jury found incriminating straw in defendant's wallet while examining the wallet during deliberations).

**Counsel Because That Evidence Supported a Finding That Love's Death Was Accidental and a Finding of Diminished Capacity at Sentencing.**

137.    In a little over thirty hours before the crime, Huguely ingested between 44 and 54 alcoholic beverages, slept little, and became so intoxicated that his coordination and motor skills were profoundly impaired.  Although trial counsel knew, in general terms, that Huguely was drunk, they failed to (1) make reasonable investigations to determine the amount that he consumed or his blood-alcohol content ("BAC") at the time of the offense, or (2) assess how his level of intoxication would have affected his motor skills, coordination, and reflexes.  Had counsel done so, they would have discovered that Huguely's BAC was at least 0.379 g%, and likely much higher.  Because a BAC at this level would have dramatically impaired Huguely's neurological and neuropsychological capacities, his motor skills and coordination, and reflexive capacity, and made it far more likely that the killing was accidental, trial counsel rendered ineffective assistance by failing to develop and present this critical information at Huguely's trial.  Likewise, because the same evidence would have supported a conclusion of diminished capacity at sentencing, their failure to present it before the jury and judge was also prejudicial at sentencing.

138.    Prior to trial, trial counsel interviewed several witnesses about the alleged crime and Huguely's state of intoxication, which became a significant issue at trial.  Tr. 2/9/2012 at 185–86, 194, 200, 242, Tr. 2/15/2012 at 48–49, 54–56, 58–59, 59–60, 61–62, 65–66, 67–69, 72–73, 74–80, 81–83, 96–103, 105, 111–17, 120–29, 134–37; JA 2039–40, 2050, 2058, 2110, 3285, 3292–94, 3297–98, 3299–300, 3301–02, 3306–07, 3309–11, 3315–16, 3318–25, 3327–28, 3346–54, 3357, 3365–72, 3376–87, 3394–97.  Trial counsel did not, however, make any attempt—before trial or during the trial itself—to determine

with any precision just how impaired Huguely was at the time of the alleged crime, even though this information was readily available.

139.    George's aunt, Alina Massaro, was in Huguely's presence for parts of the evening on May 1, 2010, and observed him drink between eleven and thirteen alcoholic beverages from approximately 4:30 p.m. on May 1, 2010, until about 2:00 a.m. on May 2, 2010.  Declaration of Alina Massaro of 1/18/16, at ¶¶ 4–11.  During this same time period, Huguely's mother Marta Murphy observed him drink approximately ten additional drinks during a cocktail hour and dinner that her sister, Alina Massaro, did not attend.  Declaration of Marta Murphy of 1/18/16, at ¶¶ 4–7.  Huguely's father not only observed his son drinking excessively on May 1 & 2, 2010, but also was in his company the following day and noticed he was drunk in the morning when they left his apartment and, thereafter, consumed approximately eighteen drinks during the day.  Declaration of George Huguely IV of 1/11/16, at ¶¶ 2–6.  Taken together, these three witnesses observed Huguely consume between 37 and 41 alcoholic beverages from about 4:30 p.m. on May 1, 2010, and 9:30 p.m. on May 2, 2010.  However, there were significant time periods that they were not in Huguely's company when he was drinking additional alcoholic drinks, including between 2:00 a.m. and 10:00 a.m., and between 9:30 p.m. and 11:45 p.m. on May 2, 2010.

140.    Counsel for Huguely has interviewed or attempted to interview many individuals who observed Huguely's drinking on May 1, 2010, and May 2, 2010, and who testified at trial, but they refused to sign declarations and/or be interviewed.  Based on their trial testimony and information available to counsel, if questioned they would corroborate that during the time periods not covered by Massaro, Murphy, and George

Huguely IV, they observed Huguely drink an additional 8–14 alcoholic beverages. These witnesses include Tim Fuchs, Brian Carroll, Kevin Carroll, Ken Clausen, Mikey Thompson, William Bolton, Scott Nizolek, and Chris Clements.

141.     According to Dr. Joseph Saady, an expert toxicologist who has testified hundreds of times in Virginia on the issue of intoxication and BAC extrapolation, Huguely's BAC would have been 0.379 g% when he arrived at Love's apartment. This BAC is based on a routine extrapolation that takes into account the person's height, weight, age, the amount of alcohol consumed, and other relevant variables. Declaration of Joseph J. Saady, Ph.D. of 1/17/16, at ¶¶ 7–8.

142.     Had trial counsel conducted the necessary investigation to develop these facts, Dr. Saady would have been allowed to provide this information in the form of a hypothetical question. *Fitzgerald v. Commonwealth*, 292 S.E.2d 798, 806 (Va. 1982); *see Johnson v. Commonwealth*, No. 1819-94-3, 1996 Va. App. LEXIS 585, at *13 (Va. Ct. App. Sept. 3, 1996) (recognizing error in excluding testimony of defense toxicologist related to extrapolated BAC); *Ball Lumber Co. v. Jones*, No. 1716-94-2, 1995 Va. App. LEXIS 375, at *7 (Va. App. Apr. 18, 1995) (noting that toxicologist provided expert opinion regarding claimant's blood alcohol level based on an extrapolation).[16] Dr.

---

[16] *See also People v. Scarlett*, 985 P.2d 36, 40–41 (Colo. App. 1998) (observing that toxicologist was permitted to testify to comparison of a defendant's actual measured BAC levels with the defendant's testimony regarding how much he drank, concluding they were inconsistent based on his calculations); *Merck v. State*, 763 So.2d 295, 297 (Fla. 2000) (noting toxicologist was permitted to testify to an estimation of a defendant's BAC at the time of a murder "based on testimony of alcohol consumption.") (internal citation omitted); *People v. Ethridge*, 610 N.E.2d 1305, 1319 (Il. Ct. App. 1993) (finding no error in allowing State's toxicologist to render opinion as to defendant's BAC based on an extrapolation); *People v. Mitchell*, No. 31147, 2014 Mich. App. LEXIS 2139, at *2 (Mich. Ct. App. Nov. 4, 2014) (observing that a prosecution toxicologist was permitted to "testif[y] that based on defendant's height and weight, if [the defendant's] report of what

Saady's testimony would have been admissible to negate premeditation and deliberation, *Swisher v. Commonwealth*, 506 S.E.2d 763, 772 (1998), to explain gaps in Huguely's memory of the incident, *Johnson*, 1996 Va. App. LEXIS 585, at *13, to assess degree of negligence, *Essex*, 322 S.E.2d at 221–22, to explain how increasing levels of alcohol affect a person's judgment and coordination, *Johnson*, 1996 Va. App. LEXIS 585, at *13, and at sentencing to determine "the appropriate quantum of punishment." *Essex*, 322 S.E.2d at 222.

143.    Evidence tending to establish the probability or improbability of any fact in issue is relevant. *Stamper v. Commonwealth*, 257 S.E.2d 808, 815 (Va. 1979). In this case, evidence showing the degree and impact of Huguely's intoxication would have been relevant for first-degree murder and made it more probable that his conduct arose from impaired coordination and diminished motor sensory functioning than from a premeditated plan or malice, and thus trial counsel's failure to introduce this evidence was deficient. Likewise, expert testimony showing Huguely's diminished capacity would have strongly supported a more lenient sentence.

---

he drank that evening was accurate, his blood-alcohol content should have been approximately .027 around the time he was stopped and arrested."); *Village of Hartland v. Buske*, No. 93-1470-FT, 1993 Wisc. App. LEXIS 1427 (Nov. 10, 1993) (noting that toxicologist was allowed to testify to an extrapolation of a defendant's blood alcohol level at the time of a crime based on later-taken breathalyzer results and computer modeling).; *State v. Thomas*, No. M2000-02440-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 203, at *7–8 (March 22, 2001) (describing how the defense was permitted to present testimony of toxicologist who extrapolated defendant's BAC based on the testimony of a witness and the defendant's description of what he drank and his physical size).

144.    Trial counsel's failure to investigate and present expert evidence of Huguely's precise level of intoxication prejudiced Huguely by depriving him of testimony that would have supported a conviction for involuntary manslaughter, not first or second-degree murder.  Such expert testimony would have powerfully supported the other evidence that Love's death was accidental, not intentional or malicious.  With a BAC of .379 g%, Huguely would have experienced dramatic slowing in his reaction time and ability to process information; profound impairment to his balance, perception, memory, and comprehension; confusion, dizziness, and poor coordination; and balance and staggering issues.  Declaration of Joseph J. Saady, Ph.D., of 1/17/16, at ¶¶ 10–11, 13; Declaration of Michael Hendricks, Ph.D., ABPP, of 1/18/16, at ¶¶ 10–11, 15.  As Dr. Hendricks noted:

> At the approximate level of intoxication indicated by both the calculated BAC and behavioral observations as reported at trial, Huguely would have experienced a severe impairment of basic neurological and neuropsychological capacities. His ability to accurately and fully receive sensory input across sensory modalities would have begun to be impaired by the time he reached a BAC of .20% and would have become increasingly impaired as his BAC increased. Similarly, motor skills would be expected to have begun to degrade before he reached a BAC of .20%, and by the time he surpassed .30% he would have had difficulty maintaining his balance and his muscle coordination would have been very impaired. While Huguely likely would have been limited to responding to various internal and external stimuli by the time his BAC surpassed .30%, even his reflexive capacity would have been much diminished. This was evident in the behavioral observations of Huguely on 2 May 2010, when he was observed to be uncoordinated, staggering, unable to speak clearly and seemingly incapable of responding appropriately to environmental cues.

*Id.* at ¶ 14.

145.    This information would have strongly bolstered the defense's theory that Love's death was the inadvertent result of a drunken altercation, not an intentional or

81

malicious murder. Given Huguely's grief and denial of an intent to harm Love—as well as the absence of significant internal injuries and thus doubts about the amount of force involved in Love's death—the case presented a close question about whether the killing was volitional or inadvertent. Although the jury was presented with extensive evidence of Huguely's intoxication, much of it was elicited by the Commonwealth, which attempted to paint Huguely as an abusive boyfriend who simply behaved violently when drunk. Expert testimony could have shown, however, that Huguely's level of intoxication profoundly impaired his motor skills and coordination, casting doubt on a theory of intentional violence and providing support for an accident. As such, evidence showing Huguely's motor skills and coordination were profoundly impaired would have very likely changed the outcome of the case. Additionally, this error prejudiced Huguely at trial because it allowed the Commonwealth to make misleading, unrebutted arguments regarding the manner in which Huguely's intoxication could be considered by the jury. *See infra* ¶ 150.

146.     Likewise, regardless of whether Huguely were acquitted of second-degree murder, the failure to introduce evidence of his diminished capacity at the sentencing before jury and Court was highly prejudicial. Dr. Jeffrey Aaron, Ph.D., who had been retained by the defense, was never asked to opine about whether Huguely's capacity to appreciate the nature of his conduct and consequences was diminished. Had he been asked to make this assessment, Dr. Aaron would have testified at sentencing that:

> Given the combined effects of severe intoxication, general deficits in impulse control, and immaturity, it is my professional opinion to a reasonable degree of clinical certainty that ***Huguely was significantly impaired on the night of May 2, 2010 to the degree that his ability to fully comprehend the nature of his actions or their consequences was limited.*** This conclusion is based in the following factors:

a.  The contribution of severe alcohol intoxication, as described above, which would have affected his emotional reactivity, his information processing and problem-solving capacities, and his motor coordination and control;

b.  The contribution of distinct deficits in impulse control, as described above, which were identified in a prior clinical assessment and yielded a diagnosis of ADHD;

c.  The contribution of developmental immaturity, as described above, which included both his adolescent developmental status and behavioral indicators of emotional immaturity;

d.  The specific activating circumstances, namely his distress related to the ending of or tension in a romantic relationship, which historically was among the most emotionally challenging circumstances for him;

e.  The cumulative effects of (a) through (d) above; and

f.  Evidence that Huguely had in fact not understood or recognized the consequences of his actions.  This was most apparent in his behavioral and emotional responses in the police interview on the morning of May 3, 2010.  In this interview, his responses strongly suggest he was not aware of Love's death, and in fact that for some time he appeared not to accept the fact that she had died.  He appeared not to understand that his actions had led to her death – *or that they could have done so*.

This cumulative evidence indicates that as a result of a combination of factors, ***Huguely had significant impairment in his cognitive, emotional, behavioral, and motor responding at the time of the offense, and that these impairments precluded his full appreciation of the nature of his conduct and its consequences***.

Declaration of Jeffrey Aaron, Ph.D. of 1/17/16, at ¶¶ 22–23 (emphasis added).

147.  Dr. Hendricks, who specializes in the effects of substances on

psychomotor functioning and was available as a witness at the time of Huguely's trial,

reached a similar conclusion:

I would expect that around the time of Love's death Huguely's capacity for accurately taking into account a variety of environmental stimuli as

83

well as his own emotional and cognitive motivations in the service of formulating a desire to achieve a specific outcome or goal, to employ strategic planning and decision making, and to effectuate any such plan by engaging in the requisite behaviors in a coordinated and effective manner needed to actualize that outcome or goal *was substantially and profoundly impaired*. At best, I anticipate that Huguely may have been able to achieve only very basic goals, mostly in response to immediately felt needs. *His capacity to effectuate a planned outcome would have been greatly reduced by impairments in his sensory perception, his ability to regulate his mood, his ability to think clearly and coherently, his executive functioning, and his lack of physical coordination*. In essence, his ability to achieve any aims would have been merely at a level of response to an immediately perceived stimulus—and even this would have been impaired by his ability to effect his immediate desires because of disorientation and lack of coordination.

Hendricks Decl. at ¶ 15 (emphasis added).

148.    Had trial counsel presented at sentencing this compelling evidence of Huguely's diminished capacity, it is likely the jury would have recommended a more lenient sentence.  This is not a case where the presentation of mitigation that was readily available to trial counsel "would barely have altered the sentencing profile presented to the sentencing" jury.  *Strickland*, 466 U.S. at 700.  The evidence in aggravation was not overwhelming, and yet the jury still did not impose the maximum sentence allowable— not even close.  This shows that the jury readily appreciated this was not the worst kind of second-degree murder.  Choosing a sentence almost exactly halfway between the minimum and the maximum strongly suggests the jury believed it was a mid-level homicide.  Similarly, the Court remarked on the complete lack of evidence before him regarding Huguely's substance abuse issues.

149.    In light of these facts, it is self-evident that had trial counsel presented *any* evidence—much less forensic proof of diminished capacity—in mitigation of the offense there is a reasonable probability that the jury would have reduced its sentencing

recommendation significantly.  Had the Court and jury been able to place Huguely's life history "on the mitigating side of the scale," it would have appropriately reduced the ballast on the aggravating side of the scale, there is clearly a reasonable probability that the advisory jury—and the Court—"would have struck a different balance," *Wiggins v. Smith*, 539 U.S. 510, 537 (2003), and it is unreasonable to conclude otherwise.  The Court's reduction of the jury recommendation, in the face of counsel's failure to present this information, confirms this truth.

150.    Further, although voluntary intoxication is not a defense to crimes in the Commonwealth, except to negate premeditation and deliberation of first-degree and capital murder, it can be admissible for other purposes.  *Essex*, 322 S.E.2d at 221–22; *see also Johnson*, 1996 Va. App. LEXIS 585 at *13.  One permissible purpose is to rebut improper argument of opposing counsel.  *Simmons v. South Carolina*, 512 U.S. 154, 170–71 (1994) (recognizing a defendant's right to rebuttal where the prosecution makes improper arguments that have the effect of encouraging the jury to consider improper facts or circumstances).  The Commonwealth encouraged the jury to find Huguely guilty of second-murder because he became more aggressive when intoxicated. Tr. 2/18/2012 at 160–61; JA 4082–83.  When the Commonwealth made this objectionable argument trial counsel was duty bound to object and request an opportunity to rebut it with facts and argument to the contrary.  Trial counsel's failure to object and rebut deprived Huguely of the effective assistance of counsel because the Commonwealth's argument misled the jury on the critical issue by using intoxication to aggravate and elevate the homicide when in fact, it demonstrated diminished capacity and inability to form intent or volition. *Strickland*, 466 U.S. 668.  The Commonwealth may not create a false assumption about

the role of intoxication while, at the same time, preventing the jury from learning that the

effects of the defendant's intoxication tended to negate volition. *Simmons*, 512 U.S. at

171.

**Claim VIII: Trial Counsel's Numerous Evidentiary, Factual, and Legal Deficiencies with Respect to the Distinction Between Malice and Manslaughter Have Created a Reasonable Probability That, Had These Errors Not Occurred, Huguely Would Have Been Convicted of a Lesser Charge or Been Found Not Guilty.**

151.    The Supreme Court has clearly established that the combined effect of

multiple trial court errors violates due process where it renders the resulting criminal trial

fundamentally unfair. *Chambers v. Miss.*, 410 U.S. 284, 290 (1973). Making the

determination requires the court deciding the ineffectiveness claim to

> consider the totality of the evidence before the judge or jury. Some of the
> factual findings will have been unaffected by the errors, and factual
> findings that were affected will have been affected in different ways.
> Some errors will have had a pervasive effect on the inferences to be drawn
> from the evidence, altering the entire evidentiary picture, and some will
> have had an isolated, trivial effect. Moreover, a verdict or conclusion only
> weakly supported by the record is more likely to have been affected by
> errors than one with overwhelming record support.

*Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011) (citing *Strickland*, 466 U.S.

at 695-96).

152.    The cumulative effect of the above errors requires a new trial.  Even if this

Court were to believe that none of the above issues independently warrants a new trial,

the cumulative prejudice certainly does.  Each of these errors went to the heart of the

case: whether Huguely had the requisite mental state for second-degree murder.  The jury

was deprived of necessary testimony on cause of death, improperly instructed on malice,

and sought the assistance of a dictionary in understanding the crucial issue before it.  In a

case this close, the cumulative prejudice of these errors is great.  *See Strickland*, 466

U.S. at 696; *see also Miller*, 268 F. Supp. 2d at 313–15 (finding cumulative prejudice in a close case where the defense attorney failed to produce expert testimony and failed to "follow[] through on the theory espoused during his opening as the key to Petitioner's defense," and noting that "[i]n a close case such as this one . . . these errors take on a special importance.").

## CONCLUSION

153.    WHEREFORE, on the basis of the above grounds, Huguely respectfully requests that this Court:

1.    Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and sentence.

2.    Grant him discovery and an evidentiary hearing at which he may present evidence in support of these claims.

3.    Direct that the criminal record in Cases 11-102-1 and 11-102-5 be incorporated into this record.

4.    Grant such other relief as law and justice require.

Respectfully submitted,

George Huguely V,
By Counsel

*(for Jon Sheldon)*

Jonathan P. Sheldon, VSB #66726
Joseph T. Flood, VSB #71716
Sheldon, Flood & Haywood, PLC
10621 Jones Street, Suite 301A
Fairfax, VA 22030
Phone (703) 691-8410
Fax (703) 251-0757
JSheldon@SFHDefense.com

Bernadette M. Donovan
Donovan & Engle, PLLC
1134 East High Street, Unit A
Charlottesville, VA 22902
Phone (571) 377-8527

Fax (571) 295-8679
Bernadette@donovanengle.com

**Certificate of Service**

      I, Jonathan P. Sheldon, hereby certify that on this 5th day of May, 2016, a true copy of the foregoing habeas petition was:

           Delivered by mail to the office of the attorney general at:

           Office of the Attorney General
           900 East Main Street
           Richmond, Virginia 23219

           And a pdf copy emailed to:
                oagcriminallitigation@oag.state.va.us and ldarron@oag.state.va.us

Jonathan P. Sheldon