RESPONDENT'S
EXHIBIT

10

**VIRGINIA:**

**IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE**

**GEORGE W. HUGUELY, V,**

                *Petitioner,*

**v.**                                **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

                *Respondent.*

---

# MOTION TO DISMISS

---

MARK R. HERRING
Attorney General of Virginia

Leah A. Darron
Senior Assistant Attorney General
Virginia State Bar No. 23823

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 phone
(804) 371-0151 fax
oagcriminallitigation@oag.state.va.us

# TABLE OF CONTENTS

Page

Procedural History...........................................................................1

Current Habeas Petition ..................................................................2

Facts of Case....................................................................................7

Burden of Proof............................................................................. 27

Ineffective Assistance of Counsel - Standard of Review ................. 27

Jury Related Claims....................................................................... 32

   Overview of Law ....................................................................... 32

      Claim 1 ................................................................................ 34

      Claim VII ............................................................................38

Medical Expert Witness Claims ..................................................... 42

      Claim 11.............................................................................. 42

      Claim 111 ....................................................................... 50

Jury Instruction ............................................................................ 54

      Claim IV ............................................................................ 54

Prosecutor's Argument .................................................................. 57

      Claim V.............................................................................. 57

Failure to Introduce Evidence ....................................................... 62

      Claim VII............................................................................ 62

Cumulative Ineffectiveness............................................................ 68

      Claim VIII.......................................................................... 68

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

**GEORGE W. HUGUELY, V,**

*Petitioner,*

v.                                                      **Case No. CL16-23**

**JOHN A. WOODSON,  WARDEN,**

*Respondent.*

## <u>MOTION TO DISMISS</u>

The respondent, by counsel, moves this Court to deny and dismiss the petition for a writ of habeas corpus, and states in support thereof:

*Procedural History*

1.      The petitioner, George W. Huguely, V, is confined pursuant to a final judgment order of this Court entered August 31, 2012. (CR11-102-1). On February 22, 2012, following a 12-day jury trial, the petitioner was found guilty of the second-degree murder of Yeardley Love in violation of Virginia Code § 18.2-32, for which the jury fixed punishment at 25 years in prison, and grand larceny in violation of Code § 18.2-95, for which the jury fixed punishment at 1 year in prison. (MR 622-624; App. 231-234). Following a

hearing on August 30, 2012, the Court ordered the petitioner to serve 23 years and 1 year on the respective convictions, the time to run concurrent. The petitioner was represented at trial by Rhonda E. Quagliana and Francis McQ. Lawrence.

2.     The petitioner appealed only on the second-degree murder conviction and was granted a limited appeal by the Court of Appeals of Virginia. After briefing and argument, his conviction was affirmed.  *Huguely v Commonwealth,* 63 Va. App. 92, 106, 754 S.E.2d 557, 564 (2014). His subsequent petition for appeal to the Supreme Court of Virginia was denied on November 19, 2014. His petition for rehearing was refused on January 15, 2015. The petitioner was represented in his state court appeal by Craig S. Cooley and Paul D. Clement. (Case No. 140678).

3.     Huguely's petition for certiorari to the United States Supreme Court was denied on October 5, 2015. The petitioner was represented in this proceeding by Paul D. Clement. (Case No. 14-1474).

### Current Habeas Petition

4.     On January 19, 2016, the last day he could do so pursuant to Virginia Code § 8.01-654(A)(2), the petitioner, by counsel Jonathan P. Sheldon, filed a petition for a writ of habeas corpus in this Court attacking the validity of his murder conviction raising *twelve* claims:

2

I. Huguely's rights to a fair trial before an impartial jury, due process, and to confront witnesses against him were violated pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Virginia Constitution Art. I and § 8, when a court officer gave the jury a dictionary during deliberations and the jury consulted the dictionary for the meaning of malice, the main issue at trial.

11. Trial Counsel provided ineffective assistance of counsel by inadvertently keeping expert testimony from the jurors on the key issue of cause of death when their violation of the rule on witnesses .led to the exclusion of expert testimony regarding CPR and reperfusion.

III. Trial Counsel provided ineffective assistance of counsel by failing to provide crucial available expert testimony on the key issue of cause of death when-either because of a failure to appropriately prepare or because of their violation of the rule on witnesses-they failed to call John S. Daniels, III, **M.D.**

IV. Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel when his trial attorneys failed to request a jury instruction that directed the jury it must find that any wrongful conduct was "likely to cause death or great bodily harm" in order to find malice.

V. Trial counsel's numerous evidentiary, factual and legal deficiencies with respect to the distinction between malice and manslaughter have created a reasonable probability that, had these errors not occurred, Mr. Huguely would have been convicted of a lesser charge or been found not guilty.

VI. Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel, his Fifth Amendment right against self-incrimination and Fourteenth Amendment right to due process by the prosecution's impermissible comment during closing argument on Mr. Huguely's

invocation of his right to not testify at trial and trial counsel's failure to object.

VII.    Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel when his counsel *moved* into evidence an exhibit with the label "type of offense: murder."

VIII.   Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to make use of a lacrosse video to demonstrate how Mr. Huguely received bruises and swelling on his hand.

IX.     Trial Counsel's failure to investigate and develop evidence of Mr. Huguely's blood-alcohol content and degree of impairment at the time of the offense denied him his Sixth Amendment right to the effective assistance of counsel because that evidence supported a finding that Yeardley Love's death was accidental or negligent and a finding of diminished capacity at sentencing.

X.      Trial Counsel provided ineffective assistance of counsel in failing to object and rebut the Commonwealth's argument that Mr. Huguely's state of intoxication could be used to prove an element of the murder.

XI.     The cumulative prejudice caused by the many merits phase errors in this case requires a new trial.

XII.    Mr. Huguely was deprived of an impartial sentencing jury when a juror used her own experiences with alcohol to recommend a long sentence for Mr. Huguely, and/or trial counsel was ineffective for failing to voir dire this juror on her experiences with alcohol.

5.      On or about May 5, 2016, the petitioner filed an amended petition raising the following claims:

4

I.   Huguely's rights to a fair trial before an impartial jury, due process, and to confront witnesses against him were violated pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Virginia Constitution Art. I and § 8, when a court officer gave the jury a dictionary during deliberations and the jury consulted the dictionary for the meaning of malice, the main issue at trial.[1]

II.   Trial Counsel provided ineffectiye assistance when their violation of the rule on witnesses led to the exclusion of expert testimony regarding CPR and reperfusion, the defense theory of cause of death.

III.  Trial Counsel provided ineffective assistance of counsel by failing to provide crucial available expert testimony on the key issue of cause of death when they failed to call John S. Daniels, 111, M.D.

IV.   Trial counsel were ineffective when they failed to request a jury instruction that directed the jury it must find that any wrongful conduct was "likely to cause death or great bodily harm" in order to find malice.[2]

---

[1] Counsel were unaware of the facts stated in the juror's affidavit until reading Huguely's habeas petition filed January 19, 2016. (R. Ex. A; affidavits of counsel).

[2] Huguely states in his amended petition he has abandoned two of his original 12 claims, but he now raises 8 claims. Out of an abundance of caution, respondent will address original claims VIII and XII. It also appears original claim V has been consolidated with current claim VIII. Respondent further notes the petitioner raises numerous ineffective counsel claims not encompassed in any numbered claim. *See e.g.* petition at 2, footnote 3. As to all claims not fairly encompassed in the enumerated 8 claims, the Court should find these unnumbered and undeveloped claims to be conclusory and insufficient to prove counsel's performance was deficient or prejudicial. Code § 8.01-655 requires that the grounds for habeas relief be plainly set forth and enumerated in the petition. Accordingly, the respondent has addressed only the allegations listed as grounds for relief in the Petition and the Amended Petition filed by counsel. *See* Petition, pages 4-5;

V.   Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel, his Fifth Amendment right against self-incrimination and Fourteenth Amendment right to due process by the prosecution's impermissible comment during closing argument on Mr. Huguely's invocation of his right to not testify at trial and trial counsel's failure to object.

VI.   Mr. Huguely was denied his Sixth Amendment right to the effective assistance of counsel when his counsel *moved* into evidence an exhibit with the label "type of offense: murder," an external impermissible influence on the jury;

VII.   Trial Counsel were ineffective based on their failure to investigate, develop and present evidence of Huguely's blood-alcohol content and degree of impairment at the time of the offense to support a finding that Yeardley Love's death was accidental or negligent and a finding of diminished capacity at sentencing.

VIII.   Trial counsel's numerous evidentiary, factual and legal deficiencies with respect to the distinction between malice and manslaughter *have* created a reasonable probability that, had these errors not occurred, Mr. Huguely would *have* been convicted of a lesser charge or been found not guilty.

---

Amended Petition, ¶¶ 6-27; *see also Elliott v. Warden,* 274 Va. 598, 613, 652 S.E.2d 465, 480 (2007); *Muhammad v. Warden,* 274 Va. 3, 18, 646 S.E.2d 182, 195 (2007); Hedrick *v.* Warden, 264 Va. 486, 521, 570 S.E.2d 847, 862 (2002) (all finding habeas petitioner had not established deficient performance or prejudice because he failed to provide evidence to support claim).

*Facts of Case*

6.      The record and opinion of the Court of Appeals of Virginia reflect that in the spring of 2010, George Huguely and Yeardley Love were 22-year-old seniors at the University of Virginia (UVA), anticipating graduation in early May. Both were UVA lacrosse players and they had many mutual friends on the men's and women's lacrosse teams. They lived in separate apartment buildings in close walking distance of each other in an area of Charlottesville known as the Corner, popular for its proximity  to campus and numerous restaurants and bars. The·pair had been in an "on-and-off" romantic relationship for two years. (2/8/12 Tr. 93-95, 97-99, 112-114, 162-165, 186-188, 208; App. 1596-1598, 1601-1603, 1620-1622, 1684-1686, 1714-1716, 1603, 1741).

7.      On February 27, 2010, a number of students had gathered for a men's lacrosse post-game party at the upstairs apartment of Huguely and his roommate, Kevin Carroll, and two lacrosse teammates, Brian Carroll and William Thompson, who lived across the hall. (2/9/12 Tr. 155-160; App. 2001-2006). Among the students present were Mike Burns, a University of North Carolina lacrosse player who had come to Charlottesville for the game. (2/9/12 Tr. 155-157; App. 2001-2003). Burns heard a female cry for help from Huguely's bedroom. He opened the bedroom door and saw Love

and Huguely on the bed. Love was lying on top of Huguely who was on his back and restraining Love from behind with his arm "around her neck." Burns could see Love struggling to remove Huguely's arm from her neck. (2/9/12 Tr. 159-162, 169-170; App. 2006-2009, 2019-2020). Huguely released Love and rolled over to his side on the bed to face the wall. Love got up and ran out of the room. As she ran past Burns she was "crying hysterically," she "could not breathe" and she said, "Thank you." (2/9/12 Tr. 159-162; App. 2006-2009). In an email Love wrote to Huguely she stated Huguely "strangled" her and Burns saved her life. (App. 4622; CW's Ex. 132).

8.    Tim Fuchs, a longtime friend and teammate of Huguely was standing behind Burns. Fuchs was unable to see into Huguely's bedroom, but he observed Love as she exited and said she looked "frightened." (2/9/12 Tr. 176-181; App. 2028-2033).

9.    As Love descended the stairs in the apartment building to the lower level, she encountered her sorority sister, Elizabeth Mclean, Kevin Carroll's girlfriend. Mclean described Love as "crying heavily," and she was holding her "right hand to [her] throat." Mclean had never seen Love so upset. (2/9/12 Tr. 228-231, 238-241; App. 2093-2096, 2106-2109). Love entered Chris Clements' apartment. He did not know what had

happened, but he could see she was crying, "emotionally disturbed" and "distraught." (2/15/12 Tr. 94-95; App. 3343).

10.    Brian Carroll heard about what happened and spoke to Huguely about the incident the next day. Huguely said he "was trying to talk to [Love] and [she] didn't want to talk to him and he was not letting her leave the room." (2/9/12 Tr. 192-198, 204-206; App. 2048-2054, 2063-2064).

11.    A few days later Caitlin Whiteley, Love's roommate, also spoke with Huguely. Although he said he had difficulty remembering what happened, he said, "he was angry at [Love] for telling other people about it and ... and was angry at her for... [telling people] he had choked her ...." Huguely did not deny he had choked Love, and he said he would write her a letter about it. (2/8/12 Tr. 167-171; App. 1690-1694). A handwritten letter from Huguely to Love which was found in Love's bedroom desk drawer said:

> I'm horrified with the way I behaved and treated  you.  I'm scared to know that I can get ... drunk to the point ... I cannot control the way I behave or act . . . . I'm horrified to think that I was using physical force to keep you in my room.

(App. 4608-4610; CW's Ex. 21}.

12.    After this incident, Burns spent the night at Love's apartment and "hooked up" with Love. They had previously "hooked up" once during the summer of 2008. (2/9/12 Tr. 152-156, 162-163, 165-167; App. 1998-

2001, 2009-2011, 2014-2015). Burns next "hooked up" with Love when she and her roommates, Caitlin Whiteley and Kaitlin Duff, visited the University of North Carolina on April 25, 2010. (2/9/12 Tr. 169; App. 2018-2019).

13.   On Tuesday evening, April 27, 2010, Love had consumed four or five drinks at a bar with her roommates when another student, Philippe Oudshoorn, mentioned Huguely had been seeing Stephanie Aladj. Love was surprised, angry and upset by this news. She said she had not known, she was disappointed and she felt stupid.[3] (2/9/12 Tr. 173-176, 200-202, 252-255; App. 2024-2027, 2058-2060, 2124-2126).

14.   Late Tuesday evening, April 27, 2010, Love left the bar and walked to Huguely's apartment. (2/8/12 Tr. 102-108, 170-172; App. 1607-1614, 1694-1696). Around midnight that same evening, Huguely and Tim Fuchs left another bar with two high school-aged girls who were visiting Charlottesville and staying with Kate Kamber, an acquaintance of Huguely's. The two girls walked with Huguely to his nearby apartment (2/9/12 Tr. 180-183, 210-217; App. 2033-2036, 2070-2078) and were in the

---

[3] Stephanie Aladj testified she and Huguely were romantically involved but not "dating." Huguely visited her at her apartment once or twice a week. (2/9/12 Tr. 261; App. 2134). Huguely told Aladj he and Love were not dating, but Aladj had heard from Love or her roommates that they were. Aladj knew Love was upset about her relationship with Huguely. (2/9/12Tr. 254-257; App. 2126-2129).

living room of Huguely's apartment when Love entered without knocking. Fuchs said Love was upset that there were two girls with Huguely. Fuchs immediately left the apartment. (2/9/12 Tr. 181-185; App. 2033-2038). Kamber arrived at Huguely's apartment to hear Love "scolding" Huguely, and in a "raised voice" Love asked Huguely if these were his "new girlfriends." (2/9/12 Tr. 216-220; App. 2078-2082}. Huguely called Love "a crazy slut." The high school girls testified Love was "angry," walked up to the couch where Huguely was seated and "yell[ed]" at him. One of the high school girls saw Love repeatedly hit Huguely with her purse. (2/9/12 Tr. 216-220, 2/15/12 Tr. 38; App. 2078-2082, 3759). Kamber hastily left the apartment with the two high school girls. (2/9/12 Tr. at 216-220; App. 2078-2082).

15.     Elizabeth Mclean was in Huguely's apartment that night in Kevin Carroll's bedroom. Through the closed bedroom door she heard voices in the living room. She recognized Huguely's voice but not the two female voices. Mclean recognized Love's voice when she entered the apartment. Love asked in a "sarcastic" tone who the girls were. Mclean heard Huguely and Love start to "bicker," and what sounded like Love striking Huguely with her purse. Mclean heard the contents  of  Love's purse spill onto the floor. She exited the bedroom to intervene, and  helped

11

Love pick up her things. McLean saw that Love was angry and could tell Love had been drinking. She attempted to walk Love home, but Love refused McLean's help. (2/9/12 Tr. 233-238; App. 2099-2105).

16.   After Love left Huguely's apartment, Huguely went to see Stephanie Aladj at her apartment. He said nothing to Aladj about what had just happened at his apartment. (2/9/12 Tr. 262; App. 2135-2136).

17.   In the aftermath of the incident, Love was missing her cell phone and camera. McLean located Love's camera in   Huguely's apartment, but was unable to find Love's cell phone. Thereafter, Love used her computer or borrowed her friends' phones to communicate with Huguely. (2/8/12 Tr. 103-104, 106-111, 172-176; App. 1609-1610, 1613-1618, 1696-1700).

18.   Love emailed Huguely the following morning, Wednesday, April 28, 2010. She said she had been drinking and apologized for her actions the night before. Huguely's reply was not conciliatory. He remarked about Love's recent visit to North Carolina with her roommates Whiteley and Duff during which Love had sexual relations with Mike Burns. (2/9/12 Tr. 162-163; App. 2009-2011, 4621; Ex. 132). The ensuing email exchange culminated on Friday, April 30, 2010, with three emails Huguely sent to Love. In the first he said "u know I don't like u with those Carolina  guys."

In the second he said, "A week ago u said u would get back together with me if I stopped getting so drunk then u go and fuck burns, attack me, and in the midst of the attack say burns [f]ucked [you] better than [me]. That is [f]ucked up on so many levels. I should have killed you." In the third email, Huguely said, "we should talk tonight." (App. 4621-4625; Ex. 132).

19.    Love received these emails on her computer.  She responded in two separate emails that Huguely had been kicked out of school twice and could not take an exam without cheating. She had dealt  with him being "absurdly drunk 24/7 and constantly peeing [the] bed." (App. 4622-4623; Ex. 132). Love shared the emails with Whiteley  and  other teammates while they were in Chicago for a lacrosse game  at Northwestern University. Love and her teammates returned to UVA from Chicago around noon on Saturday, May 1, 2010, the date of the men's lacrosse team's last home game. Love and Huguely were together that evening at a restaurant for a gathering of lacrosse players and their families. (2/8/12 Tr. 108-113, 2/9/12 Tr. 322-326; App. 1615-1620, 2210-2215).

20.    By 9:00 a.m. on Sunday, May 2, 2010, Huguely was drinking beer and "slurring his words," (2/9/12 Tr. 197-198, 2/15/12 Tr. 72-73, 96-99, 121; App. 2054, 3315-3316, 3346-3349, 3377). At a men's lacrosse team

golf tournament during the day that was attended by teammates and parents, Huguely continued drinking heavily to the point that at a post-tournament reception his *coordination* was affected, he was making inappropriate comments and his speech was so slurred that at *times* he was incoherent. (2/9/12 Tr. 187, 198-201; App. 2041, 2056-2058). During dinner that evening with his father and several teammates, Huguely knocked over a bottle of wine on the table, *dinner* was cut short due to Huguely's behavior, and he urinated in public against the outside wall of the restaurant before his father drove him home. (2/9/12 Tr. 184-188, 196-201, 2/15/12, Tr. 123-124; App. 2038-2042, 2053-2058, 3380-3381). Upon returning to his apartment at 10:30 p.m., Huguely's teammates described him as drunk and incoherent. (2/15/12 Tr. 58-59, 77-78, 125-126; App. **3298, 3322, 3382-3383).**

21. Meanwhile, on Sunday morning, May 2, 2010, Love went to brunch and returned to her apartment to study for several hours. Love had been working on a paper for a class while in Chicago, and Whiteley saw Love on her bed in her bedroom using her laptop computer. (2/8/12 Tr. 183-184; App. 1710-1711). After studying several hours, Love and Whiteley attended an evening birthday celebration at Boylan Heights, a restaurant/bar. (2/8/12 Tr. 159-160, 178-186; App. 1680-1681, 1704-1714).

14

Love consumed a considerable amount of alcohol at the gathering. Her blood alcohol level, taken several hours later, was 0.14 to 0.18, twice the legal limit for driving purposes. (2/8/12 Tr. 211-214, 2/15/12 Tr. 185-186; App. 1746-1748, 3458, 4619; Ex. 105).

22.   Whiteley and Love returned to their apartment and planned to go back out again that evening. Whiteley saw Love in her bedroom drying her hair. Love was wearing only her underwear and Whiteley observed Love had no visible injuries to her body. (2/8/12 Tr. 188-190; App. 1715-1718). When Whiteley indicated she was ready to leave to return to Boylan Heights, Love was awake but in bed. She said she was tired, had a lot of school work due the next day and wanted to stay home. Whiteley checked on Love again before leaving for Boylan Heights. Love was still in bed and said she might join Whiteley later. When Whiteley last saw Love she was asleep on her bed, still wearing only her underwear. Her hair was pulled back with a hair tie in a low bun. (2/8/12 Tr. 190-192; App. 1719-1720). Whiteley was uncertain whether she shut Love's bedroom door but she closed the front door to the apartment and left it unlocked when she departed at approximately 10:40 p.m. (2/8/12 Tr. 192; App. 1721).

23.    Kevin Carroll and Ken Clausen left Huguely in his apartment at 11:40 p.m. to buy beer. They were gone about 20 minutes and Huguely was not present when they returned. (2/15/12 Tr. 59-61; App. 3299, 3301).

24.    Anna Lehmann lived downstairs from Love, Whiteley and Duff in an identically configured apartment. Lehmann was studying on her computer in her living room on the sofa located just inside her front door. At 11:40 p.m., she heard footsteps ascend the stairs to Love's apartment. After a brief period of time she heard a "really loud" sound she likened to a falling stereo or bookshelf or "like slamming a [car] trunk if you really slammed it." (2/8/12 Tr. 136-142, 151-153; App. 1651-1658, 1669-1672). After approximately 10 minutes, Lehmann heard footsteps coming out of Love's apartment and down the steps. She saw a stocky male wearing a royal blue tee shirt, shorts, and tennis shoes walk away from the apartment. Lehmann recalled the person was "either going or gone by 11:50;" she could not see whether he was carrying anything. The man walked in the direction of Huguely's apartment building. (2/8/12 Tr. 142-146, 152-153, 156-158; App. 1658-1663, 1671-1672, 1676-1679).

25.    Huguely returned to his apartment close to midnight and Kevin Carroll asked Huguely where he had been. (2/15/12 Tr. 61; App. 3301). Huguely said he had been downstairs with Will Bolton at Chris Clements'

16

apartment. He added that Clements was drunk. Carroll, however, knew that Clements was working on a paper that evening and had not been drinking. He determined Bolton was not in Clements' apartment. Clausen recalled that Carroll pointed this out to Huguely. (2/15/12 Tr. 62-64, 81-82; App. 3302-3304; 3327).

26.   Because there was no reason for Huguely to lie about being with Clements and Bolton, Clausen followed up with Huguely. Clausen testified:

> I looked at him for a bit. I noticed there was a change in his demeanor, kind of a blank stare on his face. I asked him what was wrong with him. I said, George, what's wrong with you? He looked at me and said, nothing. He said there was nothing wrong. I asked him - I continued to look at him and observe him. I asked him two more times. I said George, what's wrong with you? Got no response.

(2/15/12 Tr. 82; App. 3327-3328).

27.   Whiteley returned to her apartment with Philippe Oudshoorn at approximately 2:20 a.m., Monday, May 3, 2010. She went to Love's room to wake her up. Since Love had been wearing only underwear bottoms when Whiteley had last seen her, Whiteley told Oudshoorn to stay back and Whiteley entered Love's bedroom alone. She saw Love lying under her comforter face down on the bed with her arms to her sides, palms facing upwards. (2/8/12 Tr. 193-195, 199; App. 1722, 1724, 1730). Love's

hair was "messed up" and spread out to the side obscuring Love's face. Whiteley kneeled on the bed, moved Love's hair and saw injuries to Love's face, a large blood stain on the pillow under her head and a hole in the door to Love's bedroom. (2/8/12 Tr. 195-198, 203-206; App. 1725-1728, 1735-1738). Whiteley yelled to Oudshoorn, and he called 911. At the request of 911 personnel, Oudshoorn checked Love's pulse and finding none, at the instruction of the 911 operator, he placed Love on her back on the floor and attempted CPR. (2/9/12 Tr. 198-199; App. 1729).

28.    Charlottesville police officer K.W. Blackwell arrived, and began CPR chest compressions in an effort to revive Love. (2/8/12 Tr. 229-232, 2/9/12 Tr. 10-12; App. 1766, 1816-1817). Within minutes, Charlottesville/Albemarle Rescue Squad (CARS) personnel arrived and relieved Blackwell. CARS efforts at resuscitation were extensive, but unsuccessful. At no point did Whiteley, Oudshoorn, Blackwell or CARS personnel detect any sign of life. Had there been any electrical activity involving Love's heart, the monitor CARS personnel used would have detected it. (2/8/12 Tr. 196-199, 202, 228-231, 2/9/12 Tr. 28-70; App. 1726-1729, 1730-1733, 1767-1770, 1838-1892).

29.    The medical examiner determined Yeardley Love died from blunt force trauma to the head that caused injuries to her brainstem.  The

18

mechanism of death was a cardiac arrhythmia precipitated by the damage to the area of the brain that regulates cardiac and respiratory functioning. Love died because her brain no longer received an adequate supply of oxygenated blood. (2/14/12 Tr. 61-62, 168-169, 210-213; App. 2872-2873, 3008-3009, 3061-3066; Ex. 104, Ex. 140, Ex. 145).

30.    Nonfatal injuries to Love's body corroborated the physical, hands-on attack to which she was subjected. She sustained a minimum of eighteen contusions to her head, neck, trunk, left arm, left hand, and both of her legs. (2/13/12 Tr. 164-168, 170-188; App. 2706-2734; Ex. 104, Photo No. 214-227). The contusion to her right eye was consistent with a blow that was struck or impact with the floor. (2/13/12 Tr. 192-193; App. 2738-2739). The size and pattern of contusions to her chest, neck, and the back of her right calf were consistent with finger marks from being grabbed. (2/13/12 Tr. 176-186; App. 2720-2731; Ex. 104, Photo No. 228-230). There were three areas of abrasion to Love's right eye, the facial tissue below her lips, and the right underside of her chin, in addition to the contusions in these areas. An additional abrasion and two lacerations from a tearing or stretching force were found inside Love's mouth. These injuries were consistent with vigorous exterior pressure administered

against her mouth. (2/13/12 Tr. 188-190; App. 2734-2736; Ex. 104, Photo No. 231-237).

31. A series of photographs taken at the scene by police showed the striking degree to which the right side of Love's face and head bulged out from her injuries in comparison to the uninjured left side of her face and head. (2/10/12 Tr. 138-143; App. 2397-2402; Ex. 104, Photo No. 76-79). Exposure during the autopsy of tissue under Love's scalp revealed a broad area of subscapular contusion above and to the rear of Love's right eye and additional subscapular contusions toward the back of her head. The broad area of contusion was consistent with her head forcibly impacting a broad, stationary surface such as the floor. (2/13/12 Tr. 194-198, 211-212; App. 2740-2745, 2759-2761; Ex.104, Photo No. 238-240).

32. Two neuropathologists, Dr. Christine Fuller, M.D., and Dr. Maria-Beatriz Lopes, M.D., assisted in the autopsy process conducted by the medical examiner, Dr. William Gormley, M.D. (2/13/12 Tr. 153-154, 205; 2/14/12 Tr. 14-17, 119-121; App. 2693-2695, 2753, 2811-2815, 2945-2948).

33. Dr. Fuller and Dr. Lopes agreed that trauma caused readily visible contusions to the underside of Love's brain in the areas of the left medial temporal lobe and the right medial parietal-occipital lobes. These

20

areas of the underside side of Love's brain impacted bony structures on the interior base of her skull where the spinal cord exits the head. The doctors found that these contusions were bilaterally located on different cerebral hemispheres. Each contusion was intraparenchymal, consisting of hemorrhaging that was contained within brain tissue rather than hemorrhaging that escaped into other structures. Dr. Fuller described that these injuries were consistent with a torsional or shear force mechanism of injury, such as when a person's head or neck is being twisted or turned when impact occurs with a stationary structure such as a floor. The traumatic injuries to this portion of Love's brain were not necessarily life-threatening. (2/14/12 Tr. 38-57, 68-69,130-140; App. 2841-2867, 2880-2882, 2959-2972; Ex. 140, Ex. 145).

34.   Dr. Fuller and Dr. Lopes also found that a shear force or torsional mechanism caused intraparenchymal hemorrhaging in multiple areas of Love's brainstem. They concluded that this mechanism caused injuries to axons in Love's brainstem, specialized conductive cells in the brain that are critical to cardiac and respiratory functioning. They are fragile. Some are microscopically short. Others  are so long they  stretch the length of the spinal cord. They are sensitive to injury from twisting or turning. Damage to axons can cause cardiac arrest or cardiac  arrhythmia

and loss of consciousness. (2/14/12 Tr. 57-69, 140-156; App. 2866-2882, 2972-2993; Ex. 140, Ex. 140F-140H, Ex. 145-145J). Further evidence on this point was supplied not only by doctors Gormley, Fuller, and Lopes, but also by Dr. William Brady, an expert on CPR, and Dr. Renu Virmani, a cardiac pathologist. (2/9/12 Tr. 72-106, 2/10/12 Tr. 7-49; App. 1894-1937, 2230-2284; Ex. 104, Ex.131, Ex.140, Ex.145, Ex.149, Ex.150, Photo No. 2; Ex.149-149F).

35.   Huguely's expert, Dr. Jan Leestma, testified extensively and concluded that the hemorrhaging in Love's brain was an artifact caused by CPR (reperfusion) rather than the result of blunt force trauma. (2/13/12 Tr. 193, 2/14/12 Tr. 69-73, 79-83, 102-104, 107, 156-158, 163-170, 173-175; App. 2739, 2881-2887, 2894-2899, 2923-2927, 2929-2930, 2992-2996, 3001-3011, 3014-3018; Ex. 104).

36.   Dr. Leestma's testimony was considered by the jury over the Commonwealth's objection. Two days after he testified, the Commonwealth learned Huguely's trial counsel was providing substantive updates regarding the testimony of Commonwealth experts, to Drs. Leestma, Uscinski and Dr. Daniel, a consulting pathologist who did not testify.

37. Dr. Uscinski was allowed to testify over objection of the Commonwealth, but only as to topics that were unaffected by the impermissible communications in which he participated regarding reperfusion. Dr. Uscinski specifically testified that Love did not die from blunt force trauma. (2/18/12 Tr. 9-54, 79, 90-91; App. 3889-3947, 3979-3981, 3993-3994; Exs. A-D).

38. At approximately 7:30 a.m. on Monday, May 3, 2010, Charlottesville Police Detectives Lisa Reeves and Ed Prachar contacted Huguely at his apartment. He was told that they were investigating a crime and wanted to talk to him. He was cooperative and agreed to accompany them to the police station.

39. At the police department, Reeves noticed Huguely had bruised knuckles on his right hand and a fresh cut on one of his arms. She had seen Love's injuries and knew that she was dead. She was also aware of the information that Whiteley and Oudshoorn provided to police, including the Friday email from Huguely to Love. As a result, she advised him of his constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966) before interviewing him. (2/10/12 Tr. 61-66; App. 2300-2305; Ex. 65). The interview was videotaped and introduced at trial. (2/10/12 Tr. 62, 66-67; App. 2301, 2305-2306; Ex. 26 at 00:00 to 1:03:28).

40.    Huguely said that he went to Love's apartment to talk to her but he did not call or text her in advance. (Ex. 26 at 5:30, 25:20). He said he was "more emotional than angry." (Ex. 26 at 19:20). He said her bedroom door was locked. He broke a hole in the hollow core door with his foot, reached through and unlocked the door because he "wanted to talk to her." (Ex. 26 at 15:14, at 16:54). Huguely's kicking a hole in the door was consistent with the fresh abrasions on his right leg and DNA evidence that was recovered from the jagged edge of the hole in the door. (App. 4633-4634, 4649-4655; Ex. 26 at 45:00-46:00, Ex. 104, Photo's No. 64-66, 134-147). He said he was "so pissed" because she would not talk to him. (Ex. 26 at 26:45).

41.    During the first ten minutes of his statement, Huguely repeatedly stated Love was "freaked out" by his being there. He later added that she was freaking out "just seeing me there." (Ex. 26 at 5:30-6:00, Ex. 26 at 8:00, Ex. 26 at 46:56). During the early portion of his statement Huguely described Love was being in the corner of her bed against the wall, (Ex. 26 at 7:00), the furthest corner of the room from the door he had kicked in. {App. 4631-4633, 4672-4684, 4691, 4698-4704;Ex. 104, Photo's No. 23, 33, 62-65, 15-27, 34, 46, 52-57). He said she was "already totally freaked out" and later said "she started getting like all

24

defensive" and "getting like all aggressive." He said that he "shook her a little bit" and she started "like freaking out." He demonstrated his perception that she was hitting her head against the wall. (Ex. 26 at 5:30-8:00). Police investigation and defense evidence revealed no blood or damage to the wall where Huguely described, nor evidence that Love actually came into contact with the wall. (App. 4631-4633, 4672-4684, 4691, 4698-4704; Ex. 104, Photo's No. 23, 33, 62-65, 15-27, 34, 46, 52-57).

42.   Huguely was approximately 6'2" tall and weighed approximately 220 pounds. (App. 4642-4643; Ex. 104, Photo No. 120-123).   Love was 5'4" and weighed 117 pounds. (App. 4611; Ex. 104).   Huguely demonstrated how he shook Love. The physical power and emotional intensity with which he did so is apparent in the video. (Ex. 26 at 20:00-21:00). He later admitted that he may have grabbed Love about the neck "a little bit," but denied he strangled her. (Ex. 26 at 21:58).

43.   The hand-to-hand quality of the physical struggle between Huguely and Love is confirmed by the mixture of their DNA found under their respective fingernails and fresh bruises on Huguely's knuckles, right hand and arm. (App. 4648-4649; Ex. 104, Photo No. 132-135). Huguely stated "somehow" he wrestled Love to the floor and demonstrated how he

held Love face down on the floor as her head rolled over from left to right. (Ex. 26 at 10:00-11:00, 20:00 -21:15). The bruising of Love's face was from being rolled over against the floor beneath Huguely's weight and the force he exerted on her head and neck. Huguely said that was when "her nose" started bleeding. (Ex. 26 at 21:00). The autopsy showed the blood came from the head injury, not a nose bleed. A bloodstain matching Love's DNA was found on the floor several feet from the foot of the bed. (2/9/12 Tr. 40-42, 115-117; App. 1854-1856, 1950-1951, 4630; Ex. 104, Photo No. 4, 19). Aside from the bloodstain found near the end of the bed on the floor, and several found on the pillow and bed coverings, no other blood traceable to the altercation was found anywhere in the apartment. Blood spatter on the bed skirt and Love's face was attributed to resuscitation efforts. (2/9/12 Tr. 36-38; App. 1849-1850).

44.   When asked how Love ended up on the bed, Huguely described that after they were "wrestling" they "stood up," he "tossed" her onto the bed and left. (Ex. 26 at 21:15, Ex. 26 at 47:33).

45.   Huguely initially denied taking anything from Love's apartment when he left. When told Love's computer was missing, Huguely said that it was in his apartment. He then described that he was so "pissed" she would not talk to him that he took it "as collateral." (Ex. 26 at 26:35-26:45).

26

He said he picked up the computer on his way out of the bedroom and tossed it in a dumpster on his way home, where it was later recovered by the police. (2/9/12 Tr. 297-309; App. 2180-2194; Ex. 26 at 26:35-26:45).

### Burden of Proof

46. "The burden of a convicted defendant attacking a judgment of conviction in a habeas corpus proceeding is to prove the allegations asserted in the petition by a preponderance of the evidence." *Jackson v. Warden,* 270 Va. 269, 282, 619 S.E.2d 92, 98 (2005).

### Ineffective Assistance of Counsel - Standard of Review

47. Claims of ineffective assistance of counsel are governed by the deferential standard of review under *Strickland v. Washington,* 466 U.S. 668 (1984). The petitioner bears the burden of showing that his trial counsel's performance was deficient in that it fell below an objective standard of reasonableness, *and* that the grossly deficient performance actually prejudiced the defense, 466 U.S. at 687, that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Hinton v. Alabama,* 571 U.S._, 134 S. Ct. 1081, 1088 (2014) (per curiam) (citation omitted). *See Director of the Dept. of Corrs. v. Kozich,* _ Va. _ 141788, 779 S.E.2d 555 (2015). This two-part analysis presents a "high bar" to

27

petitioners. *Harrington v. Richter,* 562 U.S. 86, 105 (2011); *Simon v. Director of the Dept. of Corrs.,* 285 Va. 526, 535, 739 S.E.2d 905, 909 (2013).

48. The first prong of the *Strickland* test, the "performance" inquiry, requires a petitioner to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. The state habeas court is required to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," a presumption that requires rejection of the claim if the conduct *might* have been the result of trial tactics or strategy. *Id.* at 689; *Darden v. Wainwright,* 477 U.S. 168, 186 (1986); *see also Shaikh v. Johnson,* 276 Va. 537, 544, 666 S.E.2d 325, 328 (2008) (quoting *Strickland,* 466 U.S. at 687-88). *Knowles v. Mirzayance,* 556 U.S. 111, 124 (2009) (quoting *Strickland,* 466 U.S. at 688)). (The petitioner first "must show that 'counsel's representation fell below an objective standard of reasonableness.'"

49. In reviewing counsel's performance, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter,* 562 U.S. at 105 (quoting *Strickland,* 466 U.S. at

690). There are "'countless ways to provide effective assistance of counsel," as "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," and only in "rare ... situations" is counsel "limited to any one technique or approach."' *Id.* at 106 (quoting *Strickland,* 466 U.S. at 689); *see Decastro v. Branker,* 642 F.3d 442, 451 (4th Cir. 2011) (pertinent inquiry is not which strategy is best, but whether strategy counsel chose is reasonable).

50.    Further, as *Strickland* makes clear, guidelines, such as the ABA Guidelines for counsel's performance, are just that, "only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel.... " *Strickland,* 466 U.S. at 688-89; *Wiggins v. Smith,* 539 U.S. 510, 524 (2003); *Bobby v. Van Hook,* 558 U.S. 4, 17 (2009) (reiterating that *Strickland,* not the ABA standards, govern claims of ineffective assistance). Even before *Van Hook,* the Fourth Circuit had made clear that the ABA Guidelines could not be used as a standard for evaluating counsel's performance:

> While the ABA Guidelines provide noble standards for legal representation . . . and are intended to improve that representation, they nevertheless can only be considered as a part of the overall calculus of whether counsel's representation falls below an objective standard of reasonableness; they still serve only as "guides," *Strickland,* 466 U.S. at 688, not minimum constitutional standards.

*Yarbrough v. Johnson,* 520 F.3d 329, 339 (4th Cir.), *stay and cert. denied,* 544 U.S. 931 (2008). Thus, for example, "although counsel should conduct a reasonable investigation into potential defenses, *Strickland* does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." *Tucker v. Ozmint,* 350 F.3d 433, 442 (4th Cir. 2003).

51.   The second prong of the *Strickland* test, the "prejudice" inquiry, requires the petitioner to demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. "It is not enough," however, "for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland,* 466 U.S. at 693 (citation omitted). The burden on the petitioner to prove  prejudice  is "'highly demanding.'" *Byrd v. Johnson,* 281 Va. 671, 678, 708 S.E.2d 896, 900 (2011) (quoting *Kimmelmann v. Morrison,* 477 U.S. 365, 382 (1986)). With regard to the prejudice prong, counsel's errors must have  "actually

had an adverse effect on the defense," such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Richter,* 562 U.S. at 112. The likelihood of a different outcome "must be substantial, not just conceivable." *Id.* The fact that the petitioner is unhappy with the outcome of his case does not mean counsel was ineffective. *See Lawrence v. Branker,* 517 F.3d 700, 716 (4th Cir. 2008) ("effective trial counsel cannot always produce a victory for the defendant").

52.   An ineffective counsel claim may be disposed of on either prong of the *Strickland* test. It is not necessary for a court deciding an ineffective assistance claim to address both components of the inquiry, or to address them in any particular order. If the petitioner makes an insufficient showing on either component of the test, the other need not be considered. *Shaikh,* 276 Va. at 544,666 S.E.2d at 328.

53.   In *Yeatts v. Murray,* 249 Va. 285, 288, 455 S.E.2d 18, 20 (1995), relying on Virginia Code § 8.01-660, the Virginia Supreme Court upheld the habeas trial court's decision to credit affidavits submitted in the case and dismiss the petition, rejecting Yeatts' contention that he was entitled to discovery depositions and an evidentiary hearing. Court observed given the collateral nature of a habeas proceeding, the state's

strong interest in achieving finality in judgments and the need to punish offenders, a habeas trial court is entitled "to minimize the burdens" of the proceeding by employing "simplifying procedures" including the use of affidavits from trial counsel or other witnesses or dismissing a habeas petition without an evidentiary hearing. *Yeatts,* 249 Va. at 289, 455 S.E.2d at 21. In cases in which the allegation concerns ineffective assistance of counsel, the input of trial counsel can be critical. *See generally Mu'Min v. Commonwealth,* 239 Va. 433, 452, 389 S.E.2d 886, 898 (1990) (acknowledging the importance of input from counsel). "Typically, this evidence will be in the form of an affidavit from trial counsel explaining the relevant events." *Smith v. Brown,_ Va._* 141487, 781 S.E.2d 744 (2016) citing *Yeatts,* .249 Va. at 289, 455 S.E.2d at 21; *see also Shaikh,* 276 Va. at 549, 666 S.E.2d at 328 (affidavits may be considered along with the record in deciding a motion to dismiss a habeas petition).

*Jury Related Claims*

*Overview of Law*

*54.* "Virginia has been more careful than most states to protect the inviolability and secrecy of jury deliberations, adhering to the general rule that the testimony of jurors should not be received to impeach their verdict, especially on the ground of their own misconduct." *Kasi v. Commonwealth,*

256 Va. 407, 425, 508 S.E.2d 57, 67 (1998), *cert. denied,* 527 U.S. 1038 (1999). The Supreme Court of Virginia generally has "limited findings of prejudicial juror misconduct to activities of jurors that occur *outside* the jury room." *Jenkins v. Commonwealth,* 244 Va. 445,460,423 S.E.2d 360, 370 (1992) (citation omitted; emphasis added). Indeed, the Court has held examination of jurors is not required in response to allegations of jury misconduct that is confined to the jury room. *See Jenkins,* 244 Va. at 460, 423 S.E.2d at 370; *Phillips v. Campbell,* 200 Va. 136, 140-41, 104 S.E.2d 765, 767-68 (1958); *Butler v. Commonwealth,* 31 Va. App. 614, 619-620, 525 S.E.2d 58 (2000).

55.    "A contrary rule would hold out to unsuccessful parties and their friends, the strongest temptation to tamper with jurors after their discharge, and would otherwise be productive of the greatest  evils." *Caterpillar Tractor* Co. *v. Hulvey,* 233 Va. 77, 82-83, 353 S.E.2d 747, 751 {1987) (citing *Bull's Case,* 55 Va. (14 Gratt.) 613, 632 (1857)). "Moreover, the unanimous verdict is the best evidence of each juror's opinion of the case. When a juror denies the truth of the verdict and, if the denial be true, the juror 'thereby convicts himself of the highest moral, if not legal perjury."' *Caterpillar Tractor,* 233 Va. at 82-83, 353 S.E.2d at 751 (citing *Bull's Case,* 55 Va. at 632); *accord Prieto v. Warden,* 286 Va. 99, 107, 748 S.E.2d 94,

101 (2013). An attack on the intrinsic functioning of the jury is precisely the kind of attack on the jury's deliberative process that is strictly forbidden, not only by Virginia courts but also by the federal courts under Rule 606(b). *See Warger v. Shauers,* 574 U.S.__, 135 S. Ct. 521, 529 (2014).

56.   In contrast, improper external influence on a jury may be grounds for an evidentiary hearing and retrial if the error alleged is not found to be harmless. In *Brittle v. Commonwealth,* 222 Va. 518, 522-23, 281 S.E.2d 889, 890 (1981), the Court held the review by jury of unadmitted photographic exhibits was reversible error. *See also Evans-Smith v. Commonwealth,* 5 Va. App. 188, 210, 361 S.E.2d 436, 449 (1987) (finding reversible error where the trial judge refused to examine the jurors where the defendant provided affidavits indicating that some jurors had consulted an almanac during their deliberations); *Crockett v. Commonwealth,* 187 Va. 687, 707, 47 S.E.2d 377, 387 (1948) (an unauthorized view of the crime scene by the jury); *Remmer v. United States,* 347 U.S. 227 (1954) (unnamed person's attempt to bribe a juror).

*Claim I*

57.   Huguely alleges he was denied his right to a fair trial when a bailiff gave the jury a dictionary during deliberations to look up the meaning

of the word "malice," the main issue at trial. In support of this claim Huguely relies upon the affidavit of one juror which states:

> We had a question about the meaning of the word "malice" and we asked the bailiff for a dictionary. The bailiff brought us a dictionary and we looked up the word "malice." We then continued deliberating. This helped in deciding if there was malice and whether it had been shown in the charges.[4]

Petitioner's Exhibit A.

*58.*   While there is no Virginia case precisely on point, the Fourth Circuit has held that a deliberating juror's alleged use of a dictionary constitutes an external influence. *See United States v. Duncan,* 598 F.2d 839, 866 (4th Cir. 1979). As recognized in *Duncan,* reference to a dictionary constitutes juror misconduct, but it is not deemed prejudicial *per*

---

[4] In an unnumbered claim at petition page 3, footnote 3, Huguely notes the juror also alleges she became emotional after viewing the petitioner's videotaped police interview, wrote a note to the trial judge and *gave* the note to a bailiff. She then met with the judge in his chambers and he *gave* her a "pep talk." The judge inquired whether her emotions would cloud her judgment in returning a proper verdict. When she responded, "no," the judge directed her to return to the jury room. (Petitioner's Exhibit A). Respondent notes that such ex parte contact between a juror and a judge, if it occurred, would have been deemed permissible as "administrative in nature." *Ellis v. Commonwealth,* 227 Va. 419, 423, 317 S.E.2d 479, 481 (1984). *Rushen v. Spain,* 464 U.S. 114, 121 (1983) (communication between the judge and a juror regarding a question raised in voir dire permissible as it did not relate to any "fact in controversy or any law applicable to the case."). The sort of ex parte communication related by the juror is not presumptively prejudicial and the petitioner fails to argue much less establish that he was prejudiced by the communication. *See Commonwealth v. Juares,* 274 Va. 812, 815-817, 651 S.E.2d 646 (2007).

*se. See id. See also Bauberger v. Haynes,* 632 F.3d 100 (4th Cir. 2011). Other courts *have* agreed that use of a dictionary is not an event that is inherently prejudicial. *See, e.g., United States v. Henley,* 238 F.3d 1111, 1115-16 (9th Cir. 2001) (observing that certain juror misconduct, including use of dictionary definition, constitutes a "more common and less pernicious extraneous influence on jury deliberations").

59.   Similarly, our Supreme Court has said, "a juror's reading or hearing news accounts about a criminal trial is not presumptively prejudicial, and can be harmless. *Riner v. Commonwealth,* 268 Va. 296, 316, 601 S.E.2d 555, 568 (2004) citing *Remmer v. United States,* 347 U.S. 227, 229 (1954) and *Lenz v. Warden,* 267 Va. 318, 328, 593 S.E.2d 292, 298 (2004).

60.   Here, the petitioner has not carried his burden to demonstrate that the alleged misconduct actually occurred. The trial court specifically warned the jury not to consult any outside sources, ***including a dictionary.*** (02/08/12 Tr. 789; App. 1467-1468). "It is presumed that a jury will follow the instructions given by the trial court." *Muhammad v. Warden,* 274 Va. 3, 18, 646 S.E.2d 182, 195 (2007) (citation omitted). The petitioner's claim that a dictionary was consulted to define the word "malice" is based upon the affidavit of a single juror. (Petitioner's Exhibit A). However, that lone

36

juror also says she cannot recall what the dictionary looked like, if it was hardback or paperback, or what color it was. She cannot recall which Deputy provided the dictionary or which juror read from the dictionary. She herself did not touch the dictionary or read from it.  (Respondent's Exhibit 8 [5]; jurors' affidavits). Further, ten of the remaining jurors uniformly state that no dictionary was used or they do not recall a dictionary being used in the jury room by the jury during deliberation and they do not recall a deputy providing them a dictionary. (Respondent's Exhibit B[6]) . Finally, no court officer recalls the Huguely jury asking for a dictionary and none  recall taking the jury a dictionary. (Respondent's Exhibit C; affidavits of court officers). Moreover, the petitioner relies upon jurors' statements to the media regarding jury deliberations to show the use of a dictionary was not harmless. Resorting to such statements is strictly prohibited. *Caterpillar Tractor,* 233 Va. at 82-83, 353 S.E.2d at 751 (citing *Bull's Case,* 55 Va. at 632); *Prieto,* 286 Va. at 107, 748 S.E.2d at 101.

61.    Accordingly, the petitioner has failed to carry his burden to prove his claim by a preponderance of the ,evidence that a dictionary was

---

[5] Redacted copies of the juror affidavits are attached as Respondent's Exhibit B. The original affidavits are submitted and filed with the Court under seal.

[6] The twelfth juror spoke with the respondent's investigator   but unfortunately would not agree to execute an affidavit.

provided by a bailiff and consulted by the deliberating jury. *Jackson,* 270 Va. at 282, 619 S.E.2d at 98. Petitioner's claim I should therefore be dismissed. *See Riner,* 268 Va. at 316, 601 S.E.2d at 568.

**Claim VII**

62.    Huguely complains his attorneys were ineffective for allowing the jury to see and read the information printed on the sleeve of cardboard containing a defense exhibit. Specifically, he alleges the  label stating, "Type of Offense: Murder," on the cardboard sleeve protecting the DVD was external evidence to which the jury's exposure is presumed prejudicial and he is entitled to a new trial.

63.    Huguely refers to the cardboard sleeve containing Defense Exhibit 124, a DVD video of Boylen Heights. The video sleeve is stamped, "Evidence Charlottesville Police Department," and contains the following information, the case number, the type of item, the date, time and location, the victim's name, the name of the officer, the evidence tag number and the type of offense, which was "murder."

64.    At the threshold, counsel was focused on the DVD itself and not what was printed on the protective sleeve. (Respondent's Exhibit A; Lawrence). Huguely was charged and prosecuted for first-degree murder. The jury was instructed on first-degree murder. (2/15/12 Tr. 156; App.

4752). In no sense can this be considered external information,  a fact not in evidence presented in court upon which the jury was  improperly exposed, or an injection of facts connected with the case which had not been admitted in evidence. *Cf. Brittle,* 222 Va. at 522, 281 S.E.2d at 889-90 (photographs *not* admitted into evidence taken erroneously into the jury room and were considered by the jury in its deliberations); *Evans-Smith,* 5 Va. App. at 210, 361 S.E.2d at 449 Oury consulted an  almanac); *McGuire v. Howard,* 203 Va. 965, 128 S.E.2d 281 (1962) (improper jury view); *Kearns v. Hall,* 197 Va. 736, 91 S.E.2d 648 (1956); and *Crockett v. Commonwealth,* 187 Va. 687, 47 S.E.2d 377 (1948) (unauthorized private conversations between jurors and third persons).

65.    Similarly, the words "type of offense, 'murder'" printed the DVD's protective cardboard sleeve does not amount to an "external influence" that would be considered harmful under federal law. The Fourth Circuit defines an "external influence" as either "extraneous prejudicial information; *i.e.,* information that was not admitted into evidence but nevertheless bears on a fact at issue in the case," or "an outside influence upon the partiality of the jury, such as 'private communication, contact, or tampering ... with a juror.'"  *Robinson v. Polk,* 438 F.3d 350, 363-64 (4th Cir. 2006) (case citations omitted) (no evidentiary hearing was warranted

when one juror read passages from the Bible to other jurors because the Bible was not deemed to be an external influence)). *See also   United States v. Benabe, 654 F.3d 753, 780 (7th Cir. 2011); Stockton v. Virginia,* 852 F.2d 740, 744 (4th Cir. 1988) (discussing danger of "extraneous communication").

66.   Counsel is not ineffective for failing to remove this information or make a frivolous claim of external influence on the jury based upon the information on the protective sleeve for the DVD. *Cf. Correll v. Commonwealth,* 232 Va. 454, 470, 352 S.E.2d 352, 361 (1987) (holding counsel had no duty to object to admission of presentence  report because it was admissible); *see also Moody v. Polk,* 403 F.3d 141, 151 (4th Cir. 2005) (holding counsel not required to file frivolous motion). Claim VII

should be dismissed[7].

_____

[7] Huguely abandons original petition claim XII, his allegation regarding Juror 17. (Original Petition at 98). Nevertheless, he supported this claim with statements made by other jurors to the media about their deliberation which is strictly forbidden. *See Jenkins,* 244 Va. at 460, 423 S.E.2d at 370 Oury improperly discussed impact of parole on a possible sentence); *Warger,* 135 S.Ct at 529; Rule 606(b); *Morrisette v. Warden of Sussex 1 State Prison,* 270 Va. 188, 189-190, 613 S.E.2d 551 (2005); *Kasi,* 256 Va. at 407, 508 S.E.2d at 57 ("testimony of jurors should not be received to impeach their verdict, especially on the ground of their own misconduct"). Counsel's conduct regarding voir dire of the jury, "typifies the tactical and strategic decisions that attorneys make during trials." *Tunstall v. Hopkins,* 306 F.3d 601, 608 (8th Cir. Iowa 2002). Counsel's voir dire of the jury, should not be second-guessed in this proceeding. *See Strickland,* 466 U.S. at 689-90; *Richter,* 131 S. Ct. at 790.  Further, Juror 17 indicated in her questionnaire that she was a registered nurse, working at UVA hospital. (Juror 17 Questionnaire at 4; App. 4425). She indicated she, a family member or close friend had either worked for, volunteered with or donated time or money to a group or organization in the field of alcohol or substance abuse, or intervention, or had sought help or assistance from such an organization. She held no strong opinion or belief specific to the consumption of alcohol by college students. She wrote, "They are young and they drink." (Juror 17 Questionnaire at 7; App. 4430). She had formed no opinion as to guilt or innocence. (Juror 17 Questionnaire at 7; App. 4430). Nothing about the voir dire questionnaire or individual voir dire of Juror 17 presents a scenario for a strike for cause. (02/06/12 Selection of Jury Vol. I Tr. 198-199; App. 712-715). A defendant "does not have an unlimited constitutional or statutory right to propound any question to a jury panel." *Huguely,* 63 Va. App. at 117-117, 754 S.E.2d at 569. Counsel moved for and developed the jury questionnaire. Counsel consulted with jury selection experts prior to and during voir dire. Counsel struck a balance between gaining information and alienating jurors, prioritized strikes and reviewed each juror and made on the spot judgment calls to seat as favorable a jury as possible. (Respondent's Exhibit A, Lawrence). Assuming, Juror 17 was a recovering alcoholic, that of itself, is not a basis for a strike for cause or indicative that the juror would not be sympathetic to Huguely. Finally, "Uurors] may make use of their reason and common sense, and the knowledge and experience gained by them in everyday life."

*Medical Expert Witness Claims*

*Claim II*

67.   Huguely complains trial counsel provided ineffective assistance of counsel by violating the rule on witnesses causing the trial judge to exclude Dr. Uscinski's expert testimony on reperfusion. The petitioner fails to demonstrate *Strickland* prejudice with regard to this claim.

68.   At the threshold, the petitioner does not proffer in his pleading what evidence of reperfusion Dr. Uscinski would *have* testified to or demonstrate what additional testimony he could *have* offered on the issue of reperfusion that was not covered by Dr. Leetsma. His failure to proffer this evidence is fatal to his claim. *See Muhammad,* 274 Va. at 18, 646 S.E.2d at 195 (failure to proffer affidavits regarding testimony witness would have offered is fatal to *Strickland* claims).

69.   Moreover, at best, Dr. Uscinski's testimony on reperfusion would have been cumulative of the testimony of defense expert forensic

---

Charles E. Friend, The Law of Evidence in Virginia § 19-20 (6th ed. 2003). "A juror's personal experience ... does not constitute extraneous prejudicial information." *Marquez v. City of Albuquerque,* 399 F.3d 1216, 1223 (10th Cir. 2005) Jurors are expected to bring their own life experiences to the courthouse. *United States v. Umana,* 750 F.3d 320, 343 (4th Cir. 2014), cert. denied, 135 S. Ct. 2856 (2015). A jury's use of their life experiences to arrive at an appropriate sentence means the sentence imposed was not arbitrary or unreasoned. It was grounded in fact. Huguely's claim  is without merit and fails to demonstrate either prong of the demanding *Strickland* test.

neuropathologist Jan Leestma, M.D. At the outset, the prosecution had no similarly qualified or remotely credentialed expert witness. The prosecution witness closest to Leestma in terms of credentials and experience was Christine Fuller, M.D., a neuropathologist, not a published forensic neuropathologist like Dr. Leestma. (2/14/12 Tr. 47, 198; App. 2802, 3474). Dr. Leestma, had over 40 years of experience as a forensic neuropathologist. He had conducted 20,000 brain examinations during his career and approximately 1,000 brains exhibiting evidence of blunt force trauma while employed by the Cooke County, Chicago Medical Examiner's Office. {Tr. 198-261; App. 3474-3485). Thus, there was a dramatic imbalance in favor of the defense regarding the qualifications of the neuropathology experts testifying on reperfusion. The defense team trial strategy focused on the quality and persuasiveness of the expert testimony, not the number of witnesses who testified. (Respondent's Exhibit A, Quagliana).

70.    Forensic Neuropathologist Leestma testified he noted the subarachnoid hemorrhaging and subdural bruising at the back of the brain, but saw no external injuries sufficient to cause a fatal brain injury. (2/15/12 Tr. 219-262; App. 3502-3555). Dr. Leestma testified that the cause  of death was lack of oxygen to the brain caused by asphyxia (2/15/12 Tr. 271;

App. 3566) which related to Dr. Alphonse Poklis, the defense forensic toxicologist's expert's testimony that Love's blood alcohol  concentration was .16 to .18 at 11:45 p.m. This testimony established the reasonable inference that highly intoxicated individuals, such as Love, risk suffocation if positioned face down on a pillow saturated with blood and saliva. (2/15/12 Tr. 184-191; App. 3457-3466; Respondent's Exhibit A, Quagliana). Dr. Leetsma concluded that the hemorrhaging to the vessels of the brain were a result of reperfusion, resulting from a lengthy attempt at resuscitation. (2/15/12 Tr. 277-288; App. 3555-3567, 3575-3577). In addition, Dr.

Uscinski, who had years of experience and treating traumatic brain injuries in human patients, testified that in his opinion Love's brain injuries were not consistent with blunt force trauma. This was the testimony from  Dr. Uscinski that was of the utmost importance to the defense strategy. (2/18/12 Tr. 91; App. 3993-3994; Respondent's Exhibit A; Quagliana).

71.    Given Dr. Leetsma's expertise and extensive testimony on reperfusion, any additional testimony from Dr. Ronald Uscinski, a neurosurgeon, and not a neuropathologist, on the issue of reperfusion would have been, at best, cumulative. Countless cases hold a reasonable likelihood of a different outcome at trial cannot be demonstrated with cumulative evidence. *Fitzgerald v. Bass,* 6 Va. App. 38, 49, 366 S.E.2d

44

615, 621 (1988) (en bane). The petitioner's claim thus fails to demonstrate *Strickland* prejudice. *See also Crawford v. Commonwealth,* 281 Va. 84, 101-102, 704 S.E.2d 107, 117 (2011) (finding Confrontation Clause violation harmless because the challenged "testimony was merely cumulative of the other evidence adduced by the Commonwealth"); *Greenway v. Commonwealth,* 254 Va. 147, 154, 487 S.E.2d 224, 228 (1997) ("Improper admission of evidence does not create reversible error when it is merely cumulative of other competent evidence properly admitted."). *McHone v. Polk,* 392 F.3d 691, 709-10 (4th Cir. 2004) (no prejudice from counsel's failure to present evidence that as a child petitioner had witnessed his father "regularly inflict brutal beatings" on his mother and half-sister when counsel had presented evidence that petitioner's father had engaged in "violent fights" with his mother); *Tucker v. Ozmint,* 350 F.3d at 442-43 (no prejudice from counsel's failure to present evidence undermining prosecution's argument that defendant had fabricated his claims of childhood physical and sexual abuse because prosecution and defense witnesses uniformly agreed that petitioner had suffered such abuse). *Buckner v. Polk,* 453 F.3d 195, 206 (4th Cir. 2006); *See Moody,* 408 F.3d at 154 ("[P]rejudice does not exist simply  because

more corroborating evidence could have been presented."); *see also Hedrick v. True,* 443 F.3d 342, 353 (4th Cir. 2006).

72.   Moreover, there are many instances where cross-examination exposes defects in an expert's presentation creating too much doubt about the State's theory for a jury to convict. It is difficult to establish ineffective assistance when counsel's *overall* performance indicates active and capable advocacy. *Murray v. Carrier,* 477 U.S. 478, 496 (1986). Here, the petitioner's attorney represented him with vigor and conducted a skillful cross-examination of the Commonwealth's experts, casting doubt on their conclusions that Love died as a result of blunt force trauma to the brain.

73.   The record shows defense counsel elicited concessions from the Commonwealth's experts and was able to draw attention   to weaknesses in their credentials and conclusions on cause of death while providing evidence explaining Love's brain injuries. (See Respondent's Exhibit A, Quagliana).

74.    urther, on direct examination, Dr. Fuller testified the injuries to the brain and bruising of the eye area were characteristic of an acceleration/deceleration or blunt force trauma injury causing petechial (pinpoint) hemorrhages to the pons/pituitary gland area of the brain which would have led to swelling which affected respiration and heartbeat.

46

(2/14/12 Tr. 60-70, 91; App. 2871-2883, 2889). Dr. Fuller found no evidence of reperfusion; the heart was never restarted. (2/14/12 Tr. 80-83; App. 2896-2899). This injury according to Fuller would have led to instantaneous/rapid death. On cross examination, however, Fuller agreed that death may have taken up to two hours as prosecution expert pathologist Maria Lopes testified; this two hour time frame fit her definition of "instantaneous/rapid death." (2/14/12 Tr. 96-98; App. 2916-2918).

75.    Dr. Lopes testified on cross-examination that in her opinion, the cause of death was blunt force trauma but she could not determine the mechanism and had no opinion about the degree of force necessary to cause the subarachnoid hemorrhages observed in Love's brain. Significantly, she could not rule out another cause of death other than brain trauma. She could not rule out cardiac arrhythmia, pulmonary and respiratory failure. She had no opinion as to cause of death. Dr. Gormley's determination of cause of death was based upon the opinions of these experts. (2/14/12 Tr. 178-189; App. 3020-3035; Respondent's Exhibit A, Quagliana).

76.    As petitioner's counsel argued, the Commonwealth's witnesses failed to exclude the reasonable hypothesis that Love's fatal injuries were caused by a fall to the floor, without any additional application of significant

47

force by the petitioner. (Respondent's Exhibit A, Quagliana) It was undisputed that the Commonwealth's experts concluded the mechanism that caused Love's death was force from a broad, flat surface like a floor, not a fist, object, or piece of furniture. (2/13/12 Tr. 160-163; App. 2702-2705; Gormley); (2/14/12 Tr. 102-03; App. 2923-2925; Fuller); (2/10/12 Tr. 143-44; App. 2403-2404; Flaherty). Defense counsel argued the Commonwealth inferred malice from that evidence only through conjecture that Huguely must have been "grinding her face into the ground." (2/18/12 Tr. 188 App. 4118). The Commonwealth's own witness, Dr. Gormley, testified that the area of injury to Love's mouth and chin and the area of injury to the side of Love's head and eye were consistent with a single impact event such as a fall. (2/13/12 Tr. 221-222; App. 2771-2772; Gormley). Dr. Gormley further testified that the hemorrhaging on Love's neck could have been caused by even slight pressure; that stimulation of Love's carotid sinus was consistent with even an unintentional "quick grab"; and that the abrasions on her face could have been caused by contact with a surface less rough than even a carpet. (2/13/12 Tr. 226-227; App. 2777-2778). Another Commonwealth's witness, Dr. Lopes, similarly testified that contusions in Love's brain were consistent with circumstances unrelated to

blunt force trauma. (2/14/12 Tr. 177-179; App. 3019-3022; Lopes; Respondent's Exhibit A, Qu_agliana).

77. Other evidence brought out by defense counsel on cross-examination of the Commonwealth's witnesses supported Huguely's account and the defense theory that, though he wrestled with Love on the floor, he never applied a degree of significant force likely to cause death or great bodily harm. (Respondent's Exhibit A, Quagliana). The walls revealed no dimples or marks. The furniture was in order. Anna Lehmann, who lived downstairs and heard Huguely's footsteps on the stairs and a single crash near the door, heard no other hitting or banging sounds. Love had no injuries to her left side. Nor did she have any skull fracture, grab marks, or bleeding in the carotic sheath, all of which would have indicated greater applications of force. Love's brain stem had not twisted, which would have suggested blunt force trauma. (2/18/12 Tr. 97-103; App. 4001-4009; Uscinski). And finally, the petitioner had no blood on his person or his clothes. (Ex. 152; Ex. 143)

78. All of this evidence, which was available to and was marshaled by the defense (Respondent's Exhibit A, Quagliana), demonstrates that any additional evidence Dr. Uscinski might have testified provided regarding reperfusion would have been cumulative and not reasonably likely to have

led to a different outcome of petitioner's trial. Petitioner cannot demonstrate *Strickland* prejudice with regard to this claim. *See Richter,* 562 U.S. at 111.

*Claim III*

79.    The petitioner complains trial counsel were ineffective by failing to "provide crucial available expert testimony on the key issue of cause of death when they failed to call John S. Daniel, III, M.D.," a "highly respected" forensic pathologist, as a defense witness. In Daniel's declaration, he states he disagreed with Dr. Gormley's conclusion that Love died as a result of blunt force trauma based on the absence of traumatic skull injury, clearly traumatic intracranial hemorrhage or trauma-specific brain damage, particularly because Love was found intoxicated, face down in a blood saturated pillow, conditions entirely consistent with asphyxiation deprivation of oxygen to the brain. He further states the small amount of blood in localized perivascular brain (petechial) hemorrhages were reperfusion-related damage caused by vigorous postmortem cardiopulmonary resuscitation and potentially arrhythmogenic amphetamine. He states his conclusion that Love died an unconscious asphyxia! death and not a traumatic death is corroborated by the toxicologist's (Dr. Poklis) testimony of Love's blood alcohol level as high as .18, (2/15/12 Tr. 185-186; Ex. 105;

50

App. 4619), and Dr. Leestma's testimony that the limited pattern of intracranial petechial hemorrhages were explained by reperfusion. (2/15/12 Tr. 269-307, 2/18/12 Tr. 84-91; App. 3564-3613, 3984-3994). Daniel believed he would be called by the defense to provide a global view of the forensic medical information and tie the evidence together in a single coherent theory. (Daniel Declaration at 3-7).

80.     At the outset, the presentation of evidence and calling of witnesses is a matter of trial strategy. *See Abbott v. Peyton,* 211 Va. 484, 178 S.E.2d 521 (1971). The *Strickland* standard was not intended to promote judicial second-guessing on questions of strategy as basic as the handling of a witness. *Sallie v. North Carolina,* 587 F.2d 636, 640 (4th Cir. 1978). As a general matter, a defendant must accept the consequences of his attorney's decision not to put certain witnesses on the stand to testify. *Taylor v. Illinois,* 484 U.S. 400, 418 (1988). Counsel's affidavit reflects measured consideration and evaluation of the expected testimony of every potential defense expert witness, including a blood spatter expert, a cardio-pathologist, a bruise expert as well as Dr. Daniel. This evaluation continued during trial. (Respondent's Exhibit A, Quagliana). The Court's inquiry into the present claim should end here.

81.  Moreover, similar to Claim II, it is apparent from Daniel's affidavit his testimony would have been cumulative of the testimony of Ors. Leestma and Uscinski, other more qualified defense medical expert witnesses (see Respondent's Exhibit A, Quagliana) as well as and the testimony of the prosecution witnesses brought out by defense counsel in cross-examination. *Fitzgerald,* 6 Va. App. at 49, 366 S.E.2d at 621; *Crawford,* 281 Va. at 101-102, 704 S.E.2d at 117; *Greenway,* 254 Va. at 154, 487 S.E.2d at 228; see also *McHone,* 392 F.3d at 709-1O; *Tucker,* 350 F.3d at 442-43; *Buckner,* 453 F.3d at 206; *Moody,* 408 F.3d at 154; *Hedrick,* 443 F.3d at 353.

82.  As such, failing to call Daniel a mere forensic pathologist to offer his opinion on reperfusion when the defense had testimony from forensic neuropathologist about reperfusion utterly fails to demonstrate deficient performance or prejudice under the demanding *Strickland* test.

83.  Further, counsel had numerous other tactical reasons for not calling Dr. Daniel as a witness. Daniel had shared information about his employment at the Virginia medical examiner's office that had caused counsel concern and could have come up in cross-examination. He had received significant compensation for his work which far exceeded the compensation of other experts. (Respondent's Exhibit A, Quagliana).

Compensation for services and the ultimate expert opinion was an issue of impeachment on cross-examination by the prosecution of every defense expert. Counsel was also concerned about how Daniel would perform on cross-examination on the theory of reperfusion, and that he could have difficulty contesting the Commonwealth's attacks on the theory of reperfusion, such as the medical literature addressing reperfusion mostly involved animal versus human studies. (Respondent's Exhibit A, Quagliana). Moreover, Daniel's testimony at a pretrial hearing about the effects of Adderall as contributing to Love's death was refuted by the prosecutions' witnesses at trial. As Love was an athlete on Adderall, she had frequent EKG's to test for abnormal heart rhythm, and she had no abnormal EKG's. (2/9/12 Tr. 139-146; App. 1981-1989). In fact, following a November 2011 Vanderbilt University medical study, UVA's  athletic program had ceased testing athletes on Adderall because the study had shown no adverse or added risk for cardiac events as a result of taking Adderall. (2/9/12 Tr. 146-149; App. 1989-1993). All of these  factors certainly would have impacted Daniel's credibility and any testimony as to cause of death or explanation for brain injury. Daniel acted as a consultant to defense counsel, but was never seriously considered as an expert on reperfusion or that his testimony was even warranted given Dr.  Leestma's

testimony and the previously outlined concessions counsel obtained on cross-examination of the Commonwealth's experts. (Respondent's Exhibit A, Quagliana).

84.   Finally, it is illogical to conclude that "holistic," or "wrap up" testimony from Daniel is reasonably likely to *have* led to a different outcome. Daniel's response to emails did not alter counsel's decisions about what witnesses to call to contradict Ors. Fuller and Lopes. (Respondent's Exhibit A, Quagliana). Indeed, co-counsel Francis Lawrence not only concurred with Quagliana's conclusions on the subject of Daniel's testimony, he concluded calling Daniel as a "wrap up" witness at the close of the medical evidence would *have* been "a mistake." Lawrence and Quagliana determined the defense had presented the medical evidence they wanted to present and had nothing to gain from Daniel's testimony, and there was danger that ground could be lost had Daniel testified. (Respondent's Exhibit A). Claim Ill should be dismissed as it cannot demonstrate either prong of the demanding *Strickland* test.

*Jury Instruction*

*Claim IV*

85.   The petitioner complains his trial attorneys were ineffective because they failed to request a jury instruction that directed the jury it

must find that any wrongful conduct was "likely to cause death or great bodily harm" in order to find malice. Attorney Francis Lawrence dealt with instruction issues, researched the law on malice and formulated the rejected malice instruction. (Respondent's Exhibit A, Lawrence).  As he aptly notes, the language upon which the petitioner relies comes from case law. *See Essex v. Commonwealth,* 228 Va. 273,282,322 S.E.2d 216,221 (1984). On direct appeal, Huguely attacked as inadequate the instruction given to the jury defining malice, (App. 4388-4389, 4406); the Court of Appeals rejected this argument stating:

> Here, the trial judge without question provided the jury an accurate instruction addressing malice. The instruction offered by the Commonwealth, which the trial judge accepted and read to the jury, has been approved by the Supreme Court  of Virginia and is a model jury instruction on malice. *See Thomas v. Commonwealth,*  279 Va. 131, 160-61, 688 S.E.2d 220,  236-37 (201O); Model Jury Instruction No. 33.220.   The jury was correctly instructed on malice. . . . "When granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating  to the same legal principle." *Stockton v. Commonwealth,* 227 Va. 124, 145, 314 S.E.2d 371, 384 (1984) (citing *Lincoln v. Commonwealth,* 217 Va. 370, 375, 228 S.E.2d 688, 691-92 (1976)).  This principle is well established in Virginia.  *See also, e.g. Eaton v. Commonwealth,* 240 Va. 236, 255, 397 S.E.2d 385, 396 (1990) (holding that the trial court did not abuse its discretion "in refusing to grant another, duplicative instruction"); *Gaines v. Commonwealth,* 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) (en banc) ("The defendant's instruction was no more or less correct than the instruction given. While it 'was a correct statement of the legal principles involved and the trial court, in its discretion, could properly have given the instruction,

it does not follow that it was reversible error to refuse it."'
(quoting *Lincoln,* 217 Va. at 375, 228 S.E.2d at 692)).

*Huguely,* 63 Va. App. at 129-130, 754 S.E.2d at 575.

86.    Since the jury was fully and fairly instructed on the term
"malice," trial counsel was not ineffective and Huguely cannot demonstrate
prejudice under the demanding *Strickland* test because counsel failed to
offer yet another instruction on the same legal principle. *See Stockton,* 227
Va. at 145, 314 S.E.2d at 384 (citing *Lincoln,* 217 Va. at 375,228 S.E.2d at
691-92); *Eaton,* 240 Va. at 255, 397 S.E.2d at 396. *Thomas,* 279 Va. at
162, 688 S.E.2d at 237,; *Strickler v. Commonwealth,* 241 Va. 482, 495-96,
404 S.E.2d 227, 235-36 (1991); *Yi v. Commonwealth,* 13 Vap UNP
2487114 (2013) (cases holding jury was given a proper definition of malice,
derived from the model jury instructions and accorded with the traditional
definition of malice; jury instruction fully and fairly covered the definition of
malice). Huguely's claim fails to demonstrate deficient performance or
prejudice and should be dismissed for this reason.

87.    In addition, as previously indicated, the language for this
proffered jury instruction comes from *Essex,* 228 Va. at 280, 322 S.E.2d at
220.   As defense counsel notes (Respondent's Exhibit A, Lawrence), the
Supreme Court of Virginia has repeatedly warned of the danger in using
language from one case to tailor an instruction in another, and  has

"frequently cautioned against" that practice. *Shaikh,* 276 Va. at 546-547, 666 S.E.2d at 329; *Clohessy v. Weiler,* 250 Va. 249, 255, 462 S.E.2d 94, 98 (1995) (quoting *Blonde/ v. Hayes,* 241 Va. 467, 474, 403 S.E.2d 340, 344 (1991)). "Appellate language used to explain a ruling or illustrate a point must necessarily be tailored to the facts and circumstances of the case then before the court on appeal. Unless clearly intended for use as a jury instruction, such language is inappropriate for that purpose." *See National Union Fire Ins.* Co. *v. Bruce,* 208 Va. 595, 601, 159 S.E.2d 815, 820 (1968). Trial counsel was not ineffective for failing to proffer the proposed instruction. The petitioner cannot demonstrate deficient performance or prejudice for this reason as well. *Id.*

### Prosecutor's Argument

*Claim V*

*88.*   Huguely complains counsel were ineffective for failing to object and move for a mistrial when the prosecutor impermissibly commented during closing argument on his right not to testify at trial. This claim is premised upon faulty facts and fails to meet either prong of *Strickland.*

89.   As a threshold matter, whether to make an objection is  a tactical decision. *See Evans v. Thompson,* 881 F.2d 117, 125 (4th Cir. 1989). Counsel's objection might heighten any prejudice attendant to the

prosecution's remark by drawing the jury's attention to it; thus, there are strategic considerations that factor into the decision to object to counsel's remarks. *Id.* It is well established that failure to object to inadmissible or objectionable material for tactical reasons can constitute objectively reasonable trial strategy under *Strickland." Humphries v. Ozmint,* 397 F.3d 206, 234 (4th Cir. 2005) (collecting cases).

90.    Further, the relevant question is whether the prosecutor's comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). The appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* at 642. *Darden,* 477 U.S. at 181. *See also Bennett v. Angelone,* 92 F.3d 1336, 1346-47 (4th Cir.1996) (religiously loaded closing argument, while "highly improper and deserve[d] condemnation" did not render death sentence constitutionally infirm); *Winston v. Warden of Sussex I State Prison,* 07 Va. S. Ct. UNP 052501, 2007 WL 678266, at *15-16 (Va. Mar. 7, 2007) (the prosecutor's reference to petitioner as a "pitbull" did not render jury's imposition of the death penalty constitutionally infirm). This cou,rt should find Huguely has failed to

overcome the presumption that counsel's failure to object was the result of sound trial strategy. *See Strickland,* 466 U.S. at 689.

91.   In any event, counsel did not object because he did not think the Commonwealth's Attorney's comment referred to the defendant's election not to testify or a violation of his right against self-incrimination as guaranteed by the Fifth Amendment. (Respondent's Exhibit A, Lawrence). Such a comment is constitutionally and statutorily forbidden if "'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify'." *Hines v. Commonwealth,* 217 Va. 905, 907, 234 S.E.2d 262, 263 (1977) (quoting *Knowles v. United States,* 224 F.2d 168, 170 (10th Cir. 1955)).

92.   On the other hand, a comment on the defendant's failure to contradict the incriminating evidence presented by the prosecution  does not offend the Fifth Amendment if, in context, the comment could be understood to refer to contradictory evidence from sources other than the defendant. *See Johnson v. Commonwealth,* 236 Va. 48, 51, 372 S.E.2d 134, 136 (1988). ("[A] prosecutor's comment that the Commonwealth's evidence was uncontradicted was not necessarily a reference to the defendant's failure to testify but an argument that the testimony of the

witnesses who had testified was credible." (citing *Washington v. Commonwealth,* 216 Va. 185, 195, 217 S.E.2d 815, 824 (1975)). *See also Frye v. Commonwealth,* 231 Va. 370, 394-95, 345 S.E.2d 267, 284 (1986) (holding that, where witness's "credibility was the subject of conflict in the evidence," prosecutor could point to the uncontradicted nature of the testimony as proof of witness's veracity); *Quintana v. Commonwealth,* 224 Va. 127, 146, 295 S.E.2d 643, 652 (1982) (holding no error occurs by questioning the lack of contradictory evidence where the prosecutor does not suggest that "the missing evidence should have come from [the defendant] himself or that it could come from him alone"). As the Virginia Supreme Court has recognized, prohibiting such comments "would be to make silence, the usual refuge of the guilty, still more secure." *Miller v. Commonwealth,* 153 Va. 890, 902, 149 S.E. 459, 462 (1929) (recognizing that bar against commenting on defendant's failure to testify was "not intended primarily to curtail any previously existing right of the prosecutor to comment upon the testimony of any other witness who had testified").

93.    The prosecutor's comment about which the petitioner complains plainly was not of such character that the jury would "naturally and necessarily take it to be a comment on [Huguely's] failure to testify." *Hines,* 217 Va. at 907, 234 S.E.2d at 263. *See Johnson,* 236 Va. at 51,

372 S.E.2d at 136.   *See also Patrick v. Commonwealth,* 50 Va. App. 650, 655, 653 S.E.2d 288, 290 (2007); *Hazel v. Commonwealth,* 31 Va. App. 403, 411, 524 S.E.2d 134, 138 (2000) (quoting *Hines,* 217 Va. at 907, 234 S.E.2d at 263 and *Knowles, 224 F2d at 170; see also Johnson v. Commonwealth,* 236 Va. 48, 50, 372 S.E.2d 134, 136 (1988); *United States v. Francis,* 82 F.3d 77, 78-79 (4th Cir. 1996).

94.   Here, Kevin Carroll and Ken Clausen left Huguely in his apartment at 11:40 p.m. to buy beer. They were gone about 20 minutes and Huguely was not present when they returned. (2/15/12 Tr. 59-61; App. 3299, 3301). Huguely returned to his apartment close to midnight and Kevin Carroll asked Huguely where he had been. (2/15/12 Tr. 61; App. 3301). Huguely said he had been downstairs with Will Bolton at Chris Clements' apartment. He added that Clements was drunk.   Carroll, however, knew that Clements was working on a paper that evening and had not been drinking. He determined Bolton was not in Clements' apartment. Clausen recalled that Carroll pointed this out to Huguely. (2/15/12 Tr. 62-64; App. 3302-3304, 3327). Because there was no reason for Huguely to lie about being with Clements and Bolton, Clausen followed up with Huguely. Clausen testified:

> I looked at him for a bit. I noticed there was a change in his
> demeanor, kind of a blank stare on his face. I asked him what

> was wrong with him. I said, George, what's wrong  with you? He looked at me and said, nothing. He said there was nothing wrong. I asked him - I continued to look at him and observe him. I asked him two more times. I said George, what's wrong with you? Got no response.

(2/15/12 Tr. 82; App. 3327-3328).

95.    The prosecutor's closing argument about which Huguely complains refers to Ken Clausen's testimony, Huguely's lie about where he had been and his failure to respond to Clausen's repeated inquiries, "George, what's wrong with you?" (2/18/12 Tr. 260-261; App. 4209-4211). The prosecutor's argument was not an impermissible comment on Huguely's right not to testify as proscribed under the test approved  in *Hines*. Counsel's failure to make a frivolous objection  does  not demonstrate deficient performance or prejudice.

### Failure to Introduce Evidence

*Claim VII*

96.    The petitioner complains trial counsel were ineffective for failing to investigate, develop and evidence of his alleged extrapolated blood-alcohol concentration of .379 and his degree of impairment at the time of the offense through the testimony of his family members and expert witnesses Ors. Saady, Hendricks and Aaron. He asserts the evidence would have supported a finding that Love's death was negligent or

accidental and could have been used for finding diminished capacity at sentencing.[8]

97.    "It is well settled in Virginia that, 'except in cases of first degree and capital murder, where proof of voluntary intoxication may negate deliberation and premeditation, such intoxication, whether from drugs or alcohol, is no defense to a criminal charge.'" *Herbin v. Commonwealth,* 28 Va. App. 173, 183-184, 503 S.E.2d 226 (1998) (quoting *Griggs v. Commonwealth,* 220 Va. 46, 52, 255 S.E.2d 475, 479 (1979).  "A person

---

[8] While the petitioner has withdrawn his original claim VIII, counsel made a tactical decision not to introduce the video of Huguely's May 1, 2010 lacrosse game to provide an alternative theory for the bruises and swelling of his hand observed in the police photographs. (Respondent's Exhibit A). That determination should not be second guessed. See *United States v. Kozinski,* 16 F.3d 795, 813 (7th Cir. 1994); *Byram v. Ozmint,* 339 F.3d 203, 209 (4th Cir. 2003). The lacrosse video emphasizes the petitioner's size, strength and physicality and the aggressive nature of the sport, not unlike football. Also, the lacrosse video shows players wear gloves, so it does not conclusively show the source of the injury to the petitioner's hand. The video also highlights the physical disparity between the petitioner and his victim. The petitioner admitted having to force entry into the   Love's bedroom and that he had a physical altercation with her. This possible explanation for the injury to the petitioner's hand provided by the video pales in significance to the broader "picture" of this case. Given that putting on evidence is the epitome of a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which "[courts] must afford ... enormous deference," the reasonableness of counsel's decision for not using the lacrosse video properly assessed in light of "the circumstances of counsel's challenged conduct, and ...   from counsel's perspective at the time." *Strickland,*  466 U.S. at 689, plainly fails to meet either prong of *Strickland.*

cannot voluntarily make himself so drunk as to become on that account irresponsible for his conduct during such drunkenness. He may be perfectly unconscious of what he does and yet be responsible." *Chittum v. Commonwealth,* 211 Va. 12, 17, 174 S.E.2d 779, 782 (1970). No reasonable attorney would have presented such a defense in this case and no jury or judge would have accepted it.

98.    The testimony at trial was replete with references to Huguely being extremely drunk, but functioning, the night of the offense. The petitioner was found guilty of second-degree murder. Expert testimony of Huguely's extrapolated blood-alcohol of .379, if possibly admissible, thus, could not have impacted on the guilt phase of trial. And this evidence would have been risky. The police video presented Huguely in a sympathetic light while establishing his high *level* of intoxication and how intoxication affected Huguely's behavior. Counsel were cognizant of and sensitive to not presenting evidence establishing or *even* suggesting his intoxication could have contributed to or caused anger and rage. Counsel were also aware of the contradictory role alcohol played in the case. (Respondent's Exhibit A). Thus, when "indulging a strong presumption ... that, under the circumstances, the challenged action [was the result of] sound trial strategy," *Id.,* the nature of petitioner's claim dictates that he cannot show

counsel's performance was deficient for not presenting this additional evidence regarding alcohol intoxication.

*99.*   Moreover, the case law is full of decisions recognizing that evidence of alcohol abuse and intoxication can be helpful or harmful. It therefore is not appropriate to simply assume that such evidence "would have had a mitigating effect." *Williams v. Alabama,* 791 F.3d 1267 (11th Cir. Ala. 2015). "Even when there is a factual basis for it, a showing of_ alcohol and drug abuse is a two-edged sword which can harm a . . . defendant as easily as it can help him at sentencing." *Tompkins v. Moore,* 193 F.3d 1327, 1338 (11th Cir. 1999) (evidence of intoxication or alcoholism is a double-edged sword that itself could harm a petitioner's case). *See Housel v. Head,* 238 F.3d 1289, 1296 (11th Cir. 2001). Courts have gone as far as saying that a "history of excessive alcohol and drug use" is not even "evidence in mitigation of the death penalty/' and that "admission of some of this evidence might have been harmful." *Waldrop v. Jones,* 77 F.3d 1308, 1313 (11th Cir. 1996); *see also Suggs v. McNeil,* 609 F.3d 1218, 1231 (11th Cir. 2010) ("As we have repeatedly recognized, evidence of drug and alcohol use is often a two-edged sword that provides an independent basis for moral judgment by the jury that likely could have caused some jurors to vote in favor of death.") (internal quotation marks

and citations omitted); *Crawford v. Head,* 311 F.3d 1288, 1321 (11th Cir. 2002)); *Evans v. Secy, Dep't of Corr.,* 703 F.3d 1316 (11th Cir. Fla. 2013).

100.  In general, courts are "reluctant to find ineffective assistance based upon complaints regarding uncalled witnesses." *Lenz v. True,* 370 F.Supp. 2d 446, 479 (W.D. Va. 2005). In *Lenz,* the court considered the evidence counsel did not present, noting that Lenz's test scores and psychological evaluations contained mixed information. On the one hand, they showed that Lenz was intelligent, but on the other, showed that he was impulsive and destructive, and abused drugs and alcohol. "In light of the information contained in the reports," the court concluded, "counsel's decision not to present more detail regarding those reports was not unreasonable. The particulars of those reports would have represented a 'two[-]edged sword' that counsel often confront when constructing the strategy most likely to assist rather than harm a client." *Id.* at 303. Finally, the court held that Lenz had failed to demonstrate anything that would have had a reasonable probability of changing the result of  his  sentencing. *Lenz,* 370 F. Supp. 2d at 482.

101.  The proffered testimony of experts putting a number on Huguely's level of intoxication and how alcohol affects the immature brain presented a similar "mixed bag" for counsel. Counsel characterized  the

presentation of alcohol related testimony as "complex." Mitigating testimony from experts potentially opened the door for the Commonwealth to present aggravating sentencing evidence from which the jury might conclude a pattern of violent behavior. (Respondent's Exhibit A). Defense counsel were aware that the Commonwealth would likely present evidence that Huguely had broken into a sleeping teammate's apartment and possessed graphic photographs depicting the severe beating Huguely inflicted on the teammate as a result of Huguely's belief that the teammate and Love were romantically involved. Defense counsel knew Huguely had been drunk when he threatened to choke another young woman because she had discussed Huguely's abuse of alcohol with her father, Huguely's high school lacrosse coach. Counsel were also aware Huguely had been intoxicated when he reportedly was physically aggressive toward a female Lexington, Virginia police officer. This evidence was ultimately introduced by the Commonwealth at the sentencing hearing before the judge. (Respondent's Exhibit A). As opposed to expert testimony about the impact of alcohol abuse and immaturity of a college student, counsel chose instead to focus on the sympathetic figure Huguely appeared to be in the police video and at sentencing before the judge elicited similar evidence of

Huguely's ability   to be thoughtful, helpful, empathetic and loyal from his priest, family and friends. (Respondent's Exhibit A).

102.  In sum, presenting such evidence "would have represented a 'two edged sword' that counsel often confront when constructing the strategy most likely to assist rather than harm a client." *Shaikh,* 276 Va. at 548, 666 S.E.2d at 330; *Teleguz v. Commonwealth,* 279 Va. 1, 19, 688 S.E.2d 865, 879 (2010). Claim VII cannot demonstrate deficient performance or prejudice and should be dismissed.

### Cumulative Ineffectiveness

*Claim VIII*

103.  Huguely alleges trial counsel's numerous evidentiary, factual and legal deficiencies with respect to the distinction between malice and manslaughter have created a reasonable probability that, had these errors not occurred, Huguely would have been convicted of a lesser charge or been found not guilty. Huguely alleges the cumulative prejudice caused by the many merits errors in this case requires a new trial.

104.  The Virginia Supreme Court, however, has repeatedly rejected the argument that prejudice may be viewed cumulatively. *See Lawlor v. Warden,* 288 Va. 223, 247-248, 764 S.E.2d 265, 279 (2014); *Prieto,* 286 Va. at 117-18, 748 S.E.2d at 109; *Gray v. Warden,* 281 Va. 303, 319, 707

S.E.2d 275, 290 (2011); *Teleguz v. Commonwealth,* 279 Va. 1, 19, 688 S.E.2d 865, 879 (2010); *Elliott v. Warden,* 274 Va. 598, 628, 652 S.E.2d 465, 489 (2007). The petitioner's claims cannot provide him a basis for relief. In *Lenz v. Warden,* 267 Va. 318, 340, 593 S.E.2d 292, 305 (2004), the Supreme Court of Virginia held that "[h]aving rejected each of petitioner's individual claims, there is no support for the proposition that such actions when considered collectively have deprived petitioner of his constitutional right to effective assistance of counsel." *Id.* (citations omitted).

105.  As the federal court has also ruled, cumulative treatment of ineffectiveness claims has been found improper. Ineffective assistance of counsel claims, ***like claims of trial court error,*** must be reviewed individually, rather than collectively. *Fisher v. Angelone,* 163 F.3d 835, 852-53 (4th Cir. 1998). An attorney's acts or omissions "that are not unconstitutional individually cannot be added together to create a constitutional violation." *Id. See also Mueller v. Angelone,* 181 F.3d 557, 586 n.22 (4th Cir. 1999).

106.  Respondent denies each and every allegation of the petition not specifically admitted.

69

107.  All of petitioner's allegations are refuted by the record and the affidavits filed in this matter. Thus, his allegations in the present  petition can be resolved on the basis of the existing record matters and no plenary hearing is necessary. Code§ 8.01-654(8)(4); *Friedline v. Commonwealth,* 266 Va. 273, 576 S.E.2d 491 (2003); *Yeatts,* 249 Va. at 288, 455 S.E.2d at 21.

**WHEREFORE,** the respondent prays that the Court deny and dismiss the petition for a writ of habeas corpus.

Respectfully submitted,

**JOHN A. WOODSON, WARDEN,**



counsel

Leah A. Darron
Senior Assistant Attorney General
Virginia State Bar No. 23823

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Facsimile: (804) 371-0151
oagcriminallitigation@oag.state.va.us

## CERTIFICATE OF SERVICE

On May 16, 2016, a copy of this Motion to Dismiss with exhibits was mailed to Jonathan P. Sheldon, Esquire, Joseph T. Flood, Esquire, Sheldon, Flood & Haywood, PLC, 10621 Jones Street, Suite 301A, Fairfax, VA 22030 and Bernadette M. Donovan, Esquire, Donovan & Engle, PLLC, 1134 East High Street, Unit A, Charlottesville, VA 22902.

By: _____
    Counsel