## AFFIDAVIT OF RHONDA E. QUAGLIANA

I, Rhonda E. Quagliana, being first duly sworn, state as follows:

1.  My business partner, Francis McQ. Lawrence, and I represented George Huguely ("Mr. Huguely") who was charged in the City of Charlottesville Circuit Court with first degree murder, felony murder, and other charges stemming from the death of a fellow University of Virginia student, Yeardley Love, and the removal of her computer. Throughout this affidavit, when I refer to the "Defense Team," "we" or "our," I am referring to Mr. Lawrence and myself and our law firm as Mr. Huguely's defense team (the "Defense Team") and not to Mr. Huguely.

2.  At the conclusion of evidence, the presiding Circuit Court judge instructed the jury on all counts contained in the indictments, including first degree and felony murder as well as the lesser-included offenses of second degree murder and manslaughter. The jury convicted Mr. Huguely of second degree murder and grand larceny and returned verdicts of "not guilty" on the remaining indictments.

3.  I have reviewed the Petition for *Writ of Habeas Corpus* and the First Amended Petition for *Writ of Habeas Corpus* ("the Petition").

4.  I have no personal knowledge that a juror may have relied upon a dictionary provided by a court officer to define malice. If a juror requested and was furnished a dictionary during deliberations, the episode was never brought to the attention of the Defense Team. I first learned of such an alleged event when I received and read the Petition for *Writ of Habeas Corpus* filed in this action. The Defense Team had made a series of pretrial motions, including a Motion to Sequester, to ensure the jury considered only evidence approved by the Court and submitted to them at trial.

5.  The Defense Team had considered, in depth, the expert medical testimony the Commonwealth intended to elicit at trial to establish cause of death. This included anticipated testimony from Dr. William Gormley, the medical examiner who performed Ms. Love's autopsy, and Drs. Christine Fuller and Maria-Beatriz Lopes, neuropathologists, who contended that Ms. Love died from traumatic brain injury caused by blunt force trauma.

6.  For many months, the Defense Team worked with medical experts to fully comprehend and contest the prosecution's theory regarding cause of death. As one part of that overall effort, we retained Dr. John S. "Jack" Daniel, a former medical examiner and former employee of the Virginia Office of the Chief Medical Examiner, to assist us in our preparation of the case. In his role, Dr. Daniel educated us about medical terms, provided us

RESPONDENT'S EXHIBIT A  Page 1 of 8

with medical literature, and discussed the significance of conclusions reached by the Commonwealth's medical experts. Dr. Daniel also contributed to our efforts to obtain Ms. Love's medical records as we attempted to determine whether her ingestion of a common prescription drug, Adderall, contributed to her death by causing a cardiac arrhythmia. This theory was ultimately abandoned because it lacked scientific merit. Dr. Daniel testified at a pretrial hearing for the sole purpose of helping the Defense Team explain to the Court our request for Ms. Love's medical history.

7.      Dr. Daniel continued consulting with us over the course of our representation to investigate and evaluate an alternate theory of cause of death. Dr. Daniel recommended early in the case consulting with an expert in the field of neuropathology. Dr. Daniel helped guide us to specialized medical experts who could address complex issues surrounding the alleged brain injuries discovered during Ms. Love's autopsy and subsequent testing. Dr. Daniel's qualifications allowed him to speak generally about many of the issues involving the findings of a neuropathologist. However, Dr. Daniel did not hold himself out as an expert in neuropathology.

8.      So that we could effectively challenge the Commonwealth's expert neuropathologists, Dr. Daniel recommended that we consult with Dr. Jan Leestma. Dr. Leestma is one of the country's leading neuropathologists. Like Drs. Daniel and Gormley, Dr. Leestma had performed countless autopsies and rendered countless opinions regarding cause of death. Dr. Daniel encouraged us to consult with Dr. Leestma to fully address cause of death issues and the source of Ms. Love's apparent brain injury.

9.      The Defense Team retained Dr. Leestma as an expert and called him as a defense witness. Dr. Leestma introduced the Defense Team to the theory of reperfusion to explain the presence of Ms. Love's brain injury. Dr. Leestma contested the assertion that the brain injury resulted from blunt force trauma. According to Dr. Leestma, Ms. Love's brain injury occurred when blood pressure was reintroduced by means of CPR, a mechanism that forces blood into areas of the brain already damaged by a lack of oxygen, essentially causing a medical phenomenon that appears consistent with injury from blunt force trauma but actually resulted from restoring circulation. Dr. Leestma also proposed an alternative theory regarding cause of death. Dr. Leestma proposed that Ms. Love died of positional asphyxia rather than traumatic brain injury. Dr. Leestma was qualified to testify that Ms. Love died of asphyxia, and we agreed for strategy reasons that Dr. Leestma would be the witness to offer such testimony at trial.

10.   During our representation, Drs. Leestma and Daniel discussed Dr. Leestma's reperfusion theory in detail, with each other and with the Defense Team to prepare the Defense Team for trial.

11.   Through Dr. Leestma and with guidance from Dr. Daniel, the Defense Team eventually retained a well-respected practicing neurosurgeon, Dr. Ronald Uscinski. Dr. Uscinski was retained to address whether, from the perspective of a practicing neurosurgeon, Ms. Love's brain injuries appeared consistent with a malicious assault reasonably calculated to inflict serious bodily injury or death.

12.   To negate malice, we intended to emphasize the crucial absence of findings consistent with Mr. Huguely's deliberate application of significant force and offer an alternative explanation for the apparent brain injury.

13.   Accordingly, at trial the Defense Team elicited from Dr. Leestma and Dr. Uscinski testimony challenging findings by the Commonwealth's neuropathologists, Drs. Fuller and Lopes, that Ms. Love died of brain injury caused by blunt force trauma. The testimony of Drs. Leestma and Uscinski also underscored concessions the Defense Team obtained during the cross examinations of Dr. Gormley, Dr. Fuller, and Dr. Lopes. Each Commonwealth expert acknowledged findings significantly inconsistent with their opinion that Ms. Love died of lethal brain injury caused by blunt force trauma. For example, on cross examination, Dr. Gormley conceded that many of his findings were atypical of blunt force head trauma. Dr. Gormley admitted that his findings were equally consistent with a fall as they were with the application of significant intentional force. He testified on cross examination that Ms. Love could have died from Mr. Huguely's contact with the carotid sinus, contact which can cause cardiac arrhythmia. He acknowledged such contact could have been unintentional. Dr. Fuller likewise conceded on cross examination that the findings were a mixed bag and not entirely consistent with traumatic head injury. For instance, she noted the absence of skull fractures, brain lacerations, or subdural hematomas. Dr. Lopes conceded on cross examination that she could not find the degree or mechanism of force needed to cause the injuries she examined and that her findings of edema could occur independent of trauma. She could not rule out causes of death such as cardiac arrhythmia or pulmonary and respiratory failure.

14.   Dr. Leestma testified that Ms. Love did not die of blunt force trauma. He testified that the findings cited by the Commonwealth's experts were inconsistent with such injury. Dr. Leestma opined that Ms. Love's injuries were caused by reperfusion, that restoring circulation into an empty and damaged blood vessel system could cause hemorrhage, and that it was not

true that reperfusion injuries would only show up in the watershed areas of the brain. Dr. Leestma testified as the Defense Team anticipated, including about the effects of reperfusion. It is not accurate to say that the Defense Team intended to rely primarily upon Drs. Uscinski and Daniel to develop testimony about reperfusion.

15.     Dr. Leestma also proposed an alternate cause of death, which was that Ms. Love died of positional asphyxia. This explanation was consistent with admissions made by the Commonwealth's witnesses. In addition, the Defense Team had called Dr. Alphonse Poklis, an expert toxicologist, who testified that Ms. Love had a high level of blood alcohol concentration on the night of her death, establishing the reasonable inference that highly intoxicated people risk suffocation if positioned face down on an object, such as a pillow saturated with saliva and blood. Photographs were in evidence of the stained pillow where Ms. Love came to rest.

16.     Through testimony the Defense Team elicited in cross examination of Commonwealth experts and our direct examination of defense medical experts, the jury received compelling evidence inconsistent with a malicious killing. Through the combined testimony of Drs. Leestma and Uscinski, the jury received a credible alternate explanation for findings the Commonwealth's neuropathologists described as ambiguous, but maintained resulted from blunt force trauma. The jury received evidence discrediting claims that Ms. Love's injuries resulted from the application of malicious intentional force.

17.     The Defense Team's trial strategy focused on the quality and persuasiveness of the testimony and evidence presented, not the number of witnesses who testified. We exercised our professional judgment in determining that Dr. Daniel was not needed to contradict the testimony of the Commonwealth's neuropathologists, Dr. Fuller and Dr. Lopes, or other Commonwealth medical witnesses, including Dr. Gormley.

18.     We considered and discussed the potential place of every witness in preparation for trial, including Dr. Daniel, and also made decisions about witnesses, including Dr. Daniel, as evidence unfolded during trial and we made our best judgment about what the jurors seemed to focus upon, how they appeared to be reacting to certain testimony and evidence, and how individual witnesses performed as the trial progressed.

19.     As we made decisions about witnesses prior to trial, concerns existed about Dr. Daniel's role as a trial witness. The decision not to call Dr. Daniel as a trial witness was based on a number of additional considerations, including: Dr. Daniel shared with the Defense Team information about his employment with the medical examiner's office that caused concern

regarding his possible cross examination; by the time of trial; Dr. Daniel had received significant compensation for his work that far exceeded the compensation of any other expert, which would likely be used on cross examination; and, had he testified and been subject to cross examination on some of the testimony of Dr. William Brady and others, Dr. Daniel likely would have had difficulty contesting the Commonwealth's potential attacks on the theory of reperfusion, such as whether the medical literature addressing reperfusion mostly involved only animal studies, not human studies.

20. The Defense Team had subpoenaed and prepared the testimony of a number of witnesses, like Dr. Daniel, if needed including a blood spatter expert, a cardio-pathologist, and a bruise expert. Given concessions by the Commonwealth's witnesses such as the Commonwealth's blood stain expert, cardiologist, and Dr. Gormley, those defense witnesses were not called and were eventually excused as we continued to evaluate the evidence and make strategy decisions regarding our defense during the trial.

21. I had been in frequent communication with Dr. Daniel, Dr. Uscinski, and Dr. Leestma over many months and relied heavily on them to understand complicated medical issues and prepare for cross examination of the Commonwealth's witnesses. In that vein, during breaks in the trial, I sent three emails to our three medical experts with whom I was accustomed to communicating frequently about medical issues in the case. These emails referenced trial testimony.

22. Dr. Daniel responded. His response was typical of our group communications prior to trial. Prior to trial, Dr. Daniel provided input about many medical issues as we prepared, including reperfusion. Dr. Daniel's email addressed reperfusion, but his response did not alter decisions about witnesses who should be called to contradict Drs. Fuller and Lopes.

23. When it came to my attention that statements in my emails might violate the "Rule on Witnesses" as expressed in Virginia Code § 8.01-375, I went back and reviewed their content. We then immediately self-reported the emails to Mr. Chapman and to the Court the next morning.

24. We attended court that morning and prepared to call Dr. Uscinski as our last witness. The Court heard testimony from Dr. Uscinski in which he testified that: he was not influenced by any email; his testimony was established far in advance of trial; he had served and testified as an expert in other cases; his views were not informed by emails from me or anyone else; and, his testimony was informed only by his proper review of the case and his background, training, and experience.

25.   Dr. Uscinski testified before the jury to the things we thought most important. He had years of experience identifying and treating traumatic injury in actual patients. As a practicing neurosurgeon, he diagnosed and treated countless patients who suffered traumatic brain injury by violent assault, among other means. He observed no such injury inflicted on Ms. Love.

26.   As the Petition recites, multiple witnesses testified about Mr. Huguely's undisputed level of intoxication on the night of the events.

27.   Many witnesses established that Mr. Huguely's level of intoxication made it "more probable that his conduct arose from impaired coordination and diminished motor sensory functioning, rather than from a premeditated plan or malice" without the testimony of an expert toxicologist or Mr. Huguely's mother, father, and aunt. No one doubted that, on the night of his encounter with Ms. Love, Mr. Huguely was exceptionally drunk. The Commonwealth conceded as much.

28.   Alcohol played a difficult and contradictory role in this case. Intoxication negates premeditation, an element of first degree murder. The jury was instructed to that effect and acquitted Mr. Huguely of first degree murder. Jurors can also consider intoxication for other purposes when evaluating a person's culpability. We were concerned that jurors might draw negative conclusions from alcohol abuse or extreme intoxication, and see it as aggravating rather than mitigating. The Defense Team remained concerned about issues of alcohol abuse and intoxication during our preparation of the case and during trial. We exercised our best professional judgment in making strategy and tactical decisions that accounted for the difficult role alcohol abuse and intoxication played in the case.

29.   The decision about whether to present testimony at sentencing was complex. Any mitigating testimony, including expert testimony concerning alcohol abuse from a witness such as Dr. Jeffrey Aaron, potentially opened the door for the Commonwealth to present aggravating sentencing evidence. We researched the issue to confirm what was at risk. We also anticipated answers to questions in cross examination of any defense witnesses, and whether the Commonwealth might elicit unfavorable testimony.

30.   Our discussions and deliberations on the subject of our sentencing presentation began long before trial commenced. As we examined and re-examined the difficult sentencing issues, we considered the possible effect of testimony we expected in rebuttal. We considered whether the jury would conclude a pattern of violent behavior existed. We considered whether expected rebuttal testimony might cause any unfavorable juror to

impose a longer sentence. Accordingly, the Defense Team ultimately made the decision not to call witnesses in the sentencing phase of the bifurcated trial, including Dr. Aaron. We fully consulted with Mr. Huguely about this decision, and he agreed with it.

31.     For the sentencing phase, we had interviewed multiple witnesses including friends and family members, and prepared them to testify. They were under subpoena. We were also prepared to call an expert, Dr. Aaron. We had consulted with Dr. Aaron and furnished him with all materials, such as school and medical records, needed to render an opinion about Mr. Huguely's alcohol use and the subjects outlined in Dr. Aaron's report. We held open our sentencing options until the guilt-innocence phase of the trial concluded as we continued to assess our decisions.

32.     Before making any final decisions about our sentencing approach, it remained important to assess the evidence and the jury's reactions. We believed that Mr. Huguely had given a compelling, emotional, and mitigating statement to police. We observed positive reactions to his videotaped statement from jurors, who seemed sympathetic with our client. Mr. Huguely's friends and roommates testified they cared about him and expressed concerned for his welfare. The jury had received in evidence Mr. Huguely's heartfelt letter of apology to Ms. Love expressing his disbelief that drinking had so overpowered his life.

33.     In deciding whether to present Dr. Aaron's testimony, or any other mitigation testimony at sentencing, we exercised our professional judgment in assessing the risks and benefits for our client. We considered the Commonwealth's anticipated rebuttal testimony. The Defense Team knew that the Commonwealth would likely present testimony that Mr. Huguely had broken into a teammate's apartment. We anticipated testimony that Mr. Huguely suspected his teammate and Ms. Love of having a romantic relationship. We anticipated testimony that Mr. Huguely committed an unprovoked attack on his teammate while his teammate was sleeping. We knew of graphic photographs depicting injuries his teammate sustained in that event. This witness eventually testified at sentencing before the judge. We knew that Claire Bordley, the daughter of Mr. Huguely's high school lacrosse coach, would likely testify about an episode in which Mr. Huguely was drunk and reportedly threatened to choke her at a bar because she discussed Mr. Huguely's alcohol use with her father. Ms. Bordley's testimony was later elicited in sentencing before the judge. We considered any damaging effects of her testimony given evidence presented at trial about an incident in which Mr. Huguely reportedly choked Ms. Love at a party. We knew of an incident in Lexington, Virginia, during which Mr. Huguely was intoxicated and reportedly aggressive toward a female police

officer. We had filed a Motion *in Limine* under seal to address prejudicial and inflammatory testimony possibly emanating from the encounter.

34.   When we appeared for sentencing before the judge, we presented positive evidence about Mr. Huguely and elicited testimony from family members and others, such as his priest. We deliberately placed our emphasis on Mr. Huguely's ability to be thoughtful, helpful, empathetic, and loyal among other traits. Mr. Huguely was a college student and drank heavily. The concept and impact of alcohol abuse and immaturity among college students are widely known and commonly understood. By the time of Mr. Huguely's sentencing by the judge, decisions regarding how to handle that proceeding also required us to consider an anticipated appeal and our client's wishes concerning what information would be placed in the record. As we worked through those issues, Dr. Aaron remained in a state of uncertainty about whether he would testify while we finalized our sentencing approach before the judge. There was no sentencing information Mr. Huguely wished to present to the judge that was not presented.

35.   I have reviewed Mr. Lawrence's affidavit and agree with its discussion of our decision concerning the lacrosse video and jury selection.

The above statements are true and correct to the best of my knowledge and belief.


Rhonda E. Quagliana


COMMONWEALTH OF VIRGINIA

CITY/COUNTY OF ___Charlottesville___

The foregoing affidavit was subscribed and sworn to before me this _12ᵗʰ_ day of
___May___, 2016, by Rhonda E. Quagliana.


Notary Public

My commission expires: _4/30/2019_
ID No. _7650900_

*[Notary seal: DIANE KATHRYN MATHEWS, NOTARY PUBLIC, REG. #7650900, MY COMMISSION EXPIRES 04/30/2019, COMMONWEALTH OF VIRGINIA]*

## AFFIDAVIT OF FRANCIS McQ. LAWRENCE

I, Francis McQ. Lawrence, being first duly sworn, state as follows:

1.  My business partner, Rhonda Quagliana, and I represented George Huguely ("Mr. Huguely") who was charged in the City of Charlottesville Circuit Court with first degree murder, felony murder, and other charges stemming from the death of a fellow University of Virginia student, Yeardley Love, and the removal of her computer. Throughout this affidavit, when I refer to the "Defense Team," "we" or "our," I am referring to Ms. Quagliana and myself and our law firm as Mr. Huguely's defense team (the "Defense Team") and not to Mr. Huguely.

2.  I have reviewed the affidavit of Rhonda Quagliana. It is true and accurate.

3.  I have reviewed the Petition for *Writ of Habeas Corpus* and the First Amended Petition for *Writ of Habeas Corpus* ("the Petitions").

4.  I had no knowledge during our representation of Mr. Huguely that a juror may have used a dictionary provided by a court officer to define malice. I first learned that a juror may have received a dictionary from court personnel when I received and read the Petition for *Writ of Habeas Corpus*.

5.  While Ms. Quagliana led the Defense Team with respect to medical evidence, I had close contact with her and such evidence during the representation.

6.  I fully supported our defense decision not to call Dr. John S. "Jack" Daniel ("Dr. Daniel").

7.  I have carefully reviewed Ms. Quagliana's affidavit on the subject of Dr. Daniel's testimony and concur in her memory and observations. In my view, calling Dr. Daniel as a witness at the close of our medical evidence would have been a mistake. We determined that we had presented the medical evidence we wanted and that nothing would be furthered by testimony from Dr. Daniel and, in fact, ground might be lost in the Commonwealth's cross examination of Dr. Daniel for the reasons stated in Ms. Quagliana's affidavit. At the conclusion of the defense evidence, I believed we had effectively dealt with the medical issues and cause of death. Information from some jurors, as set forth in the appendix, supports that view.

8.  I was the member of the Defense Team who dealt with the instruction issues.

9.  I had researched the rejected "malice" instruction and found it had support in a number of Virginia Supreme Court cases and believed, and still believe, that it should have been given.

10. While I made arguments in our motion for new trial from the Essex case, our rejected jury instruction raised the threshold for conduct sufficient to be termed "malicious." As the Supreme Court has noted on occasion, the language used in its opinions in appellate cases are not necessarily appropriate for use in instructions.

11. My decision would have been to object to Mr. Chapman's argument if it violated Mr. Huguely's right against self-incrimination under the Fifth Amendment. At the time of his argument I did not think it violated the Fifth Amendment.

12. The exhibit which contained the word "murder" was offered into evidence by me. I was focused on the exhibit and not the markings on it.

13. Counsel recognized that the intoxication issues were critically important. We believed that the evidence, including Mr. Huguely's videotaped statement to the police, established his high level of intoxication and how alcohol consumption affected his behavior. We were also aware of, and sensitive to, not establishing or suggesting that Mr. Huguely's intoxication could have caused or contributed to anger and rage.

14. We carefully considered the role of alcohol in our defense, including its impact on sentencing issues throughout our representation of Mr. Huguely.

15. We carefully considered the sentencing issues throughout our representation of Mr. Huguely.

16. With respect to testimony at the sentencing phase of the bifurcated jury trial, we ultimately decided it was not helpful to offer any testimony to the jury. The offer of testimony would have brought damaging rebuttal evidence. Mr. Huguely's videotaped statement depicted him in a sympathetic light and we urged the jury to consider it as they contemplated the sentence. Decisions concerning our use of sentencing witnesses in the bifurcated trial, including Dr. Jeffrey Aaron, were made in consultation with Mr. Huguely.

17. With respect to evidence at the sentencing hearing before Judge Hogshire, Ms. Quagliana in her affidavit, details our collective thinking.

18.     The Defense Team carefully and at length considered the lacrosse video
        and concluded, on balance, that the video would be harmful to our case,
        offsetting any possible help, and for that reason did not offer it in to
        evidence.

19.     To the extent the Petitions address jury selection issues and their influence
        on the outcome, we moved the Court for use of a juror questionnaire and
        developed one. We consulted with an expert on the issue of jury selection.
        During *voir dire* we consulted with one another. We attempted to strike a
        balance between gaining information needed to strike jurors who were
        unqualified and alienating potential jurors, and to make effective use of our
        strikes for cause. We reviewed each juror carefully as we made on-the-spot
        judgment calls about potential jurors. We prioritized our limited strikes to
        sit as favorable a jury as possible.

The above statements are true and correct to the best of my knowledge and belief.

_____
Francis McQ. Lawrence

COMMONWEALTH OF VIRGINIA
(CITY)/COUNTY OF ____Charlottesville____

        The foregoing affidavit was subscribed and sworn to before me this 12th day of
____May____, 2016, by Francis McQ. Lawrence.

_____
Notary Public

My commission expires: 4/30/2019
ID No. 7650900

User Name
———————

lad

·Title
————

00417855.PDF

-C
——

-J
——

Source:      Network Port

Language:    PCLXL

Printed:     Tue May 17 10:07:10 2016

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

GEORGE W. HUGUELY, V,

        *Petitioner,*

v.                            Case No. CL16-23

JOHN A. WOODSON, WARDEN,

        *Respondent.*

## AFFIDAVIT OF T_____

        ST, first being duly sworn, hereby states as follows:

1.    My name is _____. I was a member of the jury for the GEORGE WESLEY HUGUELY, V, trial. Throughout the trial I was known as Juror # 9. This affidavit is based upon my personal recollection of the events.

2.    I remember being in court when the video of Huguely's interview was played. I was not upset by witnessing the video, and I do not recall anything to indicate any of the other jurors being upset after watching the video.

1 of 2



3.      I recall during the jury deliberation phase of the trial that we, the jury, had some questions for the judge.  I believe a question dealt with the definition of the word "malice" or "provocation."  We dealt with questions by writing the judge a note with the question, then ringing the bell in the jury room where we were deliberating and a deputy would respond and take the note to the judge.  Then the deputy would return with a note back from the judge.

4.      I do not remember the jury ever asking for a dictionary.  I do not remember ever seeing a juror use a dictionary in the jury room at any time during jury deliberations.  I also do not remember any of the deputies bringing the jury a dictionary.

5.      This statement is accurate to the best of my knowledge and belief.

Sworn and subscribed to before me, a Notary Public in and for the City/County of ___Albemarle___ this _2_ day of ___May___, 20_16_.

___Denise P. Everhart___
Notary Public

My commission expires:___02/29/2020___

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires 02/29/2020

2 of 2

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

GEORGE W. HUGUELY, V,

       *Petitioner,*

v.                                      Case No. CL16-23

JOHN A. WOODSON, WARDEN,

       *Respondent.*

## AFFIDAVIT OF _____

_____ being duly sworn, hereby states as follows:

1.    My name is _____, was a member of the jury for the GEORGE WESLEY HUGUELY, V, trial.  Throughout the trial I was known as Juror # 42.  This affidavit is based upon my personal recollection of the events.

2.    I remember watching the video of Charlottesville City Police Department's interview with Huguely.  I was crying hard after watching the video.  I am a very emotional person.  After watching the video I wrote a

note to the judge because I was not sure if my emotional state would exclude me from being a juror. A deputy escorted me to the judge's chambers so I could speak with the judge. I do not remember which deputy escorted me to the judge's chambers. I also do not remember if the deputy was present for the conversation or whether the deputy was outside the door. The judge asked me if I could still be an impartial juror in the trial. I told the judge I could still be impartial. None of the other jurors knew I went to speak with the judge.

3.     During the jury deliberations the jury had an issue with the definition of the word "malice." The jury dealt with the issue by getting a dictionary. The dictionary was obtained by a juror knocking on the door to the jury room and asking a deputy for a dictionary. I am not sure which juror asked the deputy for the dictionary. I cannot recall which deputy the juror spoke with. A deputy returned with the dictionary. I do not know which deputy brought the jury the dictionary. I cannot describe the dictionary because I never had it. I cannot say if the dictionary was thick, thin, a hard back book, a soft back book, large, small, a single sheet of paper, whether it was a Webster's dictionary, or what color it was. Another juror read out of the dictionary. I do not know which juror had the dictionary

and read from it.  I do not recall what the juror did with the dictionary after reading from it or what was done with the dictionary after the jury used it.

4.     This statement is accurate to the best of my knowledge and belief.

Sworn and subscribed to before me, a Notary Public in and for the City/County of _____Albemarle_____ this _29_ day of _April_ , 20 _16_.

_____Denise P. Everhart_____
Notary Public

My commission expires: _02/29/2020_

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires _02/29/2020_

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

GEORGE W. HUGUELY, V,

Petitioner,

v.                                                          Case No. CL16-23

JOHN A. WOODSON, WARDEN,

Respondent.

AFFIDAVIT OF _____

_____ first being duly sworn, hereby states as follows:

1.    My name is _____ a. I was a member of the jury for the GEORGE WESLEY HUGUELY, V, trial.  Throughout the trial I was known as Juror # 130.   This affidavit is based upon my personal recollection of the events.

2.    I was the jury forewoman.

3.    I did not notice any of the jurors having any issues following the viewing of the video recording of the Huguely interview.  I am not aware of

any of the jurors going to the judge's chambers for any reason. No member of the jury was ever taken to the judge's chambers, to my knowledge.

4.      A couple of questions came up during jury deliberations. The jury needed clarification. One question dealt with the value of the computer and another was with the definition of a word. I believe the word the jury wanted the definition of was "intent." The jury resolved the questions by writing the question down on a piece of paper, the deputy took the piece of paper, and returned a while later with written response or a printout answering the question. I believe the written response came from the judge.

5.      I do not recall the jury ever asking for a dictionary. None of the deputies brought the jury a dictionary. I never saw any member use a dictionary during the deliberations. We did not have anything unless the Court approved it, no cell phones or anything. I am 100% sure nobody brought a dictionary into the jury deliberations and 99% sure if the jury ever had a dictionary it was provided by the court.

6.     This statement is accurate to the best of my knowledge and belief.

Sworn and subscribed to before me, a Notary Public in and for the City/County of ___*Albemarle*___ this 29 day of *April*, 20 *16*.

___*Denise P. Everhart*___
Notary Public

My commission expires: ___*02/29/2020*___

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires *02/29/2020*

3 of 3

VIRGINIA:

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

GEORGE W. HUGUELY, V,

*Petitioner*,

v.                                                    Case No. CL16-23

JOHN A. WOODSON, WARDEN,

*Respondent*.

## AFFIDAVIT OF ⸻ ⸻

⸻ st being duly sworn, hereby states as follows:

1.     My name is ⸻ I was a member of the jury for the GEORGE WESLEY HUGUELY, V, trial. Throughout the trial I was known as Juror # 211. This affidavit is based upon my personal recollection of the events.

2.     I remember watching the video of Huguely's interview in the court room. I was upset after witnessing the video in court but, not anymore upset than the rest of the jurors. I did not remember any of the

1 of 2

jurors being so upset they went to speak with judge in the judge's chambers.

3.    During the jury deliberations, the jury sent a few questions to the judge. I do not remember what the questions were. When the jurors had a question for the judge, the jurors would agree on the question, there was a phone or bell to call the deputy outside, the deputy would come to the jury room and take the question which was written on a piece of paper to the judge. After a period of time a written response was returned to the jury from the judge. I do not remember having a dictionary in the jury room. The jury was given the definitions of the words manslaughter, first-degree murder and second-degree murder. I believe the definitions were on a sheet of paper provided by the court.

4.    This statement is accurate to the best of my knowledge and belief.



Sworn and subscribed to before me, a Notary Public in and for the City/County of _Albemarle_ this _28_ day of _April_, 20_16_.

_Denise P. Everhart_
Notary Public

My commission expires: _02/29/2020_

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires 02/29/2020

2 of 2

VIRGINIA:

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

GEORGE W. HUGUELY, V,

*Petitioner,*

v.                                                    'Case No. CL16-23

JOHN A. WOODSON, WARDEN,

*Respondent.*

### AFFIDAVIT OF

'---, first being duly sworn, hereby states as follows:

1.      My name is                     ___ ᴉ. I was a member of the jury for the GEORGE WESLEY HUGUELY, V, trial.  Throughout the trial I was known as Juror # 217.  This affidavit is based upon my personal recollection of the events.

2.      I remember being in court when the video of Huguely's interview conducted by Charlottesville City Police Department being shown during the trial.  I was not upset by witnessing the video, and I do not recall anything to indicate any of the other jurors being upset after watching the

1 of 2

video.  I do not remember any of the jurors going to speak with the judge in the judge's chambers.

3.    I read about an alleged issue with the word "malice" in a recent news article in reference to Huguely's habeas petition.  I do not remember a dictionary ever being used by the jury.  I do not remember a dictionary being in the jury room.

4.    This statement is accurate to the best of my knowledge and belief.

Sworn and subscribed to before me, a Notary Public in and for the City/County of _Albemarle_ this _28_ day of _April_, 20 _16_.

_Denise P. Everhart_
Notary Public

My commission expires: _02/29/2020_

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires 02/29/2020

2 of 2

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

GEORGE W. HUGUELY, V,

        *Petitioner,*

v.                                Case No. CL16-23

JOHN A. WOODSON, WARDEN,

        *Respondent.*

## AFFIDAVIT OF _____

             rst being duly sworn, hereby states as follows:

1.    My name is              /as a member of the jury for the GEORGE WESLEY HUGUELY, V, trial.  Throughout the trial I was known as Juror # 117.  This affidavit is based upon my personal recollection of the events.

2.    I recall viewing the video recording of Huguely's police interview in the courtroom.  I do not recall any jurors going to the judge's chambers due to having an issue from watching the video.

1 of 2

3.      The jury did not ask for a dictionary but, we did send a note out asking for clarification on the word "malice." I think the note went to the judge. None of the jurors used a dictionary during deliberations. The only item I remember having during deliberations was a notebook which was provided by the Court for the jurors to take notes. The notebooks were turned into the Court at the end of the trial.

4.      This statement is accurate to the best of my knowledge and belief.

_____

Sworn and subscribed to before me, a Notary Public in and for the City/County of _Albemarle_ this _27_ day of _April_, 20 _16_.

_____
Notary Public

My commission expires: _02/29/2020_

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires _02/29/2020_

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE


GEORGE W. HUGUELY, V,

               *Petitioner,*

v.                                               Case No. CL16-23

JOHN A. WOODSON, WARDEN,

               *Respondent.*


### AFFIDAVIT OF

being duly sworn, hereby states as follows:

1.     My name is                            . I was a member of the jury for the GEORGE WESLEY HUGUELY, V, trial.  Throughout the trial I was known as Juror # 310.    This affidavit is based upon my personal recollection of the events.

2.     I remember the video of Huguely's interview being played in court.  I recall jurors being upset after watching the video.  I believed one of the other male jurors even shed a tear.  I do not think any of the jurors left the jury room to go talk to the judge in the judge's chambers.

1 of 2

3.      During the jury deliberation phase, the jury had a question about the definition of the word "malice."   The procedure to deal with questions was the jury wrote down the question on a sheet of paper, the jury rang a bell, the deputy would arrive and take the note, the deputy would return with a response.  I am not sure whether the deputy read the response or the jury read the response.  I assumed the judge wrote the response with the input of both sets of attorneys.

4.      I am not sure whether the jury asked for a dictionary or not.  My memory is very "fuzzy" on whether a dictionary might have been provided at some point.  If the jury was provided a dictionary it was obtained from a written question to the judge, and it would have come from the judge.  The jury forewoman would know best.  She wrote all of the questions to the judge from the jury.

5.      This statement is accurate to the best of my knowledge and belief.

Sworn and subscribed to before me, a Notary Public in and for the City/County of _Albemarle_ this _27_ day of _April_, 20_16_.

_Denise P. Everhart_
Notary Public

My commission expires: _02/29/2020_

2 of 2

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires 02/29/2020

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

GEORGE W. HUGUELY, V,

*Petitioner,*

v.                                                        Case No. CL16-23

JOHN A. WOODSON, WARDEN,

*Respondent.*

AFFIDAVIT OF ‾ ‾

‾ ‾ ‾ ‾ ‾ ‾, first being duly sworn, hereby states as follows:

1.    My name is ‾           ,           ‾ I was a member of the jury for the GEORGE WESLEY HUGUELY, V, trial.   Throughout the trial I was known as Juror # 127.    This affidavit is based upon my personal recollection of the events.

2.    I remember watching the video recording of the Huguely interview in court.   I believe the jury actually watched the video in its entirety twice, once in the courtroom and again during the jury deliberations.   I do not remember any of the jurors having any issues

1 of 2

watching the interview.  I also do not remember any of the jurors having to go to the judge's chambers because of issues watching the video during the trial.

3.     During jury deliberations the jury had some questions for the Judge but, I do not remember what they were.  I am not sure whether the questions dealt with a dictionary.  I remember some of the jurors having a question about the definition of the word "malice".  The jury asked the judge a question by writing a note to the judge, the deputy would come and take the note.  After a period of time, the deputy would return with a written response to the question.  I think the deputy took the note to the judge.  I do not recall a deputy ever bringing the jury a dictionary.  I do not remember ever seeing a jury member using a dictionary during jury deliberations.

4.     This statement is accurate to the best of my knowledge and belief.

Sworn and subscribed to before me, a Notary Public in and for the City/County of _____Albemarle_____ this _27_ day of _April_, 20 _16_.

_Denise P. Everhart_
Notary Public

My commission expires: _02/29/2020_

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires 02/29/2020

**VIRGINIA:**

**IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE**

**GEORGE W. HUGUELY, V,**

<em>Petitioner,</em>

**v.**                                                    . **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

<em>Respondent.</em>

<u>**AFFIDAVIT OF**</u>

          , first being duly sworn, hereby states as follows:

  1. My name is      . I was a member of the jury for the GEORGE WESLEY HUGUELY, V, trial.  Throughout the trial I was known as Juror # 27.  This affidavit is based upon my personal recollection of the events.

  2. I remember the video of Huguely's interview being played in court.  I do not remember jury members being upset due to witnessing the

1 of 2

interview video.  I do not remember any juror being so upset about the video they had to meet with the judge in the judge's chambers.

3.     During jury deliberations, the jury had an issue with the definition of a word.  I think the word the jury had an issue with was "malice."  The jury sent a written note to the judge asking for a definition. The jury received a response from the judge.

4.     I do not remember a dictionary ever coming into the jury room.

5.     This statement is accurate to the best of my knowledge and belief.

Sworn and subscribed to before me, a Notary Public in and for the City/County of _____Albemarle_____ this _27_ day of _April_, 20_16_.

_____
Notary Public

My commission expires: _02/29/2020_

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires 02/29/2020

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

GEORGE W. HUGUELY, V,

*Petitioner,*

v.                                                          Case No. CL16-23

JOHN A. WOODSON, WARDEN,

*Respondent.*

AFFIDAVIT OF _____

_____, first being duly sworn, hereby states
as follows:

1.    My name is _____. I was a member of the
jury for the GEORGE WESLEY HUGUELY, V, trial.  Throughout the trial I
was known as Juror # 17.  This affidavit is based upon my personal
recollection of the events.

2.    I do not know if any juror had any issue after viewing the video
of Huguely's interview with police.  We, the jury, had been instructed to not
talk about the case until we were in jury deliberations.  I do not recall any
juror being called to the judge's chambers for any issue during the trial.

1 of 2

3.     During deliberations the jury got "stuck" on the definition of a word. I believe the word was "reasonable." I believe the jury dealt with this by the jury forewoman sending out a question written on a piece of paper. I do not think the jury ever asked for a dictionary. I do not remember seeing any of the other jury members using a dictionary during the jury deliberations. I do not remember any of the deputies bringing the jury a dictionary during jury deliberations. The deputies brought us a flip board to write things down on.

4.     This statement is accurate to the best of my knowledge and belief.

Sworn and subscribed to before me, a Notary Public in and for the City/County of _____Albemarle_____ this _26_ day of _April_, 20_16_.

_____Denise P. Everhart_____
Notary Public

My commission expires: _04/29/2020_

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires 04/29/2020

VIRGINIA:

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

GEORGE W. HUGUELY, V,

    *Petitioner,*

v.                                                            Case No. CL16-23

JOHN A. WOODSON, WARDEN,

    *Respondent.*

## AFFIDAVIT OF

                                   , first being duly sworn, hereby states as follows:

1.     My name is _____ / _____. was a member of the jury for the GEORGE WESLEY HUGUELY, V, trial.  Throughout the trial I was known as Juror # 63.  This affidavit is based upon my personal recollection of the events.

2.     I remember the video of Huguely's interview being played in court.  I did not have any issues watching the video and I do not recall seeing any jury members being visibly upset due to watching the interview

1 of 2

video.  I do not remember any juror being so upset about the video that they had to meet with the judge in the judge's chambers.

3.      During jury deliberations, I recall that an issue came up about the definition of a word, but I do not remember which word.  A note was sent to the judge from the jury forewoman.  The jury received a response from the judge.  I do not recall the jury ever asking for a dictionary.  I do not recall the jury ever using a dictionary.  I do not recall a dictionary ever being present in the jury room.

4.      This statement is accurate to the best of my knowledge and belief.

Sworn and subscribed to before me, a Notary Public in and for the City/County of _Albemarle_ this _26_ day of _April_ , 20_16_.

_____
Notary Public

My commission expires: _02/29/2020_

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires 02/29/2020

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

**GEORGE W. HUGUELY, V,**

               *Petitioner,*

**v.**                                                                          **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

               *Respondent.*

### AFFIDAVIT OF CHRISTOPHER J. MUNDY

Christopher J. Mundy, first being duly sworn, hereby states as follows:

1.      My name is Christopher J. Mundy. I serve as a part time Deputy Sheriff for the City of Charlottesville Sheriff's Office. This affidavit is based upon my personal recollection of the events.

2.      I believe I was present in the court room when the video recording of Huguely's interview conducted by Charlottesville Police Department was played for the jury. I do not recall any jurors having issues after witnessing the video and being taken into the Judge's chambers. I also never heard any of the other Deputies say it had occurred. I was on duty for part of the jury deliberations.

3.      I was never asked by the jury to get a dictionary and I never

RESPONDENT'S EXHIBIT C

took a dictionary to the jury.  I never heard any of the other Deputies mention the jury asking for a dictionary or taking the jury a dictionary.

4.    This statement is accurate to the best of my knowledge and belief.


CHRISTOPHER J. MUNDY


Sworn and subscribed to before me, a Notary Public in and for the City/County of _Charlottesville_ this _UA 14th_ day of _April_, 20 _16_


Notary Public

My commission expires:____9-30-18____

KEVIN W. BAUGHER
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES  SEPT. 30, 2018
COMMISSION # 7338812

2

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

**GEORGE W. HUGUELY, V,**

<em>Petitioner,</em>

**v.**                                                    **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

<em>Respondent.</em>

### <u>AFFIDAVIT OF SHAWN CHANDLER FEGGANS</u>

Shawn Chandler Feggans, first being duly sworn, hereby states as follows:

1.     My name is Shawn Chandler Feggans.  I served as a Deputy Sheriff for the City of Charlottesville Sheriff's Office holding the rank of Corporal and was working in this capacity in February 2012 during the trial of George Wesley Huguely, V.  This affidavit is based upon my personal recollection of the events.

2.     In February 2016, I left the Sheriff's Office to start a new job with Charlottesville City Schools.

3.     The Deputies are cross trained in all aspects of court security

(Judge, Jury, Court Complex and the Defendant).

4.    I do not remember if I was present when the video recording of the Huguely interview was played for the jury.

5.    I do not recall any issues occurring with any of the jurors due them witnessing the video recording.  If there was an issue with a juror the Judge could call the juror into the Judge's chambers, depending on whether it is a public issue or a private issue.  Whether it was a public issue or a private issue, it was the Judge's practice to always inform both sets of counsel as to the nature of the issue.

6.    The jury never asked me for a dictionary and I never took them a dictionary.  I never heard any of the other Deputies say anything about taking the jury a dictionary.  During jury deliberations, if the jury has a question they can ring a bell in the jury room.  Any Deputy who is working court or close by can respond to the bell.  The question is submitted in writing to the Judge.  The Judge will then present the question to both sets of counsel.  Once a decision has been reached on the question the Judge will inform the jury of the decision.

2

7.     This statement is accurate to the best of my knowledge and belief.

_____
SHAWN CHANDLER FEGGANS

Sworn and subscribed to before me, a Notary Public in and for the City/County of _____Albemarle_____ this _11_ day of _April_, 20_16_.

_____
Notary Public

My commission expires:_____02/29/2020_____

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires 02/29/2020

3

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

**GEORGE W. HUGUELY, V,**

*Petitioner,*

**v.**                                                    **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

*Respondent.*

## AFFIDAVIT OF ALPHONZO CALVERT ANDERSON

Alphonzo Calvert Anderson, first being duly sworn, hereby states as follows:

1.      My name is Alphonzo Calvert Anderson.  I serve as a part time Deputy Sheriff for the City of Charlottesville Sheriff's Office and was working in this capacity in February 2012 during the trial of George Wesley Huguely, V.  This affidavit is based upon my personal recollection of the events.

2.      I was not at the trial and never had any contact with the jury.  I was assigned to the media staging area for everyday of the trial.

3.      I did not hear of any jurors getting called back to the Judge's chambers during any point of the trial.  Also, I have not heard any of the

other Deputies mention the jury asking for a dictionary or any Deputies saying a Deputy had taken a dictionary to the jury.

4.    This statement is accurate to the best of my knowledge and belief.


_Alphonzo C. Anderson_
ALPHONZO CALVERT ANDERSON


Sworn and subscribed to before me, a Notary Public in and for the City/County of _Albemarle_ this _11_ day of _April_, 20_16_.


_Denise P. Everhart_
Notary Public

My commission expires: _02/29/2020_

DENISE P. EVERHART
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7523707
My Commission Expires _02/29/2020_

2

**VIRGINIA:**

**IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE**

**GEORGE W. HUGUELY, V,**

*Petitioner,*

**v.**                                                        **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

*Respondent.*

## AFFIDAVIT OF DAVID NATHANIEL JACKSON

David Nathaniel Jackson, first being duly sworn, hereby states as follows:

1.      My name is David Nathaniel Jackson.  I serve as a Deputy Sheriff for the City of Charlottesville Sheriff's Office.  This affidavit is based upon my personal recollection of the events.

2.      I remember being present in Court on a Saturday and the jury being shown a video recording of the interview of Huguely conducted by the Charlottesville Police.

3.      I do not recall any issues occurring at the trial due to juror witnessing the video.  I never heard of any issues with any of the jurors.  If there is a problem with a juror, the Judge would talk to the juror with both

sets of counsel being present.

4.  I do not recall the jury asking for a dictionary.  I did not take the jury a dictionary and never heard of any other Deputies taking the jury a dictionary.  If the jury has a question for the Judge, the jury will hit a buzzer in the jury room.  The jury will have to write down the question and submit it to the Judge.  The Judge will present the issue to both sets of counsel.  When counsel and the Judge come to an agreement, the jury will be notified of the decision.  If the jury asked for a dictionary, it should be on the transcript.

5.   This statement is accurate to the best of my knowledge and belief.


_____

DAVID NATHANIEL JACKSON

Sworn and subscribed to before me, a Notary Public in and for the City/County of _Charlottesville_ this _VA_ _8th_ day of _April_ , 20_16_.


_____

Notary Public

My commission expires:_9-30-18_

KEVIN W. BAUGHER
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES SEPT. 30, 2018
COMMISSION # 7338812

2

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

**GEORGE W. HUGUELY, V,**

*Petitioner,*

**v.**                                                    **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

*Respondent.*

## AFFIDAVIT OF PAUL C. CRITZER

Paul C. Critzer, first being duly sworn, hereby states as follows:

1.      My name is Paul C. Critzer.  I serve as a Deputy Sheriff for the City of Charlottesville Sheriff's Office.   This affidavit is based upon my personal recollection of the events.

2.      I have definitely seen portions of Huguely's interview but cannot remember if I saw it in court or when it played on the news.  I do not remember any issues with a juror which would have caused the juror to be taken to the Judge's chambers.  I was not assigned to the jury during jury deliberations.

3.      I do not recall the jury ever asking for a dictionary and also never heard any of the Deputies mentioning a Deputy taking the jury a

dictionary.

4.    This statement is accurate to the best of my knowledge and belief.

_Paul C. Critzer_
PAUL C. CRITZER


Sworn and subscribed to before me, a Notary Public in and for the City/County of _Charlottesville_ this _8_ day of _April_, 20_16_.

_[signature]_
Notary Public

My commission expires:_9-30-18_

KEVIN W. BAUGHER
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES  SEPT. 30, 2018
COMMISSION # 7338812

2

**VIRGINIA:**

**IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE**

**GEORGE W. HUGUELY, V,**

        *Petitioner,*

**v.**                               **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

        *Respondent.*

## AFFIDAVIT OF NICOLE M. PETTY

Nicole M. Petty, first being duly sworn, hereby states as follows:

1.     My name is Nicole M. Petty.  I serve as a Deputy Sheriff for the City of Charlottesville Sheriff's Office.  I was present at the entire trial of George Wesley Huguely, V in February 2012.  I was still in Field Training Status during the trial, so I never did any assignment alone.  My Field Training Officer, Michael Twyman Greene, was always present.  This affidavit is based upon my personal recollection of the events.

2.     I was not present in the court room when the video recording of the Huguely interview was played for the jury.

3.     I never heard of any issue with a juror causing the juror to be taken back into the Judge's chambers during the trial.

4.     I did not have any contact with the jury during jury deliberations. I have not heard of any other deputy bringing a dictionary for the jury.

5.     This statement is accurate to the best of my knowledge and belief.

_____
NICOLE M. PETTY

Sworn and subscribed to before me, a Notary Public in and for the City/County of _Charlottesville_ this _8_ day of _April_, 20_16_

_____
Notary Public

My commission expires:_9-30-18_

KEVIN W. BAUGHER
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES SEPT. 30, 2018
COMMISSION # 7338812

2

**VIRGINIA:**

**IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE**

**GEORGE W. HUGUELY, V,**

*Petitioner,*

**v.**                                                   **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

*Respondent.*

**<u>AFFIDAVIT OF MICHAEL TWYMAN GREENE</u>**

Michael Twyman Greene, first being duly sworn, hereby states as follows:

1.      My name is Michael Twyman Greene.  I serve as a Deputy Sheriff for the City of Charlottesville Sheriff's Office.  This affidavit is based upon my personal recollection of the events.

2.      I was not assigned to the jury during jury deliberations.  I do not recall being present in the courtroom when the video was played.  I did not hear of any issues which arose from the playing of the video for the jury.  I did not hear any of the other Deputies mention any issues with the jury.  I do not recall if a juror got called into the Judge's chambers or not.  It "sounds vaguely familiar," but am not sure because there have been so many trials and the Huguely trial was a few years ago.  If a juror did get

called into the Judge's chambers, both counsel would have been present or notified.

3.      The security for the trial was handled by the City of Charlottesville Sheriff's Office alone.

4.      I had not heard of any of the other Deputies mention taking a dictionary to the jury or the jury asking for a dictionary.  I have not heard of anything like that.  If the jury wanted a dictionary, they would submit the request to the Judge in writing.  The Judge would present the issue to both sets of counsel, and when an agreement was reached, the Judge would inform the jury of the answer to their request.  If a request for a dictionary occurred, it would be in the transcript of the trial.

5.      This statement is accurate to the best of my knowledge and belief.

_____
MICHAEL TWYMAN GREENE

Sworn and subscribed to before me, a Notary Public in and for the City/County of _Charlottesville_ this _8th_ day of _April_, 20_16_.

_____
Notary Public

My commission expires: _March 31, 2019_

2

ALISON DORA MARKS
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES MAR. 31, 2019
COMMISSION # 7627338

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

**GEORGE W. HUGUELY, V,**

*Petitioner,*

v.                                                                          **Case No. CL16-23**

**JOHN A. WOODSON, WARDEN,**

*Respondent.*

## AFFIDAVIT OF ROSE M. CLARK

Rose M. Clark, first being duly sworn, hereby states as follows:

1.      My name is Rose M. Clark.  I serve as a Deputy Sheriff for the City of Charlottesville Sheriff's Office.   This affidavit is based upon my personal recollection of the events.

2.      I was present in the court room when the video recording of Huguely's interview was played for the jury.  I believe I was assigned to the jury on the day the video was shown.

3.      I do not remember any of the jurors having an issue.  I do not recall any juror being taken to the Judge's chambers.  Jurors have been taken to the Judge's chambers for issues during other trials.  Other trials when a juror went to the Judge's chambers for an issue, the court bailiff

would be present in the Judge's chambers along with both sets of counsel. I was not assigned to the jury during jury deliberations.  There was one trial where a jury asked for a dictionary but I don't think it was Huguely's.  In that trial, the jury submitted a question to the Judge in writing, the Judge discussed the issue with both sets of counsel, the decision was made for the jury to not have access to a dictionary and the deputy did not take a dictionary to the jury.

4.    This statement is accurate to the best of my knowledge and belief.

_____

ROSE M. CLARK

Sworn and subscribed to before me, a Notary Public in and for the City/County of _Charlottesville_ this _6_ day of _April_, 20_16_.

_____

Notary Public

My commission expires: _9-30-18_

KEVIN W. BAUGHER
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES SEPT. 30, 2018
COMMISSION # 7338812

2

**VIRGINIA:**

## IN THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

**GEORGE W. HUGUELY, V,**

*Petitioner,*

v.                                                          Case No. CL16-23

**JOHN A. WOODSON, WARDEN,**

*Respondent.*

## <u>AFFIDAVIT OF THOMAS CHRISTOPHER WALTON</u>

Thomas Christopher Walton, first being duly sworn, hereby states as follows:

1.      My name is Thomas Christopher Walton.  I serve as a Deputy Sheriff for the City of Charlottesville Sheriff's Office.  This affidavit is based upon my personal recollection of the events.

2.      I do not believe I had any contact with the jury during jury deliberations.  I did walk the jury in and out of the Court.  I was present in the court room when the jury viewed the video recording of the Huguely interview conducted by the Charlottesville Police.  The video was played numerous times during the trial.  I do not remember any issues occurring

due to a juror witnessing the video of the interview, and never heard any of the other Deputies mentioning an issue with a juror because of the video. If a juror had an issue, the Judge would have interviewed the juror with both sets of counsel present.

3.    I never took the jury a dictionary and never heard any of the other Deputies mention taking the jury a dictionary.

4.    This statement is accurate to the best of my knowledge and belief.

THOMAS CHRISTOPHER WALTON

Sworn and subscribed to before me, a Notary Public in and for the City/County of _Charlottesville_ this _8th_ day of _April_ , 20_16_

Notary Public

My commission expires: _9-30-18_

KEVIN W. BAUGHER
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES SEPT. 30, 2018
COMMISSION # 7338812

2