RESPONDENT'S EXHIBIT 11

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF CHARLOTTESVILLE

**GEORGE W. HUGUELY, V, NO. 1458946**
  **Petitioner,**

**v.**                                    **Record No. CL16-23**

**JOHN A. WOODSON, WARDEN**
  **Respondent.**

## FINAL ORDER

This matter came before the Court on a Petition for Writ of Habeas Corpus, Appendix and exhibits, Amended Petition and exhibits, Respondent's Motion to Dismiss and exhibits and Petitioner's Reply and exhibits. Upon mature consideration of all the pleadings and exhibits filed by the parties, review of pertinent portions of the trial transcripts, and controlling legal authority, the Court determines the petitioner is not entitled to the relief sought.

Pursuant to Virginia Code § 8.01-654(B)(5), the Court makes the required findings of fact and conclusions of law in the Court's letter opinion letter dated August 10, 2018, which is attached and incorporated herein by this reference.

The record in the case of *Commonwealth v. George W. Huguely, V*, Case No. CR11-102-1, is hereby made a part of the record in this case.

The Court is of the opinion that the petition for a writ of habeas corpus should be denied and dismissed; it is, therefore,

**ADJUDGED** and **ORDERED** that the petition for a writ of habeas corpus be, and is hereby, denied and dismissed.

It is further **ORDERED** that pursuant to counsel for petitioner's express written waiver, counsel's endorsement on this Order is dispensed with pursuant to Rule 1:13 of the Supreme Court of Virginia.

The Clerk is directed to forward a certified copy of this Order to the petitioner's counsel, Jonathan Sheldon, Esquire; respondent's counsel, Leah A. Darron, Senior Assistant Attorney General.

ENTERED this 17th day of August, 2018.

_____
Judge

I ask for this:

_____
LEAH A. DARRON
Senior Assistant Attorney General
Virginia State Bar No. 23823
OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 (phone)
(804) 371-0151 (fax)

2

# COMMONWEALTH OF VIRGINIA



## Sixteenth Judicial Court

Daniel R. Bouton
P.O. Box 230
Orange, Virginia 22960
(540) 672-2433
(540) 672-2189 (fax)

Timothy K. Sanner
P.O. Box 799
Louisa, Virginia 23093
(540) 967-5300
(540) 967-5681 (fax)

Cheryl V. Higgins
501 E. Jefferson St., 3rd Floor
Charlottesville, Virginia 22902
(434) 972-4015
(434) 972-4071 (fax)

Susan L. Whitlock
135 West Cameron Street
Culpeper, Virginia 22701
(540) 727-3440
(540) 727-7535 (fax)

Richard E. Moore
315 E. High Street
Charlottesville, Virginia 22902
(434) 970-3760
(434) 970-3038 (fax)

Albemarle  Culpeper  Fluvanna  Goochland
Greene  Louisa  Madison  Orange  Charlottesville

August 10, 2018

Jonathan P. Sheldon, Esq.
Sheldon & Flood, P.L.C.
10621 Jones Street, Suite 301-A
Fairfax, Virginia 22030

Leah A. Darron
Sr. Asst. Attorney General
Virginia Attorney General's Office
202 E. 9th Street
Richmond, Va. 23219

Bernadette Donovan, Esq.
Donovan Engle
1134 East High St., Unit A
Charlottesville, Va. 22902

Re: <u>Huguely v. Warden</u>—Habeas Corpus Petition—Ruling on Motion to Dismiss
Last Court hearings: Sept. 26, 2016, and June 28, 2018; Cir. Crt. File No. CL 16-23

Dear Mr. Sheldon, Ms. Donovan, and Ms. Darron:

I have re-read and fully considered the Amended Petition for a Writ of Habeas Corpus, the Motion to Dismiss, and Petitioner's Response to the Motion to Dismiss, along with the Appendix to the original Petition, the affidavits filed with the Motion to Dismiss, and portions of the trial transcript.

Petitioner raises eight claims in his Amended Petition (all of which were in the original Petition).[1]

### The Standard of Review

The standard for ineffective assistance on habeas corpus review is set by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Counsel's performance must be so deficient that no reasonable counsel would have engaged in the behavior, and the attorney is effectively not functioning as counsel as anticipated by the 6th Amendment. <u>Strickland</u>, 466 U.S. at 687. The standard is "reasonably effective assistance." <u>Id</u>. "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." <u>Id</u>. at 688. "Judicial scrutiny of counsel's performance must be

---

[1] He states he "deleted" two of the original claims (Amended Petition, page 1, footnote 1), but makes no specific reference to or mention of which; one appears to be merged with another claim.

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Two

highly deferential, ... a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, ... [and] the defendant must overcome the presumption that, under the circumstances, the challenged action '***might be*** considered sound trial strategy'." Id. at 689 (citation omitted). [Emphasis added]. This is a difficult standard to meet.

Secondly, if the performance is deficient, the effect must be prejudicial to Petitioner's case. This means that but for the deficiency it is reasonably likely that the outcome of the case would have been different. If that is not shown, there is no prejudice; that is, if the outcome would likely have been the same anyway, any error is harmless.

### Claim I—The Dictionary

Petitioner asserts that because a bailiff gave a juror a dictionary to refer to, on the issue of malice, this was an improper external influence and is presumptively prejudicial, and requires his conviction for second degree murder to be overturned.[2]

I will deny the relief requested on this claim for two reasons. First, and most importantly, I cannot find by a preponderance of the evidence that the incident occurred at all, or at least not as Petitioner describes.

There were twelve jurors. Only one juror (Juror #42) purports to remember an incident regarding a dictionary. She simply says, "During the jury deliberations the jury had an issue with the definition of the word 'malice'. The jury dealt with the issue by getting a dictionary. The dictionary was obtained by a juror knocking on the door to the jury room and asking a deputy for a dictionary....A deputy returned with the dictionary...Another juror read out of the dictionary." However, she has no recollection of any specifics or details. She continues:

> I am not sure which juror asked the deputy for the dictionary. I cannot recall which deputy the juror spoke with....I do not know which deputy brought the jury the dictionary. I cannot describe the dictionary because I never had it. I cannot say if the dictionary was thick, thin, a hard back book, a soft back book, large, small, ***a single sheet of paper***, whether it was a Webster's dictionary, or what color it was....I do not know which juror had the dictionary and read from it. I do not recall what the juror did with the dictionary after reading from it or what was done with the dictionary after the jury used it. [Emphasis added].

---

[2] This claim does not appear to be "ineffective assistance" in the strict sense, in that I do not believe there is an allegation that the attorneys knew of the alleged incident at the time. It is in the nature of an impermissible "external influence". The rest are true ineffective assistance claims.

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Three

This juror's statement certainly raises a question. However, there were also affidavits filed from ten other jurors. Not one of them remembers anything about a dictionary being asked for, obtained, or read from.[3] Their various responses were:

> I do not remember the jury ever asking for a dictionary. I do not remember ever seeing a juror use a dictionary in the jury room at any time during jury deliberations. I also do not remember any of the deputies bringing the jury a dictionary. (Juror #9).

> I do not think the jury ever asked for a dictionary. I do not remember seeing any of the other jury members using a dictionary during the jury deliberation. I do not remember any of the deputies bringing the jury a dictionary during jury deliberations. (Juror #17)

> I do not remember a dictionary ever coming in to the jury room. (Juror #27)

> I do not recall the jury ever asking for a dictionary. I do not recall the jury ever using a dictionary. I do not recall a dictionary ever being present in the jury room. (Juror #63)

> The jury did not ask for a dictionary but, we did send a note out asking for clarification on the word "malice". I think the note went to the judge. None of the jurors used a dictionary during deliberations. (Juror #117)

> During jury deliberations the jury had some questions for the Judge but, I do not remember what they were. I am not sure whether the questions dealt with a dictionary….I do not recall a deputy ever bringing the jury a dictionary. I do not remember ever seeing a jury member using a dictionary during jury deliberations. (Juror #127)

> I do not recall the jury ever asking for a dictionary. None of the deputies brought the jury a dictionary. I never saw any member use a dictionary during the deliberations. We did not have anything unless the Court approved it….I am 100% sure nobody brought a dictionary into the jury deliberations and 99% sure if the jury ever had a dictionary it was provided by the court. (Juror #130)

> I do not remember having a dictionary in the jury room. The jury was given the definitions of the words manslaughter, first-degree murder and second-degree murder. I believe the definitions were on *a sheet of paper* provided by the court. (Juror #211) [Emphasis added].

---

[3] Apparently one of the jurors refused or failed to submit an affidavit. Motion to Dismiss, page 37, footnote 6.

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Four

> I do not remember a dictionary ever being used by the jury. I do not remember a dictionary being in the jury room. (Juror #217)

> I am not sure whether the jury asked for a dictionary or not. My memory is very "fuzzy" on whether a dictionary might have been provided at some point. If the jury was provided a dictionary it was obtained from a written question to the judge, and it would have come from the judge. (Juror #310)

Further, of the nine deputies who served as bailiffs who submitted affidavits, not one of them indicated they were asked to get a dictionary, or that they got a dictionary, or gave a dictionary to the jury or a juror, or that they recall any other bailiff or deputy or anyone else giving the jury a dictionary, or that they remember seeing a juror with a dictionary. (It is of note, however, that one of the bailiffs Deputy Rose Clark, did remember one occasion where a jury asked for a dictionary, but she did not believe it was the Huguely trial, and she recalled that the request was denied by the Court after the judge consulted with counsel, and no dictionary was provided.)

So I find that the Attorney General is correct in asserting that, on this issue, a sufficient ruling can be made from the affidavits without a further evidentiary hearing, and that the factual basis for this claim is not made out by a preponderance of the evidence.[4] (See Conclusion, page 16 this letter). In fact the Court finds the opposite—that it would appear much more likely that the one juror is mistaken and has confused something else with a dictionary (perhaps a note being sent back by the judge, which everyone said was how their questions were submitted and answered, or the single sheet of paper remembered by Juror #211), or perhaps confused the incident with another case, than that a dictionary was used and not a single other juror--not even the one who supposedly had or read from it--or any bailiff remembers such. So I will dismiss this claim for that reason.

However, even if there were a dictionary requested and brought into the jury room, I also would find that there is insufficient evidence or specifics in the Petition, affidavits, or record of what if anything was read. The reason I mention this is that if, for example, a definition were read from Black's Law Dictionary that tracked the language of an instruction, then it would be of no import, or if some other definition were consistent with and not contradictory of or in conflict with the instruction given, then such would be harmless. If we do not know any of the content I cannot find that such "external influence" would be prejudicial. Petitioner asserts that such is presumed to be prejudicial, under Remmer v. U.S., 347 U.S. 227 (1954). But most of the other instances cited involved actual external "evidence" (newspaper, almanac, viewing a crime scene, or photos). See Turner v. Louisiana, 379 U.S.

---

[4] If the issue were anything else—for example, whether a traffic light was red or green, whether the car was white or blue, whether "Joseph" was at the party—a similar collection of sworn statements clearly would not be sufficient to establish the affirmative assertion by a preponderance.

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Five

466, 472-73 (1965); Barnes v. Joyner, 751 F.3d 229, 240 (4th Cir. 2014); Evans-Smith v. Commonwealth, 5 Va. App. 188, 207 (1987). While Petitioner cites two Fourth Circuit cases and one New Jersey Circuit Court case from 1940 regarding dictionaries--McNeill v. Polk, 476 F.3d 206,226 (4th Cir. 2007); U.S. v. Duncan, 598 F.2d 839, 866 (4th Cir. 1979); In re Collins' Will, 15 A.2d 98, 99 (N.J. Cir. Ct. 1940)--I am not convinced that consulting a dictionary on the meaning of a word[5] would be tantamount to insertion of external evidence into the case. See U.S. v. Henley, 238 F.3d 1111, 1115-16 (9th Cir. 2001); Riner v. Commonwealth, 268 Va. 296, 316 (2004), citing Remmer, above. I do not find Petitioner's argument persuasive on this point. I do not find that simply having a dictionary—which the evidence does not establish—without more, would be prejudicial *per se* or presumptively prejudicial.

Also, the jury was specifically instructed to make their ruling based only on the evidence and law given to them in the courtroom.[6] There is a presumption that the jury followed the instructions.

But the primary reason I am dismissing this claim is that the proffered evidence does not establish that a dictionary was brought into the jury room or used by the jury.

### Claim IV—The Instruction

The instruction that Petitioner says trial counsel should have offered was not required, based on the evidence in the case and the instructions given. It is indeed, as Petitioner claims, the Court's duty to instruct the jury properly. But as the Court of Appeals ruled, the jury here was properly instructed:

> ...the trial judge without question provided the jury an accurate instruction addressing malice. The instruction offered by the Commonwealth, which the trial judge accepted and read to the jury, has been approved by the Supreme Court of Virginia and is a model jury instruction on malice....The jury was correctly instructed on malice.

> ..."When granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle."

Huguely v. Commonwealth, 63 Va. App. 92, 129 (2014), quoting Stockton v. Commonwealth, 227 Va. 124 (1984). If the jury was adequately and properly instructed, then failure to offer other instructions could

---

[5] This is something appellate courts do regularly, outside of the record. In addition, jurors also bring their knowledge of the meaning of words—no doubt often learned from dictionaries--into the jury room every day.

[6] Motion to Dismiss, page 36, ¶ 60; 2/8/12 Tr. 789, App. 1467-68. Judge Hogshire instructed the jury, "You as jurors must decide this case based on the evidence presented [in] this courtroom....[Y]ou must not conduct any independent research about the case, the matters in the case, the individuals involved in the case; ...you should not consult dictionaries or reference materials...to obtain information about the case to help you decide the case."

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Six


not be a basis for a finding of deficient performance. This appears to be an attempt to re-litigate an issue that was raised and addressed on direct appeal.

The fact that certain terms—"probable cause", "reasonable doubt", "adequate provocation", "heat of passion", "malice"--do not admit of simple definitions, and have been the subject of much discussion in the courtroom as well as the law school classroom, does not mean that a jury cannot be adequately instructed on them. Jury instructions are not inadequate, and counsel's performance not ineffective or deficient, for the lack of introducing additional instructions in an effort or attempt to further clarify, augment, or supplement instructions that have been found to be accurate and proper.

In addition, the language urged by Petitioner was taken from a case opinion, and was not an approved instruction from the Model Jury Instructions, nor was it an agreed-upon instruction that both parties thought would assist the jury. Lawrence Affidavit ¶10. We cannot assume that such instruction, if offered, would have been given by the court. (Counsel did offer another instruction on malice that he believed was appropriate and would have been helpful, and such was refused by the Court. Lawr. Aff. ¶9.) As other courts have observed, the issue is not whether another tack might have been taken, or a different approach might have been helpful, but whether counsels' choices were reasonable among a panoply of options. Aside from the jury having been properly instructed and there being no deficiency or prejudice, trial counsels' offering instruction BB, filing a memorandum in support thereof, and arguing such certainly fulfilled their duty with regard to pursuing a proper instruction on malice.

This issue, too, can be decided on the record, transcript, and Court of Appeals opinion. The jury was adequately instructed, so trial counsels' refusal to offer the suggested language in an instruction was not deficient performance. Thus, there was also no prejudice from not giving the suggested instruction, so I will dismiss the Amended Petition as to Claim IV.

## Claim VI—The Exhibit Marking

The writing on the cover or sleeve of the DVD also is not a basis to overturn this conviction or find any deficient performance on the part of trial counsel. The marking was simply: "Type of Case—Murder". This was in fact, in common parlance, a "murder case". The defendant was charged with murder. He was arraigned on murder, and was on trial for murder. Of the four substantive charges he could have been convicted of and the jury was instructed on, two of them were murder.

I do not find that the jury would have been confused or affected by a marking on the outside of an exhibit stating what type of case it was, when that statement was accurate and there was nothing else extraneous, extreme, misleading, or prejudicial therein.

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Seven

Surely, taking the case as a whole, the jury clearly knew that they had a choice between first degree and second degree murder, and voluntary or involuntary manslaughter. They knew that the issues included malice, heat of passion, provocation, intent, and accident. There is no basis in the case, in fact or reason, to think that any juror would find that such a marking on an exhibit as to the type of case would be a signal to them that their work had already been done for them and that they needed to find the defendant guilty of some type of murder. (Petitioner stretches to say that the exhibit "told them" to find him guilty of murder. Petition page 75, ¶ 134). I do not recall seeing any evidence presented or proffered, in the way of affidavits or the record, to say that any juror was even aware of this, much less that it had any effect on anyone. Specifically, I do not find, as asserted by Petitioner, that there is a reasonable probability that the jury, because of the DVD sleeve, thought that Huguely was guilty of murder and that he had to persuade them otherwise. Amended Petition page 76, ¶ 136. There is no basis to find a reasonable likelihood that, if the exhibit had not gone to the jury in that form, the outcome would have been different, so there is no prejudice. The jury deliberated for nine hours (Am. Pet. page 34); there is no indication that the marking on the exhibit even came into their discussions, much less that it affected their deliberations.

So I dismiss the Amended Petition as to Claim VI.

### Claim V—The Prosecutor's Closing Argument

Petitioner argues that one portion of the Commonwealth's Attorney's closing argument is an improper and unconstitutional reference to his election not to testify. The prosecutor did argue in closing, "It is fair to expect some explanation for the lie that he told you, and you have none".

I do not find that this is a direct comment on Petitioner's failure to testify or is reasonably taken to be such. When I first read the statement, before I read the Motion to Dismiss, I did not read it as the prosecutor's commenting on Huguely's failure to testify. Rather, it struck me that the Commonwealth's Attorney was arguing that the defendant had put on evidence, but none of his evidence has addressed this point—explaining why the defendant would lie about being with Bolton and Clements, and about Clements being drunk, and then not responding at all to Carroll when he confronted and questioned Huguely about this. This is in line with how the Attorney General argues it was intended and heard. Trial counsel also did not believe such violated the 5th Amendment rights of Petitioner. Lawr. Aff. ¶11.

This statement fairly presented and characterized what the evidence showed Huguely had said: that he was with Bolton and Clements, and that Clements was drinking. Witness Clausen said that Carroll knew that Clements was working on a paper and was not drinking. Carroll believed that Huguely was not with Bolton in Clements' apartment. Carroll confronted Huguely, not knowing any reason

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Eight

Huguely should lie about this. Huguely gave no response. Clausen's concerns and doubts were not challenged or contradicted on this point. He was expecting some explanation from his friend. He wondered about why Huguely would lie about being with Clements and Bolton. Mot. Dism., pages 61-62, ¶ 94; 2/15/12 Tr. 101-04, App. 3325-28; 2/15/12 Tr. 80-81, 3304-05

It would be reasonable, then, for the jury also to expect some explanation for this situation and statement as well, as the statement was attributed to the defendant, and appeared to be not true, and thus would not be unfair for the Commonwealth to call attention to it and comment on it.

Many of the cases cited by Petitioner deal with direct comments on the defendant's failure to testify or exercising his right to remain silent. This is not a situation where the prosecutor argued "You did not hear the defendant tell you...", or "Why didn't Mr. Huguely take the stand?" And it was not a case where no evidence was put on by the defendant and the Commonwealth commented on such absence of evidence. The defendant did put on evidence, and did not address this discrepancy or concern. I believe that is fair game, and the subject of fair comment. So I do not believe that this would naturally be taken as a comment on the defendant's failure to testify, thus I do not find the Commonwealth's Attorney's comment improper in the first place.

But, finally, and most important, even if it were improper, it is a different matter to say that trial counsel, in not objecting, was ineffective or deficient, or fell below the standard for reasonable counsel. There is always a question in any case of whether to object to objectionable material (be it evidence, a question, or argument). The issue is whether the objection itself will do more harm than good. The objection might be overruled and the jury may think the attorney is trying to hide something from them, something that will hurt that attorney's case. Or the objection might be sustained, and the jury may think that this evidence, whatever it is, really would hurt that attorney's case, and it would hurt him so bad that he has now successfully "hidden it from us". An objection could be counterproductive.

Thus, there is always a trade-off with objections. Mr. Lawrence considered this trade-off, as all good trial attorneys should with every objection. For Petitioner to prevail on this point I would need to find that no reasonable attorney would have refused or failed to object or chosen not to, or not asked for a mistrial, and I cannot do that.

So I do not find that the statement itself infringed on Petitioner's Fifth Amendment rights, in that I do not find it to be a comment on the defendant's failure to testify. But even if it did, I cannot find that trial counsel was deficient or ineffective in failing to object, thereby emphasizing or calling attention to it and focusing on it rather than letting it go as a passing comment. There also is no reasonable probability that the trial outcome would have been different had trial counsel objected (and certainly no

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Nine

guarantee that the court would have sustained it or granted a mistrial). This issue, too, can be resolved on the record and the law without a further evidentiary hearing.

So I dismiss the Amended Petition as to Claim V.

### Claim VII—Additional Evidence and Argument of the Blood Alcohol Content

The decision as to what evidence to present, and how much evidence of a certain type to put on, and how (and how much) to argue such evidence, is a decision properly left to the discretion of trial counsel. This, above all things, is a matter of trial strategy and tactics. Only if the failure to present such evidence is something no reasonable counsel would have done would it be a deficient performance.

There was, in this case, ample evidence that Mr. Huguely was extremely intoxicated. Quagliana Affidavit ¶¶ 26, 27; Lawr. Aff. ¶ 13; Amended Petition pages 5-10, ¶¶ 7-17.

Just as with objecting, the matter of intoxication is another that could have negative repercussions as well as benefits, and is best left to the discretion of trial counsel.

To introduce more evidence of Huguely's blood alcohol level runs at least two risks. First, the jury could think "we already know he is very drunk", or "what is the point?", and they may think the attorneys are engaging in technical "mumbo jumbo" that does not matter, since neither he nor the Commonwealth contested that he was intoxicated.[7]

The other risk is that if the jury were to see exactly how much he had had to drink and how high his BAC was, it could backfire, and they could hold him more responsible, not less. In addition, if the defense only put on evidence of the BAC level and its effect, but not how much he had had to drink to get to that level, it is likely that the Commonwealth would have put on evidence of how many drinks he would need to have had in order to get that BAC. We simply do not know what a jury would think of or do with this additional evidence. I find that it is at least as likely that the more evidence of the extreme amount he had to drink over a period of time, the more culpable a jury would find him to be. But that is why such is best left to trial counsel's judgment. Trial counsel had these very concerns. Quag. Aff. ¶ 28.

Petitioner admits that voluntary intoxication is not a defense to any charge other than capital or first degree murder, to negate premeditation/deliberateness. There is no way to tell, beyond that, whether it would help or hurt. More evidence of intoxication could have caused a jury to find him more

---

[7] This might be different if from the Commonwealth's evidence it was not clear how intoxicated he was.

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Ten

likely to have gotten violently angry and out of control, with no inhibition or constraint. Surely the Commonwealth would have noted that at the proffered BAC level most people would have passed out, and he obviously was still functioning and able to kick the door open.

This is the type of second guessing and "Monday morning quarterbacking" that is easy to engage in, but again the court would have to find that no reasonable counsel would choose not to put on the additional BAC evidence. I cannot do that. After all, as the Court in Strickland said, "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 466 U.S. at 689.

I also cannot say that the jury, with such additional evidence, would have given or been more likely to give a more lenient sentence. Perhaps if a person who had only 3-4 beers and had gotten more intoxicated than expected this could have such an effect on the jury. But it is naïve to think that when a jury hears that a person had 25-40 beers in a relatively short period of time, over one day, this would produce leniency. I believe that is sheer speculation, and contrary to common sense.

The alcohol evidence (and trial counsel) accomplished its main purpose, in eliminating first degree murder from consideration. Quag. Aff. ¶¶ 27, 28. The defense's theory, as stated in the Petition, is that this was not an intentional, malicious murder, and that the extreme drinking and intoxication corroborated this. But certainly it was found by the jury not to be intentional, as second degree murder does not require an intentional, deliberate, and premeditated killing--that is, no specific intent to kill. But the jury did find malice, and intoxication does not (at least not necessarily) negate malice.

I cannot say that such additional evidence would likely have changed the outcome or presented a reasonable probability or likelihood of such, or, if it did change the outcome that such change would have been favorable to the defendant. This seems to be speculation and "wishful thinking".

The same is true as to Dr. Aaron and Dr. Hendrickson at trial. Their testimony could have backfired. The jury could have taken the view that, "he clearly is intoxicated, but they are saying he is not responsible", and been offended by this. Counsel also was concerned about this. Quag. Aff. ¶ 28, 31. I also do not see, with a jury verdict and the amount of evidence on intoxication, in light of all the evidence, that it would have made a difference at the sentencing hearing with the judge.

This falls squarely in the area of trial strategy and tactics. It truly is--as with making an objection--a two-edge sword. Emphasizing defendant's intoxication more than it already was could

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Eleven

have cut both ways. Quag. Aff. ¶ 28-30; Lawr. Aff. ¶13; Mot. Dism. Pp.64- 65. At some point it goes beyond a basis to argue diminished capacity, and gets into areas of increased likelihood of reprehensible behavior. Where to draw the line is a difficult question in every case, and a decision of necessity left to trial counsel, who knows his client, knows the evidence, sees the jury, and is in the midst of the courtroom battle. Also, it could have opened the door to the Commonwealth presenting additional evidence showing Huguely's violent behavior when intoxicated, in contrast to what might be considered the usual or common effects of such a high level of intoxication—being more sedate and less capable of intentional acts. Quag. Aff. ¶¶ 29, 30, 33. We simply cannot know the specific actual effects of alcohol in this or any case, just the general, common, or likely effects. This also is something Mr. Lawrence and Ms. Quagliana considered, thought about, and discussed. Quag. Aff. ¶ 28; Lawr. Aff. ¶ 14.

For these reasons, I will dismiss the Amended Petition as to Claim VII.

### Claim III—Dr. Daniel

Petitioner asserts that trial counsels' failure to call Dr. Daniel as an expert witness was error and that it was an error of constitutional proportion. But, as with the presentation of evidence in general, above (Claim VII, page nine this letter), whether to call a witness or not is also left to the discretion and judgment of experienced trial counsel, and is a matter of trial strategy and tactics.

Dr. Daniel was primarily a consultant and advisor to the defense team in their preparation for trial. Quag. Aff. ¶¶ 6, 7; Declaration of John S. Daniel, III, M.D. ¶ 4. He referred them to other witnesses in particular areas or fields. Quag. Aff. ¶¶ 7, 8. It was logical to have him present for trial in case there came up something he might be helpful on. But they determined they did not need to call him. Quag. Aff. ¶¶ 17, 18; Lawr. Aff. ¶¶ 6, 7.

It is certainly not unusual for trial counsel to subpoena a witness to have him or her available "just in case". Also, it is not uncommon to have a witness present that counsel actually expects, intends, and plans to call, but something that happens at trial, during the proceedings, causes counsel to reconsider and alter his plans. Good, experienced trial counsel are always evaluating and re-evaluating the need for certain witnesses or evidence as a case develops and a trial proceeds. Quag. Aff. ¶¶ 18, 20. There could be information or evidence that another witness covers adequately, or an issue that becomes less important in light of evidence already given or other developments at trial[8], or a witness

---

[8] One example in this case was that Dr. Daniel originally was expected to testify about the potential effect or impact of Adderall on a person and the likelihood of asphyxiation, but other evidence made that not a tenable avenue of defense, which initially was one of the main foci of his testimony. Quag. Aff. ¶ 6.

whose testimony may be seen to be of such minimal value that it is not worth the time and possible exposure to cross-examination, or simply a conclusion that the witness is just not needed and would not be that helpful, if at all. Counsel may come to believe that the jury would not accept or value portions or all of a witnesses' testimony. Ms. Quagliana and Mr. Lawrence explicitly address some of these concerns in their affidavits. Quag. Aff. ¶¶ 13, 20; Lawr. Aff. ¶¶ 6, 7. Here counsel also obtained several "concessions" from prosecution witnesses that further reduced the role Dr. Daniel might play as a witness or the reasons he might be called.

Petitioner says trial counsel "failed to produce the best available witness and evidence to counter the prosecution's theory [on the] cause of death". Pet. 57, ¶ 104. But this again seems to be second guessing and Monday-morning quarterbacking.

Dr. Leestma clearly had the most expertise on the cause of death and reperfusion. Dr. Daniel was not a brain specialist (not a neurologist, neuro-surgeon, or neuro-pathologist). Quag. Aff. ¶ 7. Dr. Leestma testified unhindered and unconstrained.

As to the cause of death Dr. Daniel's testimony would have been cumulative. He was not an expert on reperfusion. Trial counsel was concerned about his vulnerability on cross-examination on three points—his prior career in the Chief Medical Examiner's office, his lack of expertise in reperfusion, and his high level of compensation compared to the other experts. Quag. Aff. ¶ 19; Lawr. Aff. ¶ 7. Again, they felt he might do more harm than the good he could do. It is possible that it could affect his credibility or that of the whole defense case. Both Ms. Quagliana and Mr. Lawrence thought that he was not needed, given the issues and other evidence and witnesses' testimony, and in fact that calling him would be a mistake. Quag. Aff. ¶ 19; Lawr. Aff. ¶ 7.

But counsel did give this significant and measured consideration. They concluded they did not need his testimony and decided not to call him for articulated reasons. It is a matter of trial strategy and tactics. This was not plainly wrong, deficient performance, or ineffective assistance. So I do not find that the first prong of Strickland is met, and I further cannot find that calling Dr. Daniel, as a second medical examiner, was reasonably likely to produce a different result, so in any event there is no prejudice either.

I will dismiss the Amended Petition as to Claim III.

### Claim II—The Rule on Witnesses

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Thirteen

Petitioner asserts that trial counsels' action in communicating the substance of trial testimony to another witness in violation of the Rule on Witnesses was deficient, and that such hampered the defense in keeping Dr. Uscinski (and possibly Dr. Daniel) from testifying as to reperfusion.

I agree that the violation of the rule on witnesses (exclusion of witnesses from the courtroom when they are not testifying, and not discussing the substance of any other witness's testimony) was deficient performance.[9] The only issue regarding whether such was ineffective is whether, taking the case as a whole, the defendant was prejudiced by the inability to call Dr. Uscinski to testify on reperfusion. This is a close case on this point.

But I cannot say, taking all of the evidence as a whole, that it is reasonably likely that the outcome in this case would have been different if Dr. Uscinski had testified. I conclude this for two main reasons. First, Dr. Leestma was the defense's main witness on cause of death and reperfusion and he was the most qualified and had the most experience and expertise of all of the experts in the case. He was a forensic neurologist. The numbers of autopsies he had performed and the number of brains he had examined (over 20,000) were extraordinary and impressive. 2/15/12 Tr. 260, 272, App. 3484, 3496.

Dr. Uscinski, on the other hand, was a neurosurgeon whose area of expertise was brain trauma. The main substance of his anticipated testimony was that the evidence did not show blunt force brain trauma to be the cause of death. Quag. Aff. ¶ 11. He was allowed to testify to this. Counsel stated that he "testified before the jury to the things we thought most important". Quag. Aff. ¶25. (Reperfusion was not the main thing he was being called for, but the lack of evidence of brain trauma.) His testimony, combined with Dr. Leestma's (Amended Petition pp. 22-23, ¶¶ 38-39) and Dr. Poklis (a toxicologist testifying about intoxication), gave the defense all that it needed to argue their theory. Dr. Uscinski was not an expert in reperfusion, and could only testify that such was consistent with his findings, but counsel was able to argue that in any event. The Commonwealth had four witnesses to address reperfusion, who all gave reasons why Ms. Love's brain injury was not due to reperfusion. None of them had the credentials that Dr. Leestma had, and trial counsel was not relying on Dr. Uscinski or Dr. Daniel to prove their reperfusion theory. Quag. Aff. ¶4. The jury, presumably based on all of the other evidence in the case, rejected his conclusions and found the defendant guilty of second degree murder. It is unlikely that having a less qualified doctor testify to corroborate Dr. Leestma would then have made

---

[9] I want to note that it is not uncommon for experts to be exempted from the Rule and be allowed to remain in the courtroom, because they are not fact witnesses but are giving their professional opinion based on evidence presented. However, such an exemption was not requested in this case. The witnesses did not remain in the courtroom to hear the testimony of other witnesses, though counsel did communicate with them what other witnesses had said, but without the Court's permission. Attorneys are allowed to speak with witnesses under the rule, and talk about their testimony, and it would have been permissible and appropriate for counsel to ask them questions based on what the other witnesses testified to, but not to give them the content of such testimony.

a significant difference.[10] Certainly corroboration is something that most attorneys like to have in a case, but in effect Dr. Uscinski's testimony as to reperfusion would have been cumulative, and the failure to offer cumulative evidence is not a basis for finding prejudice. Additional cumulative evidence is not a basis for finding a reasonable likelihood of a different outcome if it had been given.

In fact, the Attorney General is correct that Petitioner has proffered no specific testimony, by affidavit or otherwise, as to what exactly Dr. Uscinski would have said about reperfusion, other than that it would be consistent with his opinion about lack of brain trauma, so that in itself is inadequate.[11] The formal proffer (App. 4758) of Dr. Uscinski's precluded testimony says "As to reperfusion, that at least in certain medical settings, reperfusion injury is a known phenomenon." That, I believe, is not in dispute, and would not really add anything. It also says of cardiopulmonary resuscitation ("CPR") that "the purpose of CPR is to reperfuse organs of the body, including the brain, with blood and that following the deprivation of blood and oxygen, the brain is susceptible to injury." See also 2/18/12 Tr. 27, App. 3906. This too is general information, covered by other witnesses, not case specific, and could not be the basis for a finding of a reasonable likelihood of a different result had it been presented. I agree that, in addition to the cumulative nature of his proffered testimony, this is a fatal omission.

Dr. Uscinski's not being allowed to testify about reperfusion does not undermine confidence in the trial outcome. As is commonly iterated, a defendant is entitled to a fair trial by competent counsel, not a perfect trial by perfect counsel. As stated in Harrington v. Richter, 562 U.S. 86, 105 (2011), the question is whether counsel's performance is incompetent, not whether it is best practices. The court must consider the overall performance of counsel. Mr. Huguely received good, diligent representation by experienced, competent, and diligent counsel. Of import, they amply and adequately cross-examined each of the Commonwealth's medical experts, obtaining several concessions supporting or consistent with the defense theory of the case. Quag. Aff. ¶ 13. This was not from happenstance or lack of preparation or competence.

I will dismiss Claim II on the affidavits, transcript, and record because I do not believe a case is made out that if Dr. Uscinski had testified as to reperfusion or related matters that there is a reasonable

---

[10] It is certainly possible that I would have had a different view if Dr. Uscinski had been the one to testify as to reperfusion but that Dr. Leestma, the more qualified expert, had been precluded. In that case, Dr. Leestma would not merely have been corroborative and cumulative, but would actually have been, with more expertise, the main witness on the topic and supplied information and testimony that Dr. Uscinski could not. I do not know how I would rule in that case, but that is not the situation before the court.

[11] Dr. Uscinski said in voir dire that he did not come prepared to talk about "blood pressure in remote areas of the body established by CPR." Tr. 2/18/12 25, App. 3904. It is not at all clear that this was because of the violation of the rule. His testimony on CPR would have been just from general training. 2/18/12 Tr. 27, App. 3906. He further said: "I understand the concepts of reperfusion injury and am *somewhat* familiar with that concept." 2/18/12 Tr. 30, App. 3909. [Emphasis added]. He said he had not been prepared, prior to Ms. Quagliana's email, to talk about reperfusion and bleeding in the "watershed" area. 2/18/12 Tr. 30-32, App. 3909-11.

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Fifteen

likelihood, in light of all of the evidence, that the outcome would have been different, and I do not think that an evidentiary hearing would add anything on this point beyond what has been presented.

### Claim VIII—The Cumulative or Aggregate Effect

Petitioner asserts that even if none of the alleged deficiencies individually constitute ineffective assistance, they do when considered in their aggregate effect. Petitioner, in the reply to the Motion to Dismiss, concedes that where the individual claims are not found to be ineffective assistance because the first prong of the Strickland test is not met--that is it was not deficient performance--such cannot be transformed into ineffective assistance by several "almost deficient" incidents. See Lawlor v. Warden, 288 Va. 223, 247-48 (2014); Prieto v. Warden, 286 Va. 99, 117-18 (2013); Gray v. Warden, 281 Va. 303, 319 (2011); Teleguz v. Commonwealth, 279 Va. 1, 19 (2010); Elliott v. Warden, 274 Va. 598, 628 (2007); Lenz v. Warden, 267 Va. 318, 340 (2004). So if the individual claims are not valid and do not call for granting relief, accumulating a number of close calls does not call for a setting aside of the conviction and a new trial.

But even if, as with exculpatory evidence[12], the prejudicial effect could be considered in the aggregate or cumulatively, as Petitioner argues, I only found one instance where trial counsels' actions fell below the standard, and that was with communicating the substance of a witness's testimony not in compliance with the rule on witnesses. Therefore, there would be nothing else for that to be accumulated with.

### Other Claims Abandoned or Not Included in the Amended Petition

There were four other claims in the original Petition that were not separately stated or reiterated in the Amended Petition. The Amended Petition states that two of the original claims are abandoned, but two others are not directly addressed. Original claim VIII involved a lacrosse team video; Claim X involved a failure to object to prosecution argument about intoxication supplying an element of the murder; Claim XI addressed the cumulative prejudice from all of the alleged deficiencies, and is presumed subsumed by and included in Claim V, above; Claim XII involved a juror potentially taking her experience with alcohol into account in the deliberations. There also was a passing reference

---

[12] With review of exculpatory evidence, whether something is exculpatory is determined on an individual basis, and not cumulatively. But whether such had a prejudicial effect (whether there is a reasonable likelihood that the outcome would have been different but for such) is viewed cumulatively. Strickland cites this test. 466 U.S. at 694-95.

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018
Page Sixteen

to the trial judge meeting briefly and privately with a juror who was upset. (Petition, page 2, footnote 3). Petitioner mentions there, but does not argue, many other alleged shortcomings or irregularities.

I will address these in summary fashion. Trial counsel considered playing the lacrosse video but they determined it would likely be harmful, so it was not offered. Lawr. Aff. ¶ 18. Mot. Dism. 63, footnote 8. This clearly falls under the rubric of trial strategy and tactics. Claim X relates to the Commonwealth's argument that Huguely's intoxication made it more likely that he was guilty of second degree murder in that he became more aggressive when intoxicated. Original Petition pages 92-93. Petitioner seems to have abandoned this claim, but I do not see why this was improper argument for which the jury would simply rely on their recollection of the evidence, and I see no reason why not objecting to this would be deficient or prejudicial. Claim XI cites the cumulative effect of prejudice, which is actually addressed in Claim V, above. In Claim XII, Petitioner says trial counsel should have pursued more voir dire with Juror #17. Original Petition pages 94-96ff. She was nurse at UVa hospital; she did not have strong feelings about drinking. Petitioner reports that her experience with alcohol affected her deliberation--apparently based on statements of a juror to the media (which should not be considered). But jurors are allowed to bring into the jury room their own personal life experiences and their common sense. There is nothing improper about a juror considering his or her own personal life experience with alcohol in weighing credibility and determining the seriousness or reasonableness of certain behavior. This would be no different than a person's familiarity with cell phones, driving, paddling a canoe, or storms being a factor in judging testimony. Mot. Dism. 41, footnote 7. Also, it is not clear that this would have made the juror prejudiced against the defendant, but in any event could just as easily have made the juror more sympathetic to the defendant, or may have caused her to put more responsibility on the victim.[13]

## Conclusion

So for all of these reasons, I deny the Petition for Habeas Corpus relief. I do not find any constitutional violation. I find there is sufficient basis in the record--affidavits (and other attachments), and the transcript--for the court to reach a conclusion under the law on each of these points, and there is no need for an evidentiary hearing. Virginia Code §8.01-654 B.4; 8.01-660; Shaikh v. Johnson, 276 Va. 537, 549 (2008); Yeatts v. Murray, 249 Va. 285, 288-90. (1995); see also Smith v. Brown, 291 Va. 260, 264 (2016).

---

[13] As to the trial judge's meeting with the one juror, this was not followed up on or preserved, but it was addressed in the affidavits submitted by the Warden, and it appears none of the other jurors were aware of this, and it was proffered that this related not to substantive matters, but simply the juror's nervousness and anxiety about serving.

Jonathan P. Sheldon, Esq.
Bernadette Donovan, Esq.
Leah Darron, Sr. Asst. Atty. Gen'l.
August 10, 2018

Page Seventeen

I ask Ms. Darron to prepare an order granting the Motion to Dismiss reflecting the findings and rulings set forth in this letter.

We are currently set for a hearing on August 17, 2018, to address the need for an evidentiary hearing on any issues not decided by the Court on the record. This ruling makes the need for such an evidentiary hearing moot; nevertheless I would like to keep that hearing, despite this ruling, to address any questions regarding the Court's ruling or any remaining issues in this matter.

I thank you for the thoroughness of your filings and arguments, and again I am sorry I was not able to get back to you with this decision sooner.

Sincerely,

*Richard E. Moore* (signature)

Richard E. Moore