## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **GEORGE WESLEY HUGUELY V,** | ) | |
| | ) | |
| **Petitioner,** | ) | **CASE NO. 7:20CV30021** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **HAROLD W. CLARKE,** | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| **Respondent.** | ) | |

In 2012, a Charlottesville jury convicted George Huguely of murdering his former girlfriend and fellow University of Virginia student, Yeardley Love, during a violent altercation. Although the prosecutor and Huguely's defense team presented different theories at trial about that altercation and the cause of Love's death, much of the evidence was not in dispute. The parties, for instance, agreed that on May 2, 2010, at approximately 11:45 p.m., Huguely—who had been drinking since early in the morning and was significantly intoxicated—walked to Love's nearby apartment and entered through the unlocked front door. None of Love's roommates was present when Huguely arrived, and Love was asleep in her bedroom. Finding the door to Love's bedroom locked, Huguely kicked a hole through the lower paneling, reached in, and opened it. By the time Huguely had forced his way into her bedroom, Love was awake.

At some point after Huguely's forced entry, a physical altercation ensued. The parties disagreed about the nature and severity of that encounter. Huguely, in his admissions to police detectives the following day, described wrestling Love on the floor during a brief struggle that he explained—unconvincingly, as it turns out—was a natural consequence of Love's agitated

state. According to Huguely, after tussling with Love on the floor, he picked her up and "tossed" her on the bed. Huguely told detectives that, although he noticed Love was bleeding from her nose, she was conscious and otherwise unharmed. Huguely, by his own admission, then grabbed Love's laptop computer and left the apartment. On the short walk back to his apartment, Huguely threw Love's computer into a dumpster.

Two hours later, one of Love's roommates returned to the apartment with a friend. Despite the late hour, they decided to go to Love's room to wake her up. When Love's roommate entered the room and approached the bed, she observed Love lying face-down with a blanket covering most of her body. Love's roommate also noticed a small pool of blood on the sheet below Love's head and quickly determined that she was not breathing. Despite efforts by the roommate's friend—who moved Love from the bed to the floor at the direction of a 911 operator—and, minutes later, by first responders who attempted CPR and other resuscitation methods, she could not be revived. Love, who was 22 years old and just two weeks from graduating, was pronounced dead at the scene.

The Charlottesville Commonwealth's Attorney presented the testimony of several medical experts, including a neurological pathologist, to substantiate the prosecution's theory that Love's death was the result of blunt force trauma and attendant traumatic brain injuries that Huguely, then a 6'2", 200-plus pound member of the UVA men's varsity lacrosse team, had inflicted during their struggle. The prosecution later argued that Huguely had caused these fatal injuries to Love when he violently overtook and grappled with her in the bedroom. Love was alive, although gravely injured, the prosecutor contended, when Huguely threw her back

on the bed and left the apartment. Within two hours, Love's head injuries caused her to suffer a cardiac arrest, which ultimately led to her death.

Huguely's lawyers, aided by their own medical experts, presented a different interpretation of the medical evidence. They argued that the injuries to Love's brain were relatively minor, and that the lack of a skull fracture indicated that she had *not* died as a result of a traumatic brain injury sustained in the altercation with Huguely. Instead, they suggested, Love had died from a combination of positional asphyxia (from lying face down on a wet pillow), alcohol intoxication, and reperfusion injury.

Ultimately, a jury of 12 Charlottesville residents sorted through the evidence and convicted Huguely of second-degree murder and theft of Love's laptop computer. The presiding Circuit Court judge sentenced Huguely to 24 years' imprisonment.

Huguely challenged his conviction in a series of appeals in Virginia's courts. Before the Virginia Court of Appeals, Huguely asserted that the trial court had violated his constitutional rights by, among other things, requiring the trial to proceed for a day and a half after one of his two retained attorneys had taken ill and been unable to attend court proceedings. Huguely also contended that the trial court had constitutionally erred during the jury-selection process, and that it had failed to properly instruct the jury on the definition of "malice," one of the elements of second-degree murder. The Court of Appeals ultimately rejected these arguments and affirmed Huguely's conviction. Huguely appealed this ruling to the Virginia Supreme Court, but it ultimately denied his appeal. Huguely then petitioned the United States Supreme Court for a writ of certiorari; the Supreme Court denied that petition.

After unsuccessfully challenging his conviction on direct appeal, in 2016 Huguely filed a writ of habeas corpus in the Charlottesville Circuit Court, where he had initially been convicted. In this state habeas proceeding, Huguely raised several new alleged constitutional violations, including that the jury had improperly consulted a dictionary on the definition of the word "malice" during its deliberations, and that his defense attorneys at trial had provided constitutionally ineffective assistance of counsel by failing to secure vital expert testimony on the cause of Love's death. The Circuit Court, after considering the written arguments of counsel and witness affidavits, denied Huguely's state habeas petition in its entirety. The Virginia Supreme Court affirmed that decision.

Having exhausted his appellate and collateral rights in Virginia's state courts, Huguely has now filed a federal writ of habeas corpus in this court. As discussed in detail below, Huguely raises six constitutional challenges to his conviction, mainly stemming from alleged errors committed by the presiding judge and his lawyers at trial.

In reviewing Huguely's federal habeas petition, this Court is required to apply the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal statute which significantly limits a federal court's ability to issue a writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254(b). Under AEDPA, this court may not grant Huguely's petition unless it finds that the state court's decision on the same issues was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(b)(2), or "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1). Put simply, this court, in reviewing

Huguely's petition, cannot grant the writ merely because it, or other courts, might disagree with the state court's decisions; Huguely is only entitled to federal habeas relief if this court determines the state courts' decisions were premised on glaringly deficient factfinding or plainly wrong based on established Supreme Court precedent.

This court has carefully considered the entire record. Specifically, it has studied the 12-volume trial transcript, the exhibits, the medical evidence, and the various court rulings (before, during, and after trial). It has read the appellate and state-habeas decisions. And it has considered the arguments of counsel in their briefs and at a hearing on November 23, 2020. Based on that review, the court concludes that three of Huguely's claims were not presented to the Virginia Supreme Court, and therefore that this court does not have the authority to review them on the merits. As to the claims that Huguely properly raises in this federal habeas petition, the court finds, with one exception, that Huguely has failed to meet the high burden of establishing that the prior courts' decisions rejecting these arguments should be disturbed under the highly deferential AEDPA standard of review. The court will grant the Director's motion to dismiss as to these claims.

But Huguely's claim that the jury consulted a dictionary during its deliberations is the exception. As explained below, the state court's resolution of that claim was an unreasonable determination of the facts before it. Therefore, the court concludes that an evidentiary hearing is necessary to determine (1) whether the jury improperly consulted a dictionary for the definition of a vital legal term; and (2) if they did, whether that action prejudiced Huguely. The court will defer final judgment on the dictionary claim pending the outcome of this evidentiary hearing, which the court will conduct in the near future.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The factual record in this case is extensive and need not be recounted in detail here. The vast majority of what occurred at trial is undisputed and irrelevant to this case. It has also been thoroughly summarized by the Virginia courts, including the Virginia Court of Appeals in Huguely's direct appeal. *See Huguely v. Commonwealth*, 754 S.E.2d 557 (Va. Ct. App. 2014). What follows is a summary highlighting the portions of the proceedings that are relevant to Huguely's federal habeas claims.

A.   Investigation and Arrest

On the morning of May 3, 2010, just hours after Love's death, police took Huguely into custody for questioning based on information from Love's roommates about her volatile relationship with Huguely. He was given *Miranda* warnings, and the interrogation was videotaped. Huguely admitted to having had an altercation with Love during which her nose started bleeding, tossing her onto her bed, and leaving. (*See* Trial Ex. 26A.) He also admitted taking her computer "so she would have to talk to him" and then throwing the computer in the trash. He was then arrested and charged with her murder. Soon after his arrest, Huguely retained attorneys Fran Lawrence and Rhonda Quagliana to represent him. Both attorneys represented him through sentencing.

B.   Pretrial Proceedings

The tragic death of a student athlete just two weeks before her graduation, along with the arrest of her ex-boyfriend, another student athlete, for her murder, garnered national media attention. So many local, state, and national journalists attended the preliminary hearing on April 11, 2011, that the hearing was moved from the General District courtroom to a larger

venue to accommodate the media presence. Following that preliminary hearing, the court certified the case to the grand jury, which subsequently indicted Huguely on six charges: first-degree willful, deliberate, and premeditated murder, in violation of Virginia Code § 18.2-32; first-degree murder in the commission of robbery, also in violation of § 18.2-32; robbery in violation of Virginia Code § 18.2-58; two counts of burglary—one with intent to commit larceny, in violation of Virginia Code § 18.2-89, and one with intent to commit assault and battery, in violation of § 18.2-91; and grand larceny in violation of Virginia Code § 18.2-95.

Following his indictment, Huguely's counsel filed a motion for prospective jurors to complete a written questionnaire before *voir dire*, and a motion for the court to order individualized, sequestered *voir dire* of each prospective juror. Because the case involved issues of intoxication and alleged intimate-partner violence, the defense believed that prospective jurors would be less embarrassed and more likely to be honest about experiences that could influence their ability to be impartial if they were given a written questionnaire to answer privately. The court granted Huguely's request. Questionnaires were completed by all prospective jurors at the beginning of the jury-service term and returned to the court to be kept under seal. The court later provided copies of the completed forms (identified only by juror number) to counsel for review before jury selection. (*See* Consolidated Tr. of Multiple Pretrial Proceedings, at 48–67.)

Huguely's counsel subsequently moved for *in camera*, individualized *voir dire* of each prospective juror, and further moved that the prospective jurors be sequestered during *voir dire*, with those ultimately selected to be jurors to remain sequestered through the trial. Huguely's counsel were concerned that prospective jurors might be embarrassed to discuss

personal experiences in front of a large group of strangers; that answers from some prospective jurors might expose other panelists to improper information; that prospective jurors might be concerned about their names and private information being reported by the media; that the heavy media coverage could inject external information into the proceedings; and that jurors might accidentally be exposed to coverage of the trial, or intentionally do their own "investigation" despite the court's instructions. The Commonwealth argued that individualized and sequestered *voir dire* would be too time-consuming and that the court could allow private sidebars if requested by a panelist, rather than adjourning to chambers for individualized *voir dire*. (*See* Tr. of Proceedings, Jan. 26, 2012, at 25–52.)

The trial court carefully weighed the time constraints, the public's right of access to proceedings, and counsel's concerns for Huguely's right to a fair trial by an unbiased jury and announced its plan to counsel on January 26, 2012. The court decided to call four sets of prospective jurors (with approximately 40 panelists in each set) to arrive at staggered times over a two-day period for jury selection. The panelists were brought into the courtroom in groups of 10 to 20 members at a time, where the court provided an overview of the case, introduced counsel, and gave preliminary instructions. The court explained the *voir dire* process and instructed panelists that some questions would be asked individually to avoid disclosure of sensitive and private information. The court also advised them that if any panelist preferred to answer a question privately rather than in open court, such a request could be accommodated. After these instructions, the court asked the panelists to review their previously submitted written questionnaires, determine if they needed to make any changes, and then affirm under oath that the answers (as modified) were true. Finally, the court asked

the group general questions, such as whether panelists knew the attorneys or witnesses, in the group setting before questioning each panelist individually in the courtroom on the more sensitive issues. Counsel then raised any objections to the qualifications of a prospective juror after that juror returned to the jury room. Once twenty-seven unobjected-to panelists were obtained, the remaining panelists were sent home, and the parties, with six peremptory challenges apiece, selected twelve jurors and three alternates. (*Id.* at 25–48.)

C.  Jury Trial

The trial began with jury selection on February 6, 2012, and continued until the final verdict on February 22, 2012.

1.  Jury Selection

a.  *Voir Dire*

On the first day of *voir dire*, defense counsel asked several panelists some version of the following question, which had been preapproved by the trial court:

> If we offered testimony about Ms. Love's consumption of alcohol or uncomplimentary testimony about her behavior to explain her relationship with Mr. Huguely, the nature of their relationship and his motives, would you think that we were blaming the victim?

(*Id.* at 41, 75, 182–83, 223.) Counsel raised the question during individual *voir dire* primarily when the panelist's answers to other questions indicated that he or she might be inclined to relate to the victim or the victim's family. (*Id.* at 34–43.) Later in the day, as the court attempted to expedite the process, counsel asked the question to two different panels, one of 14 prospective jurors and the other of 13 prospective jurors, reserving follow-up questions for

individual *voir dire* of those who answered that they would or might feel like the defense was blaming the victim. (*Id.* at 158–60, 182–83; Vol. II at 296, 327–28.)

The trial court excused four of those panelists for cause after their individual *voir dire*—Juror 3, Juror 7, Juror 15, and Juror 34—but not because of their answers to the "blame-the-victim" question. Juror 3 acknowledged a pre-formed belief in Huguely's guilt, which he still held at the time of *voir dire*. (*See* Vol. II at 344.) Juror 7 did not believe she could presume Huguely's innocence if she heard testimony from Love's mother and sister about their loss and saw graphic autopsy photos of Love. (*See id.* at 34, 38–40.) Likewise, Juror 15 expressed doubts about her ability to remain impartial if she heard testimony from Love's mother and sister, because the juror also had a daughter. (*See id.* at 184–85.)

Juror 34 indicated that he might perceive such questions as blaming the victim, depending "on how it was presented." (*Id.* at 328.) During individual *voir dire* he elaborated, saying that "[i]f you presented it in a mean or accusatory way trying to put all the blame on her, you know, then I might," and "if you were mean about it instead of just presenting facts, you could turn me over to the other side." (*Id.* at 371.) As Juror 34 continued to discuss the matter with counsel, he said that he expected professionals to present the facts in a dignified manner, not in an "angry manner," and that such a presentation would affect how he felt about the attorneys, not necessarily his ability to be impartial in considering the case against Huguely. (*Id.* at 373–75.) The defense objected to Juror 34 based solely on his answers to the "blame-the-victim" question and the ensuing discussion. The trial judge was not persuaded, noting that the juror had qualified his answer, but the prosecution did not oppose the motion to strike the juror and, on that basis, the court granted the motion. (*Id.* at 376.)

On the second day of *voir dire*, the defense did not ask the "blame-the-victim" question of the first panel of 15 panelists, but did ask the second group of 15 panelists, receiving 5 positive responses. Before the parties began individual follow-up questions with the second panel, the court recessed for lunch and the Commonwealth's Attorney raised an objection to the "blame-the-victim" question. After considering the matter, the court decided that the question was not helpful and could not be answered appropriately unless or until the jurors heard the evidence in context. Accordingly, the court sustained the objection, precluding the defense from follow-up questions on that issue, and the defense noted its exception. (Vol. III at 571–75.)

      b.  *Refusal to Strike Juror 211*

During *voir dire*, the trial court qualified several jurors to whom the defense objected, but for purposes of this proceeding, only Juror 211 is relevant.

Juror 211 was a professor at the University of Virginia who had been employed there for 12 and a half years. She testified that she did not remember any details of the case from media exposure, but did know that the victim suffered blunt force trauma and remembered reading something about a break-in. She denied having formed any conclusions about the defendant's guilt or innocence based on her limited knowledge of the case. Of note, she testified that a student, whose name she could no longer remember, asked to sit for a final exam on a different date so that she could attend Love's funeral. Juror 211 also received and read memos from the University about Love's death and the related activities on campus, but she did not attend any of the activities. She stated that neither her encounter with her student nor her employment at the University would influence her ability to judge the case impartially.

Defense counsel sought to strike Juror 211 on the grounds that her "longstanding relationship with the University" kept her from being indifferent to the case. The trial court denied the motion to strike the juror, noting that "[t]here's not a shred of indication that this juror cannot be objective." (*Id.* at 276.)

2. Battle of the Experts and Co-counsel's Illness

The most significant contested factual issue at trial was the cause of Love's death. The prosecution called multiple medical witnesses in support of its theory that blunt force trauma, inflicted by Huguely during the altercation, caused her death. Defense experts contested this theory, opining that Love's autopsy findings were not consistent with blunt force trauma, but rather with positional asphyxiation and intoxication followed by reperfusion injury. This concept of reperfusion injury, a relatively obscure phenomenon, featured heavily in Huguely's trial and remains important in this matter. Such injury occurs when blood is perfused into tissue (for example, via CPR) that has been deprived of oxygen for a relatively extended period of time. Lack of oxygen can cause damage to blood vessels and other tissue that is exacerbated by the return of circulation. This can result in hemorrhage or other damage. One of the defense's theories was that Love died from reperfusion injury resulting from her asphyxiation followed by an extended period of CPR.

Huguely's efforts to establish this theory hit a snag when, on February 18, defense counsel belatedly notified the Commonwealth that Ms. Quagliana had sent emails to Drs. Jan Leestma, Ronald Uscinski, and John Daniel, three defense experts, summarizing the substance of each of the Commonwealth's experts' testimony. (Tr. of Jury Trial Day 11, Feb. 18, 2012, at 4.) These communications violated the trial court's rule on witnesses, which prohibited all

witnesses from discussing their testimony until after trial. *See* Va. Code Ann. § 19.2-265.1. The Commonwealth's Attorney alleged prejudice and sought sanctions against the defense, including the exclusion of Dr. Uscinski's forthcoming testimony and the striking of testimony already given by Dr. Leestma. (*Id.* at 39–48.) To clarify the impact of the issue and explain the trial court's ultimate ruling on the motion to exclude defense experts, this court will summarize the expert testimony and areas of controversy.

    a.   *Expert and Other Medical Testimony for the Commonwealth*

The medical examiner who performed the autopsy on Love, Dr. William Gormley, opined that blunt force trauma caused Love's death by causing her to go into cardiac arrest. Dr. Gormley also testified that Love's toxicology report reflected a blood-alcohol level of .14, based on blood drawn from her leg. Subsequent analysis, at the defense's request, revealed the presence of amphetamine at .05 milligrams per liter, an amount within the therapeutic range for persons taking Adderall. (Tr. Jury Trial Day 7, Feb. 14, 2012, at 198–213.)

Curt Harper, Ph.D., forensic toxicology supervisor at the Virginia Department of Forensic Science lab in Richmond, also testified about Love's toxicology screen. Anticipating a potential defense that Adderall had somehow contributed to Love's death, the Commonwealth asked Dr. Harper about the potential side effects of Adderall, which include increased heart rate, blood pressure, and temperature; restlessness and agitation; and loss of appetite and weight. When concentrations of Adderall in the blood are higher than the therapeutic range, the medicine can cause insomnia, convulsions, cardiac issues, and death. However, Dr. Harper noted a recent study of 1.2 million children and young adults who had

taken Adderall which found no increased risks of a serious cardiovascular event from proper therapeutic use of the medicine. (*Id.* at 223.)

Dr. Dilaawar Mistry, an orthopedic and sports medicine physician, was the primary care team physician for the athletes at the University of Virginia during Love's time as a student athlete there. He testified that, because of research in 2006 through 2007 suggesting that Adderall use created heart risks among children and that athletes with ADHD were more likely to have latent congenital heart defects, the University began requiring athletes on Adderall to take additional comparative EKG tests, one while on the medication and one while off the medication for a period of time. Love's EKG on Adderall was done on May 11, 2009, and her EKG off Adderall was completed in September 2009. Both were normal, with no changes between them, and no signs of prolonged QT interval, which was the concern of the early study. Dr. Mistry last saw Love a week before her death, and he testified that he was not aware of any pre-existing medical reason for her to have died on May 3, 2010. (Tr. of Jury Trial, Feb. 9, 2012, at 134–47.)

The Commonwealth also presented the testimony of Dr. William Brady as an expert in emergency medical services and cardiopulmonary resuscitation ("CPR"). Board-certified in emergency medicine, Dr. Brady had practiced emergency medicine since 1991. He was a tenured professor at the University of Virginia, an emergency physician at the University Hospital, and Chair of the Hospital's resuscitation committee. Based on his review of the autopsy report, the EMS report, two neuropathology reports, and a cardiovascular pathology report, Dr. Brady opined that rescue-squad personnel had properly performed CPR techniques when they tried to resuscitate Love.

-14-

Anticipating another defense, Dr. Brady testified that reperfusion could not have caused Love's death because CPR never restored her heartbeat. Dr. Brady explained that when the heart stops beating, blood is no longer flowing, causing the brain to become oxygen deprived. The brain cells and capillaries are damaged by the oxygen deprivation, which is called anoxic injury. Brady explained that anoxic injury always occurs if a person's heart stops beating. If the heart starts beating again, normal blood flow returns, which, Brady testified, is called reperfusion. According to Brady, the blood flow through the damaged capillaries can cause bleeding in the brain and more damage to the brain's tissues. Brady testified that CPR alone cannot cause this, because chest compressions cannot generate enough blood pressure to damage the brain's blood vessels. (Tr. of Jury Trial, Feb. 9, 2012, at 114–18.) In other words, if the person's heartbeat is never restored, no reperfusion injury (*e.g.*, brain hemorrhaging) will occur.

The Commonwealth's next expert, Dr. Renu Virmani, was board certified in anatomic pathology and had specialized in cardiovascular pathology for more than 30 years. Dr. Virmani testified that the Chief Medical Examiner of Virginia asked her to evaluate samples of Love's heart tissue to see if any preexisting heart condition had led to Love's death. After evaluating 13 slides prepared for her and explaining them to the jury, Dr. Virmani concluded that Love's heart was generally healthy without any latent defect that would explain her death. Dr. Virmani also testified that she had never seen, read, or heard about CPR causing hemorrhage in any part of the body other than the heart itself. (*Id.* at 29–42.)

Dr. Christine Fuller, the state's penultimate expert, was board certified in anatomical pathology, clinical pathology, and neuropathology. Fuller identified specific areas of Love's

brain that were damaged. She noted contusions (bruises) on Love's left temporal lobe and opposite side occipital/parietal cortex, as well as hemorrhages in: subarachnoid space; between cerebral hemisphere and the cerebellum/brain stem; around the pituitary gland; in the pineal gland; in the cerebellar peduncle; near the periaqueductal gray; and petechial hemorrhages along the pons and brain stem. Blood had also filled two ventricles in the subarachnoid space. She testified that the bruises were likely caused by a sudden acceleration/deceleration in which Love's brain hit the bony part of her skull or the dura. (Tr. of Jury Trial, Feb. 14, 2012, at 59–82.)

Ultimately, Dr. Fuller concluded that Love suffered blunt force trauma of sufficient force to bruise her brain and damage her axons. The damaged axons disrupted her cardiac rhythm, which caused oxygen deprivation in her brain and caused her death rapidly, in no more than two hours. Dr. Fuller also agreed with earlier opinions that reperfusion could not be the cause of Love's injuries because her heartbeat was never reestablished and, without a heartbeat, there can be no reperfusion. (*Id.* at 73–83.)

Finally, the state called Dr. Beatriz Lopes, another University of Virginia professor, qualified as an expert in pathology and neuropathology. Dr. Lopes was asked to review the Love case after Dr. Fuller had already done so because she had the material necessary for an additional test that was unavailable to Dr. Fuller: the Beta-amyloid precursor protein (APP) stain, which identifies neurons in the brain that have been damaged from lack of blood flow and oxygen and can identify damaged axons. (*Id.* at 114–122.) Along with Dr. Fuller, Dr. Lopes opined that, based on their locations and because the hemorrhages near the brain stem looked

like shear injuries, Love's brain lesions (bruises and hemorrhages) were the result of trauma. She also testified that CPR did not cause Love's brain injuries.

      b.  *Defense Evidence*

To attempt to counter the Commonwealth's medical experts, the defense first called Dr. Alphonse Poklis, a toxicologist and professor at Virginia Commonwealth University School of Medicine for 25 years. Dr. Poklis testified that Love's blood alcohol level at 2:30 a.m., roughly when she was pronounced dead, had been .14 in the blood sample taken from her leg and .18 in the vitreous humor sample taken from her eye. Dr. Poklis then extrapolated what her blood alcohol would have been at 11:45 p.m. based on Love's age, height, and weight, given that her last alcoholic beverage had been consumed at 10:00 p.m. Based on blood alcohol content of .14 at 2:30 a.m., he calculated that her blood alcohol was between .16 and .18 at 11:45 p.m. (Tr. of Jury Trial, Feb. 15, 2012, at 178–92.)

Dr. Jan Leestma, neuropathologist, testified as a defense expert witness. Board certified in anatomic pathology and neuropathology, Dr. Leestma had been practicing for more than 40 years. Dr. Leestma opined that Love died from lack of blood flow and oxygen deprivation to the brain caused by asphyxia. She was found lying face down on her pillow, with secretions and blood on the pillow, indicating she had been breathing through wet fabric. Dr. Leestma further testified that Love's brain swelling was consistent with asphyxiation. He also explained that Love's brain did not show many of the typical symptoms of blunt force trauma. Specifically, she had no skull fracture, no epidural or subdural hematoma, no laceration or hemorrhage in the corpus collosum, insufficient areas of injury for a concussive acceleration/deceleration mechanism of injury, and no evidence of shearing force. He also

testified that Love's brain had been deprived of oxygen for some amount of time before the rescue squad arrived, giving the cells time to deteriorate and leaving her vulnerable to reperfusion injury. After that time, thirty minutes of vigorous resuscitation attempts by the rescue squad forced blood through the damaged capillaries, causing them to leak and leading to reperfusion injury. In the weakened state of the capillaries, Love did not need an independent heartbeat for the blood flowing through to cause more damage. (*Id.* at 215–71.)

Huguely next called Dr. Michael Woodhouse, a biomechanical consultant who analyzed a piece of drywall from Love's apartment to determine if Love's head impacted the wall of her apartment. He concluded, based on the condition of the drywall, that no head contacted the wall in Love's apartment.

### c. Dr. Uscinski and the Rule on Witnesses

On February 18, Huguely intended to present the testimony of Dr. Ronald Uscinski, a clinical neurosurgeon who had examined the injuries to Love's head. Before he could do so, the Commonwealth objected to Dr. Uscinski's testimony on the grounds that Huguely's counsel had violated the rule on witnesses. The Commonwealth alleged, and Huguely's counsel admitted, that Drs. Uscinski, Leestma, and Daniel had been copied on emails containing summaries of the Commonwealth's experts' testimony. (Tr. of Jury Trial, Feb. 18, 2012, at 5–7.) On that basis, the Commonwealth requested to *voir dire* Dr. Uscinski to determine the effect, if any, the rule violation might have on his forthcoming testimony. During the questioning, Dr. Uscinski clarified that he did not read the emails closely but, even if he had, they primarily dealt with reperfusion injury, a topic on which he did not intend to testify in detail. After *voir dire*, the state court ruled that Dr. Uscinski could testify, but that he

could not opine on reperfusion or CPR. (*Id.* at 56.) Dr. Uscinski went on to explain his opinion that Love's injuries were not consistent with a significant traumatic brain injury caused by blunt force. (*See id.* at 89–115.)

3. Illness of Co-Counsel During Trial

On February 15, 2012, the Commonwealth rested its case-in-chief and the defense presented its first two witnesses. Sometime after court ended that day, one of Huguely's lawyers, Rhonda Quagliana, became ill and was unable to attend trial on the morning of February 16. Fran Lawrence, Huguely's other attorney, advised the court that the next scheduled witness was Dr. Uscinski, and Lawrence was not prepared to proceed with questioning him in Quagliana's absence. The court adjourned court for the day, excusing the jury until the following morning. Unfortunately, on Friday, February 17, Quagliana remained too ill to come to court. Lawrence informed the court that he was competent and willing to proceed without Quagliana but, after speaking with Huguely, instead requested a continuance to the following week, asserting that Huguely had the right to have his full defense team present.

Lawrence admitted to the court that other witnesses for whom he would be taking the lead were present, and that he was prepared to examine those witnesses in his co-counsel's absence. Accordingly, the trial court declined to continue the matter and directed Lawrence to proceed with the witnesses he was prepared to examine. (Tr. of Jury Trial, Feb. 17, 2012, at 10–11.) When Lawrence had presented all those witnesses, so that only witnesses for whom Quagliana was responsible remained, the court adjourned court early, in hopes that Quagliana

would be able to return the next day. On Saturday, February 18, Quagliana returned, and the trial resumed.

4.   Jury Instructions and Deliberations

After the conclusion of evidence on February 18, the trial court instructed the jury. The most significant instruction for purposes of this proceeding was the instruction on malice:

> The difference between murder and manslaughter is malice. When malice is present, the killing is murder. When it is absent, the killing can be no more than manslaughter. Malice is that state of mind which results in the intentional doing of a wrongful act to another without legal excuse or justification at a time when the mind of the actor is under the control of reason. Malice may result from any unlawful or unjustifiable motive, including anger, hatred, or revenge. Malice may be inferred from any deliberate, willful, and cruel act against another, however sudden.

(Tr. of Jury Trial, Feb. 18, 2012, at 146–47.)

Following jury instructions, counsel presented closing arguments. During the Commonwealth's rebuttal, the Commonwealth's Attorney stated that "second-degree murder does not require specific intent to kill," to which the defense vigorously objected. The following exchange took place before the jury:

> [Defense Counsel]: Judge, he's saying that second[-]degree murder doesn't require the intent to kill. He is in error. It is in error.

> THE COURT: The instruction's right there, isn't it? Just read it.

> [Commonwealth Attorney]: . . . If you find from the evidence beyond a reasonable doubt each of the first two elements that the defendant killed Yeardley Love and that the killing was malicious, but you do not find beyond a reasonable doubt that the killing was willful, deliberate, and premeditated, then you shall find the defendant guilty of second-degree murder.

> [Defense Counsel]: Judge, this needs to be clarified because intent is a part of second-degree murder, so - - -
>
> [Commonwealth Attorney]: It's malice, which is a part of second-degree murder.
>
> THE COURT: He's talking about malice. That's all.
>
> [Commonwealth Attorney]: That is all.
>
> THE COURT: The instruction speaks for itself. I'm not going to go back and revisit the instructions.
>
> [Commonwealth Attorney]: Absolutely not.
>
> THE COURT: All right. That's what the law is . . .

(*Id.* at 254–55.) The Commonwealth returned to its rebuttal argument, emphasizing that malice is not the same as deliberate and specific intent to kill.

After the Commonwealth's rebuttal and out of the jury's presence, defense counsel requested the opportunity to present a brief surrebuttal, advising the jury that malice supplies the intent element for second-degree murder by requiring the intentional doing of a wrongful act, or at least reminding them to review the malice instruction. The court did not permit surrebuttal but agreed to direct the jury's attention again to instruction 21, the instruction defining malice. (*Id.* at 262–63.) The court advised the jury to consider instruction 21 during deliberation, "as it will address the issue of malice . . . I just want to flag that instruction for you as it relates to whatever the conversation we had at the end." (*Id.* at 265.) After closing argument, the court adjourned.

The next day of trial, prior to starting deliberations, one juror asked the court to explain what the foreman is supposed to do. The court answered the question, and the jurors retired to the jury room to begin deliberating. (Tr. of Jury Trial, Feb. 22, 2012, at 13.) After some time

in the deliberations, the jury sent a note requesting to see the video of Huguely's statement and to see the exhibits. With the court's permission, counsel coordinated with the clerk to inventory items being sent to the jury in response. (*Id.* at 23–24.) Later, the jurors sent a question: "We would like a definition of reason as it pertains to instruction #21." (*Id.* at 24–25.) Instruction 21 contained the definition of "malice." The court responded in writing, with agreement of counsel, that "the word reason, as it appears in the instruction[,] has no special meaning beyond its ordinary and common usage in everyday life and parlance." (*Id.* at 25–26.)

The jurors' next note said, "We read instruction #23 to contradict instructions #14 and 15." (*Id.* at 28–29.) Instruction 14 explained indirect causation, instruction 15 explained direct causation, and instruction 23 emphasized that the defendant did not have the burden of proving that the death was accidental; rather, the Commonwealth had the burden of proving that the death was not accidental. After some discussion with counsel, the court responded with a note asking the jurors to clarify their question. (*Id.* at 34.) Later, having not heard back from the jury, defense counsel asked the court to instruct them that instruction 23 deals with "intent" and 14 and 15 deal only with causation and not intent. The court declined, preferring to wait for the jury's clarification of the question. (*Id.* at 40–41.) No clarification of the question ever came.

The next communication from the jury requested Commonwealth's Exhibit 21, a letter from Huguely to Love that was found in her desk at the time of her death. With agreement of the parties, the exhibit was initialed and sent back to the jury room. (*Id.* at 36.) No further questions came from the jury.

Between 6:00 and 7:00 p.m., the jury returned with its verdict, finding Huguely guilty of second-degree murder and grand larceny. They acquitted him on the remaining charges. Following the sentencing hearing the same evening, the jury recommended a sentence of 25 years in prison for the second-degree murder and one year on the grand larceny.

5.  Post-Trial Motion for New Trial

On April 19, 2012, a civil attorney for the Love family attempted to obtain exhibits from the criminal court to use in a civil suit against Huguely. At that hearing, Huguely's attorneys learned that the civil attorney had been cooperating with the Commonwealth's Attorney by complying with every request made by the Commonwealth in order to prevent the civil matter from adversely impacting the criminal case, including waiting until the trial was over to initiate the civil suit. (Tr. of Hr'g, Apr. 19, 2012, at 51–52.) One week later, on April 26, 2012, the Love family filed a $30 million wrongful death suit against Huguely, alleging that he negligently caused Love's death.

Huguely then filed a motion for a new trial, alleging that the Commonwealth had breached its duties under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose not only that the Love family was working with an attorney to file a civil suit, but also that the prosecution had been coordinating strategic decisions with the civil attorney and failed to disclose that the theory of liability in the impending civil case conflicted with prosecution's theory of willful, deliberate, and premeditated murder.

By letter dated August 15, 2012, the trial court denied the motion for new trial, finding that the civil attorneys were not agents of the Commonwealth and that their knowledge could not be imputed to the Commonwealth. The court also noted that, in a letter dated January 30,

2012, a full week before the trial, the Commonwealth had advised defense counsel that the Loves would be testifying and that they had a "potential cause of action" against Huguely. This letter, the court concluded, put the defense on notice of the need to inquire about the status of a potential suit, as the statute of limitations would soon be running, and information about the civil suit was available to the defense if counsel had inquired. Accordingly, the trial court found no *Brady* violation.

6. Sentencing

After denying the motion for a new trial, the trial court sentenced Huguely to 23 years in prison for the murder and one year for grand larceny, to run concurrently.

D. Direct Appeal

1. Court of Appeals

On appeal to the Court of Appeals of Virginia, Huguely raised the following assignments of error: (1) violation of his right to counsel under the Sixth Amendment and the Virginia Constitution by forcing him to proceed during the trial on one of the days his retained co-counsel of choice was ill; (2) violation of his Sixth Amendment right to a fair trial by an impartial jury by (a) refusing to order individualized and sequestered *voir dire*, (b) refusing to allow the defense to ask a question relevant to the prospective jurors' ability to remain impartial, (c) refusing to strike for cause certain jurors whose answers during *voir dire* raised serious doubts about their ability to remain impartial, and (d) refusing to sequester the jury during trial; (3) violation of his due process rights under *Brady* by failing to disclose that the Love family was planning to bring a $30 million civil suit against Huguely; (4) the Circuit Court's failure to adequately instruct the jury about the meaning of "malice" under Virginia

law; and (5) insufficiency of the evidence to support a finding of malice and conviction for second-degree murder. The Court of Appeals refused to hear argument on the issues of sequestered *voir dire*, the *Brady* violation, and the sufficiency of the evidence. After hearing argument on the remaining issues, the Court of Appeals affirmed the trial court's judgment in a published opinion. *Huguely v. Commonwealth*, 754 S.E.2d 557, 576 (Va. Ct. App. 2014). Huguely filed a petition for rehearing, which the court denied. *Huguely v. Commonwealth*, Record No. 1697-12-2 (Va. Ct. App. Mar. 27, 2014).

     2.  <u>Supreme Court of Virginia</u>

Huguely appealed the final decision of the Court of Appeals to the Supreme Court of Virginia, raising only the following issues: (1) denial of right to counsel by forcing the case to continue while one of his retained attorneys was ill; (2) denial of the right to a fair and impartial jury by (a) refusing to allow the defense to ask a question relevant to the jurors' ability to remain impartial and (b) refusing to strike certain jurors for cause when their answers raised serious doubts about their ability to be impartial; and (3) failing to adequately instruct the jury on the definition of malice. (*See* ECF No. 29-5 at 4–5.) Notably, Huguely did not appeal the issues that the Court of Appeals denied without argument: the failure to conduct individualized and sequestered *voir dire*; the failure to sequester the jury; the alleged *Brady* violation; and the sufficiency of the evidence. The Supreme Court of Virginia refused Huguely's petition for appeal, *Huguely v. Commonwealth*, Record No. 140678 (Va. entered Nov. 19, 2014), and subsequently denied his petition for rehearing, *id.* (Va. entered Jan. 5, 2015).

3.  United States Supreme Court

Huguely filed a petition for certiorari with the United States Supreme Court. The Court denied his petition on October 5, 2015. *Huguely v. Virginia*, 577 U.S. 824 (2015).

E.  State Habeas

Huguely filed a state petition for habeas corpus in the Charlottesville Circuit Court on January 19, 2016, and an amended petition on May 5, 2016, raising 8 claims. His first claim alleged the denial of his rights to due process and an impartial jury because the jury improperly consulted a dictionary—a source extraneous to the evidence—to look up the definition of "malice." His remaining seven claims alleged his counsel provided ineffective assistance by: (1) violating the rule on witnesses, resulting in the trial court's exclusion of Dr. Uscinski's expert testimony on reperfusion; (2) failing to call Dr. John S. Daniel, III, as a witness; (3) failing to request a jury instruction that, in order to find malice, the jury must find that any of Huguely's wrongful conduct was "likely to cause death or great bodily harm"; (4) failing to object to the prosecution's improper comment on Huguely's failure to testify; (5) sending a defense exhibit to the jury with "Type of offense: murder" on the label; (6) failing to investigate and introduce evidence of Huguely's blood-alcohol content at the time of the offense to negate malice and to support diminished capacity as a mitigator at sentencing; and (7) through the cumulative effect of their errors, leaving the jury unable to appreciate the distinction between malice (*i.e.*, second-degree murder) and manslaughter.

Although the habeas court originally set the matter for an evidentiary hearing to begin August 17, 2018, the court issued a written opinion letter on August 10, 2018, finding a hearing unnecessary and denying all claims in the amended petition. Only three of the claims in the

state petition have been raised in this court. Because the habeas court's opinion is the final reasoned state court opinion on those three issues, the court will limit its discussion of the state habeas decision to those issues.

1.  <u>Jury's Use of a Dictionary</u>

The state court denied relief on Huguely's dictionary claim based on the evidence contained in a litany of affidavits provided by the parties. In support of his claim that jurors looked up "malice" in a dictionary during their deliberations, Huguely presented an affidavit from Juror 42. Paragraph 7 of the affidavit stated:

> Our merits phase deliberations were very methodical. We had a question about the meaning of the word "malice" and we asked the bailiff for a dictionary. The bailiff brought us a dictionary and we looked up the word "malice." We then continued deliberating. This helped in deciding if there was malice and whether it had been shown in these charges.

(ECF No. 6 at 4.)

The Commonwealth, in support of its motion to dismiss the state habeas petition, filed affidavits from ten of the other jurors, noting that one juror refused to provide an affidavit. Most of the jurors (Nos. 9, 27, 63, 127, 211, and 217) stated they could not remember whether a dictionary was used, requested, or brought into the room. Others said they could not remember or were not sure but qualified the answer. For instance, Juror 310 stated:

> I am not sure whether the jury asked for a dictionary or not. My memory is very "fuzzy" on whether a dictionary might have been provided at some point. If the jury was provided a dictionary it was obtained from a written question to the judge, and it would have come from the judge.

(ECF No. 29-12 at 6.) Juror 17 stated:

> I do not think the jury ever asked for a dictionary. I do not remember seeing any of the other jury members using a dictionary during the jury deliberations. I also do not remember any of the deputies bringing the jury a dictionary.

(*Id.* at 5.) Juror 130 stated:

> I do not recall the jury ever asking for a dictionary. None of the deputies brought the jury a dictionary. I never saw any member use a dictionary during the deliberations. We did not have anything unless the Court approved it. . . I am 100% sure nobody brought a dictionary into the jury deliberations and 99% sure if the jury ever had a dictionary it was provided by the court.

(*Id.*)

Only one juror, No. 17, positively denied that a dictionary had been used:

> The jury did not ask for a dictionary but, we did send a note out asking for clarification on the word "malice." I think the note went to the judge. None of the jurors used a dictionary during deliberations.

(*Id.*)  Nine deputies who served as bailiffs during the trial submitted affidavits denying that they were asked to get a dictionary or that they ever gave a dictionary to the jury or to any juror. Each deputy also indicated that he or she did not recall seeing a juror with a dictionary or seeing anyone else provide the jury a dictionary. (*See id.* at 6.)

Finally, the Commonwealth provided another affidavit from Juror 42, again stating that the jury asked for and received a dictionary from one of the deputies to deal with the jury's "issue with the definition of the word 'malice.'" (*Id.* at 4.) This affidavit added that one of the other jurors read aloud from the dictionary. The affidavit also stated:

> I am not sure which juror asked the deputy for the dictionary. I cannot recall which deputy the juror spoke with. . . I do not know which deputy brought the jury the dictionary. I cannot describe the dictionary because I never had it. I cannot say if the dictionary was thick, thin, a hard back [*sic*] book, a soft back [*sic*] book, large,

> small, a single sheet of paper, whether it was a Webster's
> dictionary, or what color it was. . . I do not know which juror had
> the dictionary and read from it. I do not recall what the juror did
> with the dictionary after reading from it or what was done with
> the dictionary after the jury used it.

(*Id.*)

Huguely's counsel attached a third affidavit from Juror 42 to his reply in opposition to

the Commonwealth's motion to dismiss. (ECF No. 6 at 6–8.) This affidavit was handwritten

by Juror 42 and directly responded to the second affidavit (which was obtained by an Officer

Brickhead),

> In my statement to Officer Brickhead, there was a notation about
> me not knowing if the dictionary we received was a single sheet
> of paper or not. It was not a single sheet of paper. It was multiple
> pages. It was a dictionary. When I came about a week after
> meeting with Officer Brickhead to sign his statement, I was in a
> rush. I read the statement but not thoroughly. We did not review
> the statement line by line like I had done with the defense's
> statement. I remember it was a dictionary, I just don't remember
> the details of what it looked like.

(ECF No. 6 at 6–7.)

In ruling on Huguely's claim, the court averred it had "read and fully consider[ed] the

Amended Petition for a Writ of Habeas Corpus, the Motion to Dismiss, and Petitioner's

Response to the Motion to Dismiss, along with the Appendix to the original Petition, the

affidavits filed with the Motion to Dismiss, and portions of the trial transcript." (ECF No. 29-

12 at 3.) The court never discussed or referred to Juror 42's third affidavit submitted in

Huguely's response to the motion to dismiss. The court weighed Juror 42's second affidavit

against the affidavits of the juror who denied using a dictionary and the nine jurors who did

not recall whether a dictionary had been used, as well as against the nine deputies who denied

delivering a dictionary and did not recall seeing anyone else do so. Because she was the only juror alleging the use of a dictionary, the habeas court concluded that she was mistaken, perhaps having confused the court's written answer to a question with a dictionary, and that Huguely had failed to meet his burden of proving by a preponderance of the evidence that a dictionary was used. (*Id.* at 6.)

The habeas court further ruled that Huguely failed to show prejudice even if a dictionary had been used because there was no evidence about the dictionary definition of malice. The court first held, without an evidentiary hearing, that Huguely did not establish the use of a dictionary by the jury, and second that, even if the jury had consulted a dictionary, he could not and had not shown any prejudice as a result. (*Id.* at 6–7.)

2.  Counsel's Violation of the Rule on Witnesses

The state habeas court agreed that counsel's performance was deficient in failing to abide by the trial court's rule on witnesses. However, the state habeas court found no prejudice to Huguely because the limitation on Dr. Uscinski's expert testimony was not reasonably likely to affect the outcome of the case. Dr. Leestma, a forensic neurologist who has performed over 20,000 brain autopsies, was the most qualified defense expert to testify about reperfusion and had ably testified about the issue. Dr. Uscinski was a neurosurgeon whose expertise was brain trauma; the main focus of his testimony concerned the lack of evidence for the Commonwealth's theory that blunt force trauma caused Love's death. Therefore, the state habeas court concluded that any excluded testimony on reperfusion would likely have been cumulative and less persuasive than the testimony from Dr. Leestma. It noted that the

exclusion of cumulative evidence cannot be the basis for a claim of prejudice and therefore dismissed this claim. (*Id.* at 15–17.)

    3.  <u>Counsel's Failure to Call Dr. John S. Daniel, III as an Expert Witness</u>

The state habeas court held that the decision not to call Dr. Daniel was not deficient performance. It noted that decisions about which witnesses to call are overwhelmingly matters of trial strategy entitled to great deference by courts reviewing counsel's performance. The Commonwealth submitted affidavits from Huguely's trial counsel indicating that Dr. Daniel primarily served as a consulting witness in the case. He was not a brain specialist and much of his anticipated testimony was redundant. Counsel also noted that Dr. Daniel was vulnerable on cross examination due to his prior employment in the Chief Medical Examiner's Office, his lack of expertise in reperfusion, and his relatively high fees in comparison with other experts in the case. The state court deferred to counsel's judgment and found that the decision not to call Dr. Daniel did not constitute deficient performance. *Id.* at 13–14.

Huguely appealed the Circuit Court's denial of his habeas claims to the Supreme Court of Virginia, which refused the petition on September 3, 2019, finding "no reversible error" in the judgment below. *Huguely v. Woodson*, Record No. 181357 (Va. Sept. 3, 2019).

F.  <u>Current Claims</u>

In the present, timely-filed petition, Huguely makes the following claims:

1. That his right to due process was violated by jurors consulting a dictionary regarding the meaning of "malice."

2. That he received ineffective assistance of counsel when:
   a. Counsel violated the rule on witnesses, resulting in the exclusion of Dr. Uscinski's expert testimony about reperfusion; and
   b. Counsel failed to call Dr. Daniel to testify on Huguely's behalf.

3. That the prosecution violated his due process rights under *Brady v. Maryland* when the prosecutor failed to disclose that the Love family would be filing a $30 million wrongful death suit against him after the criminal trial.

4. That the trial court violated his Sixth Amendment right to counsel of choice by forcing the case to continue in the absence of one of his attorneys.

5. That the trial court violated his Sixth Amendment right to a fair and impartial jury by:
   a. Refusing to order individualized, sequestered *voir dire*;
   b. Refusing to allow a *voir dire* question that was directly relevant to jurors' ability to remain impartial; and
   c. Refusing to strike for cause jurors whose answers raised doubts about their impartiality.

6. That the evidence was constitutionally insufficient to support a conviction for second-degree murder.

## II.   STANDARD OF REVIEW AND LIMITATIONS ON FEDERAL HABEAS

A federal court may grant a petitioner habeas relief from a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal courts reviewing constitutional claims adjudicated in state court on the merits may grant relief on such claims only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). A federal district court reviewing a § 2254(a) petition is also limited by the separate but related doctrines of exhaustion and procedural default. The standard of review and these procedural doctrines promote the principles of finality, comity, and federalism, recognizing a state's legitimate interests in enforcing its laws, preventing disruption of state judicial proceedings, and allowing states the first opportunity to address

and correct alleged violations of a state prisoner's federal rights. *Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991).

A.  Exhaustion

A habeas petitioner is required to exhaust his claims in state court before those claims can be considered in federal court. 28 U.S.C. § 2254(b)(1)(A). To exhaust his claims, a petitioner must present the merits of his federal constitutional claims to the highest state court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Failure to do so "deprives[s] the state courts of an opportunity to address those claims in the first instance," *Coleman*, 501 U.S. at 732, and thus forecloses federal review of those claims.

B.  Procedural Default

A separate but closely related issue is the doctrine of procedural default. If a state court has clearly and explicitly denied a petitioner's claim based on a state procedural rule that provides an independent and adequate ground for the state court's decision, that claim is procedurally defaulted for purposes of federal habeas review. *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). A state procedural rule is independent if it does not depend on a federal constitutional ruling, and it is adequate if it is firmly established and regularly applied by the state court. *Yeatts v. Angelone*, 166 F.3d 255, 263–64 (4th Cir. 1998). A claim that has not been presented to the highest state court—and would be procedurally barred as untimely or successive if the petitioner tried to present the issue to the state court now—is considered simultaneously exhausted and defaulted. *Bassette v. Thompson*, 915 F.2d 932, 936–37 (4th Cir. 1990).

C.  Overcoming Procedural Default

Before a federal habeas court will consider a procedurally defaulted or unexhausted claim, the prisoner must show both cause for the default and actual prejudice as a result of the claimed federal violation. *Coleman*, 501 U.S. at 750. Cause for procedural default requires the existence of some objective factor external to the defense and not fairly attributable to the prisoner. *Id.* at 756–57. Prejudice requires that the claimed violation worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

### III.   ANALYSIS OF CLAIMS

Three of the claims presented by Huguely were never raised before the Supreme Court of Virginia. The time for raising those issues has long passed, and if Huguely tried to raise them before the Supreme Court of Virginia now, he would be barred from doing so. Accordingly, those issues are considered simultaneously exhausted and defaulted. *Bassette,* 915 F.2d at 936–37. Huguely does not deny this procedural default in his brief in opposition to the motion to dismiss, and his counsel conceded as much during oral argument on November 23. (ECF No. 33 at 20.) Accordingly, the court will analyze those claims under the cause-and-prejudice standard set forth in *Coleman*, 501 U.S. at 750.

A.  Procedurally Defaulted Claims

1.  Claim 3: Alleged violation of due process rights under *Brady* when prosecution did not advise Huguely that the Loves planned to file a $30 million negligence suit against him after the criminal trial

Huguely contends the Commonwealth's failure to advise his attorneys that the Love family planned to file a $30 million civil lawsuit against him constituted a *Brady* violation,

entitling him to a new trial. As previously summarized, Huguely argued this alleged violation

as the basis for a new trial in a post-trial motion before the trial court and in his petition for

appeal to the Court of Appeals. He has offered no explanation for failing to raise this issue

before the Supreme Court of Virginia, and thus has shown no cause for his procedural default.

Even if he could show cause for the default, Huguely cannot demonstrate prejudice as

required to overcome default. *Brady* prohibits suppression of material, exculpatory evidence

by a prosecutor; such suppression becomes a violation of due process warranting reversal if

the defendant is prejudiced by the prosecution's misconduct. *Strickler v. Greene*, 527 U.S. 263,

281–82 (1999). Materiality of the evidence and prejudice to the defendant are interrelated, as

both require a showing of reasonable probability that the result of the proceeding would have

been different if the evidence had been disclosed. *United States v. Bagley*, 473 U.S. 667, 682

(1985); *United States v. Savage*, 885 F.3d 212, 221 (4th Cir. 2018). Evidence that could impeach

a government witness is included within the definition of exculpatory evidence. *Bagley*, 473

U.S. at 682.

Huguely cannot show a *Brady* violation here. The cases relied upon by Huguely to

support his argument that the Commonwealth should have disclosed information about the

proposed civil suit are readily distinguishable from the current case. His petition cites *People v.*

*Wallert*, 98 A.D.2d 47, 48 (N.Y. App. Div. 1983), for the proposition that a prosecutor commits

a "clear *Brady* violation" when he knows, but fails to disclose, that the complainant has a civil

attorney and plans to bring a civil suit. *Wallert* involved a criminal prosecution for rape,

sodomy, assault, and sexual abuse, in which the complaining witness's testimony was the only

evidence of rape. *Wallert*, 98 A.D.2d at 48–49. The testimony of the complaining witness about

what happened after her consensual dinner date with the defendant was contradicted by the defendant's testimony. *Id.* Under those facts, the complaining witness' credibility and motive for testifying were crucial, and knowledge of the planned civil suit could clearly affect the outcome of the case. Further, even though the prosecutor knew that the civil case would be filed after the criminal trial, he argued to the jury that the complaining witness had no motive to lie.

The facts of the present case are entirely different. The Love family had no personal first-hand knowledge of what transpired between Love and Huguely; they only knew that she had died following her encounter with Huguely. Their testimony did not involve controverted matters—including Huguely's intent or the cause or manner of death—and did not implicate or prejudice Huguely. Accordingly, there was nothing to impeach; indeed, defense counsel asked no questions of either witness.

Huguely's case comes closer to the facts of *In re R.D.*, which he also cites. 44 A.3d 657 (Pa. Super. Ct. 2012). In that case, the defendant was charged in juvenile court with attempted murder. A lawyer known in the legal community as a civil attorney appeared in court and observed the proceedings every time R.D.'s case was on the docket before subsequently filing a civil suit. The court found no violation of *Brady* because the defendant's attorney equally knew of the civil attorney's presence and had just as much opportunity to learn of a pending civil case as the prosecutor did; the information was not in the exclusive possession of the Commonwealth. *Id.* at 675. The Virginia Court of Appeals reached a similar conclusion in rejecting Huguely's claim, finding that the information was not in the exclusive possession of the Commonwealth, that the Loves' civil attorneys were not agents of the Commonwealth or

-36-

acting on their behalf, and that Huguely's attorneys had sufficient notice to secure the information in the exercise of due diligence. *Huguely v. Commonwealth*, Record No. 1697-12-2 at 9 (Va. Ct. App. entered Apr. 23, 2013) (per curiam). The appellate court's findings of fact are reasonable and would be binding on this court if it were considering this claim on the merits. 28 U.S.C. § 2254(e).

The *In re R.D.* court went further, however, finding that there was no prejudice to the defendant from lacking knowledge about the civil case for impeachment purposes, even though such impeachment "is permissible to show the complainant's possible bias and interest in the outcome of the case." 44 A.3d at 676 (internal quotation marks and citation omitted). In R.D.'s case, the issue was whether the defendant intended to kill the victim. Because any potential bias shown by the civil action would have no bearing on the defendant's intent, the court found that its exclusion did not prejudice the defendant. *Id.* Huguely's case is comparable in both respects. First, the prosecution did not suppress evidence in its exclusive control but advised Huguely's attorney a week before the trial that the Loves had a "potential cause of action" against Huguely.[1] Second, because the primary issue in dispute was whether Huguely acted with malice, the impeachment value of the pending civil suit does not create a reasonable probability of a different result, nor does the evidence undermine confidence in the outcome of the trial.

Because Huguely cannot demonstrate cause for his procedural default or prejudice resulting from failure to consider this claim, the issue is procedurally defaulted and will not be considered.

---

[1] It strains credulity to suggest that defense counsel was caught off guard by this.

2. Claim 5(a): The trial court's alleged violation of Huguely's Sixth Amendment right to a fair and impartial jury by refusing to order individualized, sequestered *voir dire*

Huguely argued before the trial court that fear of publicity might chill potential jurors' full and frank answers to *voir dire* questions, especially on the "sensitive and emotionally charged issues [in this case] involving domestic violence, alcohol use, wealth, and college sports." (ECF No. 1 at 49.) The trial court addressed his concerns by assigning numbers to the prospective jurors to keep their identities private and instructing the jurors to indicate if they considered an answer to be personal so that the matter could be discussed privately. Jurors followed the court's instructions, and the trial court conducted individual *voir dire* where appropriate based on the questions and the jurors' preferences. Huguely now argues that refusal to conduct individualized, sequestered *voir dire* violated the Sixth Amendment.

Public right of access to criminal trials is protected by the First Amendment of the United States Constitution. *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 605 (1982). That right extends to jury selection and *voir dire. Press-Enter. Co. v. Superior Ct.*, 464 U.S. 501, 505 (1984). Although the right is not absolute, any denial of the right must be both based upon a compelling governmental interest and narrowly tailored to serve that interest. *Globe Newspaper Co.*, 457 U.S. at 606–07. The Supreme Court has noted that such circumstances will be rare. *Waller v. Georgia*, 467 U.S. 39, 45 (1984). In *Waller*, the Supreme Court summarized the standard that must apply before excluding the public from any stage of a criminal trial, including *voir dire*:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternative to closing the

> proceeding, and it must make findings adequate to support the
> closure.

*Id.* at 48. The Court has recently reiterated that improper restriction of the public right of access to trial is structural error. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017).

The procedure adopted by the trial court in this case is exactly that recommended by the Court in *Press-Enterprise Co.* as a less restrictive means for balancing jurors' legitimate interests in privacy with the public right of access to trial proceedings. 464 U.S. at 512. In refusing to hear Huguely's appeal of this issue, the Court of Appeals relied upon this precedent. This was more than just a reasonable application of Supreme Court law; it was the correct application of that law. Huguely therefore cannot show prejudice to overcome his default.

Having shown no prejudice and offered no cause for default, this claim is procedurally defaulted and will not be addressed on the merits.

3. <u>Claim 6: The evidence was constitutionally insufficient to support a conviction for second-degree murder</u>

As with the prior two claims, Huguely has offered no explanation or cause for failing to exhaust this issue in the Supreme Court of Virginia. Further, the court finds no prejudice from failing to consider this issue on the merits.

A federal habeas court can grant relief on a constitutional sufficiency of the evidence claim only if the evidence at trial, in the light most favorable to the government, is such that no rational trier of fact could have found guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). This is the same standard used by the appellate courts in Virginia to evaluate sufficiency of the evidence claims on direct appeal. *Canipe*, 491 S.E.2d at 754 ("When

considering the sufficiency of the evidence on appeal to support a criminal conviction, this Court views the evidence in the light most favorable to the Commonwealth. . . [T]he jury's verdict will not be set aside unless it appears that it is plainly wrong or without supporting evidence." (internal citations and quotations omitted)).

In declining to hear Huguely's appeal on this issue, the Virginia Court of Appeals summarized the evidence in the light most favorable to the Commonwealth:

> [Huguely] previously used physical force to make Love submit to his desire to "talk." He told her he should have killed her two days before he did in fact kill her. [Huguely] kicked in the bedroom door with sufficient force to put a hole through the door to get at Love, who had been in bed. Love's injuries were numerous, including abrasions to her eye, lips, and chin, and contusions to her head, neck, abdomen, arms and legs. She had bruises from the force with which [Huguely] grabbed her as indicated by finger marks. The injuries alone speak to the brutal force appellant used and demonstrate a purposeful, willful, cruel series of intentional acts likely to cause great bodily harm.

*Huguely v. Commonwealth*, Record No. 1697-12-2, 13 (Va. Cir. Ct. 2013). This evidence amply supported the jury's decision to convict Huguely of second-degree murder, a lesser-included offense under the Indictment. Accordingly, Huguely cannot establish prejudice to overcome procedural default. The court will therefore not address this claim on the merits.

B.  <u>Claims Reviewed on the Merits</u>

    1.  <u>Whether Huguely's right to an impartial jury was violated by the consultation of a dictionary</u>

Huguely's first claim is that his right to an impartial jury was violated when the jury consulted a dictionary regarding the definition of "malice." (*See* ECF No. 1 at 20–27.) As detailed above, this argument is based on testimony from Juror 42 that the jurors requested a dictionary, were provided with one, and consulted it to resolve confusion over the meaning of

"malice" in the jury instructions. Because the state habeas court decided this claim without an evidentiary hearing in the face of an incomplete and conflicting record, the court will deny the motion to dismiss and hold an evidentiary hearing.

Huguely's central allegation is that the jurors utilized a dictionary to resolve questions about the meaning of the word "malice." Because a second-degree murder conviction required the jury to find that Huguely acted with malice—and the absence of malice would have necessarily resulted in an acquittal on the murder charge or a conviction on a lesser-included offense, such as voluntary or involuntary manslaughter—he argues that the use of a dictionary instead of the relevant jury instructions is grounds for overturning his conviction. (*See* Jury Instr. 12 at 2 ("If you find from the evidence that the Commonwealth did not prove that the killing was malicious…[t]hen you shall find the defendant guilty of voluntary manslaughter.") The legal theory behind this argument is sound. External influences on the jury that prejudice the defendant violate the Sixth Amendment and invalidate a jury verdict. *See Parker v. Gladden*, 385 U.S. 363, 364–66 (1966) (per curiam); *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965). It follows that, if the jurors utilized a dictionary that provided a definition materially different from the relevant instructions, Huguely's conviction must likely be overturned.

The state court did not engage with Huguely's legal argument and instead resolved the claim via two alternate factual findings. First, it held that Huguely failed to prove the jury consulted a dictionary. The court wrote: "I cannot find by a preponderance of the evidence that the incident occurred at all, or at least not as Petitioner describes." (ECF No. 29-12 at 4.) The state court summarized its reasoning as follows:

> There were twelve jurors. Only one juror (Juror #42) purports to
> remember an incident regarding a dictionary…[T]here were also

affidavits filed from ten other jurors. Not one of them
remembers anything about a dictionary being asked for, obtained,
or read from. . . . Further, of the nine deputies who served as
bailiffs who submitted affidavits, not one of them indicated they
were asked to get a dictionary, or that they got a dictionary, or
gave a dictionary to the jury or a juror, or that they recall any
other bailiff or deputy or anyone else giving the jury a dictionary,
or that they remember seeing a juror with a dictionary. . . . It
would appear much more likely that the one juror is mistaken and
has confused something else with a dictionary (perhaps a note
being sent back by the judge, which everyone said was how their
questions were submitted and answered, or the single sheet of
paper remembered by Juror #211), or perhaps confused the
incident with another case, than that a dictionary was used and
not a single other juror--not even the one who supposedly had or
read from it--or any bailiff remembers such.

(*Id.* at 4–6.) Second, the court held that, even if Huguely could prove the dictionary incident

occurred, he could not prove what, if anything, was read from the dictionary, and therefore

could not demonstrate prejudice. (*See id.* at 6.)

This resolution of Huguely's claim was an unreasonable determination of the facts

under § 2254(d)(2).[2] In resolving Huguely's dictionary claim without an evidentiary hearing,

the state court overlooked or ignored crucial evidence and left unanswered important

questions raised by the record. Namely, the court's central factual finding omitted the most

important portion of Juror 42's testimony, and its analysis ignored a string of statements

supporting Juror 42's account of events. These shortcomings in the court's decisional process

---

[2] Although the court takes issue with the state court's fact-finding methodology on the dictionary claim, as
discussed below, the court notes that the state court's analysis of Huguely's remaining claims was exceptionally
thorough and well-reasoned. And even though this court must conclude that the state court's analysis of the
dictionary claim without fully developing the factual record was insufficient, the court does not intend to
impugn the state court's conduct in reviewing Huguely's conviction. This is, at bottom, a difficult issue, and
this court's reasoning and ultimate decision on the need for an evidentiary hearing should not be read as
suggesting anything other than a disagreement about what the law requires.

render its ultimate factual determination—that the record before it precluded relief on Huguely's claim—unreasonable.

When a state court ignores a petitioner's properly presented evidence, "its fact-finding process may lead to unreasonable determinations of fact under § 2254(d)(2)." *Gray v. Zook*, 806 F.3d 783, 791 (4th Cir. 2015). To determine whether a state court's decision to ignore evidence renders its factual determinations unreasonable, the reviewing federal court must keep in mind that "a state court need not refer specifically to each piece of a petitioner's evidence to avoid the accusation that it unreasonably ignored the evidence," *id.*, and must instead review "the entirety of the [state] court's order," *Moore v. Hardee*, 723 F.3d 488, 499 (4th Cir. 2013). Where a state court's order represents a failure to properly develop the record because it ignored evidence or for another reason, that order may be based on an unreasonable determination of the facts. *See Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005); *Lambert v. Blackwell*, 387 F.3d 210, 239 (3d Cir. 2004). A review of the entirety of the state court's order in this case reveals that it overlooked or ignored two crucial pieces of evidence that supported Huguely's claim and should have, at a minimum, compelled the court to hold an evidentiary hearing.[3]

First, the state court's central factual finding ignored the substance of Juror 42's testimony. There are three statements from Juror 42 in the record. The first is a declaration, which states: "We had a question about the meaning of the word 'malice'[,] and we asked the

---

[3] The state court initially scheduled a hearing at which it would hear witness testimony to determine whether an evidentiary hearing was necessary but decided to forgo that hearing and issue its opinion based solely on the written record. (*See* ECF Nos. 29-12 at 19, 1 at 18.)

bailiff for a dictionary. The bailiff brought us a dictionary and we looked up the word 'malice.'"

(ECF No. 6 at 4.) The second affidavit says:

> During the jury deliberations the jury had an issue with the definition of the word "malice." The jury dealt with the issue by getting a dictionary. The dictionary was obtained by a juror knocking on the door to the jury room and asking a deputy for a dictionary. I am not sure which juror asked the deputy for the dictionary. I cannot recall which deputy the juror spoke with. A deputy returned with the dictionary. I do not know which deputy brought the jury the dictionary. I cannot describe the dictionary because I never had it. I cannot say if the dictionary was thick thin, a hard[-]back book, a soft[-]back book, large, small, a single sheet of paper, whether it was a Webster's dictionary, or what color it was.

(ECF No. 29-11 at 16.) The final piece of testimony—a signed statement—is a repudiation of

that portion of the second affidavit that undergirded the state court's decision. The statement

reads:

> In my statement to Officer Brickhead, there was a notation about me not knowing if the dictionary we received was a single sheet of paper or not. It was not a single sheet of paper. It was multiple pages. It was a dictionary. When I came about a week after meeting with Officer Brickhead to sign his statement, I was in a rush. I read the statement but not thoroughly. We did not review the statement line by line like I had done with the defense's statement. I remember it was a dictionary, I just don't remember the details of what it looked like.

(ECF No. 6 at 6–7.)

The state court's decision ignored the final statement from Juror 42. In its summary of

the evidence, the court only quoted the first and second statements, but never mentioned the

third. (*See* ECF No. 29-12 at 4–7.) Even more concerningly, the court placed a heavy emphasis

on Juror 42's later-retracted statement that the dictionary may have been a single sheet of

paper. The court's decision emphasizes the words "single sheet of paper" by bolding them in

its quotes from Juror 42 and Juror 211's affidavits. (*Id.* at 4–5.) The court went even further,

explicitly basing its finding on the portions of Juror 42's affidavit that she later recanted:

> So I find . . . that the factual basis for this claim is not made out
> by a preponderance of the evidence. In fact the Court finds the
> opposite—that it would appear much more likely that the one
> juror is mistaken and has confused something else with a
> dictionary (*perhaps a note being sent back by the judge, which everyone said
> was how their questions were submitted and answered, or the single sheet of
> paper remembered by Juror #211*), or perhaps confused the incident
> with another case, than that a dictionary was used and not a single
> other juror--not even the one who supposedly had or read from
> it--or any bailiff remembers such. So I will dismiss this claim for
> that reason.

(ECF No. 29-12 at 6 (emphasis added).) This finding is directly contradicted by Juror 42's final

statement clarifying that the document the jurors referenced for the definition of "malice" was

not a single sheet of paper, but a multipage book. The state habeas court's finding that Juror

42 likely confused a single sheet of paper with a dictionary only makes sense if the court was

unaware of or chose to ignore Juror 42's final and most unequivocal statement. In other words,

the determination that Juror 42 was mostly likely confused by a note from the judge or other

piece of paper—the foundation of the state court's decision—ignores Huguely's most

compelling piece of evidence. This court need not analyze whether this error is itself sufficient

to render the state court's decision unreasonable because it is compounded by another similar

error in the decisional process.

The state court's decision to proceed without an evidentiary hearing also ignored a

series of statements from other jurors that lend credence to Juror 42's testimony and demands

further inquiry. The record before the state habeas court consisted of affidavits from eleven

of the twelve jurors and nine deputies who served as bailiff's during the trial, as well as the

two additional statements by Juror 42. Seven of the jurors did not recall a dictionary and one was "not sure." But only two jurors stated that they were confident no dictionary was consulted, and one of those equivocated by saying that, while they were "100% sure" that no one brought a dictionary into deliberations, they were somehow also only "99% sure" that if the jury did have a dictionary, it came from the judge. (ECF No. 29-12 at 5.)

The state court examined this evidence and characterized the dispute as a routine weight-of-the-evidence issue with one witness on Huguely's side and ten on the Commonwealth's. (*See* ECF No. 29-12 at 6 n.4.) Putting aside whether this is even an accurate characterization of the generally equivocal evidence,[4] the state court's review of the record ignored an entire line of evidence that favors Huguely and requires further inquiry.

Strikingly, the jurors generally agreed there was some confusion over the meaning of the word "malice," which, as noted above, was the determinative legal issue underlying the murder conviction. Juror 42's testimony is that the jury resolved their dispute by asking a deputy for a dictionary. While none of the other jurors remember asking a deputy for a dictionary, five of them (9, 27, 127, 117, and 310) corroborate Juror 42's account that the jury had a dispute over the definition of "malice," and agree that the jury asked the court for clarification. (*See* ECF No. 29-11 at 14, 26, 28, 30, 32.) Another juror (63) remembers requesting that the court clarify the definition of a word but does not remember which word

---

[4] The state court's decision interpreted "I'm not sure" and "I don't remember" as synonymous with "It did not happen." Respondent makes similar errors in characterizing the remaining juror affidavits in his opposition brief. The jurors' statements—aside from the one definitive statement—do *not* assert that a dictionary was not consulted, as the state court's ruling strongly implied.

(*see id.* at 36), and yet another (130) recalls asking the court for a definition of "intent" (*see id.* at 19).

This would seem all well and good (the jury had a dispute about a word, sent out for clarification, and Juror 42 mistook the court's answer for a dictionary) but for one thing: the trial court never received a question from the jury about the definition of "malice" or "intent." (*See* Tr. of Jury Trial, Feb. 22, 2012, at 24–52.)[5] This raises a troubling question: if the court did not answer the jury's question about the definition of "malice," who—or what—did? This question is particularly concerning in light of the fact that six jurors seem to be under the impression that *the court* resolved their question. (*See* ECF No. 29-11 at 14, 19, 28, 30, 32, 36.) It is even more concerning that Juror 42's account provides a ready answer to the question: a deputy (or someone Juror 42 believed to be a deputy) gave the jury a dictionary. Indeed, Juror 42's account of the "malice" dispute is the only one that does not say the jury sent a question to the trial judge, and is therefore the only one that comports with the record of the proceedings. (*See* ECF No. 29-11 at 16.)

The state court did not acknowledge this unanswered question when deciding the claim without a hearing. Its decision to ignore the clear need for further factual development establishes the unreasonableness of proceeding without a hearing. Huguely presented the state habeas court with a paper record that contained unequivocal testimony from Juror 42 that the jury used a dictionary, along with affidavits from seven other jurors corroborating important predicates in Juror 42's statements—namely, that the jurors needed guidance on the definition

---

[5] The court received a question about the definition of "reason," *see* Tr. of Jury Trial, Feb. 22, 2012, at 24–25, a question about whether instructions 14, 15, and 23 were contradictory, *see id.* at 28–29, and a request for a copy of Commonwealth's exhibit 21, *see id.* at 36.

of a vital legal term and sought guidance from the court. Further factual development was needed to clarify exactly how the jury resolved its dispute over the meaning of "malice," or, to put a finer point on it, determine whether the jury strayed beyond constitutional boundaries to resolve this critical question. It was unreasonable for the state court to confront that paper record and decide that no further investigation was warranted, particularly because it did so in a way that ignored the testimony of Huguely's key witness and incorrectly characterized evidence as refuting Juror 42's testimony.

This is not to say that state courts must hold evidentiary hearings every time there is an unanswered question in the record. Indeed, Virginia law does not require state habeas courts to conduct evidentiary hearings, *see Smith v. Brown*, 781 S.E.2d 744, 747 (Va. 2016); Va. Code Ann. § 8.01-660 (2020), and the Fourth Circuit has approved this practice, *see Strong v. Johnson*, 495 F.3d 134, 139 (4th Cir. 2007). But this is not the kind of case where forgoing an evidentiary hearing is acceptable. Huguely's allegations are not "conclusory"; they are detailed. *Gray*, 806 F.3d at 792 (quoting *Strong*, 495 F.3d at 139). And the record does not present "a detailed account of events contradicting" his allegations; it raises questions that require answering. *Id.* While state courts are not always required to have an evidentiary hearing, they are also not free, when confronted with a record as underdeveloped as this one, to ignore the petitioner's most compelling evidence, overlook corroborating evidence, mischaracterize other testimony, and resolve a thorny constitutional claim without a hearing.

That the state court erred under § 2254(d)(2) does not automatically entitle Huguely to relief, however. This court is "not permitted to grant habeas relief unless [it is] convinced that the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'"

*Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Before he can secure relief, Huguely must demonstrate that the state habeas court's error actually prejudiced him. *Bauberger v. Haynes*, 632 F.3d 100, 104 (4th Cir. 2011).

Here, the prejudice inquiry requires giving Huguely a chance to develop the factual record. *See Barnes v. Joyner*, 751 F.3d 229, 252 (4th Cir. 2014) (giving petitioner as opportunity to show prejudice in an evidentiary hearing where the state court unreasonably denied one). The court will hold an evidentiary hearing where the parties may develop the record surrounding the alleged dictionary incident.

Huguely's burden at this hearing will be immense. To demonstrate prejudice justifying habeas relief, he must not only show that the jury consulted a dictionary regarding the meaning of "malice," a threshold factual hurdle that the evidence presented to date does not establish by clear and convincing evidence, but also that the definition they consulted prejudiced him. *See Barnes*, 751 F.3d at 252 ("[T]o be entitled to habeas relief, [petitioner] will need to affirmatively prove actual prejudice by demonstrating that the jury's verdict was tainted by the extraneous communication."). He is nevertheless entitled to that opportunity.

### 2. Whether Huguely's trial counsel rendered ineffective assistance

Huguely's second claim is that his trial counsel rendered ineffective assistance. He claims his counsel erred in two respects: by failing to call Dr. Daniel as an expert witness, and by violating the rule on witnesses with respect to Dr. Uscinski. The state habeas court concluded that Huguely's counsels' decision not to call Dr. Daniel was a matter of trial strategy and therefore was not deficient performance. With respect the rule on witnesses, it held that the violation of the rule on witnesses was deficient performance, but that Huguely was not

prejudiced by his counsels' failure. Based on the deferential standard of review for ineffective assistance claims and the evidence in the record regarding the doctors' testimony, the motion to dismiss will be granted as to these claims.

A defense attorney is constitutionally ineffective if (1) their performance is deficient and (2) their deficient performance prejudices the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if his or her representation falls "below an objective standard of reasonableness." *Id* at 688. A more specific definition of deficient performance is impossible because "[t]he Sixth Amendment refers simply to 'counsel,' not specifying particular requirements of effective assistance." *Strickland*, 466 U.S. at 688. Therefore, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* When making this determination, the court must ensure that "hindsight is discounted by pegging adequacy to counsel's perspective at the time . . . decisions are made and by giving a heavy measure of deference to counsel's judgments." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (cleaned up). Section 2254(d) review adds yet another layer of deference, making this court's review of Huguely's ineffective assistance claim "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "This double-deference standard effectively cabins [this court's] review to determining whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020) (cleaned up).

Deficient performance alone does not constitute ineffective assistance of counsel; the deficiency must also prejudice the defendant. A defendant has been prejudiced by his counsel's deficient performance where "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. When a defendant alleges ineffective assistance to challenge his conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome," *id.*, but is less than a preponderance of the evidence, *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002).

      a.  *Dr. Daniel*

Huguely cannot show that the decision not to call Dr. Daniel was deficient performance. The decision whether to a call a witness is a strategic decision to which this court must "afford . . . enormous deference." *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (quoting *United States v. Kozinski*, 16 F.3d 795, 813 (7th Cir. 1994)). That deference, combined with his counsels' plausible explanation for their decision not to call Dr. Daniel, bars Huguely from receiving relief on this claim.

Dr. John Daniel is a forensic pathologist who was retained by defense counsel to aid in trial preparation and draw scientific conclusions. Dr. Daniel believes that Love died of asphyxia, not blunt force trauma. (*See* State Court Record at 124.) Additionally, he believes that any blood present in Love's brain was due to reperfusion. (*See id.*) The latter opinion is buttressed by Dr. Daniel's conclusion that the likelihood of reperfusion injury is increased by asphyxia and amphetamine usage. (*See id.*) While he was retained by the defense to aid in investigation of these issues, Dr. Daniel does not have any specialized knowledge or experience in neurology or neuropathology. *See id.* Both Dr. Daniel and defense counsel understood that he would be called as the final defense expert with the goal of "tying the

evidence together," not providing any independently important evidence. (*See id.* at 127.) However, at some time before the close of evidence, defense counsel decided against calling Dr. Daniel. Huguely claims this constituted ineffective assistance of counsel.

In affidavits provided during the state habeas proceeding, Huguely's counsel explained their decision, stating they did not call Dr. Daniel because they feared damaging cross examination with respect to his employment and compensation, because he would not have been able to contest the state's attacks on the defense's reperfusion theory, and because concessions by state witnesses rendered his testimony partially redundant. (*See* ECF No. 29-11 at 4–5.) Huguely counters by arguing that counsel should have called Dr. Daniel because he would have been able to "tie[] together" other expert testimony, explain the connection between asphyxia and reperfusion, and respond to the prosecution's medical examiner. (*See* ECF No. 1 at 34–35.)

While Huguely makes a good argument that the optimal trial strategy would have involved calling Dr. Daniel, there is a reasonable argument that an effective attorney could choose not to call him. His expertise and conclusions are largely redundant of other defense experts who testified, meaning he would have added little of substance to Huguely's defense. Although Huguely identifies a few minor exceptions, they are extremely limited in scope. (*See* ECF No. 1 at 34–35.) The only unique elements of Dr. Daniel's testimony Huguely can identify are his conclusions that intoxication increases the risk of asphyxia and that asphyxia can increase the risk of reperfusion. *See id.* While these pieces of information may have been helpful to Huguely's argument, they are not so revelatory as to mandate calling an otherwise redundant and vulnerable witness.

Moreover, as the state habeas court aptly noted, Dr. Daniel lacks the specialized credentials of the defense's other experts, and his word was unlikely to carry as much weight with the jury as the experts who did testify. While the other defense experts—Drs. Leestma and Uscinski—are both specialized neurologists (Dr. Leestma as a neuropathologist and Dr. Uscinski as a neurosurgeon), Dr. Daniel has no particular expertise with respect to the brain. (*See* State Court Record at 121.) Additionally, counsel had valid concerns about damaging cross examination clouding Dr. Daniel's testimony and souring the final element of the defense's case. To wit, Dr. Daniel's compensation "far exceeded" that of other experts despite his relative lack of expertise. (*See* ECF No. 29-11 at 5.) Even more importantly, defense counsel was concerned that Dr. Daniel "would have had difficulty contesting the Commonwealth's potential attacks of the theory of reperfusion"—the central theory of Huguely's defense. (*Id.*) This is not to say that Huguely's counsel made the most reasonable decision, or even a good one. However, from a review of the record—and respecting the extremely deferential posture of this court's review—there is a reasonable argument that their decision conformed to "prevailing professional norms." *Strickland*, 466 U.S. at 688. This court therefore cannot grant Huguely relief on this claim under Section 2254.

   b.   *Dr. Uscinski and the Rule on Witnesses Violation*

Huguely also argues that his counsel was ineffective when they violated the rule on witnesses, *see* Va. Code Ann. § 19.2-265.1, causing the trial court to rule that Dr. Uscinski could not testify on reperfusion. (*See* ECF No. 1 at 28.)[6] The state habeas court held that counsels'

---

[6] Huguely's petition also suggests that defense counsels' decision not to call Dr. Daniel should be considered when evaluating the violation of the rule on witnesses. (*See* ECF No. 1 at 34.) This connection between Dr. Daniel and the rule violation is conjecture. While nothing in the record rules out the conclusion that counsel

violation of the rule on witnesses was deficient performance but denied relief because it found that Huguely failed to demonstrate prejudice. (*See* ECF No. 29-12 at 15.) This conclusion was a reasonable determination of the facts in light of Dr. Uscinski's *voir dire* and Huguely's proffer as to the doctor's excluded testimony.

The state court's conclusion that Huguely's counsel rendered deficient performance was reasonable. Neither party disputes that the state court applied the correct legal test and properly determined that the actions of Huguely's counsel fell below the constitutional standard of reasonableness when they violated the rule on witnesses. (*See* ECF No. 29 at 33–37.) The only dispute, therefore, is whether the state court correctly concluded that counsels' deficient performance did not prejudice Huguely. On this question, too, the state court applied the correct legal test. The court analyzed the facts to determine whether "it [was] reasonably likely that the outcome in this case would have been different if Dr. Uscinski had testified." (ECF No. 29-12 at 15.) It determined that Dr. Uscinski's testimony would not have changed the outcome of the trial, although it acknowledged that it was a "close case." (ECF No. 29-12 at 15.) The court reached this decision because it determined that Dr. Uscinski was not an expert in reperfusion, did not anticipate testifying about reperfusion in detail, and lacked the expertise of the other defense witnesses. (*See id.*) Huguely now asks this court to review that factual conclusion. *See Harrington v. Richter*, 562 U.S. 86, 112 (2011) (treating the prejudice

---

chose not to call Dr. Daniel in order to avoid eliciting further consequences from their violation of the rule, nothing in the record confirms Huguely's hypothesis either. Without a ruling from the state trial court excluding Dr. Daniel's potential testimony or evidence of counsels' motives, this court will not draw an inference of bad faith. Ineffective assistance claims are accompanied by a "strong presumption" that counsels' conduct was reasonable. *Strickland*, 466 U.S. at 689. Here, that means the court will presume counsels' choice not to call Dr. Daniel and their subsequent explanation for that decision were made in good faith absent evidence to the contrary.

determination as a question of fact). The question for this court, therefore, is whether the state court's prejudice determination—that Huguely would have been convicted of second-degree murder even if Dr. Uscinski testified about reperfusion—was an unreasonable determination of the facts.

The state court's prejudice conclusion was reasonable for a very simple reason: Dr. Uscinski was not going to testify about reperfusion in the first place. During the commonwealth's *voir dire* of Dr. Uscinski, the following exchange occurred between the Commonwealth's Attorney and Dr. Uscinski:

> Q: Have you come prepared to talk about [the effect of blood pressure that can be created or established by CPR and from that, the likelihood or lack of likelihood of producing hemorrhage in some remote part of the body such as the brain]?
>
> A: No
>
> Q: Not at all, any whatsoever. You're not going to talk as a witness about blood pressure in remote areas of the body - - -
>
> A: No
>
> Q: - - - established by CPR?
>
> A: No.

(Tr. of Jury Trial, Feb. 18, 2012, at 20.) Dr. Uscinski reiterated his inability to testify to reperfusion injury at several other points during *voir dire*, at one point saying he was only "somewhat familiar with th[e] concept." (*Id.* at 24.) He also stated that, had defense counsel not emailed him information about testimony provided by a prosecution witness (thereby

violating the rule on witnesses), he would not have even known that reperfusion injury in the brain was a potential topic on which he may be asked to testify. (*See id.* at 25.)

The unimportance of Dr. Uscinski's reperfusion testimony is reinforced by Huguely's trial attorneys' own proffer regarding the doctor's excluded testimony. According to that proffer, the full extent of Dr. Uscinski's testimony on reperfusion would have been that "the purpose of CPR is to reperfuse organs of the body, including the brain, with blood and that following the deprivation of blood and oxygen, the brain is susceptible to injury. . . . As to reperfusion, that at least in certain settings, reperfusion injury is a known phenomenon." (*See* ECF No. 6 at 15.) Despite Huguely's protests, this is simply not "vital expert testimony . . . on reperfusion." (ECF. No. 1 at 28.) None of the prosecution witnesses denied that reperfusion injury is possible, *see* Tr. of Jury Trial, Feb. 14, 2012, at 79–83, 163; Tr. of Jury Trial, Feb. 9, 2012, 90–91; Tr. of Jury Trial, Feb. 10, 2012, at 40–41, 48–49, and only one stated that it was not a widely recognized phenomenon, *see* Tr. of Jury Trial, Feb. 9, 2012, at 90–91 (acknowledging that studies show reperfusion injury is possible, but denying that it is a recognized phenomenon).

The exclusion of this relatively trivial testimony is not sufficient to undermine confidence in Huguely's conviction. The jury heard six expert witnesses opine on reperfusion injury and debate whether the defense's theory was correct. (*See* Tr. of Jury Trial, Feb. 9, 2012, at 72–92; Tr. of Jury Trial, Feb. 10, 2012, at 40–41, 48–49; Tr. of Jury Trial, Feb. 14, 2012, at 68–83, 100–05, 156–58, 163–76; Tr. of Jury Trial, Feb. 15, 2012, at 260–69.) Dr. Uscinski would have waded into this debate with no substantive testimony about the nature of reperfusion injury and no opinion as to whether the defense's theory was correct. It is not

reasonably likely that his acknowledgement that reperfusion injuries exist would have swayed the jury's opinion about Huguely's culpability for second-degree murder.[7] Therefore, the state habeas court's decision was not an unreasonable determination of the facts, and Huguely cannot obtain relief on this claim.

3. Whether Huguely's right to counsel of his choice was violated when the state court declined to grant a continuance to accommodate Quagliana's illness

Huguely's fourth claim is that the state trial court violated his Sixth Amendment right to counsel when it refused to continue his trial for more than one day to accommodate the serious illness of one of Huguely's trial attorneys, Rhonda Quagliana. Because the Virginia Court of Appeals thoroughly and persuasively justified its denial of Huguely's second motion for a continuance, and because the Supreme Court has not established law in this context, the motion to dismiss will be granted on this claim.

From the day of his arrest, Huguely was represented by a team of two retained attorneys: Rhonda Quagliana and Fran Lawrence. Both attorneys represented Huguely at trial, and both participated in varying and different elements. Quagliana and Lawrence, both highly experienced criminal defense attorneys in Charlottesville, served as co-counsels throughout the prosecution; that is, neither was designated as lead counsel and each had significant responsibilities at trial. Lawrence's primary role was presenting arguments to the jury and examining fact witnesses, while Quagliana, who also holds a Ph.D., was responsible for handling the enormous volume of medical and scientific evidence presented by both sides. On

---

[7] Huguely also makes a passing argument that counsel was ineffective (or that counsels' ineffectiveness was compounded) when they stated in closing argument that Drs. Uscinski and Leestma disagreed with respect to reperfusion. (*See* ECF No. 1 at 29.) Since Dr. Uscinski didn't opine on this phenomenon at all, the argument that this aside by counsel during closing had any, let alone a material, impact on the jury is specious.

the ninth day of trial—February 16, 2012—Quagliana developed a stomach flu and was unable to attend court. Lawrence requested a recess and ultimately an adjournment as a result of Quagliana's inability to participate in the trial. The court adjourned later that day but refused to delay proceedings further. Because the court would not continue the case, Huguely presented his evidence on February 17 represented only by Lawrence. According to Huguely's petition, this forced the defense to call its witnesses out of order, as Lawrence was understandably not prepared to examine every witness. (*See* ECF No. 1 at 41–42.) Lawrence examined five witnesses that day, and there is no dispute that he was prepared to examine them. By the next day, Quagliana was feeling well enough to return to court, and the trial continued with both defense attorneys present.

Huguely argues that the state trial court's refusal to grant his second motion for a continuance violated his Sixth Amendment right to counsel by forcing him to try one day of his case represented by only one of his two chosen attorneys. For this proposition, he relies on *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). He points to the Supreme Court's conclusion that "erroneous deprivation of the right to counsel of choice . . . unquestionably qualifies as structural error," *id.* at 150 (internal quotation marks omitted), to argue that he is entitled to a new trial because he was denied one of his two chosen attorneys. But the rule of *Gonzalez-Lopez* does not clearly apply here. Before he can wield *Gonzalez-Lopez*, Huguely must establish that he was erroneously denied counsel of choice, something he cannot do. Moreover, the central holding of *Gonzalez-Lopez* stemmed from the unique facts of that case, none of which occurred here.

By its own terms, *Gonzalez-Lopez* applies only where a defendant was erroneously deprived of his chosen counsel. *See Gonzalez-Lopez*, 548 U.S. at 144. Because both of the parties in that case agreed that the lower court erred, the Supreme Court's analysis was concerned solely with the consequences of a violation of the right to chosen counsel, not identifying an error in the first instance. *See id.* Thus, before Huguely can invoke *Gonzalez-Lopez*, he must first establish that the state court's denial of his motion for a continuance was in error.

The right to be represented by chosen counsel is not absolute. Instead, the right "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Directly applicable here, the Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against . . . the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (internal citations omitted). A trial court's discretion in scheduling matters extends so broadly that it violates the Sixth Amendment only where it is exercised on the basis of an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (internal quotation marks omitted). This holds true even where a defendant requests a continuance because their counsel of choice is unavailable. *See Sampley v. Att'y Gen. of N.C.*, 786 F.2d 610, 613 (4th Cir. 1986).

The "unreasoning and arbitrary" test is an insurmountable obstacle for Huguely's claim. The test is vague and laden with discretion; there is no bright-line legal rule for when a continuance must be granted. But even setting aside the strictures of § 2254(d)(1), the trial court's denial of Huguely's motion for a continuance was neither "unreasoning" nor "arbitrary." The court granted Huguely's first motion for continuance, accommodating

Quagliana's illness. When it did so, it reasonably inquired if Lawrence, Huguely's other attorney, was prepared to examine witnesses should the trial continue the next day without Quagliana. Lawrence indicated that he was prepared, but it would necessitate calling one of the defense's witnesses out of order. This—Huguely's preferred witness call order—was the sole justification for his second continuance motion. The trial court weighed this concern against the inconvenience to the jury, the concerns of the calendar, and the fact that Lawrence stated, both before and after making the objection, that he was comfortable proceeding without Quagliana. (*See* Tr. of Jury Trial, Feb. 16, 2012, at 411.) Relying on Lawrence's representation that he was prepared to proceed and unconcerned about the consequences of doing so, the court concluded that a continuance was not warranted. This decision was not "unreasoning and arbitrary." Indeed, the record reflects a well-reasoned weighing of the concerns before the court. This reasonable decision precludes the application of *Gonzalez-Lopez* because it falls well within the ambit of a trial court's discretion in managing its calendar.

But even if Huguely could show that denial of the continuance motion was erroneous, he still could not satisfy § 2254(d)(1). *Gonzalez-Lopez*, his sole Supreme Court authority, dealt with a defendant who was denied his one and only chosen attorney throughout the entire course of trial and at all critical stages of the proceeding, including investigation and discovery, development of defense strategy, jury *voir dire*, presentation of witnesses, and closing arguments. *See Gonzalez-Lopez*, 548 U.S. at 142–43. Huguely was not so deprived. He was allowed his chosen counsel prior to trial and was only denied the services of Quagliana for 1 of the 12 days of trial. These factual distinctions vitiate Huguely's choice-of-counsel claim by placing it outside the realm of clearly established federal law as determined by the Supreme

Court. While some circuit courts have held that the right to counsel of choice applies with equal force to multi-attorney teams, *see Rodriguez v. Chandler*, 492 F.3d 863, 864–65 (7th Cir. 2007); *United States v. Laura*, 607 F.2d 52, 55–57 (3d Cir. 1979), the Supreme Court has not. That ends the inquiry. Without a determination from the Supreme Court, Huguely's choice-of-counsel claim cannot succeed. *See* § 2254(d)(1) (providing that a federal court may not grant a writ of habeas corpus unless that the state court's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established federal law, *as determined by the Supreme Court of the United States*."(emphasis added)).

    4.  <u>Whether Huguely's right to an impartial jury was violated by the state court *voir dire*</u>

Huguely's final claim is that the state court violated his Sixth Amendment right to an impartial jury. He argues that the state court failed to ensure an impartial jury by refusing to allow certain *voir dire* questions and refusing to strike Juror 211 for cause. Neither claim has merit.

    a.  *Denial of proposed questions*

Huguely's *voir dire* claim fails because there is no applicable, clearly established federal standard. He argues that the state court erred when it refused to allow him to ask the jurors whether they would have difficulty considering evidence that might be seen as "blaming the victim." (ECF No. 1 at 50–51.) But "the adequacy of voir dire is not easily subject to appellate review." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Like all matters involving credibility, *voir dire* relies on the perceptions of those present in the courtroom and is "particularly within the province of the trial judge." *Ristaino v. Ross*, 424 U.S. 589, 595 (1976) (quoting *Rideau v. Louisiana*, 373 U.S. 723, 733 (1963) (Clark, J., dissenting)). Decisions

regarding the manner in which *voir dire* is conducted and the questions asked are a matter for the court conducting the process and "a great deal must, of necessity, be left to its sound discretion." *Connors v. United States*, 158 U.S. 408, 413 (1895).

Cases in which a trial court's refusal to ask a particular line of questions required a new trial are exceedingly rare, even on direct appeal. The Supreme Court has generally only found such error where a trial court failed to make any attempt to ferret out potential racial prejudice. *See Aldridge v. United States*, 283 U.S. 308 (1931) (holding that failure to inquire into the possibility of racial prejudice was error); *Ham v. South Carolina*, 409 U.S. 524 (1973) (finding reversible error where court refused to inquire into the possibility of racial prejudice, but not where it refused to inquire about prejudice against persons with beards); *Turner v. Murray*, 476 U.S. 28 (1986) (holding that state courts must inquire into the possibility of racial prejudice in capital cases of murder of a white person by a black defendant).

Huguely's claim is far afield from such cases; he takes issue with the trial court's refusal to ask the jurors if they could fairly interpret evidence that could be seen as blaming the victim. An argument that a state court failed to delve into one particular line of questioning—a line unrelated to any concerns of prejudice against the defendant—is insufficient to demonstrate error of a constitutional magnitude. A "[trial] court need not pursue a specific line of questioning on *voir dire*, provided the *voir dire* as a whole is reasonably sufficient to uncover bias or partiality in the venire." *United States v. Lancaster*, 96 F.3d 734, 739–40 (4th Cir. 1996). "Part and parcel of deference to the trial court's conduct of *voir dire* is a reluctance to second-guess the court's decision to refuse inquiry into certain matters." *Id.* at 739. This is doubly true when reviewing the *voir dire* practices of a state court, as much of federal *voir dire* precedent is based

on the Supreme Court's supervisory authority, which is inapplicable here. *See Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991).

Huguely does not argue that the *voir dire* as a whole was inadequate, and a review of the record shows that the state court's procedure hewed to standard *voir dire* practices for such a high-profile case. The question Huguely believes the Sixth Amendment mandated did not seek to reveal potential constitutional concerns, such as racial prejudice in the prospective jurors; it did not even seek to uncover bias against Huguely personally. A dispute over such a question lies in the innermost parts of the "province of the trial judge." *Ristaino*, 424 U.S. at 595. There is no clearly established federal law mandating that a state trial court handle the proposed question in any particular way. Thus, this claim cannot be the basis for relief under Section 2254(d)(2).

     b.  *Seating of Juror 211*

The same reasoning applies to Huguely's claim that the state court was constitutionally obligated to strike Juror 211 based on her knowledge of the case. "A trial court's findings of juror impartiality may 'be overturned only for manifest error.'" *Mu'Min*, 500 U.S. at 428. (quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)). When searching for such an error, the inquiry is not whether a juror is familiar with the case, but whether the juror can be impartial about the case. *See Skilling v. United States*, 561 U.S. 358, 381 (2010) ("[J]uror impartiality, we have reiterated, does not require ignorance.") (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). A juror is not disqualified merely because she is familiar with some aspects of the matter before the court. Even by Huguely's own account, Juror 211 was only familiar with objective facts about the case. He does not claim that Juror 211 was actually biased against him, only that she

-63-

was familiar with some details. (*See* ECF No. 1 at 52–53.) Specifically, he argues that the state

court erred by seating Juror 211 because she:

> [W]as a professor at the University of Virginia who taught a close
> friend of Ms. Love and excused this student from her final exam
> for Ms. Love's funeral. She had also read "memos" from the
> University about the case and Ms. Love, and she remembered
> hearing that there was a "break in" and "blunt trauma."

(*See* ECF No. 1 at 53.)

Trying to circumvent this lack of any evident bias, Huguely cites *Marshall v. United States*,

360 U.S. 310, 312 (1959), for the proposition that "a new trial may be warranted where a juror

has been exposed to outside information about a case." (ECF No. 1 at 52.) But *Marshall* itself

states: "The trial judge has a large discretion in ruling on the issue of prejudice resulting from

the reading by jurors [of outside information] concerning the trial. Generalizations beyond

that statement are not profitable, because each case must turn on its special facts." *Marshall*,

360 U.S. at 312 (internal citations omitted). What's more, *Marshall* was not a constitutional

ruling, but an exercise of the Supreme Court's supervisory power to formulate standards for

federal criminal trials and is therefore inapplicable here. *Id.* at 313; *see Murphy v. Fla.*, 421 U.S.

794, 797 (1975).

The state trial court's decision to seat a juror exposed to relatively innocuous publicity

was not "manifest error" or unreasonable in any way. Huguely's case was, in many ways,

marked by enormous publicity, and the state court's handling of the difficult situation was

reasonable, if not commendable. Juror 211 did not espouse any bias against Huguely or give

the parties any reason to believe she had formed an opinion about the case prior to the

presentation of evidence. Relief on such a claim would require Huguely to bring more serious

allegations of actual bias or an attack on the sufficiency of the *voir dire* as a whole. Therefore, the motion to dismiss will be granted on this claim as well.

## IV.   CONCLUSION

Because the state court's decision to deny relief on Huguely's dictionary claim without an evidentiary hearing was an unreasonable determination of the facts before it, this court will hold an evidentiary hearing on that sole issue so that Huguely may attempt to demonstrate prejudice. The remainder of Huguely's claims, however, are either procedurally defaulted or lack merit. On those claims, the Director's motion to dismiss will be granted.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 21st day of December, 2020.


    */s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE